# Exhibit 1

## CIVIL INVESTIGATIVE DEMAND

# United States Department of Justice
**Washington, D.C. 20530**

TO:  Wound Pros Management Group, Inc.                    Civil Investigative
     c/o Christopher Otiko (Registered Agent)              Demand No. 23-1300
     4640 Admiralty Way, Ste. 500
     Marina Del Ray, California 90292

This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729.  The False Claims Act investigation concerns allegations that Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, Wound Pros Management Group, Inc., and certain related entities and individuals (collectively, "Wound Pros") made false statements in claims submitted to the federal healthcare programs in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral ("Stark") Law, 42 U.S.C. § 1395nn, and common law. Specifically, we are investigating whether Wound Pros submitted or caused the submission of (1) claims for reimbursement falsely stating that services provided by non-physician personnel were "incident to" a physician's services; (2) claims for medically unnecessary skin substitutes and associated services; (3) point of service information falsely indicating that services were provided in an office setting; (4) claims for reimbursement through entities other than the one that performed the services; and (5) claims for durable medical equipment based on self-referrals in violation of the Stark Law.  We further are investigating whether Wound Pros paid or caused the payment of unlawful kickbacks to personnel in exchange for the personnel ordering products and services reimbursable by the federal healthcare programs.

This Demand requires you to provide documents and answers to the attached written interrogatories to the Federal Government.  This is the original of the Demand; no copies have been served on other parties.  The information and documents provided in response to this Demand may be shared, used, and disclosed as provided by 31 U.S.C. § 3733.

-2-

**Document Request**:

In accordance with the definitions and instructions set forth in **Attachment A** and the production specifications in **Attachment B**, you are required by this Demand to produce any and all documents in your possession, custody or control responsive to the document requests set forth in **Attachment C**.

You must make this material available to Department of Justice Trial Attorney Jessica M. Bergin and Assistant United States Attorney David Thiess, who have been designated as False Claims Act custodians in this case. Ms. Bergin may be contacted at (202) 305-4207 or Jessica.Bergin@usdoj.gov, and Mr. Thiess may be contacted at (916) 554-2825 or David.Thiess@usdoj.gov, if you have any questions. These documents shall be produced no later than thirty (30) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The production of documentary material in response to this Demand must be made under a sworn certificate in the form printed in this Demand.

**Written Interrogatories**:

In accordance with the definitions and instructions set forth in **Attachment A**, you are required by this Demand to answer the interrogatories set forth in **Attachment D**. The answers to interrogatories shall be submitted no later than twenty (20) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The interrogatories shall be answered separately and fully in writing under oath and also shall be submitted under a sworn certificate in the form printed in this Demand. If you object to any interrogatory, the reasons for the objection shall be stated with specificity.

Issued at Washington, DC, this __27th__ day of __September__, 2023.


_____
Jamie Ann Yavelberg
Director
Commercial Litigation Branch

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for producing the documents requested in Civil Investigative Demand No. 23-1300.  I hereby certify that all the materials required by that Civil Investigative Demand which are in the possession, custody or control of the person to whom the Demand is directed have been submitted to a custodian named therein.

If any such material has not been produced because of a lawful objection, the objection to the document request and the reasons for the objection have been stated.

Signature  —————————————

Title   —————————————

**SWORN TO** before me this _____ day of
_____, 2023


_____
NOTARY PUBLIC

---

[1]     In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for answering interrogatory numbers_____in Civil Investigative Demand No. 23-1300. I hereby certify that all the information required by the Civil Investigative Demand and in the possession, custody, control, or knowledge of the person to whom the Civil Investigative Demand is directed has been submitted. To the extent information has not been furnished, the information is identified and the reasons why the information was not furnished are set forth with particularity. Additionally, if any such information has not been produced because of a lawful objection, the objection to the interrogatory and the reasons for the objection have been stated. I certify under penalty of perjury that the foregoing interrogatory responses are true and correct.


Signature_____

Title_____


**SWORN TO** before me this_____day of
_____, 2023


_____
            NOTARY PUBLIC

---

[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## VERIFIED RETURN OF SERVICE

I,_____, an employee of the United States working under the direction and supervision of attorney Jessica Bergin in connection with a false claims law investigation, hereby certify that at the time of _____, on the_____day of _____, 2023, I personally served Civil Investigative Demand No. 23-1300 on _____, by delivering an executed copy of such Demand at:

_____

_____

_____

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this _____day of _____, 2023.

Signature_____

Title_____

ATTACHMENT A TO CIVIL INVESTIGATIVE DEMAND NO. 23-1300

<u>DEFINITIONS AND INSTRUCTIONS</u>

## A. DEFINITIONS

1.      Unless specified otherwise, the terms "You" or "Your" mean Wound Pros Management Group, Inc., and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

2.      Unless specified otherwise, the term "Wound Pros" means Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, and Wound Pros Management Group, Inc.; and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

3.      "Communication" is used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and means any transmission or exchange of information orally or in writing, and include, but are not limited to, any emails and text message conversations (including those stored on organization and personal devices).

4.      "CPT code" means any Current Procedural Terminology code.

5.      "DME" means any durable medical equipment, including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes:  A4245-A5120, A6000-A6461, and L4360-L4387.

6.      "Document" and "documents" are used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations.

7.      "Employee" shall mean any person including, but not limited to, an employee, volunteer, independent contractor or agent, all past and present directors, officers, agents, representatives, accountants, advisors, and consultants who acted or purported to act on Your or Wound Pros' behalf or who performed any service for You or Wound Pros under Your or Wound Pros' name, whether on a full-time, part-time, piece-work, commission or other basis and whether paid or unpaid.

8. "Federal healthcare program" means any healthcare program administered or funded wholly or in part by the United States, including, but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA and other VA health care programs and services, the Federal Employee Health Benefits Program, and the Federal Bureau of Prisons Health Services Program.

9. "HCPCS code" means any Healthcare Common Procedure Coding System code.

10. "Identify" means to provide the following information in Your response:

    a.    With respect to a natural person:
- (i)    the person's full name;
- (ii)    the name of the person's current or last known employer;
- (iii)    the person's title and position, if known;
- (iv)    the person's current or last known business and home address and telephone number; and
- (v)    if applicable, the person's National Provider Identifier ("NPI");

    b.    With respect to a corporation, partnership, joint venture, or other entity:
- (i)    the name of the entity;
- (ii)    the addresses and telephone numbers of its principal office(s);
- (iii)    the tax identification number; and
- (iv)    if the entity is a medical provider, the entity's NPI, Medicare provider number, and CMS Certification Number ("CCN"), if applicable;

    c.    With respect to documents:
- (i)    the title of the document;
- (ii)    the date of the document;
- (iii)    a description of the type of document;
- (iv)    a summary of the document's contents;
- (v)    the present location of the original and all existing copies of the document;
- (vi)    a list of all intended recipients of the document, including, but not limited to, all addressees, and all persons who were supposed to receive a copy of the document (*i.e.*, through "cc" or "bcc"); and
- (vii)    the identity of the author and a list of all persons who participated in the creation of the document.

11. "Non-physician practitioner" means any practitioner of healthcare services who is not also a doctor of medicine or a doctor of osteopathic medicine.

12. "Physician" means any provider of healthcare services who is a doctor of medicine or a doctor of osteopathic medicine

13. "Provider" means any physician, physician group, hospital, laboratory, skilled nursing facility, home health agency, hospice, board and care facility, physician assistant, nurse,

nurse practitioner, medical assistant, or any other person or entity who provides any healthcare services, including any non-physician practitioner who provides any healthcare services.

14.  "Relating to" and "related to" mean consisting of, concerning, referring to, reflecting, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the matter discussed.

15.  "Skin substitute" means any graft used to assist with wound healing, such as non-autologous human skin (dermal or epidermal, cellular and acellular) grafts, non-human skin substitute grafts, and biological products (placental and amniotic skin substitutes), including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: C5271-C5278 and Q4101-Q4284.

16.  "Text message conversations" refers to any and all electronic communications (other than emails) that can or do contain text, regardless of the format of the communications, the application or platform used to send or receive the communications, and whether the communications are immediately retrievable or retrievable only via a forensic extraction, including, but not limited to, those occurring in or via SMS, MMS, EMS, iMessage, Facebook chat, Facebook messenger, Google Talk (formerly Gchat), Blackberry Messenger (BBM), Skype, GroupMe, AIM, WhatsApp, Slack, Snapchat, Signal, WeChat, or company-deployed electronic health records or communications platforms, as well as, recoverable deleted data, backup files (e.g., iCloud or iPhone backup files), and archive snapshots.

17.  The terms "and" and "or" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

18.  The terms "any" and "all" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

19.  The singular and plural forms of any word shall be construed interchangeably so as to bring within the scope of this Demand any document which might otherwise be construed as outside its scope.

## B. INSTRUCTIONS

1.  *Relevant Time Period:* Unless otherwise stated in any specific request below, each request covers the relevant time period since January 1, 2016.

2.  This Demand is continuing in nature. If You become aware of or acquire possession, custody, or control of additional documents that are responsive to this Demand, or if You become aware of or acquire additional information that is responsive to these interrogatories, You shall promptly produce such additional documents or supplement Your interrogatory responses.

3.  This Demand applies to all documents and information in Your possession, custody, or control regardless of their location and regardless of whether such documents or

information are held by Your current or former employees, including, but not limited to, in-house IT specialists and technicians, IT specialists and technicians to whom digital services have been out-sourced.

4.      All documents produced pursuant to this Demand are to be organized in such a manner that all documents relating to a particular request are grouped together and identified as being responsive to that request.

5.      If any document which is otherwise responsive to this Demand is not disclosed because of a claim of privilege or other objection, You shall identify such documents on a Privilege Log. The Privilege Log shall be produced in Excel or Word format and include the following information:

        (a) the basis for the assertion of the privilege or objection;

        (b) the type of document (e.g., letter, memorandum, email, etc.)

        (c) the name and title of the author (and if different, the preparer and signatory);

        (d) the name(s) and title(s) of the individual(s) to whom the document was addressed;

        (e) the name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

        (f) the date of the document;

        (g) number of pages;

        (h) a general description of the subject matter; and

        (i) the Request(s) to which the document is responsive.

6.      When a requested document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible. If a privilege is asserted with regard to a part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a document is redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration. Any redaction must be clearly visible on the redacted document.

7.      If any document otherwise responsive to this Demand is not produced because it was lost, destroyed, or discarded:

        (a) identify the document by type, date, and title;

(b) identify the person who last had custody or control over the document;

(c) state the date on which the document was destroyed or was discovered to have been lost;

(d) if the document was destroyed, state why it was destroyed and identify the person(s) who destroyed it;

(e) if the document was lost, describe the circumstances in which its loss was discovered, state the date that it was last seen or otherwise accounted for, and identify the person(s) who discovered its loss and who last saw or otherwise accounted for it;

(f) identify all persons who have knowledge pertaining to the destruction or loss of the document, giving a concise but complete statement of the knowledge You claim each such person has;

(g) identify all persons who have knowledge of the contents of each lost or destroyed document, giving a concise but complete statement of the knowledge You claim each such person has; and

(h) produce all existing indices, lists, or other documents in Your possession, custody, or control that reflect the existence of such lost or destroyed documents, and/or their transfer or destruction.

8.    If no documents exist that are responsive to a specific document request, a written statement to that effect shall be provided at the time of production.

9.    To the extent that documents responsive to this Demand are in the possession, custody, or control of third parties, this Demand requires a statement to that effect at the time of production, specifically providing the name, address, telephone number and principal contact of the third party, and shall further identify those documents in said third party's possession.

10.    Please produce imaged hard copy and electronic documents according to the Specifications for Production of Electronically Stored Information and Digitized Images at **Attachment B**.

11.    For each interrogatory and subpart thereof, You must respond separately and in writing.  Your responses must identify all documents that You used, referenced, or relied upon in Your written responses.

12.    If You withhold any information responsive to any interrogatory based on a claim of privilege or other objection: (a) furnish the basis for the assertion of the privilege or objection, (b) identify all individuals who could respond to the interrogatory with regard to the information that is being withheld, and (c) set forth the general subject matter and the specific interrogatory or interrogatories to which each individual could testify.

13.    When providing the name of an individual in response to any interrogatory or individuals identified pursuant to Instruction 12 above, provide the individual's last known address, telephone number, email address, or other contact information, as well as the individual's relationship to You.  If the individual is or was an employee, provide the individual's title and dates of employment.

**ATTACHMENT B TO CIVIL INVESTIGATIVE DEMAND NO. 23-1300**

**Specifications for Production of ESI and Digitized ("Scanned") Images
("Production Specifications")**

### Collection of Electronically Stored Information (ESI)

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

1.    **Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

2.    **Production Format of ESI and Imaged Hard Copy Documents**

Responsive ESI and imaged hard copy shall be produced in the format outlined below.  All ESI, except as outlined below in sections 5 – 21, shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

a.    **Image File Format:** All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

b.    When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT Group IV (2D Compression).  When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

   i.    All TIFF file names shall include the unique Bates number burned into the image.  (See section 22, below, regarding Bates number instructions.)

   ii.    All TIFF image files shall be stored with the ".tif" extension.

   iii. Images without corresponding extracted text shall be OCR'd using standard COTS products.

     1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

   iv. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

   v. No image folder shall contain more than 2,000 images.

  c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

```
REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,
```

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.
- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

  d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat

database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| Field Separator | ¶ or Code 020 |
| Text Qualifier | þ or Code 254 |
| Newline | ® or Code 174 |
| Multi-value | ; or Code 059 |
| Nested values | \ or Code 092 |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAM Eþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:
\*CaseName*\**LoadFiles**
\*CaseName*\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
\*CaseName*\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
\*CaseName*\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)
\*CaseName*\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)

\*CaseName*\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

**3.      Required Metadata/Database Fields**

A "✓" denotes that the indicated field should be present in the load file produced.  "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below.  Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | ✓ | ✓ | ✓ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | ✓ | ✓ | ✓ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| AUTHOR | Creator of the document | Text | 500 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | ✓ | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/ YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

**4.    Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

a. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.
   ▪ All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.
b. All files should be globally de-duplicated with the following conditions:

   i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.
   ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.
   iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.
   iv. No customization of hashing may occur without prior express approval by the Government.
   v. De-duplication must be done by document family, not by individual document.
   vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be

expressly stated in the cover letter accompanying the subsequent production(s).

c.  The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

### 5.  Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

### 6.  Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

### 7.  Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8.  Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

a.  The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.
  ▪ If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

### 9.     Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

     a.   Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).

       ▪ The first document in the collection represents the parent document and all other documents will represent the children.

     b.   All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

       ▪ All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

### 10.     Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

### 11.     Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

### 12.     Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies.  These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies.  However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.   Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.   Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format.  The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.   Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production.  The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#.  The parties shall meet and confer regarding any required audio file redactions.

### 20.   Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.   Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government.  The following are examples:

      a.  AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.

         ▪  GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

      b.   Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

### 22.    Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|         | *Document #1*         | *Document #2*         |
|---------|-----------------------|-----------------------|
| *Page #1* | PREFIX00000000001     | PREFIX00000000002     |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

### 23.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

      a.   CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
- External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives

      b.   Government approved File Transfer Protocol (FTP) technologies.
- Storage media used to deliver ESI shall be appropriate to the size of the data in the production.

      c.   Media should be labeled with the case name, production date, Bates range, and producing party.

### 24.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

### 25.    Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 26.    Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 27.    Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 28.    Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

**ATTACHMENT C TO CIVIL INVESTIGATIVE DEMAND NO. 23-1300**

**DOCUMENT REQUESTS**

You are required by this Demand to produce any and all of the following documents in Your possession, custody, or control:

1.    All documents reflecting any formal or informal contracts and agreements between You or Wound Pros and the persons and entities identified in connection with interrogatory 1, including all documents and communications reflecting any compensation, payment, commissions, bonuses, reimbursement of expenses, risk sharing, or any other remuneration or benefits of any kind.

2.    All documents and communications concerning any compensation, commission, bonus, or any other remuneration or benefits of any kind offered and/or paid by or on behalf of You or Wound Pros to any person or entity that provides, supervises, directs, refers, or otherwise causes the provision or billing of the federal healthcare programs for any skin substitute products or services by or on behalf of You or Wound Pros, including, but not limited to, all documents and communications related to any fair market value assessment of that compensation.

3.    All personnel evaluations, records, schedules, timesheets, logs, and any other documentation of payments, remuneration, commission, reimbursement of expenses, risk sharing, benefits of any kind, referral, sanction, penalty, disciplinary action, or any other unfavorable action or consequence of any kind relating to the provision of or billing for any skin substitute products or services by or on behalf of You or Wound Pros.

4.    All documents and communications relating to supervision or direction by any physician affiliated with Wound Pros, including, but not limited to, Dr. Bill J. Releford, Dr. Christopher Otiko, Dr. Owen Ellington, Dr. Joseph M. Palumbo, Dr. Sherman Washington, and Dr. Allyson Pizzo-Berkey, of the provision of any skin substitute products or services by any non-physician practitioner on behalf of Wound Pros.

5.    All projections, analyses, reports, drafts, reviews, or other documentation reflecting any performance metric, including, but not limited to, revenue, profit, and return on investment ("ROI"), relating to the provision of or billing for any skin substitute products or services by any person or entity affiliated with Wound Pros.

6.    All documents and communications relating to the ordering by any Wound Pros-affiliated provider of any DME supplies from any Wound Pros-affiliated DME supplier, including the preparation and ordering of pre-made DME kits.

7.    All formal and informal policies, practices, procedures, guidelines, standard operating procedures, FAQs, training materials, instructions, advice, evaluations, or other guidance in any form relating to (a) supervision of non-physician practitioners, including remote supervision; (b) billing for products and services provided by non-physician practitioners, including billing for services "incident to" services provided by a physician; (c) billing

for products and services provided to patients in hospice, nursing facilities, skilled nursing facilities, or any other board or care facilities; (d) identifying the point of service and the entity that provided any products or services in any documentation related to billing; (e) ordering DME supplies; (f) providing DME to patients; and (g) compliance with federal healthcare program billing requirements, the False Claims Act, Stark Law, Anti-Kickback Statute, or other state and federal laws and regulatory guidance.

8.    All documents and communications concerning compliance with the requirements of any federal healthcare program, including, but not limited to, all documents exchanged with CMS relating to Your or Wound Pros' ability to participate in the federal healthcare programs, revocation by CMS, and any notifications from CMS regarding any actual, potential, or suspected failure to comply with CMS requirements.

9.    All formal or informal complaints, allegations, objections, inquiries, or concerns of any kind from any source concerning potential fraud, inappropriate billing, noncompliance with federal healthcare program requirements, unsatisfactory or inappropriate products or services, harm to patients, or violations of statutes or regulations by You or Wound Pros.

10.   Documents sufficient to show Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.

11.   Documents sufficient to show Your organizational chart(s) for the Relevant Time Period.

12.   All documents relied on to answer the interrogatories in **Attachment D**.

**ATTACHMENT D TO CIVIL INVESTIGATIVE DEMAND NO. 23-1300**

**INTERROGATORIES**

1.   Identify in Microsoft Excel format all persons and entities with which You and/or Wound Pros contracted in connection with providing or billing for healthcare products or services, by specifying in separate fields: (a) the name of the person or entity with which You and/or Wound Pros contracted; (b) the contract name(s); (c) the contract date(s); (d) the contract number(s); (e) all parties to the contract(s); (f) the signatories to the contract(s); (g) the person(s) involved in the contracting process(es); (h) all products and services covered by the contract(s), including whether the contract related in any way to skin substitutes; (i) any amendments to the contract(s); (j) the status of any pending contract negotiations; (k) the reason(s) for any amendment, modification, or termination of any contract; (l) the termination date of the contract; and (m) any documentation related to the contract(s).

2.   For each Wound Pros entity and affiliate, identify in Microsoft Excel format all owners, investors, and financial supporters of any kind by (a) full name; (b) current or last known business address, home address, and telephone number; (c) ownership share, if applicable; (d) investments and/or financial support provided, including the itemized amount(s) and date(s); (e) return on investment provided by the Wound Pros entity or affiliate to the owner, investor, or financial supporter, if applicable, including the amount(s) and date(s); (f) description of the nature of the ownership, investment relationship, and/or financial support; and (g) any other metric that You or Wound Pros uses to track or quantify the relationship with the owner, investor, or financial supporter.

3.   For each Wound Pros entity and affiliate, identify in Microsoft Excel format all current and former employees by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) job title; (e) job responsibilities; (f) whether the employee was a direct employee, volunteer, independent contractor, agent, director, officer, representative, account, advisor, or consultant; (g) start date; (h) termination date, if applicable; (i) Wound Pros entity with which the individual interacted; (j) locations where any services were provided by the individual; (k) all compensation and benefits of any kind; (l) supervising responsibilities; (m) direct report(s); (n) supervisor(s); and (o) manager(s).

4.   Identify in Microsoft Excel format all persons and/or entities through whom Wound Pros submits claims for reimbursement to the federal healthcare programs by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) nature of the relationship with Wound Pros; (f) start date of relationship; (g) end date of the relationship; (h) services provided; (i) dates during which the services were provided; (j) locations where the services were provided; (k) Wound Pros entity on behalf of which the person or entity submitted claims; (l) all compensation and benefits of any kind; and (m) whether the compensation was consistent with fair market value, including the basis for that conclusion.

5.      Identify in Microsoft Excel format all systems, programs, platforms, software, algorithms, analytics, or other tools used by Wound Pros, including, but not limited to, Slack, RITA, HL7, Smart Sheet, Black Doctor 24/7, Wound Docs, Office Ally, Kareo, Google Drive, Google Email, Zelis, Paychex, and ADP, by (a) name; (b) function and/or use; (c) dates of use; (d) the Wound Pros entities and/or individuals involved or impacted; and (e) the name(s) and title(s) of the employees or other third parties most knowledgeable about its function and/or use.

6.      For each system, program, platform, software, algorithm, analytic, or other tool identified in response to interrogatory 5, describe (a) all fields that are auto-populated by the system; (b) all fields that are added or revised by anyone other than the provider who directly treated the patient; and (c) the circumstances under which those fields are auto-populated, added, or revised. If this process changed during the Relevant Time Period, describe all changes during this time period.

7.      Identify in Microsoft Excel format all DME suppliers used by any person or entity affiliated with Wound Pros by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) DME supplies ordered from that supplier; and (f) dates during which DME supplies were ordered from that supplier.

8.      Identify in Microsoft Excel format all DME orders filled by Wound Pros for DME, including (a) the item or service furnished; (b) the patient (i) full name, (ii) date of birth, (iii) social security number, and (iv) Medicare Beneficiary Number or other federal health care program identifier; (c) the referring physician; and (d) the amount reimbursed.

9.      Identify in Microsoft Excel format all Wound Pros facilities and medical offices where services were provided by any Wound Pros provider by (a) full name; (b) address; (c) the date range(s) during which services were provided at that facility or medical office; (d) all persons and entities that billed the federal healthcare programs for services performed at that facility or medical office, including the person's or entity's NPI and EIN; and (e) the services provided at that facility.

10.     Identify in Microsoft Excel format all patients treated by a Wound Pros non-physician practitioner, including identifying the patient by (a) full name; (b) date of birth; (c) social security number; (d) date of first encounter with Wound Pros; (e) date of the most recent encounter with Wound Pros; (f) date on which the service was provided; (g) whether the patient was treated with a skin substitute; (h) date of the skin substitute service, if any; (i) address where the service was performed; (j) whether the patient was located at a facility of any kind when the patient received the service, and if so, the type of facility, name of the facility, and address of the facility; (k) name of the person who performed the service; (l) name of the supervising physician, if any; (m) health insurance plan; (n) whether the patient was diagnosed with any condition related to the services provided, and if so, any associated diagnosis, HCPCS, and CPT codes; (o) all follow-up treatments

associated with the services provided; and (p) all documentation or other information considered in connection with the services provided.

11.   Describe Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.  If the structure has changed during the Relevant Time Period, describe all changes to the structure during this time period.

12.   Describe Your relationship with each of the following entities, including any ownership interest, financial relationship, and overlap in providers, services, or patients:  (a) Wound Pros Washington; (b) Wound Pros Utah; (c) Wound Pros Louisiana; (d) Wound Pros Illinois; (e) Texas Wound Care Management; (f) PLS Podiatry Group; (g) Ohio Wound Care Specialists; (h) Ohio Wound Care Network; (i) DPMOTIKONRCA LLC; (j) Coast to Coast Podiatry; (l) Coast to Coast Foot Doctors, a Podiatry Corporation; (m) Coast to Coast DME; (n) Christopher A Otiko DPM; (o) Global Wound Care Medical Group; (p) American Wound Care Partners; (q) National Wound Care Associates; (r) Horizon Wound Care LLC; and (s) PLS Foot Doctors.  If the relationship has changed during the Relevant Time Period, describe all changes during this time period.

# Exhibit 2

## CIVIL INVESTIGATIVE DEMAND

# United States Department of Justice
### Washington, D.C. 20530

TO:    Wound Pros Holdings, P.C.                            Civil Investigative
         c/o LegalCorp Solutions, Inc. (Registered Agent)     Demand No. 23-1301
         13854 Lakeside Circle, 2nd Floor
         Sterling Heights, Michigan 48313

This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729. The False Claims Act investigation concerns allegations that Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, Wound Pros Management Group, Inc., and certain related entities and individuals (collectively, "Wound Pros") made false statements in claims submitted to the federal healthcare programs in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral ("Stark") Law, 42 U.S.C. § 1395nn, and common law. Specifically, we are investigating whether Wound Pros submitted or caused the submission of (1) claims for reimbursement falsely stating that services provided by non-physician personnel were "incident to" a physician's services; (2) claims for medically unnecessary skin substitutes and associated services; (3) point of service information falsely indicating that services were provided in an office setting; (4) claims for reimbursement through entities other than the one that performed the services; and (5) claims for durable medical equipment based on self-referrals in violation of the Stark Law. We further are investigating whether Wound Pros paid or caused the payment of unlawful kickbacks to personnel in exchange for the personnel ordering products and services reimbursable by the federal healthcare programs.

This Demand requires you to provide documents and answers to the attached written interrogatories to the Federal Government. This is the original of the Demand; no copies have been served on other parties. The information and documents provided in response to this Demand may be shared, used, and disclosed as provided by 31 U.S.C. § 3733.

-2-

**Document Request:**

In accordance with the definitions and instructions set forth in **Attachment A** and the production specifications in **Attachment B**, you are required by this Demand to produce any and all documents in your possession, custody or control responsive to the document requests set forth in **Attachment C**.

You must make this material available to Department of Justice Trial Attorney Jessica M. Bergin and Assistant United States Attorney David Thiess, who have been designated as False Claims Act custodians in this case. Ms. Bergin may be contacted at (202) 305-4207 or Jessica.Bergin@usdoj.gov, and Mr. Thiess may be contacted at (916) 554-2825 or David.Thiess@usdoj.gov, if you have any questions. These documents shall be produced no later than thirty (30) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The production of documentary material in response to this Demand must be made under a sworn certificate in the form printed in this Demand.

**Written Interrogatories:**

In accordance with the definitions and instructions set forth in **Attachment A**, you are required by this Demand to answer the interrogatories set forth in **Attachment D**. The answers to interrogatories shall be submitted no later than twenty (20) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The interrogatories shall be answered separately and fully in writing under oath and also shall be submitted under a sworn certificate in the form printed in this Demand. If you object to any interrogatory, the reasons for the objection shall be stated with specificity.

Issued at Washington, DC, this ___27th___ day of ___September___, 2023.


_____
Jamie Ann Yavelberg
Director
Commercial Litigation Branch

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for producing the documents requested in Civil Investigative Demand No. 23-1301. I hereby certify that all the materials required by that Civil Investigative Demand which are in the possession, custody or control of the person to whom the Demand is directed have been submitted to a custodian named therein.

If any such material has not been produced because of a lawful objection, the objection to the document request and the reasons for the objection have been stated.

Signature ————————————————

Title    ————————————————

**SWORN TO** before me this _____ day of
_____, 2023

————————————————————
NOTARY PUBLIC

————————————————

[1]    In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for answering interrogatory numbers_____in Civil Investigative Demand No. 23-1301. I hereby certify that all the information required by the Civil Investigative Demand and in the possession, custody, control, or knowledge of the person to whom the Civil Investigative Demand is directed has been submitted. To the extent information has not been furnished, the information is identified and the reasons why the information was not furnished are set forth with particularity. Additionally, if any such information has not been produced because of a lawful objection, the objection to the interrogatory and the reasons for the objection have been stated. I certify under penalty of perjury that the foregoing interrogatory responses are true and correct.

Signature_____

Title_____

**SWORN TO** before me this_____day of
_____, 2023

_____
NOTARY PUBLIC

_____
[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## VERIFIED RETURN OF SERVICE

I,_____, an employee of the United States working under the direction and supervision of attorney Jessica Bergin in connection with a false claims law investigation, hereby certify that at the time of _____, on the_____day of _____, 2023, I personally served Civil Investigative Demand No. 23-1301 on _____, by delivering an executed copy of such Demand at:

_____

_____

_____

I declare under penalty of perjury that the foregoing is true and correct. Executed on this _____day of _____, 2023.

Signature_____

Title_____

ATTACHMENT A TO CIVIL INVESTIGATIVE DEMAND NO. 23-1301

**DEFINITIONS AND INSTRUCTIONS**

**A. DEFINITIONS**

1.    Unless specified otherwise, the terms "You" or "Your" mean Wound Pros Holdings, P.C., and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

2.    Unless specified otherwise, the term "Wound Pros" means Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, and Wound Pros Management Group, Inc.; and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

3.    "Communication" is used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and means any transmission or exchange of information orally or in writing, and include, but are not limited to, any emails and text message conversations (including those stored on organization and personal devices).

4.    "CPT code" means any Current Procedural Terminology code.

5.    "DME" means any durable medical equipment, including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes:  A4245-A5120, A6000-A6461, and L4360-L4387.

6.    "Document" and "documents" are used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations.

7.    "Employee" shall mean any person including, but not limited to, an employee, volunteer, independent contractor or agent, all past and present directors, officers, agents, representatives, accountants, advisors, and consultants who acted or purported to act on Your or Wound Pros' behalf or who performed any service for You or Wound Pros under Your or Wound Pros' name, whether on a full-time, part-time, piece-work, commission or other basis and whether paid or unpaid.

8.      "Federal healthcare program" means any healthcare program administered or funded wholly or in part by the United States, including, but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA and other VA health care programs and services, the Federal Employee Health Benefits Program, and the Federal Bureau of Prisons Health Services Program.

9.      "HCPCS code" means any Healthcare Common Procedure Coding System code.

10.     "Identify" means to provide the following information in Your response:

    a.      With respect to a natural person:
        (i)     the person's full name;
        (ii)    the name of the person's current or last known employer;
        (iii)   the person's title and position, if known;
        (iv)    the person's current or last known business and home address and telephone number; and
        (v)     if applicable, the person's National Provider Identifier ("NPI");

    b.      With respect to a corporation, partnership, joint venture, or other entity:
        (i)     the name of the entity;
        (ii)    the addresses and telephone numbers of its principal office(s);
        (iii)   the tax identification number; and
        (iv)    if the entity is a medical provider, the entity's NPI, Medicare provider number, and CMS Certification Number ("CCN"), if applicable;

    c.      With respect to documents:
        (i)     the title of the document;
        (ii)    the date of the document;
        (iii)   a description of the type of document;
        (iv)    a summary of the document's contents;
        (v)     the present location of the original and all existing copies of the document;
        (vi)    a list of all intended recipients of the document, including, but not limited to, all addressees, and all persons who were supposed to receive a copy of the document (*i.e.*, through "cc" or "bcc"); and
        (vii)   the identity of the author and a list of all persons who participated in the creation of the document.

11.     "Non-physician practitioner" means any practitioner of healthcare services who is not also a doctor of medicine or a doctor of osteopathic medicine.

12.     "Physician" means any provider of healthcare services who is a doctor of medicine or a doctor of osteopathic medicine

13.     "Provider" means any physician, physician group, hospital, laboratory, skilled nursing facility, home health agency, hospice, board and care facility, physician assistant, nurse,

nurse practitioner, medical assistant, or any other person or entity who provides any healthcare services, including any non-physician practitioner who provides any healthcare services.

14.     "Relating to" and "related to" mean consisting of, concerning, referring to, reflecting, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the matter discussed.

15.     "Skin substitute" means any graft used to assist with wound healing, such as non-autologous human skin (dermal or epidermal, cellular and acellular) grafts, non-human skin substitute grafts, and biological products (placental and amniotic skin substitutes), including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: C5271-C5278 and Q4101-Q4284.

16.     "Text message conversations" refers to any and all electronic communications (other than emails) that can or do contain text, regardless of the format of the communications, the application or platform used to send or receive the communications, and whether the communications are immediately retrievable or retrievable only via a forensic extraction, including, but not limited to, those occurring in or via SMS, MMS, EMS, iMessage, Facebook chat, Facebook messenger, Google Talk (formerly Gchat), Blackberry Messenger (BBM), Skype, GroupMe, AIM, WhatsApp, Slack, Snapchat, Signal, WeChat, or company-deployed electronic health records or communications platforms, as well as, recoverable deleted data, backup files (e.g., iCloud or iPhone backup files), and archive snapshots.

17.     The terms "and" and "or" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

18.     The terms "any" and "all" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

19.     The singular and plural forms of any word shall be construed interchangeably so as to bring within the scope of this Demand any document which might otherwise be construed as outside its scope.

## B. INSTRUCTIONS

1.     *Relevant Time Period:* Unless otherwise stated in any specific request below, each request covers the relevant time period since January 1, 2016.

2.     This Demand is continuing in nature.  If You become aware of or acquire possession, custody, or control of additional documents that are responsive to this Demand, or if You become aware of or acquire additional information that is responsive to these interrogatories, You shall promptly produce such additional documents or supplement Your interrogatory responses.

3.     This Demand applies to all documents and information in Your possession, custody, or control regardless of their location and regardless of whether such documents or

information are held by Your current or former employees, including, but not limited to, in-house IT specialists and technicians, IT specialists and technicians to whom digital services have been out-sourced.

4.      All documents produced pursuant to this Demand are to be organized in such a manner that all documents relating to a particular request are grouped together and identified as being responsive to that request.

5.      If any document which is otherwise responsive to this Demand is not disclosed because of a claim of privilege or other objection, You shall identify such documents on a Privilege Log. The Privilege Log shall be produced in Excel or Word format and include the following information:

> (a)  the basis for the assertion of the privilege or objection;
>
> (b)  the type of document (e.g., letter, memorandum, email, etc.)
>
> (c)  the name and title of the author (and if different, the preparer and signatory);
>
> (d)  the name(s) and title(s) of the individual(s) to whom the document was addressed;
>
> (e)  the name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
> (f)  the date of the document;
>
> (g)  number of pages;
>
> (h)  a general description of the subject matter; and
>
> (i)  the Request(s) to which the document is responsive.

6.      When a requested document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible. If a privilege is asserted with regard to a part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a document is redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration. Any redaction must be clearly visible on the redacted document.

7.      If any document otherwise responsive to this Demand is not produced because it was lost, destroyed, or discarded:

> (a)  identify the document by type, date, and title;

(b) identify the person who last had custody or control over the document;

(c) state the date on which the document was destroyed or was discovered to have been lost;

(d) if the document was destroyed, state why it was destroyed and identify the person(s) who destroyed it;

(e) if the document was lost, describe the circumstances in which its loss was discovered, state the date that it was last seen or otherwise accounted for, and identify the person(s) who discovered its loss and who last saw or otherwise accounted for it;

(f) identify all persons who have knowledge pertaining to the destruction or loss of the document, giving a concise but complete statement of the knowledge You claim each such person has;

(g) identify all persons who have knowledge of the contents of each lost or destroyed document, giving a concise but complete statement of the knowledge You claim each such person has; and

(h) produce all existing indices, lists, or other documents in Your possession, custody, or control that reflect the existence of such lost or destroyed documents, and/or their transfer or destruction.

8.    If no documents exist that are responsive to a specific document request, a written statement to that effect shall be provided at the time of production.

9.    To the extent that documents responsive to this Demand are in the possession, custody, or control of third parties, this Demand requires a statement to that effect at the time of production, specifically providing the name, address, telephone number and principal contact of the third party, and shall further identify those documents in said third party's possession.

10.    Please produce imaged hard copy and electronic documents according to the Specifications for Production of Electronically Stored Information and Digitized Images at **Attachment B**.

11.    For each interrogatory and subpart thereof, You must respond separately and in writing. Your responses must identify all documents that You used, referenced, or relied upon in Your written responses.

12.    If You withhold any information responsive to any interrogatory based on a claim of privilege or other objection: (a) furnish the basis for the assertion of the privilege or objection, (b) identify all individuals who could respond to the interrogatory with regard to the information that is being withheld, and (c) set forth the general subject matter and the specific interrogatory or interrogatories to which each individual could testify.

13.    When providing the name of an individual in response to any interrogatory or individuals identified pursuant to Instruction 12 above, provide the individual's last known address, telephone number, email address, or other contact information, as well as the individual's relationship to You.  If the individual is or was an employee, provide the individual's title and dates of employment.

### ATTACHMENT B TO CIVIL INVESTIGATIVE DEMAND NO. 23-1301

### Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")

#### Collection of Electronically Stored Information (ESI)

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

#### 1.    Specification Modifications

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

#### 2.    Production Format of ESI and Imaged Hard Copy Documents

Responsive ESI and imaged hard copy shall be produced in the format outlined below.  All ESI, except as outlined below in sections 5 – 21, shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

           a.    **Image File Format:** All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

           b.    When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT Group IV (2D Compression).  When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

              i.    All TIFF file names shall include the unique Bates number burned into the image.  (See section 22, below, regarding Bates number instructions.)

             ii.    All TIFF image files shall be stored with the ".tif" extension.

       iii.  Images without corresponding extracted text shall be OCR'd using standard COTS products.

          1.  An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

       iv.  All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

       v.  No image folder shall contain more than 2,000 images.

  c.  **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

```
REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,,
REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,,
REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,,
```

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.
- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

  d.  **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat

database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| Field Separator | ¶ or Code 020 |
|---|---|
| Text Qualifier | þ or Code 254 |
| Newline | ® or Code 174 |
| Multi-value | ; or Code 059 |
| Nested values | \ or Code 092 |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:
   \\*CaseName*\\**LoadFiles**
   \\*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)

\*CaseName*\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

**3.    Required Metadata/Database Fields**

A "√" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | √ | √ | √ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | √ | √ | √ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | √ | √ | √ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | √ | √ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | √ | √ |
| AUTHOR | Creator of the document | Text | 500 | | | √ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | √ | √ | √ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/ YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

**4.    Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

    a. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.

    ▪ All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

    b. All files should be globally de-duplicated with the following conditions:

      i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

      ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

      iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

      iv. No customization of hashing may occur without prior express approval by the Government.

      v. De-duplication must be done by document family, not by individual document.

      vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be

expressly stated in the cover letter accompanying the subsequent production(s).

c. The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

## 5. Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

## 6. Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

## 7. Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

## 8. Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

a. The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.
- If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

9.     **Production of Imaged Hard Copy Records**

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

      a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).

         ▪  The first document in the collection represents the parent document and all other documents will represent the children.

      b.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

         ▪  All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

10.     **Production of Spreadsheets and Presentation Files**

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

11.     **Production of E-mail Repositories**

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

12.     **Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items**

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies.  These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies.  However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements:  (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format.  The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production.  The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#.  The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government.  The following are examples:

> a.  AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.
>> ▪ GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

b.  Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

## 22.    Bates Number Convention

All images should be assigned Bates numbers before production to the government.  Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page.  The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document.  Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field).  The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion.  The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file).  If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production.  There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation."  Below is a sample of dot notation:

|          | *Document #1*         | *Document #2*         |
|----------|-----------------------|-----------------------|
| *Page #1* | PREFIX00000000001     | PREFIX00000000002     |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

## 23.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

a.  CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
  ▪ External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
b.  Government approved File Transfer Protocol (FTP) technologies.
  ▪ Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
c.  Media should be labeled with the case name, production date, Bates range, and producing party.

## 24.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses.  Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

### 25.    Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 26.    Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 27.    Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 28.    Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

## ATTACHMENT C TO CIVIL INVESTIGATIVE DEMAND NO. 23-1301

### DOCUMENT REQUESTS

You are required by this Demand to produce any and all of the following documents in Your possession, custody, or control:

1.  All documents reflecting any formal or informal contracts and agreements between You or Wound Pros and the persons and entities identified in connection with interrogatory 1, including all documents and communications reflecting any compensation, payment, commissions, bonuses, reimbursement of expenses, risk sharing, or any other remuneration or benefits of any kind.

2.  All documents and communications concerning any compensation, commission, bonus, or any other remuneration or benefits of any kind offered and/or paid by or on behalf of You or Wound Pros to any person or entity that provides, supervises, directs, refers, or otherwise causes the provision or billing of the federal healthcare programs for any skin substitute products or services by or on behalf of You or Wound Pros, including, but not limited to, all documents and communications related to any fair market value assessment of that compensation.

3.  All personnel evaluations, records, schedules, timesheets, logs, and any other documentation of payments, remuneration, commission, reimbursement of expenses, risk sharing, benefits of any kind, referral, sanction, penalty, disciplinary action, or any other unfavorable action or consequence of any kind relating to the provision of or billing for any skin substitute products or services by or on behalf of You or Wound Pros.

4.  All documents and communications relating to supervision or direction by any physician affiliated with Wound Pros, including, but not limited to, Dr. Bill J. Releford, Dr. Christopher Otiko, Dr. Owen Ellington, Dr. Joseph M. Palumbo, Dr. Sherman Washington, and Dr. Allyson Pizzo-Berkey, of the provision of any skin substitute products or services by any non-physician practitioner on behalf of Wound Pros.

5.  All projections, analyses, reports, drafts, reviews, or other documentation reflecting any performance metric, including, but not limited to, revenue, profit, and return on investment ("ROI"), relating to the provision of or billing for any skin substitute products or services by any person or entity affiliated with Wound Pros.

6.  All documents and communications relating to the ordering by any Wound Pros-affiliated provider of any DME supplies from any Wound Pros-affiliated DME supplier, including the preparation and ordering of pre-made DME kits.

7.  All formal and informal policies, practices, procedures, guidelines, standard operating procedures, FAQs, training materials, instructions, advice, evaluations, or other guidance in any form relating to (a) supervision of non-physician practitioners, including remote supervision; (b) billing for products and services provided by non-physician practitioners, including billing for services "incident to" services provided by a physician; (c) billing

for products and services provided to patients in hospice, nursing facilities, skilled nursing facilities, or any other board or care facilities; (d) identifying the point of service and the entity that provided any products or services in any documentation related to billing; (e) ordering DME supplies; (f) providing DME to patients; and (g) compliance with federal healthcare program billing requirements, the False Claims Act, Stark Law, Anti-Kickback Statute, or other state and federal laws and regulatory guidance.

8. All documents and communications concerning compliance with the requirements of any federal healthcare program, including, but not limited to, all documents exchanged with CMS relating to Your or Wound Pros' ability to participate in the federal healthcare programs, revocation by CMS, and any notifications from CMS regarding any actual, potential, or suspected failure to comply with CMS requirements.

9. All formal or informal complaints, allegations, objections, inquiries, or concerns of any kind from any source concerning potential fraud, inappropriate billing, noncompliance with federal healthcare program requirements, unsatisfactory or inappropriate products or services, harm to patients, or violations of statutes or regulations by You or Wound Pros.

10. Documents sufficient to show Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.

11. Documents sufficient to show Your organizational chart(s) for the Relevant Time Period.

12. All documents relied on to answer the interrogatories in **Attachment D**.

**ATTACHMENT D TO CIVIL INVESTIGATIVE DEMAND NO. 23-1301**

**INTERROGATORIES**

1.  Identify in Microsoft Excel format all persons and entities with which You and/or Wound Pros contracted in connection with providing or billing for healthcare products or services, by specifying in separate fields: (a) the name of the person or entity with which You and/or Wound Pros contracted; (b) the contract name(s); (c) the contract date(s); (d) the contract number(s); (e) all parties to the contract(s); (f) the signatories to the contract(s); (g) the person(s) involved in the contracting process(es); (h) all products and services covered by the contract(s), including whether the contract related in any way to skin substitutes; (i) any amendments to the contract(s); (j) the status of any pending contract negotiations; (k) the reason(s) for any amendment, modification, or termination of any contract; (l) the termination date of the contract; and (m) any documentation related to the contract(s).

2.  For each Wound Pros entity and affiliate, identify in Microsoft Excel format all owners, investors, and financial supporters of any kind by (a) full name; (b) current or last known business address, home address, and telephone number; (c) ownership share, if applicable; (d) investments and/or financial support provided, including the itemized amount(s) and date(s); (e) return on investment provided by the Wound Pros entity or affiliate to the owner, investor, or financial supporter, if applicable, including the amount(s) and date(s); (f) description of the nature of the ownership, investment relationship, and/or financial support; and (g) any other metric that You or Wound Pros uses to track or quantify the relationship with the owner, investor, or financial supporter.

3.  For each Wound Pros entity and affiliate, identify in Microsoft Excel format all current and former employees by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) job title; (e) job responsibilities; (f) whether the employee was a direct employee, volunteer, independent contractor, agent, director, officer, representative, account, advisor, or consultant; (g) start date; (h) termination date, if applicable; (i) Wound Pros entity with which the individual interacted; (j) locations where any services were provided by the individual; (k) all compensation and benefits of any kind; (l) supervising responsibilities; (m) direct report(s); (n) supervisor(s); and (o) manager(s).

4.  Identify in Microsoft Excel format all persons and/or entities through whom Wound Pros submits claims for reimbursement to the federal healthcare programs by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) nature of the relationship with Wound Pros; (f) start date of relationship; (g) end date of the relationship; (h) services provided; (i) dates during which the services were provided; (j) locations where the services were provided; (k) Wound Pros entity on behalf of which the person or entity submitted claims; (l) all compensation and benefits of any kind; and (m) whether the compensation was consistent with fair market value, including the basis for that conclusion.

5.    Identify in Microsoft Excel format all systems, programs, platforms, software, algorithms, analytics, or other tools used by Wound Pros, including, but not limited to, Slack, RITA, HL7, Smart Sheet, Black Doctor 24/7, Wound Docs, Office Ally, Kareo, Google Drive, Google Email, Zelis, Paychex, and ADP, by (a) name; (b) function and/or use; (c) dates of use; (d) the Wound Pros entities and/or individuals involved or impacted; and (e) the name(s) and title(s) of the employees or other third parties most knowledgeable about its function and/or use.

6.    For each system, program, platform, software, algorithm, analytic, or other tool identified in response to interrogatory 5, describe (a) all fields that are auto-populated by the system; (b) all fields that are added or revised by anyone other than the provider who directly treated the patient; and (c) the circumstances under which those fields are auto-populated, added, or revised.  If this process changed during the Relevant Time Period, describe all changes during this time period.

7.    Identify in Microsoft Excel format all DME suppliers used by any person or entity affiliated with Wound Pros by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) DME supplies ordered from that supplier; and (f) dates during which DME supplies were ordered from that supplier.

8.    Identify in Microsoft Excel format all DME orders filled by Wound Pros for DME, including (a) the item or service furnished; (b) the patient (i) full name, (ii) date of birth, (iii) social security number, and (iv) Medicare Beneficiary Number or other federal health care program identifier; (c) the referring physician; and (d) the amount reimbursed.

9.    Identify in Microsoft Excel format all Wound Pros facilities and medical offices where services were provided by any Wound Pros provider by (a) full name; (b) address; (c) the date range(s) during which services were provided at that facility or medical office; (d) all persons and entities that billed the federal healthcare programs for services performed at that facility or medical office, including the person's or entity's NPI and EIN; and (e) the services provided at that facility.

10.    Identify in Microsoft Excel format all patients treated by a Wound Pros non-physician practitioner, including identifying the patient by (a) full name; (b) date of birth; (c) social security number; (d) date of first encounter with Wound Pros; (e) date of the most recent encounter with Wound Pros; (f) date on which the service was provided; (g) whether the patient was treated with a skin substitute; (h) date of the skin substitute service, if any; (i) address where the service was performed; (j) whether the patient was located at a facility of any kind when the patient received the service, and if so, the type of facility, name of the facility, and address of the facility; (k) name of the person who performed the service; (l) name of the supervising physician, if any; (m) health insurance plan; (n) whether the patient was diagnosed with any condition related to the services provided, and if so, any associated diagnosis, HCPCS, and CPT codes; (o) all follow-up treatments

associated with the services provided; and (p) all documentation or other information considered in connection with the services provided.

11.   Describe Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.  If the structure has changed during the Relevant Time Period, describe all changes to the structure during this time period.

12.   Describe Your relationship with each of the following entities, including any ownership interest, financial relationship, and overlap in providers, services, or patients:  (a) Wound Pros Washington; (b) Wound Pros Utah; (c) Wound Pros Louisiana; (d) Wound Pros Illinois; (e) Texas Wound Care Management; (f) PLS Podiatry Group; (g) Ohio Wound Care Specialists; (h) Ohio Wound Care Network; (i) DPMOTIKONRCA LLC; (j) Coast to Coast Podiatry; (l) Coast to Coast Foot Doctors, a Podiatry Corporation; (m) Coast to Coast DME; (n) Christopher A Otiko DPM; (o) Global Wound Care Medical Group; (p) American Wound Care Partners; (q) National Wound Care Associates; (r) Horizon Wound Care LLC; and (s) PLS Foot Doctors.  If the relationship has changed during the Relevant Time Period, describe all changes during this time period.

# Exhibit 3

## CIVIL INVESTIGATIVE DEMAND

# United States Department of Justice
### Washington, D.C. 20530

TO:   Wound Pros Enterprises LLC                    Civil Investigative
      4640 Admiralty Way, Ste. 500                   Demand No. 23-1302
      Marina Del Ray, California 90292
      c/o LegalCorp Solutions, Inc. (Registered Agent)
      8939 Sepulveda Blvd, Ste. 102
      Los Angeles, California 90045

This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729. The False Claims Act investigation concerns allegations that Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, Wound Pros Management Group, Inc., and certain related entities and individuals (collectively, "Wound Pros") made false statements in claims submitted to the federal healthcare programs in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral ("Stark") Law, 42 U.S.C. § 1395nn, and common law. Specifically, we are investigating whether Wound Pros submitted or caused the submission of (1) claims for reimbursement falsely stating that services provided by non-physician personnel were "incident to" a physician's services; (2) claims for medically unnecessary skin substitutes and associated services; (3) point of service information falsely indicating that services were provided in an office setting; (4) claims for reimbursement through entities other than the one that performed the services; and (5) claims for durable medical equipment based on self-referrals in violation of the Stark Law. We further are investigating whether Wound Pros paid or caused the payment of unlawful kickbacks to personnel in exchange for the personnel ordering products and services reimbursable by the federal healthcare programs.

This Demand requires you to provide documents and answers to the attached written interrogatories to the Federal Government. This is the original of the Demand; no copies have been served on other parties. The information and documents provided in response to this Demand may be shared, used, and disclosed as provided by 31 U.S.C. § 3733.

-2-

**Document Request:**

In accordance with the definitions and instructions set forth in **Attachment A** and the production specifications in **Attachment B**, you are required by this Demand to produce any and all documents in your possession, custody or control responsive to the document requests set forth in **Attachment C**.

You must make this material available to Department of Justice Trial Attorney Jessica M. Bergin and Assistant United States Attorney David Thiess, who have been designated as False Claims Act custodians in this case. Ms. Bergin may be contacted at (202) 305-4207 or Jessica.Bergin@usdoj.gov, and Mr. Thiess may be contacted at (916) 554-2825 or David.Thiess@usdoj.gov, if you have any questions. These documents shall be produced no later than thirty (30) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The production of documentary material in response to this Demand must be made under a sworn certificate in the form printed in this Demand.

**Written Interrogatories:**

In accordance with the definitions and instructions set forth in **Attachment A**, you are required by this Demand to answer the interrogatories set forth in **Attachment D**. The answers to interrogatories shall be submitted no later than twenty (20) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The interrogatories shall be answered separately and fully in writing under oath and also shall be submitted under a sworn certificate in the form printed in this Demand. If you object to any interrogatory, the reasons for the objection shall be stated with specificity.

Issued at Washington, DC, this ___27th___ day of ___September___, 2023.

 

 

_____
Jamie Ann Yavelberg
Director
Commercial Litigation Branch

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for producing the documents requested in Civil Investigative Demand No. 23-1302. I hereby certify that all the materials required by that Civil Investigative Demand which are in the possession, custody or control of the person to whom the Demand is directed have been submitted to a custodian named therein.

If any such material has not been produced because of a lawful objection, the objection to the document request and the reasons for the objection have been stated.

Signature _____

Title      _____

**SWORN TO** before me this _____ day of

_____, 2023

_____
NOTARY PUBLIC

---

[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for answering interrogatory numbers_____in Civil Investigative Demand No. 23-1302. I hereby certify that all the information required by the Civil Investigative Demand and in the possession, custody, control, or knowledge of the person to whom the Civil Investigative Demand is directed has been submitted. To the extent information has not been furnished, the information is identified and the reasons why the information was not furnished are set forth with particularity. Additionally, if any such information has not been produced because of a lawful objection, the objection to the interrogatory and the reasons for the objection have been stated. I certify under penalty of perjury that the foregoing interrogatory responses are true and correct.

Signature_____

Title_____

**SWORN TO** before me this_____day of
_____, 2023

_____
NOTARY PUBLIC

---

[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## VERIFIED RETURN OF SERVICE

I,_____, an employee of the United States working under the direction and supervision of attorney Jessica Bergin in connection with a false claims law investigation, hereby certify that at the time of _____, on the_____day of _____, 2023, I personally served Civil Investigative Demand No. 23-1302 on _____, by delivering an executed copy of such Demand at:

_____

_____

_____

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this _____day of _____, 2023.

Signature_____

Title_____

## ATTACHMENT A TO CIVIL INVESTIGATIVE DEMAND NO. 23-1302

### DEFINITIONS AND INSTRUCTIONS

#### A. DEFINITIONS

1.　　Unless specified otherwise, the terms "You" or "Your" mean Wound Pros Enterprises LLC, and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

2.　　Unless specified otherwise, the term "Wound Pros" means Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, and Wound Pros Management Group, Inc.; and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

3.　　"Communication" is used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and means any transmission or exchange of information orally or in writing, and include, but are not limited to, any emails and text message conversations (including those stored on organization and personal devices).

4.　　"CPT code" means any Current Procedural Terminology code.

5.　　"DME" means any durable medical equipment, including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: A4245-A5120, A6000-A6461, and L4360-L4387.

6.　　"Document" and "documents" are used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations.

7.　　"Employee" shall mean any person including, but not limited to, an employee, volunteer, independent contractor or agent, all past and present directors, officers, agents, representatives, accountants, advisors, and consultants who acted or purported to act on Your or Wound Pros' behalf or who performed any service for You or Wound Pros under Your or Wound Pros' name, whether on a full-time, part-time, piece-work, commission or other basis and whether paid or unpaid.

8.      "Federal healthcare program" means any healthcare program administered or funded wholly or in part by the United States, including, but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA and other VA health care programs and services, the Federal Employee Health Benefits Program, and the Federal Bureau of Prisons Health Services Program.

9.      "HCPCS code" means any Healthcare Common Procedure Coding System code.

10.     "Identify" means to provide the following information in Your response:

    a.      With respect to a natural person:
        (i)     the person's full name;
        (ii)    the name of the person's current or last known employer;
        (iii)   the person's title and position, if known;
        (iv)    the person's current or last known business and home address and telephone number; and
        (v)     if applicable, the person's National Provider Identifier ("NPI");

    b.      With respect to a corporation, partnership, joint venture, or other entity:
        (i)     the name of the entity;
        (ii)    the addresses and telephone numbers of its principal office(s);
        (iii)   the tax identification number; and
        (iv)    if the entity is a medical provider, the entity's NPI, Medicare provider number, and CMS Certification Number ("CCN"), if applicable;

    c.      With respect to documents:
        (i)     the title of the document;
        (ii)    the date of the document;
        (iii)   a description of the type of document;
        (iv)    a summary of the document's contents;
        (v)     the present location of the original and all existing copies of the document;
        (vi)    a list of all intended recipients of the document, including, but not limited to, all addressees, and all persons who were supposed to receive a copy of the document (*i.e.*, through "cc" or "bcc"); and
        (vii)   the identity of the author and a list of all persons who participated in the creation of the document.

11.     "Non-physician practitioner" means any practitioner of healthcare services who is not also a doctor of medicine or a doctor of osteopathic medicine.

12.     "Physician" means any provider of healthcare services who is a doctor of medicine or a doctor of osteopathic medicine

13.     "Provider" means any physician, physician group, hospital, laboratory, skilled nursing facility, home health agency, hospice, board and care facility, physician assistant, nurse,

nurse practitioner, medical assistant, or any other person or entity who provides any healthcare services, including any non-physician practitioner who provides any healthcare services.

14.     "Relating to" and "related to" mean consisting of, concerning, referring to, reflecting, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the matter discussed.

15.     "Skin substitute" means any graft used to assist with wound healing, such as non-autologous human skin (dermal or epidermal, cellular and acellular) grafts, non-human skin substitute grafts, and biological products (placental and amniotic skin substitutes), including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: C5271-C5278 and Q4101-Q4284.

16.     "Text message conversations" refers to any and all electronic communications (other than emails) that can or do contain text, regardless of the format of the communications, the application or platform used to send or receive the communications, and whether the communications are immediately retrievable or retrievable only via a forensic extraction, including, but not limited to, those occurring in or via SMS, MMS, EMS, iMessage, Facebook chat, Facebook messenger, Google Talk (formerly Gchat), Blackberry Messenger (BBM), Skype, GroupMe, AIM, WhatsApp, Slack, Snapchat, Signal, WeChat, or company-deployed electronic health records or communications platforms, as well as, recoverable deleted data, backup files (e.g., iCloud or iPhone backup files), and archive snapshots.

17.     The terms "and" and "or" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

18.     The terms "any" and "all" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

19.     The singular and plural forms of any word shall be construed interchangeably so as to bring within the scope of this Demand any document which might otherwise be construed as outside its scope.

## B. INSTRUCTIONS

1.     *Relevant Time Period:* Unless otherwise stated in any specific request below, each request covers the relevant time period since January 1, 2016.

2.     This Demand is continuing in nature.  If You become aware of or acquire possession, custody, or control of additional documents that are responsive to this Demand, or if You become aware of or acquire additional information that is responsive to these interrogatories, You shall promptly produce such additional documents or supplement Your interrogatory responses.

3.     This Demand applies to all documents and information in Your possession, custody, or control regardless of their location and regardless of whether such documents or

information are held by Your current or former employees, including, but not limited to, in-house IT specialists and technicians, IT specialists and technicians to whom digital services have been out-sourced.

4.      All documents produced pursuant to this Demand are to be organized in such a manner that all documents relating to a particular request are grouped together and identified as being responsive to that request.

5.      If any document which is otherwise responsive to this Demand is not disclosed because of a claim of privilege or other objection, You shall identify such documents on a Privilege Log. The Privilege Log shall be produced in Excel or Word format and include the following information:

　　　　　　(a)  the basis for the assertion of the privilege or objection;

　　　　　　(b)  the type of document (e.g., letter, memorandum, email, etc.)

　　　　　　(c)  the name and title of the author (and if different, the preparer and signatory);

　　　　　　(d)  the name(s) and title(s) of the individual(s) to whom the document was addressed;

　　　　　　(e)  the name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
　　　　　　(f)  the date of the document;

　　　　　　(g)  number of pages;

　　　　　　(h)  a general description of the subject matter; and

　　　　　　(i)  the Request(s) to which the document is responsive.

6.      When a requested document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible. If a privilege is asserted with regard to a part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a document is redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration. Any redaction must be clearly visible on the redacted document.

7.      If any document otherwise responsive to this Demand is not produced because it was lost, destroyed, or discarded:

　　　　　　(a)  identify the document by type, date, and title;

(b) identify the person who last had custody or control over the document;

(c) state the date on which the document was destroyed or was discovered to have been lost;

(d) if the document was destroyed, state why it was destroyed and identify the person(s) who destroyed it;

(e) if the document was lost, describe the circumstances in which its loss was discovered, state the date that it was last seen or otherwise accounted for, and identify the person(s) who discovered its loss and who last saw or otherwise accounted for it;

(f) identify all persons who have knowledge pertaining to the destruction or loss of the document, giving a concise but complete statement of the knowledge You claim each such person has;

(g) identify all persons who have knowledge of the contents of each lost or destroyed document, giving a concise but complete statement of the knowledge You claim each such person has; and

(h) produce all existing indices, lists, or other documents in Your possession, custody, or control that reflect the existence of such lost or destroyed documents, and/or their transfer or destruction.

8.     If no documents exist that are responsive to a specific document request, a written statement to that effect shall be provided at the time of production.

9.     To the extent that documents responsive to this Demand are in the possession, custody, or control of third parties, this Demand requires a statement to that effect at the time of production, specifically providing the name, address, telephone number and principal contact of the third party, and shall further identify those documents in said third party's possession.

10.     Please produce imaged hard copy and electronic documents according to the Specifications for Production of Electronically Stored Information and Digitized Images at **Attachment B**.

11.     For each interrogatory and subpart thereof, You must respond separately and in writing. Your responses must identify all documents that You used, referenced, or relied upon in Your written responses.

12.     If You withhold any information responsive to any interrogatory based on a claim of privilege or other objection: (a) furnish the basis for the assertion of the privilege or objection, (b) identify all individuals who could respond to the interrogatory with regard to the information that is being withheld, and (c) set forth the general subject matter and the specific interrogatory or interrogatories to which each individual could testify.

13.    When providing the name of an individual in response to any interrogatory or individuals identified pursuant to Instruction 12 above, provide the individual's last known address, telephone number, email address, or other contact information, as well as the individual's relationship to You.  If the individual is or was an employee, provide the individual's title and dates of employment.

## ATTACHMENT B TO CIVIL INVESTIGATIVE DEMAND NO. 23-1302

### Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")

#### Collection of Electronically Stored Information (ESI)

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

### 1.    Specification Modifications

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

### 2.    Production Format of ESI and Imaged Hard Copy Documents

Responsive ESI and imaged hard copy shall be produced in the format outlined below.  All ESI, except as outlined below in sections 5 – 21, shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

   a.  **Image File Format:** All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

   b.  When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT Group IV (2D Compression).  When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.
      i.   All TIFF file names shall include the unique Bates number burned into the image.  (See section 22, below, regarding Bates number instructions.)
      ii.  All TIFF image files shall be stored with the ".tif" extension.

   iii. Images without corresponding extracted text shall be OCR'd using standard COTS products.

    1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

   iv. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

   v. No image folder shall contain more than 2,000 images.

 c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

```
REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,
```

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.
- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

 d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat

database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| | |
|---|---|
| *Field Separator* | ¶ *or Code 020* |
| *Text Qualifier* | þ *or Code 254* |
| *Newline* | ® *or Code 174* |
| *Multi-value* | ; *or Code 059* |
| *Nested values* | \ *or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAM Eþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:
    \\*CaseName*\\**LoadFiles**
    \\*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
    \\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
    \\*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)
    \\*CaseName*\\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)

\\*CaseName*\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

**3.    Required Metadata/Database Fields**

A "✓" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | ✓ | ✓ | ✓ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | ✓ | ✓ | ✓ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| AUTHOR | Creator of the document | Text | 500 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | ✓ | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

Case 2:24-mc-00263-DJC-AC    Document 1-3    Filed 06/27/24    Page 90 of 565

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent.  Do not provide 00/00/0000. | Date | MM/DD/ YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |

Page 12 of 30

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

### 4.     Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures

a. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.
   ▪ All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.
b. All files should be globally de-duplicated with the following conditions:

   i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.
   ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.
   iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.
   iv. No customization of hashing may occur without prior express approval by the Government.
   v. De-duplication must be done by document family, not by individual document.
   vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be

expressly stated in the cover letter accompanying the subsequent production(s).

c. The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

### 5.    Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

### 6.    Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

### 7.    Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8.    Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

a. The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.
- If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

9.    **Production of Imaged Hard Copy Records**

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

- a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).
  - The first document in the collection represents the parent document and all other documents will represent the children.
- b.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.
  - All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

10.    **Production of Spreadsheets and Presentation Files**

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

11.    **Production of E-mail Repositories**

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

12.    **Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items**

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies.  These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies.  However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

| Field Name | Field Description | Mobile | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Mobile Cellebrite Categories | | | | |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.     Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.     Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format.  The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.     Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production.  The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#.  The parties shall meet and confer regarding any required audio file redactions.

### 20.     Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.     Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government.  The following are examples:

> a.   AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.
> - GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

b. Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

## 22.    Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|          | *Document #1*           | *Document #2*           |
|----------|-------------------------|-------------------------|
| *Page #1* | PREFIX00000000001       | PREFIX00000000002       |
| *Page #2* | PREFIX00000000001.002   | PREFIX00000000002.002   |
| *Page #3* | PREFIX00000000001.003   | PREFIX00000000002.003   |

## 23.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

a. CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
  ▪ External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
b. Government approved File Transfer Protocol (FTP) technologies.
  ▪ Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
c. Media should be labeled with the case name, production date, Bates range, and producing party.

## 24.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

### 25. Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 26. Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing: total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats. The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 27. Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 28. Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced. Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

**ATTACHMENT C TO CIVIL INVESTIGATIVE DEMAND NO. 23-1302**

**DOCUMENT REQUESTS**

You are required by this Demand to produce any and all of the following documents in Your possession, custody, or control:

1. All documents reflecting any formal or informal contracts and agreements between You or Wound Pros and the persons and entities identified in connection with interrogatory 1, including all documents and communications reflecting any compensation, payment, commissions, bonuses, reimbursement of expenses, risk sharing, or any other remuneration or benefits of any kind.

2. All documents and communications concerning any compensation, commission, bonus, or any other remuneration or benefits of any kind offered and/or paid by or on behalf of You or Wound Pros to any person or entity that provides, supervises, directs, refers, or otherwise causes the provision or billing of the federal healthcare programs for any skin substitute products or services by or on behalf of You or Wound Pros, including, but not limited to, all documents and communications related to any fair market value assessment of that compensation.

3. All personnel evaluations, records, schedules, timesheets, logs, and any other documentation of payments, remuneration, commission, reimbursement of expenses, risk sharing, benefits of any kind, referral, sanction, penalty, disciplinary action, or any other unfavorable action or consequence of any kind relating to the provision of or billing for any skin substitute products or services by or on behalf of You or Wound Pros.

4. All documents and communications relating to supervision or direction by any physician affiliated with Wound Pros, including, but not limited to, Dr. Bill J. Releford, Dr. Christopher Otiko, Dr. Owen Ellington, Dr. Joseph M. Palumbo, Dr. Sherman Washington, and Dr. Allyson Pizzo-Berkey, of the provision of any skin substitute products or services by any non-physician practitioner on behalf of Wound Pros.

5. All projections, analyses, reports, drafts, reviews, or other documentation reflecting any performance metric, including, but not limited to, revenue, profit, and return on investment ("ROI"), relating to the provision of or billing for any skin substitute products or services by any person or entity affiliated with Wound Pros.

6. All documents and communications relating to the ordering by any Wound Pros-affiliated provider of any DME supplies from any Wound Pros-affiliated DME supplier, including the preparation and ordering of pre-made DME kits.

7. All formal and informal policies, practices, procedures, guidelines, standard operating procedures, FAQs, training materials, instructions, advice, evaluations, or other guidance in any form relating to (a) supervision of non-physician practitioners, including remote supervision; (b) billing for products and services provided by non-physician practitioners, including billing for services "incident to" services provided by a physician; (c) billing

for products and services provided to patients in hospice, nursing facilities, skilled nursing facilities, or any other board or care facilities; (d) identifying the point of service and the entity that provided any products or services in any documentation related to billing; (e) ordering DME supplies; (f) providing DME to patients; and (g) compliance with federal healthcare program billing requirements, the False Claims Act, Stark Law, Anti-Kickback Statute, or other state and federal laws and regulatory guidance.

8.  All documents and communications concerning compliance with the requirements of any federal healthcare program, including, but not limited to, all documents exchanged with CMS relating to Your or Wound Pros' ability to participate in the federal healthcare programs, revocation by CMS, and any notifications from CMS regarding any actual, potential, or suspected failure to comply with CMS requirements.

9.  All formal or informal complaints, allegations, objections, inquiries, or concerns of any kind from any source concerning potential fraud, inappropriate billing, noncompliance with federal healthcare program requirements, unsatisfactory or inappropriate products or services, harm to patients, or violations of statutes or regulations by You or Wound Pros.

10. Documents sufficient to show Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.

11. Documents sufficient to show Your organizational chart(s) for the Relevant Time Period.

12. All documents relied on to answer the interrogatories in **Attachment D**.

## ATTACHMENT D TO CIVIL INVESTIGATIVE DEMAND NO. 23-1302

## INTERROGATORIES

1.   Identify in Microsoft Excel format all persons and entities with which You and/or Wound Pros contracted in connection with providing or billing for healthcare products or services, by specifying in separate fields: (a) the name of the person or entity with which You and/or Wound Pros contracted; (b) the contract name(s); (c) the contract date(s); (d) the contract number(s); (e) all parties to the contract(s); (f) the signatories to the contract(s); (g) the person(s) involved in the contracting process(es); (h) all products and services covered by the contract(s), including whether the contract related in any way to skin substitutes; (i) any amendments to the contract(s); (j) the status of any pending contract negotiations; (k) the reason(s) for any amendment, modification, or termination of any contract; (l) the termination date of the contract; and (m) any documentation related to the contract(s).

2.   For each Wound Pros entity and affiliate, identify in Microsoft Excel format all owners, investors, and financial supporters of any kind by (a) full name; (b) current or last known business address, home address, and telephone number; (c) ownership share, if applicable; (d) investments and/or financial support provided, including the itemized amount(s) and date(s); (e) return on investment provided by the Wound Pros entity or affiliate to the owner, investor, or financial supporter, if applicable, including the amount(s) and date(s); (f) description of the nature of the ownership, investment relationship, and/or financial support; and (g) any other metric that You or Wound Pros uses to track or quantify the relationship with the owner, investor, or financial supporter.

3.   For each Wound Pros entity and affiliate, identify in Microsoft Excel format all current and former employees by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) job title; (e) job responsibilities; (f) whether the employee was a direct employee, volunteer, independent contractor, agent, director, officer, representative, account, advisor, or consultant; (g) start date; (h) termination date, if applicable; (i) Wound Pros entity with which the individual interacted; (j) locations where any services were provided by the individual; (k) all compensation and benefits of any kind; (l) supervising responsibilities; (m) direct report(s); (n) supervisor(s); and (o) manager(s).

4.   Identify in Microsoft Excel format all persons and/or entities through whom Wound Pros submits claims for reimbursement to the federal healthcare programs by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) nature of the relationship with Wound Pros; (f) start date of relationship; (g) end date of the relationship; (h) services provided; (i) dates during which the services were provided; (j) locations where the services were provided; (k) Wound Pros entity on behalf of which the person or entity submitted claims; (l) all compensation and benefits of any kind; and (m) whether the compensation was consistent with fair market value, including the basis for that conclusion.

5.      Identify in Microsoft Excel format all systems, programs, platforms, software, algorithms, analytics, or other tools used by Wound Pros, including, but not limited to, Slack, RITA, HL7, Smart Sheet, Black Doctor 24/7, Wound Docs, Office Ally, Kareo, Google Drive, Google Email, Zelis, Paychex, and ADP, by (a) name; (b) function and/or use; (c) dates of use; (d) the Wound Pros entities and/or individuals involved or impacted; and (e) the name(s) and title(s) of the employees or other third parties most knowledgeable about its function and/or use.

6.      For each system, program, platform, software, algorithm, analytic, or other tool identified in response to interrogatory 5, describe (a) all fields that are auto-populated by the system; (b) all fields that are added or revised by anyone other than the provider who directly treated the patient; and (c) the circumstances under which those fields are auto-populated, added, or revised.  If this process changed during the Relevant Time Period, describe all changes during this time period.

7.      Identify in Microsoft Excel format all DME suppliers used by any person or entity affiliated with Wound Pros by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) DME supplies ordered from that supplier; and (f) dates during which DME supplies were ordered from that supplier.

8.      Identify in Microsoft Excel format all DME orders filled by Wound Pros for DME, including (a) the item or service furnished; (b) the patient (i) full name, (ii) date of birth, (iii) social security number, and (iv) Medicare Beneficiary Number or other federal health care program identifier; (c) the referring physician; and (d) the amount reimbursed.

9.      Identify in Microsoft Excel format all Wound Pros facilities and medical offices where services were provided by any Wound Pros provider by (a) full name; (b) address; (c) the date range(s) during which services were provided at that facility or medical office; (d) all persons and entities that billed the federal healthcare programs for services performed at that facility or medical office, including the person's or entity's NPI and EIN; and (e) the services provided at that facility.

10.     Identify in Microsoft Excel format all patients treated by a Wound Pros non-physician practitioner, including identifying the patient by (a) full name; (b) date of birth; (c) social security number; (d) date of first encounter with Wound Pros; (e) date of the most recent encounter with Wound Pros; (f) date on which the service was provided; (g) whether the patient was treated with a skin substitute; (h) date of the skin substitute service, if any; (i) address where the service was performed; (j) whether the patient was located at a facility of any kind when the patient received the service, and if so, the type of facility, name of the facility, and address of the facility; (k) name of the person who performed the service; (l) name of the supervising physician, if any; (m) health insurance plan; (n) whether the patient was diagnosed with any condition related to the services provided, and if so, any associated diagnosis, HCPCS, and CPT codes; (o) all follow-up treatments

associated with the services provided; and (p) all documentation or other information considered in connection with the services provided.

11.    Describe Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.  If the structure has changed during the Relevant Time Period, describe all changes to the structure during this time period.

12.    Describe Your relationship with each of the following entities, including any ownership interest, financial relationship, and overlap in providers, services, or patients:  (a) Wound Pros Washington; (b) Wound Pros Utah; (c) Wound Pros Louisiana; (d) Wound Pros Illinois; (e) Texas Wound Care Management; (f) PLS Podiatry Group; (g) Ohio Wound Care Specialists; (h) Ohio Wound Care Network; (i) DPMOTIKONRCA LLC; (j) Coast to Coast Podiatry; (l) Coast to Coast Foot Doctors, a Podiatry Corporation; (m) Coast to Coast DME; (n) Christopher A Otiko DPM; (o) Global Wound Care Medical Group; (p) American Wound Care Partners; (q) National Wound Care Associates; (r) Horizon Wound Care LLC; and (s) PLS Foot Doctors.  If the relationship has changed during the Relevant Time Period, describe all changes during this time period.

# Exhibit 4

# CIVIL INVESTIGATIVE DEMAND

# United States Department of Justice
**Washington, D.C. 20530**

TO:    Wound Pros Technology Inc.                                    Civil Investigative
       5901 W Century Blvd, Ste. 750                                 Demand No. 23-1303
       Los Angeles, California 90045
       c/o LegalCorp Solutions, Inc. (Registered Agent)
       8939 S Sepulveda Blvd, Ste. 102
       Los Angeles, California 90045

This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729. The False Claims Act investigation concerns allegations that Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, Wound Pros Management Group, Inc., and certain related entities and individuals (collectively, "Wound Pros") made false statements in claims submitted to the federal healthcare programs in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral ("Stark") Law, 42 U.S.C. § 1395nn, and common law. Specifically, we are investigating whether Wound Pros submitted or caused the submission of (1) claims for reimbursement falsely stating that services provided by non-physician personnel were "incident to" a physician's services; (2) claims for medically unnecessary skin substitutes and associated services; (3) point of service information falsely indicating that services were provided in an office setting; (4) claims for reimbursement through entities other than the one that performed the services; and (5) claims for durable medical equipment based on self-referrals in violation of the Stark Law. We further are investigating whether Wound Pros paid or caused the payment of unlawful kickbacks to personnel in exchange for the personnel ordering products and services reimbursable by the federal healthcare programs.

This Demand requires you to provide documents and answers to the attached written interrogatories to the Federal Government. This is the original of the Demand; no copies have been served on other parties. The information and documents provided in response to this Demand may be shared, used, and disclosed as provided by 31 U.S.C. § 3733.

-2-

**Document Request**:

In accordance with the definitions and instructions set forth in **Attachment A** and the production specifications in **Attachment B**, you are required by this Demand to produce any and all documents in your possession, custody or control responsive to the document requests set forth in **Attachment C**.

You must make this material available to Department of Justice Trial Attorney Jessica M. Bergin and Assistant United States Attorney David Thiess, who have been designated as False Claims Act custodians in this case. Ms. Bergin may be contacted at (202) 305-4207 or Jessica.Bergin@usdoj.gov, and Mr. Thiess may be contacted at (916) 554-2825 or David.Thiess@usdoj.gov, if you have any questions. These documents shall be produced no later than thirty (30) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The production of documentary material in response to this Demand must be made under a sworn certificate in the form printed in this Demand.

**Written Interrogatories**:

In accordance with the definitions and instructions set forth in **Attachment A**, you are required by this Demand to answer the interrogatories set forth in **Attachment D**. The answers to interrogatories shall be submitted no later than twenty (20) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The interrogatories shall be answered separately and fully in writing under oath and also shall be submitted under a sworn certificate in the form printed in this Demand. If you object to any interrogatory, the reasons for the objection shall be stated with specificity.

Issued at Washington, DC, this _27th_ day of ___September___, 2023.

_____
Jamie Ann Yavelberg
Director
Commercial Litigation Branch

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for producing the documents requested in Civil Investigative Demand No. 23-1303. I hereby certify that all the materials required by that Civil Investigative Demand which are in the possession, custody or control of the person to whom the Demand is directed have been submitted to a custodian named therein.

If any such material has not been produced because of a lawful objection, the objection to the document request and the reasons for the objection have been stated.

Signature ————————————————

Title ————————————————

**SWORN TO** before me this _____ day of

_____, 2023

_____

NOTARY PUBLIC

_____

[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## FORM OF CERTIFICATE OF COMPLIANCE[1]

      I have responsibility for answering interrogatory numbers_____in Civil Investigative Demand No. 23-1303.  I hereby certify that all the information required by the Civil Investigative Demand and in the possession, custody, control, or knowledge of the person to whom the Civil Investigative Demand is directed has been submitted.  To the extent information has not been furnished, the information is identified and the reasons why the information was not furnished are set forth with particularity.  Additionally, if any such information has not been produced because of a lawful objection, the objection to the interrogatory and the reasons for the objection have been stated. I certify under penalty of perjury that the foregoing interrogatory responses are true and correct.


                                  Signature_____

                                  Title_____


**SWORN TO** before me this_____day of _____, 2023

_____
                    NOTARY PUBLIC

---

[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## <u>VERIFIED RETURN OF SERVICE</u>

I,_____, an employee of the United States working under the direction and supervision of attorney Jessica Bergin in connection with a false claims law investigation, hereby certify that at the time of _____, on the_____day of _____, 2023, I personally served Civil Investigative Demand No. 23-1303 on _____, by delivering an executed copy of such Demand at:

_____

_____

_____

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this _____day of _____, 2023.

Signature_____

Title_____

ATTACHMENT A TO CIVIL INVESTIGATIVE DEMAND NO. 23-1303

<u>DEFINITIONS AND INSTRUCTIONS</u>

A. **DEFINITIONS**

1.　　Unless specified otherwise, the terms "You" or "Your" mean Wound Pros Technology Inc., and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

2.　　Unless specified otherwise, the term "Wound Pros" means Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, and Wound Pros Management Group, Inc.; and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

3.　　"Communication" is used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and means any transmission or exchange of information orally or in writing, and include, but are not limited to, any emails and text message conversations (including those stored on organization and personal devices).

4.　　"CPT code" means any Current Procedural Terminology code.

5.　　"DME" means any durable medical equipment, including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes:  A4245-A5120, A6000-A6461, and L4360-L4387.

6.　　"Document" and "documents" are used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations.

7.　　"Employee" shall mean any person including, but not limited to, an employee, volunteer, independent contractor or agent, all past and present directors, officers, agents, representatives, accountants, advisors, and consultants who acted or purported to act on Your or Wound Pros' behalf or who performed any service for You or Wound Pros under Your or Wound Pros' name, whether on a full-time, part-time, piece-work, commission or other basis and whether paid or unpaid.

8.    "Federal healthcare program" means any healthcare program administered or funded wholly or in part by the United States, including, but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA and other VA health care programs and services, the Federal Employee Health Benefits Program, and the Federal Bureau of Prisons Health Services Program.

9.    "HCPCS code" means any Healthcare Common Procedure Coding System code.

10.    "Identify" means to provide the following information in Your response:

a.    With respect to a natural person:
   (i)    the person's full name;
   (ii)    the name of the person's current or last known employer;
   (iii)    the person's title and position, if known;
   (iv)    the person's current or last known business and home address and telephone number; and
   (v)    if applicable, the person's National Provider Identifier ("NPI");

b.    With respect to a corporation, partnership, joint venture, or other entity:
   (i)    the name of the entity;
   (ii)    the addresses and telephone numbers of its principal office(s);
   (iii)    the tax identification number; and
   (iv)    if the entity is a medical provider, the entity's NPI, Medicare provider number, and CMS Certification Number ("CCN"), if applicable;

c.    With respect to documents:
   (i)    the title of the document;
   (ii)    the date of the document;
   (iii)    a description of the type of document;
   (iv)    a summary of the document's contents;
   (v)    the present location of the original and all existing copies of the document;
   (vi)    a list of all intended recipients of the document, including, but not limited to, all addressees, and all persons who were supposed to receive a copy of the document (*i.e.*, through "cc" or "bcc"); and
   (vii)    the identity of the author and a list of all persons who participated in the creation of the document.

11.    "Non-physician practitioner" means any practitioner of healthcare services who is not also a doctor of medicine or a doctor of osteopathic medicine.

12.    "Physician" means any provider of healthcare services who is a doctor of medicine or a doctor of osteopathic medicine

13.    "Provider" means any physician, physician group, hospital, laboratory, skilled nursing facility, home health agency, hospice, board and care facility, physician assistant, nurse,

nurse practitioner, medical assistant, or any other person or entity who provides any healthcare services, including any non-physician practitioner who provides any healthcare services.

14. "Relating to" and "related to" mean consisting of, concerning, referring to, reflecting, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the matter discussed.

15. "Skin substitute" means any graft used to assist with wound healing, such as non-autologous human skin (dermal or epidermal, cellular and acellular) grafts, non-human skin substitute grafts, and biological products (placental and amniotic skin substitutes), including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: C5271-C5278 and Q4101-Q4284.

16. "Text message conversations" refers to any and all electronic communications (other than emails) that can or do contain text, regardless of the format of the communications, the application or platform used to send or receive the communications, and whether the communications are immediately retrievable or retrievable only via a forensic extraction, including, but not limited to, those occurring in or via SMS, MMS, EMS, iMessage, Facebook chat, Facebook messenger, Google Talk (formerly Gchat), Blackberry Messenger (BBM), Skype, GroupMe, AIM, WhatsApp, Slack, Snapchat, Signal, WeChat, or company-deployed electronic health records or communications platforms, as well as, recoverable deleted data, backup files (e.g., iCloud or iPhone backup files), and archive snapshots.

17. The terms "and" and "or" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

18. The terms "any" and "all" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

19. The singular and plural forms of any word shall be construed interchangeably so as to bring within the scope of this Demand any document which might otherwise be construed as outside its scope.

## B. INSTRUCTIONS

1. *Relevant Time Period:* Unless otherwise stated in any specific request below, each request covers the relevant time period since January 1, 2016.

2. This Demand is continuing in nature. If You become aware of or acquire possession, custody, or control of additional documents that are responsive to this Demand, or if You become aware of or acquire additional information that is responsive to these interrogatories, You shall promptly produce such additional documents or supplement Your interrogatory responses.

3. This Demand applies to all documents and information in Your possession, custody, or control regardless of their location and regardless of whether such documents or

information are held by Your current or former employees, including, but not limited to, in-house IT specialists and technicians, IT specialists and technicians to whom digital services have been out-sourced.

4.    All documents produced pursuant to this Demand are to be organized in such a manner that all documents relating to a particular request are grouped together and identified as being responsive to that request.

5.    If any document which is otherwise responsive to this Demand is not disclosed because of a claim of privilege or other objection, You shall identify such documents on a Privilege Log. The Privilege Log shall be produced in Excel or Word format and include the following information:

> (a) the basis for the assertion of the privilege or objection;
>
> (b) the type of document (e.g., letter, memorandum, email, etc.)
>
> (c) the name and title of the author (and if different, the preparer and signatory);
>
> (d) the name(s) and title(s) of the individual(s) to whom the document was addressed;
>
> (e) the name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
> (f) the date of the document;
>
> (g) number of pages;
>
> (h) a general description of the subject matter; and
>
> (i) the Request(s) to which the document is responsive.

6.    When a requested document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible. If a privilege is asserted with regard to a part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a document is redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration. Any redaction must be clearly visible on the redacted document.

7.    If any document otherwise responsive to this Demand is not produced because it was lost, destroyed, or discarded:

> (a) identify the document by type, date, and title;

(b) identify the person who last had custody or control over the document;

(c) state the date on which the document was destroyed or was discovered to have been lost;

(d) if the document was destroyed, state why it was destroyed and identify the person(s) who destroyed it;

(e) if the document was lost, describe the circumstances in which its loss was discovered, state the date that it was last seen or otherwise accounted for, and identify the person(s) who discovered its loss and who last saw or otherwise accounted for it;

(f) identify all persons who have knowledge pertaining to the destruction or loss of the document, giving a concise but complete statement of the knowledge You claim each such person has;

(g) identify all persons who have knowledge of the contents of each lost or destroyed document, giving a concise but complete statement of the knowledge You claim each such person has; and

(h) produce all existing indices, lists, or other documents in Your possession, custody, or control that reflect the existence of such lost or destroyed documents, and/or their transfer or destruction.

8.    If no documents exist that are responsive to a specific document request, a written statement to that effect shall be provided at the time of production.

9.    To the extent that documents responsive to this Demand are in the possession, custody, or control of third parties, this Demand requires a statement to that effect at the time of production, specifically providing the name, address, telephone number and principal contact of the third party, and shall further identify those documents in said third party's possession.

10.    Please produce imaged hard copy and electronic documents according to the Specifications for Production of Electronically Stored Information and Digitized Images at **Attachment B**.

11.    For each interrogatory and subpart thereof, You must respond separately and in writing. Your responses must identify all documents that You used, referenced, or relied upon in Your written responses.

12.    If You withhold any information responsive to any interrogatory based on a claim of privilege or other objection: (a) furnish the basis for the assertion of the privilege or objection, (b) identify all individuals who could respond to the interrogatory with regard to the information that is being withheld, and (c) set forth the general subject matter and the specific interrogatory or interrogatories to which each individual could testify.

13.    When providing the name of an individual in response to any interrogatory or individuals identified pursuant to Instruction 12 above, provide the individual's last known address, telephone number, email address, or other contact information, as well as the individual's relationship to You.  If the individual is or was an employee, provide the individual's title and dates of employment.

### ATTACHMENT B TO CIVIL INVESTIGATIVE DEMAND NO. 23-1303

**Specifications for Production of ESI and Digitized ("Scanned") Images
("Production Specifications")**

#### Collection of Electronically Stored Information (ESI)

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

#### 1.    Specification Modifications

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

#### 2.    Production Format of ESI and Imaged Hard Copy Documents

Responsive ESI and imaged hard copy shall be produced in the format outlined below.  All ESI, except as outlined below in sections 5 – 21, shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

     a.  **Image File Format:** All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

     b.  When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT Group IV (2D Compression).  When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

        i.  All TIFF file names shall include the unique Bates number burned into the image.  (See section 22, below, regarding Bates number instructions.)

        ii.  All TIFF image files shall be stored with the ".tif" extension.

          iii.  Images without corresponding extracted text shall be OCR'd using standard COTS products.

              1.  An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

          iv.  All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

          v.  No image folder shall contain more than 2,000 images.

    c.  **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

        REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
        REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,,
        REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,,
        REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
        REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,,

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.
- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

    d.  **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat

database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| | |
|---|---|
| *Field Separator* | ¶ *or Code 020* |
| *Text Qualifier* | þ *or Code 254* |
| *Newline* | ® *or Code 174* |
| *Multi-value* | ; *or Code 059* |
| *Nested values* | \ *or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:
   \\*CaseName*\\**LoadFiles**
   \\*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)

\\*CaseName*\\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

**3.    Required Metadata/Database Fields**

A "√" denotes that the indicated field should be present in the load file produced.  "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below.  Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | √ | √ | √ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | √ | √ | √ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | √ | √ | √ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | √ | √ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | √ | √ |
| AUTHOR | Creator of the document | Text | 500 | | | √ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | √ | √ | √ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent.  Do not provide 00/00/0000. | Date | MM/DD/ YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

**4.      Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

    a.  De-duplication of exact hash copies shall be performed globally – across all custodians.  The custodian of each record shall be populated in the DupeCustodian field.

    ▪ All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

    b.  All files should be globally de-duplicated with the following conditions:

      i.  The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

      ii.  The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

      iii.  All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

      iv.  No customization of hashing may occur without prior express approval by the Government.

      v.  De-duplication must be done by document family, not by individual document.

      vi.  A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government.  For every production after the first, a separate Unified Custodian overlay shall be provided.  If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be

expressly stated in the cover letter accompanying the subsequent production(s).

    c.   The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

### 5.    Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

### 6.    Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

### 7.    Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8.    Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

    a.   The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.

          ▪  If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

9.    **Production of Imaged Hard Copy Records**

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

   a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).
   - The first document in the collection represents the parent document and all other documents will represent the children.
   b.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.
   - All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

10.    **Production of Spreadsheets and Presentation Files**

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

11.    **Production of E-mail Repositories**

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

12.    **Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items**

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.   Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies.  These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies.  However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

| Field Name | Field Description | Mobile | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

**14.    Production of Social Media**

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements:  (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

**15.    Production of Structured Data**

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

**16.    Production of Photographs with Native File or Digitized ESI**

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format.  The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production.  The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#.  The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government.  The following are examples:

  a.   AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.

  ▪  GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

b.  Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

## 22.    Bates Number Convention

All images should be assigned Bates numbers before production to the government.  Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page.  The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document.  Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field).  The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion.  The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file).  If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production.  There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation."  Below is a sample of dot notation:

|          | *Document #1*          | *Document #2*          |
|----------|------------------------|------------------------|
| *Page #1* | PREFIX00000000001      | PREFIX00000000002      |
| *Page #2* | PREFIX00000000001.002  | PREFIX00000000002.002  |
| *Page #3* | PREFIX00000000001.003  | PREFIX00000000002.003  |

## 23.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

a.  CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
- External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
b.  Government approved File Transfer Protocol (FTP) technologies.
- Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
c.  Media should be labeled with the case name, production date, Bates range, and producing party.

## 24.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses.  Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions.  All encryption software shall be used with approval by and with the written consent of the government.

**25.     Compliance and Adherence to Generally Accepted Technical Standards**

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

**26.     Read Me Text File**

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

**27.     Exception Report**

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

**28.     Transmittal Letter to Accompany Deliverables**

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

## ATTACHMENT C TO CIVIL INVESTIGATIVE DEMAND NO. 23-1303

### <u>DOCUMENT REQUESTS</u>

You are required by this Demand to produce any and all of the following documents in Your possession, custody, or control:

1.   All documents reflecting any formal or informal contracts and agreements between You or Wound Pros and the persons and entities identified in connection with interrogatory 1, including all documents and communications reflecting any compensation, payment, commissions, bonuses, reimbursement of expenses, risk sharing, or any other remuneration or benefits of any kind.

2.   All documents and communications concerning any compensation, commission, bonus, or any other remuneration or benefits of any kind offered and/or paid by or on behalf of You or Wound Pros to any person or entity that provides, supervises, directs, refers, or otherwise causes the provision or billing of the federal healthcare programs for any skin substitute products or services by or on behalf of You or Wound Pros, including, but not limited to, all documents and communications related to any fair market value assessment of that compensation.

3.   All personnel evaluations, records, schedules, timesheets, logs, and any other documentation of payments, remuneration, commission, reimbursement of expenses, risk sharing, benefits of any kind, referral, sanction, penalty, disciplinary action, or any other unfavorable action or consequence of any kind relating to the provision of or billing for any skin substitute products or services by or on behalf of You or Wound Pros.

4.   All documents and communications relating to supervision or direction by any physician affiliated with Wound Pros, including, but not limited to, Dr. Bill J. Releford, Dr. Christopher Otiko, Dr. Owen Ellington, Dr. Joseph M. Palumbo, Dr. Sherman Washington, and Dr. Allyson Pizzo-Berkey, of the provision of any skin substitute products or services by any non-physician practitioner on behalf of Wound Pros.

5.   All projections, analyses, reports, drafts, reviews, or other documentation reflecting any performance metric, including, but not limited to, revenue, profit, and return on investment ("ROI"), relating to the provision of or billing for any skin substitute products or services by any person or entity affiliated with Wound Pros.

6.   All documents and communications relating to the ordering by any Wound Pros-affiliated provider of any DME supplies from any Wound Pros-affiliated DME supplier, including the preparation and ordering of pre-made DME kits.

7.   All formal and informal policies, practices, procedures, guidelines, standard operating procedures, FAQs, training materials, instructions, advice, evaluations, or other guidance in any form relating to (a) supervision of non-physician practitioners, including remote supervision; (b) billing for products and services provided by non-physician practitioners, including billing for services "incident to" services provided by a physician; (c) billing

for products and services provided to patients in hospice, nursing facilities, skilled nursing facilities, or any other board or care facilities; (d) identifying the point of service and the entity that provided any products or services in any documentation related to billing; (e) ordering DME supplies; (f) providing DME to patients; and (g) compliance with federal healthcare program billing requirements, the False Claims Act, Stark Law, Anti-Kickback Statute, or other state and federal laws and regulatory guidance.

8.    All documents and communications concerning compliance with the requirements of any federal healthcare program, including, but not limited to, all documents exchanged with CMS relating to Your or Wound Pros' ability to participate in the federal healthcare programs, revocation by CMS, and any notifications from CMS regarding any actual, potential, or suspected failure to comply with CMS requirements.

9.    All formal or informal complaints, allegations, objections, inquiries, or concerns of any kind from any source concerning potential fraud, inappropriate billing, noncompliance with federal healthcare program requirements, unsatisfactory or inappropriate products or services, harm to patients, or violations of statutes or regulations by You or Wound Pros.

10.   Documents sufficient to show Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.

11.   Documents sufficient to show Your organizational chart(s) for the Relevant Time Period.

12.   All documents relied on to answer the interrogatories in **Attachment D**.

## ATTACHMENT D TO CIVIL INVESTIGATIVE DEMAND NO. 23-1303

## INTERROGATORIES

1.  Identify in Microsoft Excel format all persons and entities with which You and/or Wound Pros contracted in connection with providing or billing for healthcare products or services, by specifying in separate fields: (a) the name of the person or entity with which You and/or Wound Pros contracted; (b) the contract name(s); (c) the contract date(s); (d) the contract number(s); (e) all parties to the contract(s); (f) the signatories to the contract(s); (g) the person(s) involved in the contracting process(es); (h) all products and services covered by the contract(s), including whether the contract related in any way to skin substitutes; (i) any amendments to the contract(s); (j) the status of any pending contract negotiations; (k) the reason(s) for any amendment, modification, or termination of any contract; (l) the termination date of the contract; and (m) any documentation related to the contract(s).

2.  For each Wound Pros entity and affiliate, identify in Microsoft Excel format all owners, investors, and financial supporters of any kind by (a) full name; (b) current or last known business address, home address, and telephone number; (c) ownership share, if applicable; (d) investments and/or financial support provided, including the itemized amount(s) and date(s); (e) return on investment provided by the Wound Pros entity or affiliate to the owner, investor, or financial supporter, if applicable, including the amount(s) and date(s); (f) description of the nature of the ownership, investment relationship, and/or financial support; and (g) any other metric that You or Wound Pros uses to track or quantify the relationship with the owner, investor, or financial supporter.

3.  For each Wound Pros entity and affiliate, identify in Microsoft Excel format all current and former employees by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) job title; (e) job responsibilities; (f) whether the employee was a direct employee, volunteer, independent contractor, agent, director, officer, representative, account, advisor, or consultant; (g) start date; (h) termination date, if applicable; (i) Wound Pros entity with which the individual interacted; (j) locations where any services were provided by the individual; (k) all compensation and benefits of any kind; (l) supervising responsibilities; (m) direct report(s); (n) supervisor(s); and (o) manager(s).

4.  Identify in Microsoft Excel format all persons and/or entities through whom Wound Pros submits claims for reimbursement to the federal healthcare programs by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) nature of the relationship with Wound Pros; (f) start date of relationship; (g) end date of the relationship; (h) services provided; (i) dates during which the services were provided; (j) locations where the services were provided; (k) Wound Pros entity on behalf of which the person or entity submitted claims; (l) all compensation and benefits of any kind; and (m) whether the compensation was consistent with fair market value, including the basis for that conclusion.

5.    Identify in Microsoft Excel format all systems, programs, platforms, software, algorithms, analytics, or other tools used by Wound Pros, including, but not limited to, Slack, RITA, HL7, Smart Sheet, Black Doctor 24/7, Wound Docs, Office Ally, Kareo, Google Drive, Google Email, Zelis, Paychex, and ADP, by (a) name; (b) function and/or use; (c) dates of use; (d) the Wound Pros entities and/or individuals involved or impacted; and (e) the name(s) and title(s) of the employees or other third parties most knowledgeable about its function and/or use.

6.    For each system, program, platform, software, algorithm, analytic, or other tool identified in response to interrogatory 5, describe (a) all fields that are auto-populated by the system; (b) all fields that are added or revised by anyone other than the provider who directly treated the patient; and (c) the circumstances under which those fields are auto-populated, added, or revised.  If this process changed during the Relevant Time Period, describe all changes during this time period.

7.    Identify in Microsoft Excel format all DME suppliers used by any person or entity affiliated with Wound Pros by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) DME supplies ordered from that supplier; and (f) dates during which DME supplies were ordered from that supplier.

8.    Identify in Microsoft Excel format all DME orders filled by Wound Pros for DME, including (a) the item or service furnished; (b) the patient (i) full name, (ii) date of birth, (iii) social security number, and (iv) Medicare Beneficiary Number or other federal health care program identifier; (c) the referring physician; and (d) the amount reimbursed.

9.    Identify in Microsoft Excel format all Wound Pros facilities and medical offices where services were provided by any Wound Pros provider by (a) full name; (b) address; (c) the date range(s) during which services were provided at that facility or medical office; (d) all persons and entities that billed the federal healthcare programs for services performed at that facility or medical office, including the person's or entity's NPI and EIN; and (e) the services provided at that facility.

10.    Identify in Microsoft Excel format all patients treated by a Wound Pros non-physician practitioner, including identifying the patient by (a) full name; (b) date of birth; (c) social security number; (d) date of first encounter with Wound Pros; (e) date of the most recent encounter with Wound Pros; (f) date on which the service was provided; (g) whether the patient was treated with a skin substitute; (h) date of the skin substitute service, if any; (i) address where the service was performed; (j) whether the patient was located at a facility of any kind when the patient received the service, and if so, the type of facility, name of the facility, and address of the facility; (k) name of the person who performed the service; (l) name of the supervising physician, if any; (m) health insurance plan; (n) whether the patient was diagnosed with any condition related to the services provided, and if so, any associated diagnosis, HCPCS, and CPT codes; (o) all follow-up treatments

associated with the services provided; and (p) all documentation or other information considered in connection with the services provided.

11.   Describe Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.  If the structure has changed during the Relevant Time Period, describe all changes to the structure during this time period.

12.   Describe Your relationship with each of the following entities, including any ownership interest, financial relationship, and overlap in providers, services, or patients:  (a) Wound Pros Washington; (b) Wound Pros Utah; (c) Wound Pros Louisiana; (d) Wound Pros Illinois; (e) Texas Wound Care Management; (f) PLS Podiatry Group; (g) Ohio Wound Care Specialists; (h) Ohio Wound Care Network; (i) DPMOTIKONRCA LLC; (j) Coast to Coast Podiatry; (l) Coast to Coast Foot Doctors, a Podiatry Corporation; (m) Coast to Coast DME; (n) Christopher A Otiko DPM; (o) Global Wound Care Medical Group; (p) American Wound Care Partners; (q) National Wound Care Associates; (r) Horizon Wound Care LLC; and (s) PLS Foot Doctors.  If the relationship has changed during the Relevant Time Period, describe all changes during this time period.

# Exhibit 5

## CIVIL INVESTIGATIVE DEMAND

# United States Department of Justice
### Washington, D.C. 20530

TO:  Wound Pros Ventures, LP                           Civil Investigative
     c/o Christopher Otiko (Registered Agent)          Demand No. 23-1304
     4640 Admiralty Way, Ste. 500
     Marina Del Ray, California 90292

This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729.  The False Claims Act investigation concerns allegations that Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, Wound Pros Management Group, Inc., and certain related entities and individuals (collectively, "Wound Pros") made false statements in claims submitted to the federal healthcare programs in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral ("Stark") Law, 42 U.S.C. § 1395nn, and common law. Specifically, we are investigating whether Wound Pros submitted or caused the submission of (1) claims for reimbursement falsely stating that services provided by non-physician personnel were "incident to" a physician's services; (2) claims for medically unnecessary skin substitutes and associated services; (3) point of service information falsely indicating that services were provided in an office setting; (4) claims for reimbursement through entities other than the one that performed the services; and (5) claims for durable medical equipment based on self-referrals in violation of the Stark Law.  We further are investigating whether Wound Pros paid or caused the payment of unlawful kickbacks to personnel in exchange for the personnel ordering products and services reimbursable by the federal healthcare programs.

This Demand requires you to provide documents and answers to the attached written interrogatories to the Federal Government.  This is the original of the Demand; no copies have been served on other parties.  The information and documents provided in response to this Demand may be shared, used, and disclosed as provided by 31 U.S.C. § 3733.

-2-

**Document Request**:

In accordance with the definitions and instructions set forth in **Attachment A** and the production specifications in **Attachment B**, you are required by this Demand to produce any and all documents in your possession, custody or control responsive to the document requests set forth in **Attachment C**.

You must make this material available to Department of Justice Trial Attorney Jessica M. Bergin and Assistant United States Attorney David Thiess, who have been designated as False Claims Act custodians in this case.  Ms. Bergin may be contacted at (202) 305-4207 or Jessica.Bergin@usdoj.gov, and Mr. Thiess may be contacted at (916) 554-2825 or David.Thiess@usdoj.gov, if you have any questions.  These documents shall be produced no later than thirty (30) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian.  The production of documentary material in response to this Demand must be made under a sworn certificate in the form printed in this Demand.

**Written Interrogatories**:

In accordance with the definitions and instructions set forth in **Attachment A**, you are required by this Demand to answer the interrogatories set forth in **Attachment D**.  The answers to interrogatories shall be submitted no later than twenty (20) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian.  The interrogatories shall be answered separately and fully in writing under oath and also shall be submitted under a sworn certificate in the form printed in this Demand.  If you object to any interrogatory, the reasons for the objection shall be stated with specificity.

Issued at Washington, DC, this __27th__ day of __September__, 2023.


_____
Jamie Ann Yavelberg
Director
Commercial Litigation Branch

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for producing the documents requested in Civil Investigative Demand No. 23-1304. I hereby certify that all the materials required by that Civil Investigative Demand which are in the possession, custody or control of the person to whom the Demand is directed have been submitted to a custodian named therein.

If any such material has not been produced because of a lawful objection, the objection to the document request and the reasons for the objection have been stated.

Signature ———————————————

Title      ———————————————

**SWORN TO** before me this _____ day of
_____, 2023


————————————————————————
          NOTARY PUBLIC

---

[1]    In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for answering interrogatory numbers_____in Civil Investigative Demand No. 23-1304. I hereby certify that all the information required by the Civil Investigative Demand and in the possession, custody, control, or knowledge of the person to whom the Civil Investigative Demand is directed has been submitted. To the extent information has not been furnished, the information is identified and the reasons why the information was not furnished are set forth with particularity. Additionally, if any such information has not been produced because of a lawful objection, the objection to the interrogatory and the reasons for the objection have been stated. I certify under penalty of perjury that the foregoing interrogatory responses are true and correct.



Signature_____

Title_____


**SWORN TO** before me this_____day of
_____, 2023


_____
        NOTARY PUBLIC



_____
[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## **VERIFIED RETURN OF SERVICE**

I,_____, an employee of the United States working under the direction and supervision of attorney Jessica Bergin in connection with a false claims law investigation, hereby certify that at the time of _____, on the_____day of _____, 2023, I personally served Civil Investigative Demand No. 23-1304 on _____, by delivering an executed copy of such Demand at:

_____

_____

_____

I declare under penalty of perjury that the foregoing is true and correct. Executed on this _____day of _____, 2023.

Signature_____

Title_____

ATTACHMENT A TO CIVIL INVESTIGATIVE DEMAND NO. 23-1304

DEFINITIONS AND INSTRUCTIONS

A. DEFINITIONS

1.    Unless specified otherwise, the terms "You" or "Your" mean Wound Pros Ventures, LP, and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

2.    Unless specified otherwise, the term "Wound Pros" means Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, and Wound Pros Management Group, Inc.; and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

3.    "Communication" is used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and means any transmission or exchange of information orally or in writing, and include, but are not limited to, any emails and text message conversations (including those stored on organization and personal devices).

4.    "CPT code" means any Current Procedural Terminology code.

5.    "DME" means any durable medical equipment, including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes:  A4245-A5120, A6000-A6461, and L4360-L4387.

6.    "Document" and "documents" are used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations.

7.    "Employee" shall mean any person including, but not limited to, an employee, volunteer, independent contractor or agent, all past and present directors, officers, agents, representatives, accountants, advisors, and consultants who acted or purported to act on Your or Wound Pros' behalf or who performed any service for You or Wound Pros under Your or Wound Pros' name, whether on a full-time, part-time, piece-work, commission or other basis and whether paid or unpaid.

8.    "Federal healthcare program" means any healthcare program administered or funded wholly or in part by the United States, including, but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA and other VA health care programs and services, the Federal Employee Health Benefits Program, and the Federal Bureau of Prisons Health Services Program.

9.    "HCPCS code" means any Healthcare Common Procedure Coding System code.

10.    "Identify" means to provide the following information in Your response:

    a.    With respect to a natural person:
       (i)    the person's full name;
       (ii)    the name of the person's current or last known employer;
       (iii)    the person's title and position, if known;
       (iv)    the person's current or last known business and home address and telephone number; and
       (v)    if applicable, the person's National Provider Identifier ("NPI");

    b.    With respect to a corporation, partnership, joint venture, or other entity:
       (i)    the name of the entity;
       (ii)    the addresses and telephone numbers of its principal office(s);
       (iii)    the tax identification number; and
       (iv)    if the entity is a medical provider, the entity's NPI, Medicare provider number, and CMS Certification Number ("CCN"), if applicable;

    c.    With respect to documents:
       (i)    the title of the document;
       (ii)    the date of the document;
       (iii)    a description of the type of document;
       (iv)    a summary of the document's contents;
       (v)    the present location of the original and all existing copies of the document;
       (vi)    a list of all intended recipients of the document, including, but not limited to, all addressees, and all persons who were supposed to receive a copy of the document (*i.e.*, through "cc" or "bcc"); and
       (vii)    the identity of the author and a list of all persons who participated in the creation of the document.

11.    "Non-physician practitioner" means any practitioner of healthcare services who is not also a doctor of medicine or a doctor of osteopathic medicine.

12.    "Physician" means any provider of healthcare services who is a doctor of medicine or a doctor of osteopathic medicine

13.    "Provider" means any physician, physician group, hospital, laboratory, skilled nursing facility, home health agency, hospice, board and care facility, physician assistant, nurse,

nurse practitioner, medical assistant, or any other person or entity who provides any healthcare services, including any non-physician practitioner who provides any healthcare services.

14.     "Relating to" and "related to" mean consisting of, concerning, referring to, reflecting, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the matter discussed.

15.     "Skin substitute" means any graft used to assist with wound healing, such as non-autologous human skin (dermal or epidermal, cellular and acellular) grafts, non-human skin substitute grafts, and biological products (placental and amniotic skin substitutes), including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: C5271-C5278 and Q4101-Q4284.

16.     "Text message conversations" refers to any and all electronic communications (other than emails) that can or do contain text, regardless of the format of the communications, the application or platform used to send or receive the communications, and whether the communications are immediately retrievable or retrievable only via a forensic extraction, including, but not limited to, those occurring in or via SMS, MMS, EMS, iMessage, Facebook chat, Facebook messenger, Google Talk (formerly Gchat), Blackberry Messenger (BBM), Skype, GroupMe, AIM, WhatsApp, Slack, Snapchat, Signal, WeChat, or company-deployed electronic health records or communications platforms, as well as, recoverable deleted data, backup files (e.g., iCloud or iPhone backup files), and archive snapshots.

17.     The terms "and" and "or" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

18.     The terms "any" and "all" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

19.     The singular and plural forms of any word shall be construed interchangeably so as to bring within the scope of this Demand any document which might otherwise be construed as outside its scope.

## B. INSTRUCTIONS

1.     *Relevant Time Period:* Unless otherwise stated in any specific request below, each request covers the relevant time period since January 1, 2016.

2.     This Demand is continuing in nature.  If You become aware of or acquire possession, custody, or control of additional documents that are responsive to this Demand, or if You become aware of or acquire additional information that is responsive to these interrogatories, You shall promptly produce such additional documents or supplement Your interrogatory responses.

3.     This Demand applies to all documents and information in Your possession, custody, or control regardless of their location and regardless of whether such documents or

information are held by Your current or former employees, including, but not limited to, in-house IT specialists and technicians, IT specialists and technicians to whom digital services have been out-sourced.

4.    All documents produced pursuant to this Demand are to be organized in such a manner that all documents relating to a particular request are grouped together and identified as being responsive to that request.

5.    If any document which is otherwise responsive to this Demand is not disclosed because of a claim of privilege or other objection, You shall identify such documents on a Privilege Log.  The Privilege Log shall be produced in Excel or Word format and include the following information:

(a)  the basis for the assertion of the privilege or objection;

(b)  the type of document (e.g., letter, memorandum, email, etc.)

(c)  the name and title of the author (and if different, the preparer and signatory);

(d)  the name(s) and title(s) of the individual(s) to whom the document was addressed;

(e)  the name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

(f)  the date of the document;

(g)  number of pages;

(h)  a general description of the subject matter; and

(i)  the Request(s) to which the document is responsive.

6.    When a requested document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible.  If a privilege is asserted with regard to a part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed.  When a document is redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration.  Any redaction must be clearly visible on the redacted document.

7.    If any document otherwise responsive to this Demand is not produced because it was lost, destroyed, or discarded:

(a)  identify the document by type, date, and title;

(b) identify the person who last had custody or control over the document;

(c) state the date on which the document was destroyed or was discovered to have been lost;

(d) if the document was destroyed, state why it was destroyed and identify the person(s) who destroyed it;

(e) if the document was lost, describe the circumstances in which its loss was discovered, state the date that it was last seen or otherwise accounted for, and identify the person(s) who discovered its loss and who last saw or otherwise accounted for it;

(f) identify all persons who have knowledge pertaining to the destruction or loss of the document, giving a concise but complete statement of the knowledge You claim each such person has;

(g) identify all persons who have knowledge of the contents of each lost or destroyed document, giving a concise but complete statement of the knowledge You claim each such person has; and

(h) produce all existing indices, lists, or other documents in Your possession, custody, or control that reflect the existence of such lost or destroyed documents, and/or their transfer or destruction.

8.      If no documents exist that are responsive to a specific document request, a written statement to that effect shall be provided at the time of production.

9.      To the extent that documents responsive to this Demand are in the possession, custody, or control of third parties, this Demand requires a statement to that effect at the time of production, specifically providing the name, address, telephone number and principal contact of the third party, and shall further identify those documents in said third party's possession.

10.     Please produce imaged hard copy and electronic documents according to the Specifications for Production of Electronically Stored Information and Digitized Images at **Attachment B**.

11.     For each interrogatory and subpart thereof, You must respond separately and in writing.  Your responses must identify all documents that You used, referenced, or relied upon in Your written responses.

12.     If You withhold any information responsive to any interrogatory based on a claim of privilege or other objection: (a) furnish the basis for the assertion of the privilege or objection, (b) identify all individuals who could respond to the interrogatory with regard to the information that is being withheld, and (c) set forth the general subject matter and the specific interrogatory or interrogatories to which each individual could testify.

13.     When providing the name of an individual in response to any interrogatory or individuals identified pursuant to Instruction 12 above, provide the individual's last known address, telephone number, email address, or other contact information, as well as the individual's relationship to You. If the individual is or was an employee, provide the individual's title and dates of employment.

**ATTACHMENT B TO CIVIL INVESTIGATIVE DEMAND NO. 23-1304**

**Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")**

**Collection of Electronically Stored Information (ESI)**

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

1.    **Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

2.    **Production Format of ESI and Imaged Hard Copy Documents**

Responsive ESI and imaged hard copy shall be produced in the format outlined below.  All ESI, except as outlined below in sections 5 – 21, shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

a.    **Image File Format:** All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

b.    When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT Group IV (2D Compression).  When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

i.    All TIFF file names shall include the unique Bates number burned into the image.  (See section 22, below, regarding Bates number instructions.)

ii.    All TIFF image files shall be stored with the ".tif" extension.

       iii. Images without corresponding extracted text shall be OCR'd using standard COTS products.

          1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

       iv. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

       v. No image folder shall contain more than 2,000 images.

c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

```
REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,
```

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.
- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat

database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

   | Field Separator | ¶ or Code 020 |
   | Text Qualifier | þ or Code 254 |
   | Newline | ® or Code 174 |
   | Multi-value | ; or Code 059 |
   | Nested values | \ or Code 092 |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:
   \*CaseName*\**LoadFiles**
   \*CaseName*\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
   \*CaseName*\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \*CaseName*\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \*CaseName*\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)

\\*CaseName*\\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

**3.    Required Metadata/Database Fields**

A "√" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | √ | √ | √ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | √ | √ | √ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | √ | √ | √ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | √ | √ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | √ | √ |
| AUTHOR | Creator of the document | Text | 500 | | | √ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | √ | √ | √ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/ YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

**4.    Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

a. De-duplication of exact hash copies shall be performed globally – across all custodians.  The custodian of each record shall be populated in the DupeCustodian field.

- All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

b. All files should be globally de-duplicated with the following conditions:

i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

iv. No customization of hashing may occur without prior express approval by the Government.

v. De-duplication must be done by document family, not by individual document.

vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government.  For every production after the first, a separate Unified Custodian overlay shall be provided.  If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be

expressly stated in the cover letter accompanying the subsequent production(s).

   c.  The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

## 5.   Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

## 6.   Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

## 7.   Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

## 8.   Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

   a.  The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.
   ▪  If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

### 9.    Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

      a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).

        ▪ The first document in the collection represents the parent document and all other documents will represent the children.

      b.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression).  All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.  Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

        ▪ All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

### 10.    Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number.  *See* section 22 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

### 11.    Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc.  E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

### 12.    Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13. Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies. These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format. The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production. The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#. The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government. The following are examples:

    a.   AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.

      ▪  GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

    b.   Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

## 22.    Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|  | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

## 23.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

    a.   CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
       ▪  External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
    b.   Government approved File Transfer Protocol (FTP) technologies.
       ▪  Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
    c.   Media should be labeled with the case name, production date, Bates range, and producing party.

## 24.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

### 25. Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 26. Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 27. Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 28. Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

### ATTACHMENT C TO CIVIL INVESTIGATIVE DEMAND NO. 23-1304

### DOCUMENT REQUESTS

You are required by this Demand to produce any and all of the following documents in Your possession, custody, or control:

1.  All documents reflecting any formal or informal contracts and agreements between You or Wound Pros and the persons and entities identified in connection with interrogatory 1, including all documents and communications reflecting any compensation, payment, commissions, bonuses, reimbursement of expenses, risk sharing, or any other remuneration or benefits of any kind.

2.  All documents and communications concerning any compensation, commission, bonus, or any other remuneration or benefits of any kind offered and/or paid by or on behalf of You or Wound Pros to any person or entity that provides, supervises, directs, refers, or otherwise causes the provision or billing of the federal healthcare programs for any skin substitute products or services by or on behalf of You or Wound Pros, including, but not limited to, all documents and communications related to any fair market value assessment of that compensation.

3.  All personnel evaluations, records, schedules, timesheets, logs, and any other documentation of payments, remuneration, commission, reimbursement of expenses, risk sharing, benefits of any kind, referral, sanction, penalty, disciplinary action, or any other unfavorable action or consequence of any kind relating to the provision of or billing for any skin substitute products or services by or on behalf of You or Wound Pros.

4.  All documents and communications relating to supervision or direction by any physician affiliated with Wound Pros, including, but not limited to, Dr. Bill J. Releford, Dr. Christopher Otiko, Dr. Owen Ellington, Dr. Joseph M. Palumbo, Dr. Sherman Washington, and Dr. Allyson Pizzo-Berkey, of the provision of any skin substitute products or services by any non-physician practitioner on behalf of Wound Pros.

5.  All projections, analyses, reports, drafts, reviews, or other documentation reflecting any performance metric, including, but not limited to, revenue, profit, and return on investment ("ROI"), relating to the provision of or billing for any skin substitute products or services by any person or entity affiliated with Wound Pros.

6.  All documents and communications relating to the ordering by any Wound Pros-affiliated provider of any DME supplies from any Wound Pros-affiliated DME supplier, including the preparation and ordering of pre-made DME kits.

7.  All formal and informal policies, practices, procedures, guidelines, standard operating procedures, FAQs, training materials, instructions, advice, evaluations, or other guidance in any form relating to (a) supervision of non-physician practitioners, including remote supervision; (b) billing for products and services provided by non-physician practitioners, including billing for services "incident to" services provided by a physician; (c) billing

for products and services provided to patients in hospice, nursing facilities, skilled nursing facilities, or any other board or care facilities; (d) identifying the point of service and the entity that provided any products or services in any documentation related to billing; (e) ordering DME supplies; (f) providing DME to patients; and (g) compliance with federal healthcare program billing requirements, the False Claims Act, Stark Law, Anti-Kickback Statute, or other state and federal laws and regulatory guidance.

8.     All documents and communications concerning compliance with the requirements of any federal healthcare program, including, but not limited to, all documents exchanged with CMS relating to Your or Wound Pros' ability to participate in the federal healthcare programs, revocation by CMS, and any notifications from CMS regarding any actual, potential, or suspected failure to comply with CMS requirements.

9.     All formal or informal complaints, allegations, objections, inquiries, or concerns of any kind from any source concerning potential fraud, inappropriate billing, noncompliance with federal healthcare program requirements, unsatisfactory or inappropriate products or services, harm to patients, or violations of statutes or regulations by You or Wound Pros.

10.    Documents sufficient to show Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.

11.    Documents sufficient to show Your organizational chart(s) for the Relevant Time Period.

12.    All documents relied on to answer the interrogatories in **Attachment D**.

## ATTACHMENT D TO CIVIL INVESTIGATIVE DEMAND NO. 23-1304

### INTERROGATORIES

1. Identify in Microsoft Excel format all persons and entities with which You and/or Wound Pros contracted in connection with providing or billing for healthcare products or services, by specifying in separate fields: (a) the name of the person or entity with which You and/or Wound Pros contracted; (b) the contract name(s); (c) the contract date(s); (d) the contract number(s); (e) all parties to the contract(s); (f) the signatories to the contract(s); (g) the person(s) involved in the contracting process(es); (h) all products and services covered by the contract(s), including whether the contract related in any way to skin substitutes; (i) any amendments to the contract(s); (j) the status of any pending contract negotiations; (k) the reason(s) for any amendment, modification, or termination of any contract; (l) the termination date of the contract; and (m) any documentation related to the contract(s).

2. For each Wound Pros entity and affiliate, identify in Microsoft Excel format all owners, investors, and financial supporters of any kind by (a) full name; (b) current or last known business address, home address, and telephone number; (c) ownership share, if applicable; (d) investments and/or financial support provided, including the itemized amount(s) and date(s); (e) return on investment provided by the Wound Pros entity or affiliate to the owner, investor, or financial supporter, if applicable, including the amount(s) and date(s); (f) description of the nature of the ownership, investment relationship, and/or financial support; and (g) any other metric that You or Wound Pros uses to track or quantify the relationship with the owner, investor, or financial supporter.

3. For each Wound Pros entity and affiliate, identify in Microsoft Excel format all current and former employees by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) job title; (e) job responsibilities; (f) whether the employee was a direct employee, volunteer, independent contractor, agent, director, officer, representative, account, advisor, or consultant; (g) start date; (h) termination date, if applicable; (i) Wound Pros entity with which the individual interacted; (j) locations where any services were provided by the individual; (k) all compensation and benefits of any kind; (l) supervising responsibilities; (m) direct report(s); (n) supervisor(s); and (o) manager(s).

4. Identify in Microsoft Excel format all persons and/or entities through whom Wound Pros submits claims for reimbursement to the federal healthcare programs by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) nature of the relationship with Wound Pros; (f) start date of relationship; (g) end date of the relationship; (h) services provided; (i) dates during which the services were provided; (j) locations where the services were provided; (k) Wound Pros entity on behalf of which the person or entity submitted claims; (l) all compensation and benefits of any kind; and (m) whether the compensation was consistent with fair market value, including the basis for that conclusion.

5.    Identify in Microsoft Excel format all systems, programs, platforms, software, algorithms, analytics, or other tools used by Wound Pros, including, but not limited to, Slack, RITA, HL7, Smart Sheet, Black Doctor 24/7, Wound Docs, Office Ally, Kareo, Google Drive, Google Email, Zelis, Paychex, and ADP, by (a) name; (b) function and/or use; (c) dates of use; (d) the Wound Pros entities and/or individuals involved or impacted; and (e) the name(s) and title(s) of the employees or other third parties most knowledgeable about its function and/or use.

6.    For each system, program, platform, software, algorithm, analytic, or other tool identified in response to interrogatory 5, describe (a) all fields that are auto-populated by the system; (b) all fields that are added or revised by anyone other than the provider who directly treated the patient; and (c) the circumstances under which those fields are auto-populated, added, or revised.  If this process changed during the Relevant Time Period, describe all changes during this time period.

7.    Identify in Microsoft Excel format all DME suppliers used by any person or entity affiliated with Wound Pros by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) DME supplies ordered from that supplier; and (f) dates during which DME supplies were ordered from that supplier.

8.    Identify in Microsoft Excel format all DME orders filled by Wound Pros for DME, including (a) the item or service furnished; (b) the patient (i) full name, (ii) date of birth, (iii) social security number, and (iv) Medicare Beneficiary Number or other federal health care program identifier; (c) the referring physician; and (d) the amount reimbursed.

9.    Identify in Microsoft Excel format all Wound Pros facilities and medical offices where services were provided by any Wound Pros provider by (a) full name; (b) address; (c) the date range(s) during which services were provided at that facility or medical office; (d) all persons and entities that billed the federal healthcare programs for services performed at that facility or medical office, including the person's or entity's NPI and EIN; and (e) the services provided at that facility.

10.   Identify in Microsoft Excel format all patients treated by a Wound Pros non-physician practitioner, including identifying the patient by (a) full name; (b) date of birth; (c) social security number; (d) date of first encounter with Wound Pros; (e) date of the most recent encounter with Wound Pros; (f) date on which the service was provided; (g) whether the patient was treated with a skin substitute; (h) date of the skin substitute service, if any; (i) address where the service was performed; (j) whether the patient was located at a facility of any kind when the patient received the service, and if so, the type of facility, name of the facility, and address of the facility; (k) name of the person who performed the service; (l) name of the supervising physician, if any; (m) health insurance plan; (n) whether the patient was diagnosed with any condition related to the services provided, and if so, any associated diagnosis, HCPCS, and CPT codes; (o) all follow-up treatments

associated with the services provided; and (p) all documentation or other information considered in connection with the services provided.

11.  Describe Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership. If the structure has changed during the Relevant Time Period, describe all changes to the structure during this time period.

12.  Describe Your relationship with each of the following entities, including any ownership interest, financial relationship, and overlap in providers, services, or patients: (a) Wound Pros Washington; (b) Wound Pros Utah; (c) Wound Pros Louisiana; (d) Wound Pros Illinois; (e) Texas Wound Care Management; (f) PLS Podiatry Group; (g) Ohio Wound Care Specialists; (h) Ohio Wound Care Network; (i) DPMOTIKONRCA LLC; (j) Coast to Coast Podiatry; (l) Coast to Coast Foot Doctors, a Podiatry Corporation; (m) Coast to Coast DME; (n) Christopher A Otiko DPM; (o) Global Wound Care Medical Group; (p) American Wound Care Partners; (q) National Wound Care Associates; (r) Horizon Wound Care LLC; and (s) PLS Foot Doctors. If the relationship has changed during the Relevant Time Period, describe all changes during this time period.

# Exhibit 6

# CIVIL INVESTIGATIVE DEMAND

# United States Department of Justice
### Washington, D.C. 20530

TO:    Wound Pros, P.C.                              Civil Investigative
       301 N. Prairie Ave 202                        Demand No. 23-1305
       Inglewood, California 90301
       c/o LegalCorp Solutions, Inc. (Registered Agent)
       8939 S Sepulveda Blvd, Ste. 102
       Los Angeles, California 90045

This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729. The False Claims Act investigation concerns allegations that Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, Wound Pros Management Group, Inc., and certain related entities and individuals (collectively, "Wound Pros") made false statements in claims submitted to the federal healthcare programs in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral ("Stark") Law, 42 U.S.C. § 1395nn, and common law. Specifically, we are investigating whether Wound Pros submitted or caused the submission of (1) claims for reimbursement falsely stating that services provided by non-physician personnel were "incident to" a physician's services; (2) claims for medically unnecessary skin substitutes and associated services; (3) point of service information falsely indicating that services were provided in an office setting; (4) claims for reimbursement through entities other than the one that performed the services; and (5) claims for durable medical equipment based on self-referrals in violation of the Stark Law. We further are investigating whether Wound Pros paid or caused the payment of unlawful kickbacks to personnel in exchange for the personnel ordering products and services reimbursable by the federal healthcare programs.

This Demand requires you to provide documents and answers to the attached written interrogatories to the Federal Government. This is the original of the Demand; no copies have been served on other parties. The information and documents provided in response to this Demand may be shared, used, and disclosed as provided by 31 U.S.C. § 3733.

-2-

**Document Request**:

In accordance with the definitions and instructions set forth in **Attachment A** and the production specifications in **Attachment B**, you are required by this Demand to produce any and all documents in your possession, custody or control responsive to the document requests set forth in **Attachment C**.

You must make this material available to Department of Justice Trial Attorney Jessica M. Bergin and Assistant United States Attorney David Thiess, who have been designated as False Claims Act custodians in this case. Ms. Bergin may be contacted at (202) 305-4207 or Jessica.Bergin@usdoj.gov, and Mr. Thiess may be contacted at (916) 554-2825 or David.Thiess@usdoj.gov, if you have any questions. These documents shall be produced no later than thirty (30) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The production of documentary material in response to this Demand must be made under a sworn certificate in the form printed in this Demand.

**Written Interrogatories**:

In accordance with the definitions and instructions set forth in **Attachment A**, you are required by this Demand to answer the interrogatories set forth in **Attachment D**. The answers to interrogatories shall be submitted no later than twenty (20) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The interrogatories shall be answered separately and fully in writing under oath and also shall be submitted under a sworn certificate in the form printed in this Demand. If you object to any interrogatory, the reasons for the objection shall be stated with specificity.

Issued at Washington, DC, this __27th__ day of _____September_____, 2023.


_____
Jamie Ann Yavelberg
Director
Commercial Litigation Branch

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for producing the documents requested in Civil Investigative Demand No. 23-1305.  I hereby certify that all the materials required by that Civil Investigative Demand which are in the possession, custody or control of the person to whom the Demand is directed have been submitted to a custodian named therein.

If any such material has not been produced because of a lawful objection, the objection to the document request and the reasons for the objection have been stated.

Signature ————————————————

Title ————————————————

**SWORN TO** before me this _____ day of

_____, 2023

————————————————————
NOTARY PUBLIC

———————————————

[1]    In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for answering interrogatory numbers_____in Civil Investigative Demand No. 23-1305. I hereby certify that all the information required by the Civil Investigative Demand and in the possession, custody, control, or knowledge of the person to whom the Civil Investigative Demand is directed has been submitted. To the extent information has not been furnished, the information is identified and the reasons why the information was not furnished are set forth with particularity. Additionally, if any such information has not been produced because of a lawful objection, the objection to the interrogatory and the reasons for the objection have been stated. I certify under penalty of perjury that the foregoing interrogatory responses are true and correct.


Signature_____

Title_____


**SWORN TO** before me this_____day of
_____, 2023


_____
        NOTARY PUBLIC


_____

[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## VERIFIED RETURN OF SERVICE

I,_____, an employee of the United States working under the direction and supervision of attorney Jessica Bergin in connection with a false claims law investigation, hereby certify that at the time of _____, on the_____ day of _____, 2023, I personally served Civil Investigative Demand No. 23-1305 on _____, by delivering an executed copy of such Demand at:

_____

_____

_____

I declare under penalty of perjury that the foregoing is true and correct. Executed on this _____ day of _____, 2023.

Signature_____

Title_____

ATTACHMENT A TO CIVIL INVESTIGATIVE DEMAND NO. 23-1305

DEFINITIONS AND INSTRUCTIONS

A. DEFINITIONS

1.     Unless specified otherwise, the terms "You" or "Your" mean Wound Pros, P.C., and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

2.     Unless specified otherwise, the term "Wound Pros" means Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, and Wound Pros Management Group, Inc.; and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

3.     "Communication" is used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and means any transmission or exchange of information orally or in writing, and include, but are not limited to, any emails and text message conversations (including those stored on organization and personal devices).

4.     "CPT code" means any Current Procedural Terminology code.

5.     "DME" means any durable medical equipment, including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: A4245-A5120, A6000-A6461, and L4360-L4387.

6.     "Document" and "documents" are used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations.

7.     "Employee" shall mean any person including, but not limited to, an employee, volunteer, independent contractor or agent, all past and present directors, officers, agents, representatives, accountants, advisors, and consultants who acted or purported to act on Your or Wound Pros' behalf or who performed any service for You or Wound Pros under Your or Wound Pros' name, whether on a full-time, part-time, piece-work, commission or other basis and whether paid or unpaid.

8.      "Federal healthcare program" means any healthcare program administered or funded wholly or in part by the United States, including, but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA and other VA health care programs and services, the Federal Employee Health Benefits Program, and the Federal Bureau of Prisons Health Services Program.

9.      "HCPCS code" means any Healthcare Common Procedure Coding System code.

10.     "Identify" means to provide the following information in Your response:

     a.      With respect to a natural person:
       (i)     the person's full name;
       (ii)    the name of the person's current or last known employer;
       (iii)   the person's title and position, if known;
       (iv)    the person's current or last known business and home address and telephone number; and
       (v)     if applicable, the person's National Provider Identifier ("NPI");

     b.      With respect to a corporation, partnership, joint venture, or other entity:
       (i)     the name of the entity;
       (ii)    the addresses and telephone numbers of its principal office(s);
       (iii)   the tax identification number; and
       (iv)    if the entity is a medical provider, the entity's NPI, Medicare provider number, and CMS Certification Number ("CCN"), if applicable;

     c.      With respect to documents:
       (i)     the title of the document;
       (ii)    the date of the document;
       (iii)   a description of the type of document;
       (iv)    a summary of the document's contents;
       (v)     the present location of the original and all existing copies of the document;
       (vi)    a list of all intended recipients of the document, including, but not limited to, all addressees, and all persons who were supposed to receive a copy of the document (*i.e.*, through "cc" or "bcc"); and
       (vii)   the identity of the author and a list of all persons who participated in the creation of the document.

11.     "Non-physician practitioner" means any practitioner of healthcare services who is not also a doctor of medicine or a doctor of osteopathic medicine.

12.     "Physician" means any provider of healthcare services who is a doctor of medicine or a doctor of osteopathic medicine

13.     "Provider" means any physician, physician group, hospital, laboratory, skilled nursing facility, home health agency, hospice, board and care facility, physician assistant, nurse,

nurse practitioner, medical assistant, or any other person or entity who provides any healthcare services, including any non-physician practitioner who provides any healthcare services.

14.     "Relating to" and "related to" mean consisting of, concerning, referring to, reflecting, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the matter discussed.

15.     "Skin substitute" means any graft used to assist with wound healing, such as non-autologous human skin (dermal or epidermal, cellular and acellular) grafts, non-human skin substitute grafts, and biological products (placental and amniotic skin substitutes), including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: C5271-C5278 and Q4101-Q4284.

16.     "Text message conversations" refers to any and all electronic communications (other than emails) that can or do contain text, regardless of the format of the communications, the application or platform used to send or receive the communications, and whether the communications are immediately retrievable or retrievable only via a forensic extraction, including, but not limited to, those occurring in or via SMS, MMS, EMS, iMessage, Facebook chat, Facebook messenger, Google Talk (formerly Gchat), Blackberry Messenger (BBM), Skype, GroupMe, AIM, WhatsApp, Slack, Snapchat, Signal, WeChat, or company-deployed electronic health records or communications platforms, as well as, recoverable deleted data, backup files (e.g., iCloud or iPhone backup files), and archive snapshots.

17.     The terms "and" and "or" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

18.     The terms "any" and "all" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

19.     The singular and plural forms of any word shall be construed interchangeably so as to bring within the scope of this Demand any document which might otherwise be construed as outside its scope.

## B. INSTRUCTIONS

1.     *Relevant Time Period:* Unless otherwise stated in any specific request below, each request covers the relevant time period since January 1, 2016.

2.     This Demand is continuing in nature.  If You become aware of or acquire possession, custody, or control of additional documents that are responsive to this Demand, or if You become aware of or acquire additional information that is responsive to these interrogatories, You shall promptly produce such additional documents or supplement Your interrogatory responses.

3.     This Demand applies to all documents and information in Your possession, custody, or control regardless of their location and regardless of whether such documents or

information are held by Your current or former employees, including, but not limited to, in-house IT specialists and technicians, IT specialists and technicians to whom digital services have been out-sourced.

4.    All documents produced pursuant to this Demand are to be organized in such a manner that all documents relating to a particular request are grouped together and identified as being responsive to that request.

5.    If any document which is otherwise responsive to this Demand is not disclosed because of a claim of privilege or other objection, You shall identify such documents on a Privilege Log. The Privilege Log shall be produced in Excel or Word format and include the following information:

    (a) the basis for the assertion of the privilege or objection;

    (b) the type of document (e.g., letter, memorandum, email, etc.)

    (c) the name and title of the author (and if different, the preparer and signatory);

    (d) the name(s) and title(s) of the individual(s) to whom the document was addressed;

    (e) the name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
    (f) the date of the document;

    (g) number of pages;

    (h) a general description of the subject matter; and

    (i) the Request(s) to which the document is responsive.

6.    When a requested document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible. If a privilege is asserted with regard to a part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a document is redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration. Any redaction must be clearly visible on the redacted document.

7.    If any document otherwise responsive to this Demand is not produced because it was lost, destroyed, or discarded:

    (a) identify the document by type, date, and title;

(b) identify the person who last had custody or control over the document;

(c) state the date on which the document was destroyed or was discovered to have been lost;

(d) if the document was destroyed, state why it was destroyed and identify the person(s) who destroyed it;

(e) if the document was lost, describe the circumstances in which its loss was discovered, state the date that it was last seen or otherwise accounted for, and identify the person(s) who discovered its loss and who last saw or otherwise accounted for it;

(f) identify all persons who have knowledge pertaining to the destruction or loss of the document, giving a concise but complete statement of the knowledge You claim each such person has;

(g) identify all persons who have knowledge of the contents of each lost or destroyed document, giving a concise but complete statement of the knowledge You claim each such person has; and

(h) produce all existing indices, lists, or other documents in Your possession, custody, or control that reflect the existence of such lost or destroyed documents, and/or their transfer or destruction.

8.     If no documents exist that are responsive to a specific document request, a written statement to that effect shall be provided at the time of production.

9.     To the extent that documents responsive to this Demand are in the possession, custody, or control of third parties, this Demand requires a statement to that effect at the time of production, specifically providing the name, address, telephone number and principal contact of the third party, and shall further identify those documents in said third party's possession.

10.     Please produce imaged hard copy and electronic documents according to the Specifications for Production of Electronically Stored Information and Digitized Images at **Attachment B**.

11.     For each interrogatory and subpart thereof, You must respond separately and in writing. Your responses must identify all documents that You used, referenced, or relied upon in Your written responses.

12.     If You withhold any information responsive to any interrogatory based on a claim of privilege or other objection: (a) furnish the basis for the assertion of the privilege or objection, (b) identify all individuals who could respond to the interrogatory with regard to the information that is being withheld, and (c) set forth the general subject matter and the specific interrogatory or interrogatories to which each individual could testify.

13.     When providing the name of an individual in response to any interrogatory or individuals identified pursuant to Instruction 12 above, provide the individual's last known address, telephone number, email address, or other contact information, as well as the individual's relationship to You.  If the individual is or was an employee, provide the individual's title and dates of employment.

### ATTACHMENT B TO CIVIL INVESTIGATIVE DEMAND NO. 23-1305

#### Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")

##### Collection of Electronically Stored Information (ESI)

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

**1.    Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

**2.    Production Format of ESI and Imaged Hard Copy Documents**

Responsive ESI and imaged hard copy shall be produced in the format outlined below.  All ESI, except as outlined below in sections 5 – 21, shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

a.    **Image File Format:** All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

b.    When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT Group IV (2D Compression).  When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

i.    All TIFF file names shall include the unique Bates number burned into the image.  (See section 22, below, regarding Bates number instructions.)

ii.    All TIFF image files shall be stored with the ".tif" extension.

   iii. Images without corresponding extracted text shall be OCR'd using standard COTS products.

     1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

   iv. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

   v. No image folder shall contain more than 2,000 images.

  c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

   REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
   REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,,
   REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,,
   REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
   REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,,

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.
- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

  d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat

database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| Field Separator | ¶ or Code 020 |
| Text Qualifier | þ or Code 254 |
| Newline | ® or Code 174 |
| Multi-value | ; or Code 059 |
| Nested values | \ or Code 092 |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:
   \\*CaseName*\\**LoadFiles**
   \\*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)

\\*CaseName*\\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

**3.    Required Metadata/Database Fields**

A "√" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | √ | √ | √ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | √ | √ | √ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | √ | √ | √ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | √ | √ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | √ | √ |
| AUTHOR | Creator of the document | Text | 500 | | | √ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | √ | √ | √ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent.  Do not provide 00/00/0000. | Date | MM/DD/YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

**4.    Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

    a. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.

      • All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

    b. All files should be globally de-duplicated with the following conditions:

      i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

      ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

      iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

      iv. No customization of hashing may occur without prior express approval by the Government.

      v. De-duplication must be done by document family, not by individual document.

      vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be

expressly stated in the cover letter accompanying the subsequent production(s).

c.  The Producing Party  shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government.  All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

## 5.   Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file.  Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file.  If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

## 6.   Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced.  For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

## 7.   Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

## 8.   Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

a.  The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b.  The unencrypted native file shall be produced pursuant to sections 10-21.
- If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

9.    **Production of Imaged Hard Copy Records**

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

  a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).
    - The first document in the collection represents the parent document and all other documents will represent the children.
  b.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.
    - All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

10.    **Production of Spreadsheets and Presentation Files**

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

11.    **Production of E-mail Repositories**

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

12.    **Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items**

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13. Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies. These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies. However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

| Field Name | Field Description | Mobile | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

Page 20 of 30

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format.  The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production.  The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#.  The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government.  The following are examples:

> a.  AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.
>   ▪  GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

b.  Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

### 22.  Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|          | *Document #1*          | *Document #2*          |
|----------|------------------------|------------------------|
| *Page #1* | PREFIX00000000001     | PREFIX00000000002      |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002  |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003  |

### 23.  Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

a.  CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
  ▪ External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
b.  Government approved File Transfer Protocol (FTP) technologies.
  ▪ Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
c.  Media should be labeled with the case name, production date, Bates range, and producing party.

### 24.  Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

### 25.    Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 26.    Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 27.    Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 28.    Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

## ATTACHMENT C TO CIVIL INVESTIGATIVE DEMAND NO. 23-1305

### DOCUMENT REQUESTS

You are required by this Demand to produce any and all of the following documents in Your possession, custody, or control:

1.  All documents reflecting any formal or informal contracts and agreements between You or Wound Pros and the persons and entities identified in connection with interrogatory 1, including all documents and communications reflecting any compensation, payment, commissions, bonuses, reimbursement of expenses, risk sharing, or any other remuneration or benefits of any kind.

2.  All documents and communications concerning any compensation, commission, bonus, or any other remuneration or benefits of any kind offered and/or paid by or on behalf of You or Wound Pros to any person or entity that provides, supervises, directs, refers, or otherwise causes the provision or billing of the federal healthcare programs for any skin substitute products or services by or on behalf of You or Wound Pros, including, but not limited to, all documents and communications related to any fair market value assessment of that compensation.

3.  All personnel evaluations, records, schedules, timesheets, logs, and any other documentation of payments, remuneration, commission, reimbursement of expenses, risk sharing, benefits of any kind, referral, sanction, penalty, disciplinary action, or any other unfavorable action or consequence of any kind relating to the provision of or billing for any skin substitute products or services by or on behalf of You or Wound Pros.

4.  All documents and communications relating to supervision or direction by any physician affiliated with Wound Pros, including, but not limited to, Dr. Bill J. Releford, Dr. Christopher Otiko, Dr. Owen Ellington, Dr. Joseph M. Palumbo, Dr. Sherman Washington, and Dr. Allyson Pizzo-Berkey, of the provision of any skin substitute products or services by any non-physician practitioner on behalf of Wound Pros.

5.  All projections, analyses, reports, drafts, reviews, or other documentation reflecting any performance metric, including, but not limited to, revenue, profit, and return on investment ("ROI"), relating to the provision of or billing for any skin substitute products or services by any person or entity affiliated with Wound Pros.

6.  All documents and communications relating to the ordering by any Wound Pros-affiliated provider of any DME supplies from any Wound Pros-affiliated DME supplier, including the preparation and ordering of pre-made DME kits.

7.  All formal and informal policies, practices, procedures, guidelines, standard operating procedures, FAQs, training materials, instructions, advice, evaluations, or other guidance in any form relating to (a) supervision of non-physician practitioners, including remote supervision; (b) billing for products and services provided by non-physician practitioners, including billing for services "incident to" services provided by a physician; (c) billing

for products and services provided to patients in hospice, nursing facilities, skilled nursing facilities, or any other board or care facilities; (d) identifying the point of service and the entity that provided any products or services in any documentation related to billing; (e) ordering DME supplies; (f) providing DME to patients; and (g) compliance with federal healthcare program billing requirements, the False Claims Act, Stark Law, Anti-Kickback Statute, or other state and federal laws and regulatory guidance.

8.  All documents and communications concerning compliance with the requirements of any federal healthcare program, including, but not limited to, all documents exchanged with CMS relating to Your or Wound Pros' ability to participate in the federal healthcare programs, revocation by CMS, and any notifications from CMS regarding any actual, potential, or suspected failure to comply with CMS requirements.

9.  All formal or informal complaints, allegations, objections, inquiries, or concerns of any kind from any source concerning potential fraud, inappropriate billing, noncompliance with federal healthcare program requirements, unsatisfactory or inappropriate products or services, harm to patients, or violations of statutes or regulations by You or Wound Pros.

10. Documents sufficient to show Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.

11. Documents sufficient to show Your organizational chart(s) for the Relevant Time Period.

12. All documents relied on to answer the interrogatories in **Attachment D**.

## ATTACHMENT D TO CIVIL INVESTIGATIVE DEMAND NO. 23-1305

## INTERROGATORIES

1.   Identify in Microsoft Excel format all persons and entities with which You and/or Wound Pros contracted in connection with providing or billing for healthcare products or services, by specifying in separate fields: (a) the name of the person or entity with which You and/or Wound Pros contracted; (b) the contract name(s); (c) the contract date(s); (d) the contract number(s); (e) all parties to the contract(s); (f) the signatories to the contract(s); (g) the person(s) involved in the contracting process(es); (h) all products and services covered by the contract(s), including whether the contract related in any way to skin substitutes; (i) any amendments to the contract(s); (j) the status of any pending contract negotiations; (k) the reason(s) for any amendment, modification, or termination of any contract; (l) the termination date of the contract; and (m) any documentation related to the contract(s).

2.   For each Wound Pros entity and affiliate, identify in Microsoft Excel format all owners, investors, and financial supporters of any kind by (a) full name; (b) current or last known business address, home address, and telephone number; (c) ownership share, if applicable; (d) investments and/or financial support provided, including the itemized amount(s) and date(s); (e) return on investment provided by the Wound Pros entity or affiliate to the owner, investor, or financial supporter, if applicable, including the amount(s) and date(s); (f) description of the nature of the ownership, investment relationship, and/or financial support; and (g) any other metric that You or Wound Pros uses to track or quantify the relationship with the owner, investor, or financial supporter.

3.   For each Wound Pros entity and affiliate, identify in Microsoft Excel format all current and former employees by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) job title; (e) job responsibilities; (f) whether the employee was a direct employee, volunteer, independent contractor, agent, director, officer, representative, account, advisor, or consultant; (g) start date; (h) termination date, if applicable; (i) Wound Pros entity with which the individual interacted; (j) locations where any services were provided by the individual; (k) all compensation and benefits of any kind; (l) supervising responsibilities; (m) direct report(s); (n) supervisor(s); and (o) manager(s).

4.   Identify in Microsoft Excel format all persons and/or entities through whom Wound Pros submits claims for reimbursement to the federal healthcare programs by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) nature of the relationship with Wound Pros; (f) start date of relationship; (g) end date of the relationship; (h) services provided; (i) dates during which the services were provided; (j) locations where the services were provided; (k) Wound Pros entity on behalf of which the person or entity submitted claims; (l) all compensation and benefits of any kind; and (m) whether the compensation was consistent with fair market value, including the basis for that conclusion.

5.  Identify in Microsoft Excel format all systems, programs, platforms, software, algorithms, analytics, or other tools used by Wound Pros, including, but not limited to, Slack, RITA, HL7, Smart Sheet, Black Doctor 24/7, Wound Docs, Office Ally, Kareo, Google Drive, Google Email, Zelis, Paychex, and ADP, by (a) name; (b) function and/or use; (c) dates of use; (d) the Wound Pros entities and/or individuals involved or impacted; and (e) the name(s) and title(s) of the employees or other third parties most knowledgeable about its function and/or use.

6.  For each system, program, platform, software, algorithm, analytic, or other tool identified in response to interrogatory 5, describe (a) all fields that are auto-populated by the system; (b) all fields that are added or revised by anyone other than the provider who directly treated the patient; and (c) the circumstances under which those fields are auto-populated, added, or revised.  If this process changed during the Relevant Time Period, describe all changes during this time period.

7.  Identify in Microsoft Excel format all DME suppliers used by any person or entity affiliated with Wound Pros by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) DME supplies ordered from that supplier; and (f) dates during which DME supplies were ordered from that supplier.

8.  Identify in Microsoft Excel format all DME orders filled by Wound Pros for DME, including (a) the item or service furnished; (b) the patient (i) full name, (ii) date of birth, (iii) social security number, and (iv) Medicare Beneficiary Number or other federal health care program identifier; (c) the referring physician; and (d) the amount reimbursed.

9.  Identify in Microsoft Excel format all Wound Pros facilities and medical offices where services were provided by any Wound Pros provider by (a) full name; (b) address; (c) the date range(s) during which services were provided at that facility or medical office; (d) all persons and entities that billed the federal healthcare programs for services performed at that facility or medical office, including the person's or entity's NPI and EIN; and (e) the services provided at that facility.

10. Identify in Microsoft Excel format all patients treated by a Wound Pros non-physician practitioner, including identifying the patient by (a) full name; (b) date of birth; (c) social security number; (d) date of first encounter with Wound Pros; (e) date of the most recent encounter with Wound Pros; (f) date on which the service was provided; (g) whether the patient was treated with a skin substitute; (h) date of the skin substitute service, if any; (i) address where the service was performed; (j) whether the patient was located at a facility of any kind when the patient received the service, and if so, the type of facility, name of the facility, and address of the facility; (k) name of the person who performed the service; (l) name of the supervising physician, if any; (m) health insurance plan; (n) whether the patient was diagnosed with any condition related to the services provided, and if so, any associated diagnosis, HCPCS, and CPT codes; (o) all follow-up treatments

associated with the services provided; and (p) all documentation or other information considered in connection with the services provided.

11.  Describe Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.  If the structure has changed during the Relevant Time Period, describe all changes to the structure during this time period.

12.  Describe Your relationship with each of the following entities, including any ownership interest, financial relationship, and overlap in providers, services, or patients:  (a) Wound Pros Washington; (b) Wound Pros Utah; (c) Wound Pros Louisiana; (d) Wound Pros Illinois; (e) Texas Wound Care Management; (f) PLS Podiatry Group; (g) Ohio Wound Care Specialists; (h) Ohio Wound Care Network; (i) DPMOTIKONRCA LLC; (j) Coast to Coast Podiatry; (l) Coast to Coast Foot Doctors, a Podiatry Corporation; (m) Coast to Coast DME; (n) Christopher A Otiko DPM; (o) Global Wound Care Medical Group; (p) American Wound Care Partners; (q) National Wound Care Associates; (r) Horizon Wound Care LLC; and (s) PLS Foot Doctors.  If the relationship has changed during the Relevant Time Period, describe all changes during this time period.

# Exhibit 7

# CIVIL INVESTIGATIVE DEMAND

# United States Department of Justice
## Washington, D.C. 20530

TO:    Global Wound Care Medical Group                    Civil Investigative
       5901 W. Century Blvd, Suite 750                    Demand No. 23-1306
       Los Angeles, California 90045
       c/o Curtis Keith Greer (Registered Agent)
       16855 W Bernardo Drive, Suite 255
       San Diego, California 92127

This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729. The False Claims Act investigation concerns allegations that Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, Wound Pros Management Group, Inc., and certain related entities and individuals (collectively, "Wound Pros") made false statements in claims submitted to the federal healthcare programs in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral ("Stark") Law, 42 U.S.C. § 1395nn, and common law. Specifically, we are investigating whether Wound Pros submitted or caused the submission of (1) claims for reimbursement falsely stating that services provided by non-physician personnel were "incident to" a physician's services; (2) claims for medically unnecessary skin substitutes and associated services; (3) point of service information falsely indicating that services were provided in an office setting; (4) claims for reimbursement through entities other than the one that performed the services; and (5) claims for durable medical equipment based on self-referrals in violation of the Stark Law. We further are investigating whether Wound Pros paid or caused the payment of unlawful kickbacks to personnel in exchange for the personnel ordering products and services reimbursable by the federal healthcare programs.

This Demand requires you to provide documents and answers to the attached written interrogatories to the Federal Government. This is the original of the Demand; no copies have been served on other parties. The information and documents provided in response to this Demand may be shared, used, and disclosed as provided by 31 U.S.C. § 3733.

-2-

**Document Request**:

In accordance with the definitions and instructions set forth in **Attachment A** and the production specifications in **Attachment B**, you are required by this Demand to produce any and all documents in your possession, custody or control responsive to the document requests set forth in **Attachment C**.

You must make this material available to Department of Justice Trial Attorney Jessica M. Bergin and Assistant United States Attorney David Thiess, who have been designated as False Claims Act custodians in this case. Ms. Bergin may be contacted at (202) 305-4207 or Jessica.Bergin@usdoj.gov, and Mr. Thiess may be contacted at (916) 554-2825 or David.Thiess@usdoj.gov, if you have any questions. These documents shall be produced no later than thirty (30) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The production of documentary material in response to this Demand must be made under a sworn certificate in the form printed in this Demand.

**Written Interrogatories**:

In accordance with the definitions and instructions set forth in **Attachment A**, you are required by this Demand to answer the interrogatories set forth in **Attachment D**. The answers to interrogatories shall be submitted no later than twenty (20) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The interrogatories shall be answered separately and fully in writing under oath and also shall be submitted under a sworn certificate in the form printed in this Demand. If you object to any interrogatory, the reasons for the objection shall be stated with specificity.

Issued at Washington, DC, this __27th__ day of _September_____, 2023.


_____
Jamie Ann Yavelberg
Director
Commercial Litigation Branch

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for producing the documents requested in Civil Investigative Demand No. 23-1306. I hereby certify that all the materials required by that Civil Investigative Demand which are in the possession, custody or control of the person to whom the Demand is directed have been submitted to a custodian named therein.

If any such material has not been produced because of a lawful objection, the objection to the document request and the reasons for the objection have been stated.

Signature ――――――――――――――

Title    ――――――――――――――

**SWORN TO** before me this _____ day of

_____, 2023

_____
NOTARY PUBLIC

---

[1]   In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## FORM OF CERTIFICATE OF COMPLIANCE[1]

      I have responsibility for answering interrogatory numbers_____in Civil Investigative Demand No. 23-1306. I hereby certify that all the information required by the Civil Investigative Demand and in the possession, custody, control, or knowledge of the person to whom the Civil Investigative Demand is directed has been submitted. To the extent information has not been furnished, the information is identified and the reasons why the information was not furnished are set forth with particularity. Additionally, if any such information has not been produced because of a lawful objection, the objection to the interrogatory and the reasons for the objection have been stated. I certify under penalty of perjury that the foregoing interrogatory responses are true and correct.

                                Signature_____

                                Title_____

**SWORN TO** before me this_____day of
_____, 2023

_____
                    NOTARY PUBLIC

---

[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## <u>VERIFIED RETURN OF SERVICE</u>

I,_____, an employee of the United States working under the direction and supervision of attorney Jessica Bergin in connection with a false claims law investigation, hereby certify that at the time of _____, on the_____day of _____, 2023, I personally served Civil Investigative Demand No. 23-1306 on _____, by delivering an executed copy of such Demand at:

_____

_____

_____

I declare under penalty of perjury that the foregoing is true and correct. Executed on this _____day of _____, 2023.

Signature_____

Title_____

ATTACHMENT A TO CIVIL INVESTIGATIVE DEMAND NO. 23-1306

## DEFINITIONS AND INSTRUCTIONS

### A. DEFINITIONS

1.    Unless specified otherwise, the terms "You" or "Your" mean Global Wound Care Medical Group, and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

2.    Unless specified otherwise, the term "Wound Pros" means Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, and Wound Pros Management Group, Inc.; and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

3.    "Communication" is used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and means any transmission or exchange of information orally or in writing, and include, but are not limited to, any emails and text message conversations (including those stored on organization and personal devices).

4.    "CPT code" means any Current Procedural Terminology code.

5.    "DME" means any durable medical equipment, including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes:  A4245-A5120, A6000-A6461, and L4360-L4387.

6.    "Document" and "documents" are used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations.

7.    "Employee" shall mean any person including, but not limited to, an employee, volunteer, independent contractor or agent, all past and present directors, officers, agents, representatives, accountants, advisors, and consultants who acted or purported to act on Your or Wound Pros' behalf or who performed any service for You or Wound Pros under Your or Wound Pros' name, whether on a full-time, part-time, piece-work, commission or other basis and whether paid or unpaid.

8.     "Federal healthcare program" means any healthcare program administered or funded wholly or in part by the United States, including, but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA and other VA health care programs and services, the Federal Employee Health Benefits Program, and the Federal Bureau of Prisons Health Services Program.

9.     "HCPCS code" means any Healthcare Common Procedure Coding System code.

10.    "Identify" means to provide the following information in Your response:

    a.    With respect to a natural person:
       (i)    the person's full name;
      (ii)    the name of the person's current or last known employer;
     (iii)    the person's title and position, if known;
     (iv)    the person's current or last known business and home address and telephone number; and
      (v)    if applicable, the person's National Provider Identifier ("NPI");

    b.    With respect to a corporation, partnership, joint venture, or other entity:
       (i)    the name of the entity;
      (ii)    the addresses and telephone numbers of its principal office(s);
     (iii)    the tax identification number; and
     (iv)    if the entity is a medical provider, the entity's NPI, Medicare provider number, and CMS Certification Number ("CCN"), if applicable;

    c.    With respect to documents:
       (i)    the title of the document;
      (ii)    the date of the document;
     (iii)    a description of the type of document;
     (iv)    a summary of the document's contents;
      (v)    the present location of the original and all existing copies of the document;
     (vi)    a list of all intended recipients of the document, including, but not limited to, all addressees, and all persons who were supposed to receive a copy of the document (*i.e.*, through "cc" or "bcc"); and
    (vii)    the identity of the author and a list of all persons who participated in the creation of the document.

11.    "Non-physician practitioner" means any practitioner of healthcare services who is not also a doctor of medicine or a doctor of osteopathic medicine.

12.    "Physician" means any provider of healthcare services who is a doctor of medicine or a doctor of osteopathic medicine

13.    "Provider" means any physician, physician group, hospital, laboratory, skilled nursing facility, home health agency, hospice, board and care facility, physician assistant, nurse,

nurse practitioner, medical assistant, or any other person or entity who provides any healthcare services, including any non-physician practitioner who provides any healthcare services.

14.    "Relating to" and "related to" mean consisting of, concerning, referring to, reflecting, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the matter discussed.

15.    "Skin substitute" means any graft used to assist with wound healing, such as non-autologous human skin (dermal or epidermal, cellular and acellular) grafts, non-human skin substitute grafts, and biological products (placental and amniotic skin substitutes), including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: C5271-C5278 and Q4101-Q4284.

16.    "Text message conversations" refers to any and all electronic communications (other than emails) that can or do contain text, regardless of the format of the communications, the application or platform used to send or receive the communications, and whether the communications are immediately retrievable or retrievable only via a forensic extraction, including, but not limited to, those occurring in or via SMS, MMS, EMS, iMessage, Facebook chat, Facebook messenger, Google Talk (formerly Gchat), Blackberry Messenger (BBM), Skype, GroupMe, AIM, WhatsApp, Slack, Snapchat, Signal, WeChat, or company-deployed electronic health records or communications platforms, as well as, recoverable deleted data, backup files (e.g., iCloud or iPhone backup files), and archive snapshots.

17.    The terms "and" and "or" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

18.    The terms "any" and "all" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

19.    The singular and plural forms of any word shall be construed interchangeably so as to bring within the scope of this Demand any document which might otherwise be construed as outside its scope.

## B. INSTRUCTIONS

1.    *Relevant Time Period:* Unless otherwise stated in any specific request below, each request covers the relevant time period since January 1, 2016.

2.    This Demand is continuing in nature. If You become aware of or acquire possession, custody, or control of additional documents that are responsive to this Demand, or if You become aware of or acquire additional information that is responsive to these interrogatories, You shall promptly produce such additional documents or supplement Your interrogatory responses.

3.    This Demand applies to all documents and information in Your possession, custody, or control regardless of their location and regardless of whether such documents or

information are held by Your current or former employees, including, but not limited to, in-house IT specialists and technicians, IT specialists and technicians to whom digital services have been out-sourced.

4.　　All documents produced pursuant to this Demand are to be organized in such a manner that all documents relating to a particular request are grouped together and identified as being responsive to that request.

5.　　If any document which is otherwise responsive to this Demand is not disclosed because of a claim of privilege or other objection, You shall identify such documents on a Privilege Log. The Privilege Log shall be produced in Excel or Word format and include the following information:

　　　　(a) the basis for the assertion of the privilege or objection;

　　　　(b) the type of document (e.g., letter, memorandum, email, etc.)

　　　　(c) the name and title of the author (and if different, the preparer and signatory);

　　　　(d) the name(s) and title(s) of the individual(s) to whom the document was addressed;

　　　　(e) the name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
　　　　(f) the date of the document;

　　　　(g) number of pages;

　　　　(h) a general description of the subject matter; and

　　　　(i) the Request(s) to which the document is responsive.

6.　　When a requested document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible. If a privilege is asserted with regard to a part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a document is redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration. Any redaction must be clearly visible on the redacted document.

7.　　If any document otherwise responsive to this Demand is not produced because it was lost, destroyed, or discarded:

　　　　(a) identify the document by type, date, and title;

(b) identify the person who last had custody or control over the document;

(c) state the date on which the document was destroyed or was discovered to have been lost;

(d) if the document was destroyed, state why it was destroyed and identify the person(s) who destroyed it;

(e) if the document was lost, describe the circumstances in which its loss was discovered, state the date that it was last seen or otherwise accounted for, and identify the person(s) who discovered its loss and who last saw or otherwise accounted for it;

(f) identify all persons who have knowledge pertaining to the destruction or loss of the document, giving a concise but complete statement of the knowledge You claim each such person has;

(g) identify all persons who have knowledge of the contents of each lost or destroyed document, giving a concise but complete statement of the knowledge You claim each such person has; and

(h) produce all existing indices, lists, or other documents in Your possession, custody, or control that reflect the existence of such lost or destroyed documents, and/or their transfer or destruction.

8.    If no documents exist that are responsive to a specific document request, a written statement to that effect shall be provided at the time of production.

9.    To the extent that documents responsive to this Demand are in the possession, custody, or control of third parties, this Demand requires a statement to that effect at the time of production, specifically providing the name, address, telephone number and principal contact of the third party, and shall further identify those documents in said third party's possession.

10.    Please produce imaged hard copy and electronic documents according to the Specifications for Production of Electronically Stored Information and Digitized Images at **Attachment B**.

11.    For each interrogatory and subpart thereof, You must respond separately and in writing.  Your responses must identify all documents that You used, referenced, or relied upon in Your written responses.

12.    If You withhold any information responsive to any interrogatory based on a claim of privilege or other objection: (a) furnish the basis for the assertion of the privilege or objection, (b) identify all individuals who could respond to the interrogatory with regard to the information that is being withheld, and (c) set forth the general subject matter and the specific interrogatory or interrogatories to which each individual could testify.

13.    When providing the name of an individual in response to any interrogatory or individuals identified pursuant to Instruction 12 above, provide the individual's last known address, telephone number, email address, or other contact information, as well as the individual's relationship to You.  If the individual is or was an employee, provide the individual's title and dates of employment.

## ATTACHMENT B TO CIVIL INVESTIGATIVE DEMAND NO. 23-1306

### Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")

#### Collection of Electronically Stored Information (ESI)

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

1.    **Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form. Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

2.    **Production Format of ESI and Imaged Hard Copy Documents**

Responsive ESI and imaged hard copy shall be produced in the format outlined below. All ESI, except as outlined below in sections 5 – 21, shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

   a.    **Image File Format:** All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

   b.    When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT Group IV (2D Compression). When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

      i.    All TIFF file names shall include the unique Bates number burned into the image. (See section 22, below, regarding Bates number instructions.)

      ii.    All TIFF image files shall be stored with the ".tif" extension.

       iii.  Images without corresponding extracted text shall be OCR'd using standard COTS products.

            1.  An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

       iv.  All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

       v.  No image folder shall contain more than 2,000 images.

  c.  **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

       REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
       REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,,
       REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,,
       REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
       REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,,

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.
- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

  d.  **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat

database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| | |
|---|---|
| *Field Separator* | ¶ *or Code 020* |
| *Text Qualifier* | þ *or Code 254* |
| *Newline* | ® *or Code 174* |
| *Multi-value* | ; *or Code 059* |
| *Nested values* | \ *or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:
   \\*CaseName*\\**LoadFiles**
   \\*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)

\*CaseName*\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

**3.    Required Metadata/Database Fields**

A "✓" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | ✓ | ✓ | ✓ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | ✓ | ✓ | ✓ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| AUTHOR | Creator of the document | Text | 500 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | ✓ | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/ YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

### 4.    Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures

a. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.
   - All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.
b. All files should be globally de-duplicated with the following conditions:

   i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.
   ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.
   iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.
   iv. No customization of hashing may occur without prior express approval by the Government.
   v. De-duplication must be done by document family, not by individual document.
   vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be

expressly stated in the cover letter accompanying the subsequent production(s).

c.  The Producing Party  shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government.  All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

## 5.    Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file.  Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file.  If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

## 6.    Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced.  For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

## 7.    Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

## 8.    Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

a.  The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b.  The unencrypted native file shall be produced pursuant to sections 10-21.
- If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

9.    **Production of Imaged Hard Copy Records**

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

      a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).

        ▪ The first document in the collection represents the parent document and all other documents will represent the children.

      b.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

        ▪ All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

10.    **Production of Spreadsheets and Presentation Files**

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

11.    **Production of E-mail Repositories**

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

12.    **Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items**

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies.  These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies.  However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participa nts | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timesta mp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format.  The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production.  The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#.  The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government.  The following are examples:

> a.   AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.
> - GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

b. Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

## 22. Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|         | *Document #1*          | *Document #2*          |
|---------|------------------------|------------------------|
| *Page #1* | PREFIX00000000001      | PREFIX00000000002      |
| *Page #2* | PREFIX00000000001.002  | PREFIX00000000002.002  |
| *Page #3* | PREFIX00000000001.003  | PREFIX00000000002.003  |

## 23. Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

a. CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
   - External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
b. Government approved File Transfer Protocol (FTP) technologies.
   - Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
c. Media should be labeled with the case name, production date, Bates range, and producing party.

## 24. Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

### 25. Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 26. Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing: total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats. The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 27. Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 28. Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced. Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

**ATTACHMENT C TO CIVIL INVESTIGATIVE DEMAND NO. 23-1306**

**DOCUMENT REQUESTS**

You are required by this Demand to produce any and all of the following documents in Your possession, custody, or control:

1.    All documents reflecting any formal or informal contracts and agreements between You or Wound Pros and the persons and entities identified in connection with interrogatory 1, including all documents and communications reflecting any compensation, payment, commissions, bonuses, reimbursement of expenses, risk sharing, or any other remuneration or benefits of any kind.

2.    All documents and communications concerning any compensation, commission, bonus, or any other remuneration or benefits of any kind offered and/or paid by or on behalf of You or Wound Pros to any person or entity that provides, supervises, directs, refers, or otherwise causes the provision or billing of the federal healthcare programs for any skin substitute products or services by or on behalf of You or Wound Pros, including, but not limited to, all documents and communications related to any fair market value assessment of that compensation.

3.    All personnel evaluations, records, schedules, timesheets, logs, and any other documentation of payments, remuneration, commission, reimbursement of expenses, risk sharing, benefits of any kind, referral, sanction, penalty, disciplinary action, or any other unfavorable action or consequence of any kind relating to the provision of or billing for any skin substitute products or services by or on behalf of You or Wound Pros.

4.    All documents and communications relating to supervision or direction by any physician affiliated with Wound Pros, including, but not limited to, Dr. Bill J. Releford, Dr. Christopher Otiko, Dr. Owen Ellington, Dr. Joseph M. Palumbo, Dr. Sherman Washington, and Dr. Allyson Pizzo-Berkey, of the provision of any skin substitute products or services by any non-physician practitioner on behalf of Wound Pros.

5.    All projections, analyses, reports, drafts, reviews, or other documentation reflecting any performance metric, including, but not limited to, revenue, profit, and return on investment ("ROI"), relating to the provision of or billing for any skin substitute products or services by any person or entity affiliated with Wound Pros.

6.    All documents and communications relating to the ordering by any Wound Pros-affiliated provider of any DME supplies from any Wound Pros-affiliated DME supplier, including the preparation and ordering of pre-made DME kits.

7.    All formal and informal policies, practices, procedures, guidelines, standard operating procedures, FAQs, training materials, instructions, advice, evaluations, or other guidance in any form relating to (a) supervision of non-physician practitioners, including remote supervision; (b) billing for products and services provided by non-physician practitioners, including billing for services "incident to" services provided by a physician; (c) billing

for products and services provided to patients in hospice, nursing facilities, skilled nursing facilities, or any other board or care facilities; (d) identifying the point of service and the entity that provided any products or services in any documentation related to billing; (e) ordering DME supplies; (f) providing DME to patients; and (g) compliance with federal healthcare program billing requirements, the False Claims Act, Stark Law, Anti-Kickback Statute, or other state and federal laws and regulatory guidance.

8.    All documents and communications concerning compliance with the requirements of any federal healthcare program, including, but not limited to, all documents exchanged with CMS relating to Your or Wound Pros' ability to participate in the federal healthcare programs, revocation by CMS, and any notifications from CMS regarding any actual, potential, or suspected failure to comply with CMS requirements.

9.    All formal or informal complaints, allegations, objections, inquiries, or concerns of any kind from any source concerning potential fraud, inappropriate billing, noncompliance with federal healthcare program requirements, unsatisfactory or inappropriate products or services, harm to patients, or violations of statutes or regulations by You or Wound Pros.

10.   Documents sufficient to show Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.

11.   Documents sufficient to show Your organizational chart(s) for the Relevant Time Period.

12.   All documents relied on to answer the interrogatories in **Attachment D**.

## ATTACHMENT D TO CIVIL INVESTIGATIVE DEMAND NO. 23-1306

## INTERROGATORIES

1. Identify in Microsoft Excel format all persons and entities with which You and/or Wound Pros contracted in connection with providing or billing for healthcare products or services, by specifying in separate fields: (a) the name of the person or entity with which You and/or Wound Pros contracted; (b) the contract name(s); (c) the contract date(s); (d) the contract number(s); (e) all parties to the contract(s); (f) the signatories to the contract(s); (g) the person(s) involved in the contracting process(es); (h) all products and services covered by the contract(s), including whether the contract related in any way to skin substitutes; (i) any amendments to the contract(s); (j) the status of any pending contract negotiations; (k) the reason(s) for any amendment, modification, or termination of any contract; (l) the termination date of the contract; and (m) any documentation related to the contract(s).

2. For each Wound Pros entity and affiliate, identify in Microsoft Excel format all owners, investors, and financial supporters of any kind by (a) full name; (b) current or last known business address, home address, and telephone number; (c) ownership share, if applicable; (d) investments and/or financial support provided, including the itemized amount(s) and date(s); (e) return on investment provided by the Wound Pros entity or affiliate to the owner, investor, or financial supporter, if applicable, including the amount(s) and date(s); (f) description of the nature of the ownership, investment relationship, and/or financial support; and (g) any other metric that You or Wound Pros uses to track or quantify the relationship with the owner, investor, or financial supporter.

3. For each Wound Pros entity and affiliate, identify in Microsoft Excel format all current and former employees by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) job title; (e) job responsibilities; (f) whether the employee was a direct employee, volunteer, independent contractor, agent, director, officer, representative, account, advisor, or consultant; (g) start date; (h) termination date, if applicable; (i) Wound Pros entity with which the individual interacted; (j) locations where any services were provided by the individual; (k) all compensation and benefits of any kind; (l) supervising responsibilities; (m) direct report(s); (n) supervisor(s); and (o) manager(s).

4. Identify in Microsoft Excel format all persons and/or entities through whom Wound Pros submits claims for reimbursement to the federal healthcare programs by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) nature of the relationship with Wound Pros; (f) start date of relationship; (g) end date of the relationship; (h) services provided; (i) dates during which the services were provided; (j) locations where the services were provided; (k) Wound Pros entity on behalf of which the person or entity submitted claims; (l) all compensation and benefits of any kind; and (m) whether the compensation was consistent with fair market value, including the basis for that conclusion.

5.    Identify in Microsoft Excel format all systems, programs, platforms, software, algorithms, analytics, or other tools used by Wound Pros, including, but not limited to, Slack, RITA, HL7, Smart Sheet, Black Doctor 24/7, Wound Docs, Office Ally, Kareo, Google Drive, Google Email, Zelis, Paychex, and ADP, by (a) name; (b) function and/or use; (c) dates of use; (d) the Wound Pros entities and/or individuals involved or impacted; and (e) the name(s) and title(s) of the employees or other third parties most knowledgeable about its function and/or use.

6.    For each system, program, platform, software, algorithm, analytic, or other tool identified in response to interrogatory 5, describe (a) all fields that are auto-populated by the system; (b) all fields that are added or revised by anyone other than the provider who directly treated the patient; and (c) the circumstances under which those fields are auto-populated, added, or revised.  If this process changed during the Relevant Time Period, describe all changes during this time period.

7.    Identify in Microsoft Excel format all DME suppliers used by any person or entity affiliated with Wound Pros by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) DME supplies ordered from that supplier; and (f) dates during which DME supplies were ordered from that supplier.

8.    Identify in Microsoft Excel format all DME orders filled by Wound Pros for DME, including (a) the item or service furnished; (b) the patient (i) full name, (ii) date of birth, (iii) social security number, and (iv) Medicare Beneficiary Number or other federal health care program identifier; (c) the referring physician; and (d) the amount reimbursed.

9.    Identify in Microsoft Excel format all Wound Pros facilities and medical offices where services were provided by any Wound Pros provider by (a) full name; (b) address; (c) the date range(s) during which services were provided at that facility or medical office; (d) all persons and entities that billed the federal healthcare programs for services performed at that facility or medical office, including the person's or entity's NPI and EIN; and (e) the services provided at that facility.

10.    Identify in Microsoft Excel format all patients treated by a Wound Pros non-physician practitioner, including identifying the patient by (a) full name; (b) date of birth; (c) social security number; (d) date of first encounter with Wound Pros; (e) date of the most recent encounter with Wound Pros; (f) date on which the service was provided; (g) whether the patient was treated with a skin substitute; (h) date of the skin substitute service, if any; (i) address where the service was performed; (j) whether the patient was located at a facility of any kind when the patient received the service, and if so, the type of facility, name of the facility, and address of the facility; (k) name of the person who performed the service; (l) name of the supervising physician, if any; (m) health insurance plan; (n) whether the patient was diagnosed with any condition related to the services provided, and if so, any associated diagnosis, HCPCS, and CPT codes; (o) all follow-up treatments

associated with the services provided; and (p) all documentation or other information considered in connection with the services provided.

11.    Describe Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership. If the structure has changed during the Relevant Time Period, describe all changes to the structure during this time period.

12.    Describe Your relationship with each of the following entities, including any ownership interest, financial relationship, and overlap in providers, services, or patients: (a) Wound Pros Washington; (b) Wound Pros Utah; (c) Wound Pros Louisiana; (d) Wound Pros Illinois; (e) Texas Wound Care Management; (f) PLS Podiatry Group; (g) Ohio Wound Care Specialists; (h) Ohio Wound Care Network; (i) DPMOTIKONRCA LLC; (j) Coast to Coast Podiatry; (l) Coast to Coast Foot Doctors, a Podiatry Corporation; (m) Coast to Coast DME; (n) Christopher A Otiko DPM; (o) Global Wound Care Medical Group; (p) American Wound Care Partners; (q) National Wound Care Associates; (r) Horizon Wound Care LLC; and (s) PLS Foot Doctors. If the relationship has changed during the Relevant Time Period, describe all changes during this time period.

# Exhibit 8

**CIVIL INVESTIGATIVE DEMAND**

# United States Department of Justice
**Washington, D.C. 20530**

TO:  Wound Pros Texas PLLC                              Civil Investigative
     c/o Cook Legal Group, LLP (Registered Agent)       Demand No. 23-1308
     12505 Memorial Drive, Suite 330
     Houston, Texas 77024

      This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729. The False Claims Act investigation concerns allegations that Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, Wound Pros Management Group, Inc., and certain related entities and individuals (collectively, "Wound Pros") made false statements in claims submitted to the federal healthcare programs in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral ("Stark") Law, 42 U.S.C. § 1395nn, and common law. Specifically, we are investigating whether Wound Pros submitted or caused the submission of (1) claims for reimbursement falsely stating that services provided by non-physician personnel were "incident to" a physician's services; (2) claims for medically unnecessary skin substitutes and associated services; (3) point of service information falsely indicating that services were provided in an office setting; (4) claims for reimbursement through entities other than the one that performed the services; and (5) claims for durable medical equipment based on self-referrals in violation of the Stark Law. We further are investigating whether Wound Pros paid or caused the payment of unlawful kickbacks to personnel in exchange for the personnel ordering products and services reimbursable by the federal healthcare programs.

      This Demand requires you to provide documents and answers to the attached written interrogatories to the Federal Government. This is the original of the Demand; no copies have been served on other parties. The information and documents provided in response to this Demand may be shared, used, and disclosed as provided by 31 U.S.C. § 3733.

-2-

**Document Request:**

In accordance with the definitions and instructions set forth in **Attachment A** and the production specifications in **Attachment B**, you are required by this Demand to produce any and all documents in your possession, custody or control responsive to the document requests set forth in **Attachment C**.

You must make this material available to Department of Justice Trial Attorney Jessica M. Bergin and Assistant United States Attorney David Thiess, who have been designated as False Claims Act custodians in this case. Ms. Bergin may be contacted at (202) 305-4207 or Jessica.Bergin@usdoj.gov, and Mr. Thiess may be contacted at (916) 554-2825 or David.Thiess@usdoj.gov, if you have any questions. These documents shall be produced no later than thirty (30) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The production of documentary material in response to this Demand must be made under a sworn certificate in the form printed in this Demand.

**Written Interrogatories:**

In accordance with the definitions and instructions set forth in **Attachment A**, you are required by this Demand to answer the interrogatories set forth in **Attachment D**. The answers to interrogatories shall be submitted no later than twenty (20) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The interrogatories shall be answered separately and fully in writing under oath and also shall be submitted under a sworn certificate in the form printed in this Demand. If you object to any interrogatory, the reasons for the objection shall be stated with specificity.

Issued at Washington, DC, this _27th_ day of ___September___, 2023.


_____
Jamie Ann Yavelberg
Director
Commercial Litigation Branch

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for producing the documents requested in Civil Investigative Demand No. 23-1308.  I hereby certify that all the materials required by that Civil Investigative Demand which are in the possession, custody or control of the person to whom the Demand is directed have been submitted to a custodian named therein.

If any such material has not been produced because of a lawful objection, the objection to the document request and the reasons for the objection have been stated.

Signature ————————————————

Title ————————————————

**SWORN TO** before me this _____ day of
_____, 2023

————————————————————
             NOTARY PUBLIC

————————————————

[1]     In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for answering interrogatory numbers_____in Civil Investigative Demand No. 23-1308. I hereby certify that all the information required by the Civil Investigative Demand and in the possession, custody, control, or knowledge of the person to whom the Civil Investigative Demand is directed has been submitted. To the extent information has not been furnished, the information is identified and the reasons why the information was not furnished are set forth with particularity. Additionally, if any such information has not been produced because of a lawful objection, the objection to the interrogatory and the reasons for the objection have been stated. I certify under penalty of perjury that the foregoing interrogatory responses are true and correct.

Signature_____

Title_____

**SWORN TO** before me this_____day of
_____, 2023

_____
                NOTARY PUBLIC

_____

[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## VERIFIED RETURN OF SERVICE

I,_____, an employee of the United States working under the direction and supervision of attorney Jessica Bergin in connection with a false claims law investigation, hereby certify that at the time of _____, on the_____day of _____, 2023, I personally served Civil Investigative Demand No. 23-1308 on _____, by delivering an executed copy of such Demand at:

_____

_____

_____

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this _____day of _____, 2023.

Signature_____

Title_____

## ATTACHMENT A TO CIVIL INVESTIGATIVE DEMAND NO. 23-1308

## DEFINITIONS AND INSTRUCTIONS

### A. DEFINITIONS

1.      Unless specified otherwise, the terms "You" or "Your" mean Wound Pros Texas PLLC, and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

2.      Unless specified otherwise, the term "Wound Pros" means Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, and Wound Pros Management Group, Inc.; and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

3.      "Communication" is used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and means any transmission or exchange of information orally or in writing, and include, but are not limited to, any emails and text message conversations (including those stored on organization and personal devices).

4.      "CPT code" means any Current Procedural Terminology code.

5.      "DME" means any durable medical equipment, including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes:  A4245-A5120, A6000-A6461, and L4360-L4387.

6.      "Document" and "documents" are used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations.

7.      "Employee" shall mean any person including, but not limited to, an employee, volunteer, independent contractor or agent, all past and present directors, officers, agents, representatives, accountants, advisors, and consultants who acted or purported to act on Your or Wound Pros' behalf or who performed any service for You or Wound Pros under Your or Wound Pros' name, whether on a full-time, part-time, piece-work, commission or other basis and whether paid or unpaid.

8.    "Federal healthcare program" means any healthcare program administered or funded wholly or in part by the United States, including, but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA and other VA health care programs and services, the Federal Employee Health Benefits Program, and the Federal Bureau of Prisons Health Services Program.

9.    "HCPCS code" means any Healthcare Common Procedure Coding System code.

10.    "Identify" means to provide the following information in Your response:

a.    With respect to a natural person:
    (i)    the person's full name;
    (ii)    the name of the person's current or last known employer;
    (iii)    the person's title and position, if known;
    (iv)    the person's current or last known business and home address and telephone number; and
    (v)    if applicable, the person's National Provider Identifier ("NPI");

b.    With respect to a corporation, partnership, joint venture, or other entity:
    (i)    the name of the entity;
    (ii)    the addresses and telephone numbers of its principal office(s);
    (iii)    the tax identification number; and
    (iv)    if the entity is a medical provider, the entity's NPI, Medicare provider number, and CMS Certification Number ("CCN"), if applicable;

c.    With respect to documents:
    (i)    the title of the document;
    (ii)    the date of the document;
    (iii)    a description of the type of document;
    (iv)    a summary of the document's contents;
    (v)    the present location of the original and all existing copies of the document;
    (vi)    a list of all intended recipients of the document, including, but not limited to, all addressees, and all persons who were supposed to receive a copy of the document (*i.e.*, through "cc" or "bcc"); and
    (vii)    the identity of the author and a list of all persons who participated in the creation of the document.

11.    "Non-physician practitioner" means any practitioner of healthcare services who is not also a doctor of medicine or a doctor of osteopathic medicine.

12.    "Physician" means any provider of healthcare services who is a doctor of medicine or a doctor of osteopathic medicine

13.    "Provider" means any physician, physician group, hospital, laboratory, skilled nursing facility, home health agency, hospice, board and care facility, physician assistant, nurse,

nurse practitioner, medical assistant, or any other person or entity who provides any healthcare services, including any non-physician practitioner who provides any healthcare services.

14.    "Relating to" and "related to" mean consisting of, concerning, referring to, reflecting, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the matter discussed.

15.    "Skin substitute" means any graft used to assist with wound healing, such as non-autologous human skin (dermal or epidermal, cellular and acellular) grafts, non-human skin substitute grafts, and biological products (placental and amniotic skin substitutes), including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: C5271-C5278 and Q4101-Q4284.

16.    "Text message conversations" refers to any and all electronic communications (other than emails) that can or do contain text, regardless of the format of the communications, the application or platform used to send or receive the communications, and whether the communications are immediately retrievable or retrievable only via a forensic extraction, including, but not limited to, those occurring in or via SMS, MMS, EMS, iMessage, Facebook chat, Facebook messenger, Google Talk (formerly Gchat), Blackberry Messenger (BBM), Skype, GroupMe, AIM, WhatsApp, Slack, Snapchat, Signal, WeChat, or company-deployed electronic health records or communications platforms, as well as, recoverable deleted data, backup files (e.g., iCloud or iPhone backup files), and archive snapshots.

17.    The terms "and" and "or" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

18.    The terms "any" and "all" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

19.    The singular and plural forms of any word shall be construed interchangeably so as to bring within the scope of this Demand any document which might otherwise be construed as outside its scope.

## B. INSTRUCTIONS

1.    *Relevant Time Period:* Unless otherwise stated in any specific request below, each request covers the relevant time period since January 1, 2016.

2.    This Demand is continuing in nature.  If You become aware of or acquire possession, custody, or control of additional documents that are responsive to this Demand, or if You become aware of or acquire additional information that is responsive to these interrogatories, You shall promptly produce such additional documents or supplement Your interrogatory responses.

3.    This Demand applies to all documents and information in Your possession, custody, or control regardless of their location and regardless of whether such documents or

information are held by Your current or former employees, including, but not limited to, in-house IT specialists and technicians, IT specialists and technicians to whom digital services have been out-sourced.

4.    All documents produced pursuant to this Demand are to be organized in such a manner that all documents relating to a particular request are grouped together and identified as being responsive to that request.

5.    If any document which is otherwise responsive to this Demand is not disclosed because of a claim of privilege or other objection, You shall identify such documents on a Privilege Log.  The Privilege Log shall be produced in Excel or Word format and include the following information:

> (a)  the basis for the assertion of the privilege or objection;
>
> (b)  the type of document (e.g., letter, memorandum, email, etc.)
>
> (c)  the name and title of the author (and if different, the preparer and signatory);
>
> (d)  the name(s) and title(s) of the individual(s) to whom the document was addressed;
>
> (e)  the name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
> (f)  the date of the document;
>
> (g)  number of pages;
>
> (h)  a general description of the subject matter; and
>
> (i)  the Request(s) to which the document is responsive.

6.    When a requested document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible.  If a privilege is asserted with regard to a part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed.  When a document is redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration.  Any redaction must be clearly visible on the redacted document.

7.    If any document otherwise responsive to this Demand is not produced because it was lost, destroyed, or discarded:

> (a)  identify the document by type, date, and title;

(b) identify the person who last had custody or control over the document;

(c) state the date on which the document was destroyed or was discovered to have been lost;

(d) if the document was destroyed, state why it was destroyed and identify the person(s) who destroyed it;

(e) if the document was lost, describe the circumstances in which its loss was discovered, state the date that it was last seen or otherwise accounted for, and identify the person(s) who discovered its loss and who last saw or otherwise accounted for it;

(f) identify all persons who have knowledge pertaining to the destruction or loss of the document, giving a concise but complete statement of the knowledge You claim each such person has;

(g) identify all persons who have knowledge of the contents of each lost or destroyed document, giving a concise but complete statement of the knowledge You claim each such person has; and

(h) produce all existing indices, lists, or other documents in Your possession, custody, or control that reflect the existence of such lost or destroyed documents, and/or their transfer or destruction.

8.    If no documents exist that are responsive to a specific document request, a written statement to that effect shall be provided at the time of production.

9.    To the extent that documents responsive to this Demand are in the possession, custody, or control of third parties, this Demand requires a statement to that effect at the time of production, specifically providing the name, address, telephone number and principal contact of the third party, and shall further identify those documents in said third party's possession.

10.    Please produce imaged hard copy and electronic documents according to the Specifications for Production of Electronically Stored Information and Digitized Images at **Attachment B**.

11.    For each interrogatory and subpart thereof, You must respond separately and in writing.  Your responses must identify all documents that You used, referenced, or relied upon in Your written responses.

12.    If You withhold any information responsive to any interrogatory based on a claim of privilege or other objection: (a) furnish the basis for the assertion of the privilege or objection, (b) identify all individuals who could respond to the interrogatory with regard to the information that is being withheld, and (c) set forth the general subject matter and the specific interrogatory or interrogatories to which each individual could testify.

13.     When providing the name of an individual in response to any interrogatory or individuals identified pursuant to Instruction 12 above, provide the individual's last known address, telephone number, email address, or other contact information, as well as the individual's relationship to You.  If the individual is or was an employee, provide the individual's title and dates of employment.

**ATTACHMENT B TO CIVIL INVESTIGATIVE DEMAND NO. 23-1308**

**Specifications for Production of ESI and Digitized ("Scanned") Images
("Production Specifications")**

**Collection of Electronically Stored Information (ESI)**

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

### 1.    Specification Modifications

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

### 2.    Production Format of ESI and Imaged Hard Copy Documents

Responsive ESI and imaged hard copy shall be produced in the format outlined below.  All ESI, except as outlined below in sections 5 – 21, shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

    a.  **Image File Format:** All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

    b.  When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT Group IV (2D Compression).  When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

      i.  All TIFF file names shall include the unique Bates number burned into the image.  (See section 22, below, regarding Bates number instructions.)

      ii.  All TIFF image files shall be stored with the ".tif" extension.

       iii.  Images without corresponding extracted text shall be OCR'd using standard COTS products.

           1.  An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

       iv.  All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

       v.  No image folder shall contain more than 2,000 images.

  c.  **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

      REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
      REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,,
      REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,,
      REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
      REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,,

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.
- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

  d.  **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat

database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| Field Separator | ¶ or Code 020 |
| Text Qualifier | þ or Code 254 |
| Newline | ® or Code 174 |
| Multi-value | ; or Code 059 |
| Nested values | \ or Code 092 |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAM Eþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:
  \\*CaseName*\\**LoadFiles**
  \\*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
  \\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
  \\*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)
  \\*CaseName*\\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)

\\*CaseName*\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

### 3. Required Metadata/Database Fields

A "✓" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | ✓ | ✓ | ✓ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | ✓ | ✓ | ✓ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| AUTHOR | Creator of the document | Text | 500 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | ✓ | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other. If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.: e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent.  Do not provide 00/00/0000. | Date | MM/DD/ YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

4.    **Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

a. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.

- All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

b. All files should be globally de-duplicated with the following conditions:

i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

iv. No customization of hashing may occur without prior express approval by the Government.

v. De-duplication must be done by document family, not by individual document.

vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be

expressly stated in the cover letter accompanying the subsequent production(s).

    c.  The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

### 5.    Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

### 6.    Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

### 7.    Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8.    Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

    a.  The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.

    ▪  If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

### 9.    Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

      a.   Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).
- The first document in the collection represents the parent document and all other documents will represent the children.

      b.   All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.
- All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

### 10.    Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

### 11.    Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

### 12.    Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies.  These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies.  However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
|---|---|---|---|---|---|---|---|---|---|---|---|
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format.  The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production.  The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#.  The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government.  The following are examples:

  a.  AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.
  - GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

    b.  Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

## 22.    Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|  | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

## 23.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

    a.  CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
      ▪  External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
    b.  Government approved File Transfer Protocol (FTP) technologies.
      ▪  Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
    c.  Media should be labeled with the case name, production date, Bates range, and producing party.

## 24.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

### 25. Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 26. Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing: total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats. The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 27. Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 28. Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced. Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

**ATTACHMENT C TO CIVIL INVESTIGATIVE DEMAND NO. 23-1308**

**DOCUMENT REQUESTS**

You are required by this Demand to produce any and all of the following documents in Your possession, custody, or control:

1. All documents reflecting any formal or informal contracts and agreements between You or Wound Pros and the persons and entities identified in connection with interrogatory 1, including all documents and communications reflecting any compensation, payment, commissions, bonuses, reimbursement of expenses, risk sharing, or any other remuneration or benefits of any kind.

2. All documents and communications concerning any compensation, commission, bonus, or any other remuneration or benefits of any kind offered and/or paid by or on behalf of You or Wound Pros to any person or entity that provides, supervises, directs, refers, or otherwise causes the provision or billing of the federal healthcare programs for any skin substitute products or services by or on behalf of You or Wound Pros, including, but not limited to, all documents and communications related to any fair market value assessment of that compensation.

3. All personnel evaluations, records, schedules, timesheets, logs, and any other documentation of payments, remuneration, commission, reimbursement of expenses, risk sharing, benefits of any kind, referral, sanction, penalty, disciplinary action, or any other unfavorable action or consequence of any kind relating to the provision of or billing for any skin substitute products or services by or on behalf of You or Wound Pros.

4. All documents and communications relating to supervision or direction by any physician affiliated with Wound Pros, including, but not limited to, Dr. Bill J. Releford, Dr. Christopher Otiko, Dr. Owen Ellington, Dr. Joseph M. Palumbo, Dr. Sherman Washington, and Dr. Allyson Pizzo-Berkey, of the provision of any skin substitute products or services by any non-physician practitioner on behalf of Wound Pros.

5. All projections, analyses, reports, drafts, reviews, or other documentation reflecting any performance metric, including, but not limited to, revenue, profit, and return on investment ("ROI"), relating to the provision of or billing for any skin substitute products or services by any person or entity affiliated with Wound Pros.

6. All documents and communications relating to the ordering by any Wound Pros-affiliated provider of any DME supplies from any Wound Pros-affiliated DME supplier, including the preparation and ordering of pre-made DME kits.

7. All formal and informal policies, practices, procedures, guidelines, standard operating procedures, FAQs, training materials, instructions, advice, evaluations, or other guidance in any form relating to (a) supervision of non-physician practitioners, including remote supervision; (b) billing for products and services provided by non-physician practitioners, including billing for services "incident to" services provided by a physician; (c) billing

for products and services provided to patients in hospice, nursing facilities, skilled nursing facilities, or any other board or care facilities; (d) identifying the point of service and the entity that provided any products or services in any documentation related to billing; (e) ordering DME supplies; (f) providing DME to patients; and (g) compliance with federal healthcare program billing requirements, the False Claims Act, Stark Law, Anti-Kickback Statute, or other state and federal laws and regulatory guidance.

8.    All documents and communications concerning compliance with the requirements of any federal healthcare program, including, but not limited to, all documents exchanged with CMS relating to Your or Wound Pros' ability to participate in the federal healthcare programs, revocation by CMS, and any notifications from CMS regarding any actual, potential, or suspected failure to comply with CMS requirements.

9.    All formal or informal complaints, allegations, objections, inquiries, or concerns of any kind from any source concerning potential fraud, inappropriate billing, noncompliance with federal healthcare program requirements, unsatisfactory or inappropriate products or services, harm to patients, or violations of statutes or regulations by You or Wound Pros.

10.    Documents sufficient to show Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.

11.    Documents sufficient to show Your organizational chart(s) for the Relevant Time Period.

12.    All documents relied on to answer the interrogatories in **Attachment D**.

## ATTACHMENT D TO CIVIL INVESTIGATIVE DEMAND NO. 23-1308

## INTERROGATORIES

1.  Identify in Microsoft Excel format all persons and entities with which You and/or Wound Pros contracted in connection with providing or billing for healthcare products or services, by specifying in separate fields: (a) the name of the person or entity with which You and/or Wound Pros contracted; (b) the contract name(s); (c) the contract date(s); (d) the contract number(s); (e) all parties to the contract(s); (f) the signatories to the contract(s); (g) the person(s) involved in the contracting process(es); (h) all products and services covered by the contract(s), including whether the contract related in any way to skin substitutes; (i) any amendments to the contract(s); (j) the status of any pending contract negotiations; (k) the reason(s) for any amendment, modification, or termination of any contract; (l) the termination date of the contract; and (m) any documentation related to the contract(s).

2.  For each Wound Pros entity and affiliate, identify in Microsoft Excel format all owners, investors, and financial supporters of any kind by (a) full name; (b) current or last known business address, home address, and telephone number; (c) ownership share, if applicable; (d) investments and/or financial support provided, including the itemized amount(s) and date(s); (e) return on investment provided by the Wound Pros entity or affiliate to the owner, investor, or financial supporter, if applicable, including the amount(s) and date(s); (f) description of the nature of the ownership, investment relationship, and/or financial support; and (g) any other metric that You or Wound Pros uses to track or quantify the relationship with the owner, investor, or financial supporter.

3.  For each Wound Pros entity and affiliate, identify in Microsoft Excel format all current and former employees by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) job title; (e) job responsibilities; (f) whether the employee was a direct employee, volunteer, independent contractor, agent, director, officer, representative, account, advisor, or consultant; (g) start date; (h) termination date, if applicable; (i) Wound Pros entity with which the individual interacted; (j) locations where any services were provided by the individual; (k) all compensation and benefits of any kind; (l) supervising responsibilities; (m) direct report(s); (n) supervisor(s); and (o) manager(s).

4.  Identify in Microsoft Excel format all persons and/or entities through whom Wound Pros submits claims for reimbursement to the federal healthcare programs by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) nature of the relationship with Wound Pros; (f) start date of relationship; (g) end date of the relationship; (h) services provided; (i) dates during which the services were provided; (j) locations where the services were provided; (k) Wound Pros entity on behalf of which the person or entity submitted claims; (l) all compensation and benefits of any kind; and (m) whether the compensation was consistent with fair market value, including the basis for that conclusion.

5.   Identify in Microsoft Excel format all systems, programs, platforms, software, algorithms, analytics, or other tools used by Wound Pros, including, but not limited to, Slack, RITA, HL7, Smart Sheet, Black Doctor 24/7, Wound Docs, Office Ally, Kareo, Google Drive, Google Email, Zelis, Paychex, and ADP, by (a) name; (b) function and/or use; (c) dates of use; (d) the Wound Pros entities and/or individuals involved or impacted; and (e) the name(s) and title(s) of the employees or other third parties most knowledgeable about its function and/or use.

6.   For each system, program, platform, software, algorithm, analytic, or other tool identified in response to interrogatory 5, describe (a) all fields that are auto-populated by the system; (b) all fields that are added or revised by anyone other than the provider who directly treated the patient; and (c) the circumstances under which those fields are auto-populated, added, or revised.  If this process changed during the Relevant Time Period, describe all changes during this time period.

7.   Identify in Microsoft Excel format all DME suppliers used by any person or entity affiliated with Wound Pros by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) DME supplies ordered from that supplier; and (f) dates during which DME supplies were ordered from that supplier.

8.   Identify in Microsoft Excel format all DME orders filled by Wound Pros for DME, including (a) the item or service furnished; (b) the patient (i) full name, (ii) date of birth, (iii) social security number, and (iv) Medicare Beneficiary Number or other federal health care program identifier; (c) the referring physician; and (d) the amount reimbursed.

9.   Identify in Microsoft Excel format all Wound Pros facilities and medical offices where services were provided by any Wound Pros provider by (a) full name; (b) address; (c) the date range(s) during which services were provided at that facility or medical office; (d) all persons and entities that billed the federal healthcare programs for services performed at that facility or medical office, including the person's or entity's NPI and EIN; and (e) the services provided at that facility.

10.  Identify in Microsoft Excel format all patients treated by a Wound Pros non-physician practitioner, including identifying the patient by (a) full name; (b) date of birth; (c) social security number; (d) date of first encounter with Wound Pros; (e) date of the most recent encounter with Wound Pros; (f) date on which the service was provided; (g) whether the patient was treated with a skin substitute; (h) date of the skin substitute service, if any; (i) address where the service was performed; (j) whether the patient was located at a facility of any kind when the patient received the service, and if so, the type of facility, name of the facility, and address of the facility; (k) name of the person who performed the service; (l) name of the supervising physician, if any; (m) health insurance plan; (n) whether the patient was diagnosed with any condition related to the services provided, and if so, any associated diagnosis, HCPCS, and CPT codes; (o) all follow-up treatments

associated with the services provided; and (p) all documentation or other information considered in connection with the services provided.

11.    Describe Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.  If the structure has changed during the Relevant Time Period, describe all changes to the structure during this time period.

12.    Describe Your relationship with each of the following entities, including any ownership interest, financial relationship, and overlap in providers, services, or patients:  (a) Wound Pros Washington; (b) Wound Pros Utah; (c) Wound Pros Louisiana; (d) Wound Pros Illinois; (e) Texas Wound Care Management; (f) PLS Podiatry Group; (g) Ohio Wound Care Specialists; (h) Ohio Wound Care Network; (i) DPMOTIKONRCA LLC; (j) Coast to Coast Podiatry; (l) Coast to Coast Foot Doctors, a Podiatry Corporation; (m) Coast to Coast DME; (n) Christopher A Otiko DPM; (o) Global Wound Care Medical Group; (p) American Wound Care Partners; (q) National Wound Care Associates; (r) Horizon Wound Care LLC; and (s) PLS Foot Doctors.  If the relationship has changed during the Relevant Time Period, describe all changes during this time period.

# Exhibit 9

# CIVIL INVESTIGATIVE DEMAND

# United States Department of Justice
### Washington, D.C. 20530

TO:   Wound Pros Georgia P.C.                          Civil Investigative
      c/o Christopher Otiko (Registered Agent)         Demand No. 23-1309
      206 Peachtree Street NW, Suite 200
      Atlanta, Georgia 30303

     This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729.  The False Claims Act investigation concerns allegations that Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, Wound Pros Management Group, Inc., and certain related entities and individuals (collectively, "Wound Pros") made false statements in claims submitted to the federal healthcare programs in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral ("Stark") Law, 42 U.S.C. § 1395nn, and common law. Specifically, we are investigating whether Wound Pros submitted or caused the submission of (1) claims for reimbursement falsely stating that services provided by non-physician personnel were "incident to" a physician's services; (2) claims for medically unnecessary skin substitutes and associated services; (3) point of service information falsely indicating that services were provided in an office setting; (4) claims for reimbursement through entities other than the one that performed the services; and (5) claims for durable medical equipment based on self-referrals in violation of the Stark Law.  We further are investigating whether Wound Pros paid or caused the payment of unlawful kickbacks to personnel in exchange for the personnel ordering products and services reimbursable by the federal healthcare programs.

     This Demand requires you to provide documents and answers to the attached written interrogatories to the Federal Government.  This is the original of the Demand; no copies have been served on other parties.  The information and documents provided in response to this Demand may be shared, used, and disclosed as provided by 31 U.S.C. § 3733.

-2-

**Document Request**:

In accordance with the definitions and instructions set forth in **Attachment A** and the production specifications in **Attachment B**, you are required by this Demand to produce any and all documents in your possession, custody or control responsive to the document requests set forth in **Attachment C**.

You must make this material available to Department of Justice Trial Attorney Jessica M. Bergin and Assistant United States Attorney David Thiess, who have been designated as False Claims Act custodians in this case. Ms. Bergin may be contacted at (202) 305-4207 or Jessica.Bergin@usdoj.gov, and Mr. Thiess may be contacted at (916) 554-2825 or David.Thiess@usdoj.gov, if you have any questions. These documents shall be produced no later than thirty (30) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The production of documentary material in response to this Demand must be made under a sworn certificate in the form printed in this Demand.

**Written Interrogatories**:

In accordance with the definitions and instructions set forth in **Attachment A**, you are required by this Demand to answer the interrogatories set forth in **Attachment D**. The answers to interrogatories shall be submitted no later than twenty (20) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The interrogatories shall be answered separately and fully in writing under oath and also shall be submitted under a sworn certificate in the form printed in this Demand. If you object to any interrogatory, the reasons for the objection shall be stated with specificity.

Issued at Washington, DC, this _27th_ day of ___September___, 2023.

_____
Jamie Ann Yavelberg
Director
Commercial Litigation Branch

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for producing the documents requested in Civil Investigative Demand No. 23-1309. I hereby certify that all the materials required by that Civil Investigative Demand which are in the possession, custody or control of the person to whom the Demand is directed have been submitted to a custodian named therein.

If any such material has not been produced because of a lawful objection, the objection to the document request and the reasons for the objection have been stated.

Signature ————————————————

Title     ————————————————

**SWORN TO** before me this _____ day of

_____, 2023

————————————————————
NOTARY PUBLIC

---

[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## FORM OF CERTIFICATE OF COMPLIANCE[1]

     I have responsibility for answering interrogatory numbers_____in Civil Investigative Demand No. 23-1309.  I hereby certify that all the information required by the Civil Investigative Demand and in the possession, custody, control, or knowledge of the person to whom the Civil Investigative Demand is directed has been submitted.  To the extent information has not been furnished, the information is identified and the reasons why the information was not furnished are set forth with particularity.  Additionally, if any such information has not been produced because of a lawful objection, the objection to the interrogatory and the reasons for the objection have been stated. I certify under penalty of perjury that the foregoing interrogatory responses are true and correct.

 

                        Signature_____

                        Title_____

**SWORN TO** before me this_____day of
_____, 2023

_____
          NOTARY PUBLIC

---

[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## <u>VERIFIED RETURN OF SERVICE</u>

I,_____, an employee of the United States working under the direction and supervision of attorney Jessica Bergin in connection with a false claims law investigation, hereby certify that at the time of _____, on the_____day of _____, 2023, I personally served Civil Investigative Demand No. 23-1309 on _____, by delivering an executed copy of such Demand at:

_____

_____

_____

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this _____day of _____, 2023.

Signature_____

Title_____

ATTACHMENT A TO CIVIL INVESTIGATIVE DEMAND NO. 23-1309

**DEFINITIONS AND INSTRUCTIONS**

### A. DEFINITIONS

1.  Unless specified otherwise, the terms "You" or "Your" mean Wound Pros Georgia P.C., and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

2.  Unless specified otherwise, the term "Wound Pros" means Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, and Wound Pros Management Group, Inc.; and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

3.  "Communication" is used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and means any transmission or exchange of information orally or in writing, and include, but are not limited to, any emails and text message conversations (including those stored on organization and personal devices).

4.  "CPT code" means any Current Procedural Terminology code.

5.  "DME" means any durable medical equipment, including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes:  A4245-A5120, A6000-A6461, and L4360-L4387.

6.  "Document" and "documents" are used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations.

7.  "Employee" shall mean any person including, but not limited to, an employee, volunteer, independent contractor or agent, all past and present directors, officers, agents, representatives, accountants, advisors, and consultants who acted or purported to act on Your or Wound Pros' behalf or who performed any service for You or Wound Pros under Your or Wound Pros' name, whether on a full-time, part-time, piece-work, commission or other basis and whether paid or unpaid.

8.    "Federal healthcare program" means any healthcare program administered or funded wholly or in part by the United States, including, but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA and other VA health care programs and services, the Federal Employee Health Benefits Program, and the Federal Bureau of Prisons Health Services Program.

9.    "HCPCS code" means any Healthcare Common Procedure Coding System code.

10.    "Identify" means to provide the following information in Your response:

    a.    With respect to a natural person:
        (i)    the person's full name;
        (ii)    the name of the person's current or last known employer;
        (iii)    the person's title and position, if known;
        (iv)    the person's current or last known business and home address and telephone number; and
        (v)    if applicable, the person's National Provider Identifier ("NPI");

    b.    With respect to a corporation, partnership, joint venture, or other entity:
        (i)    the name of the entity;
        (ii)    the addresses and telephone numbers of its principal office(s);
        (iii)    the tax identification number; and
        (iv)    if the entity is a medical provider, the entity's NPI, Medicare provider number, and CMS Certification Number ("CCN"), if applicable;

    c.    With respect to documents:
        (i)    the title of the document;
        (ii)    the date of the document;
        (iii)    a description of the type of document;
        (iv)    a summary of the document's contents;
        (v)    the present location of the original and all existing copies of the document;
        (vi)    a list of all intended recipients of the document, including, but not limited to, all addressees, and all persons who were supposed to receive a copy of the document (*i.e.*, through "cc" or "bcc"); and
        (vii)    the identity of the author and a list of all persons who participated in the creation of the document.

11.    "Non-physician practitioner" means any practitioner of healthcare services who is not also a doctor of medicine or a doctor of osteopathic medicine.

12.    "Physician" means any provider of healthcare services who is a doctor of medicine or a doctor of osteopathic medicine

13.    "Provider" means any physician, physician group, hospital, laboratory, skilled nursing facility, home health agency, hospice, board and care facility, physician assistant, nurse,

nurse practitioner, medical assistant, or any other person or entity who provides any healthcare services, including any non-physician practitioner who provides any healthcare services.

14.     "Relating to" and "related to" mean consisting of, concerning, referring to, reflecting, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the matter discussed.

15.     "Skin substitute" means any graft used to assist with wound healing, such as non-autologous human skin (dermal or epidermal, cellular and acellular) grafts, non-human skin substitute grafts, and biological products (placental and amniotic skin substitutes), including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: C5271-C5278 and Q4101-Q4284.

16.     "Text message conversations" refers to any and all electronic communications (other than emails) that can or do contain text, regardless of the format of the communications, the application or platform used to send or receive the communications, and whether the communications are immediately retrievable or retrievable only via a forensic extraction, including, but not limited to, those occurring in or via SMS, MMS, EMS, iMessage, Facebook chat, Facebook messenger, Google Talk (formerly Gchat), Blackberry Messenger (BBM), Skype, GroupMe, AIM, WhatsApp, Slack, Snapchat, Signal, WeChat, or company-deployed electronic health records or communications platforms, as well as, recoverable deleted data, backup files (e.g., iCloud or iPhone backup files), and archive snapshots.

17.     The terms "and" and "or" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

18.     The terms "any" and "all" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

19.     The singular and plural forms of any word shall be construed interchangeably so as to bring within the scope of this Demand any document which might otherwise be construed as outside its scope.

## B. INSTRUCTIONS

1.     *Relevant Time Period:* Unless otherwise stated in any specific request below, each request covers the relevant time period since January 1, 2016.

2.     This Demand is continuing in nature. If You become aware of or acquire possession, custody, or control of additional documents that are responsive to this Demand, or if You become aware of or acquire additional information that is responsive to these interrogatories, You shall promptly produce such additional documents or supplement Your interrogatory responses.

3.     This Demand applies to all documents and information in Your possession, custody, or control regardless of their location and regardless of whether such documents or

information are held by Your current or former employees, including, but not limited to, in-house IT specialists and technicians, IT specialists and technicians to whom digital services have been out-sourced.

4.      All documents produced pursuant to this Demand are to be organized in such a manner that all documents relating to a particular request are grouped together and identified as being responsive to that request.

5.      If any document which is otherwise responsive to this Demand is not disclosed because of a claim of privilege or other objection, You shall identify such documents on a Privilege Log.  The Privilege Log shall be produced in Excel or Word format and include the following information:

> (a) the basis for the assertion of the privilege or objection;
>
> (b) the type of document (e.g., letter, memorandum, email, etc.)
>
> (c) the name and title of the author (and if different, the preparer and signatory);
>
> (d) the name(s) and title(s) of the individual(s) to whom the document was addressed;
>
> (e) the name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
> (f) the date of the document;
>
> (g) number of pages;
>
> (h) a general description of the subject matter; and
>
> (i) the Request(s) to which the document is responsive.

6.      When a requested document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible.  If a privilege is asserted with regard to a part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed.  When a document is redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration.  Any redaction must be clearly visible on the redacted document.

7.      If any document otherwise responsive to this Demand is not produced because it was lost, destroyed, or discarded:

> (a) identify the document by type, date, and title;

(b) identify the person who last had custody or control over the document;

(c) state the date on which the document was destroyed or was discovered to have been lost;

(d) if the document was destroyed, state why it was destroyed and identify the person(s) who destroyed it;

(e) if the document was lost, describe the circumstances in which its loss was discovered, state the date that it was last seen or otherwise accounted for, and identify the person(s) who discovered its loss and who last saw or otherwise accounted for it;

(f) identify all persons who have knowledge pertaining to the destruction or loss of the document, giving a concise but complete statement of the knowledge You claim each such person has;

(g) identify all persons who have knowledge of the contents of each lost or destroyed document, giving a concise but complete statement of the knowledge You claim each such person has; and

(h) produce all existing indices, lists, or other documents in Your possession, custody, or control that reflect the existence of such lost or destroyed documents, and/or their transfer or destruction.

8.      If no documents exist that are responsive to a specific document request, a written statement to that effect shall be provided at the time of production.

9.      To the extent that documents responsive to this Demand are in the possession, custody, or control of third parties, this Demand requires a statement to that effect at the time of production, specifically providing the name, address, telephone number and principal contact of the third party, and shall further identify those documents in said third party's possession.

10.     Please produce imaged hard copy and electronic documents according to the Specifications for Production of Electronically Stored Information and Digitized Images at **Attachment B**.

11.     For each interrogatory and subpart thereof, You must respond separately and in writing.  Your responses must identify all documents that You used, referenced, or relied upon in Your written responses.

12.     If You withhold any information responsive to any interrogatory based on a claim of privilege or other objection: (a) furnish the basis for the assertion of the privilege or objection, (b) identify all individuals who could respond to the interrogatory with regard to the information that is being withheld, and (c) set forth the general subject matter and the specific interrogatory or interrogatories to which each individual could testify.

13.    When providing the name of an individual in response to any interrogatory or individuals identified pursuant to Instruction 12 above, provide the individual's last known address, telephone number, email address, or other contact information, as well as the individual's relationship to You.  If the individual is or was an employee, provide the individual's title and dates of employment.

**ATTACHMENT B TO CIVIL INVESTIGATIVE DEMAND NO. 23-1309**

**Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")**

**Collection of Electronically Stored Information (ESI)**

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

1.    **Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

2.    **Production Format of ESI and Imaged Hard Copy Documents**

Responsive ESI and imaged hard copy shall be produced in the format outlined below.  All ESI, except as outlined below in sections 5 – 21, shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

a.    **Image File Format:** All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

b.    When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT Group IV (2D Compression).  When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

i.    All TIFF file names shall include the unique Bates number burned into the image.  (See section 22, below, regarding Bates number instructions.)

ii.    All TIFF image files shall be stored with the ".tif" extension.

       iii.  Images without corresponding extracted text shall be OCR'd using standard COTS products.

           1.  An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

       iv.  All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

       v.  No image folder shall contain more than 2,000 images.

  c.  **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file.  The Cross Reference file should also contain the relative image file path for each Bates numbered page.  The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

        REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
        REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,,
        REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,,
        REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
        REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,,

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.
- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

  d.  **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat

database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| | |
|---|---|
| *Field Separator* | ¶ *or Code 020* |
| *Text Qualifier* | þ *or Code 254* |
| *Newline* | ® *or Code 174* |
| *Multi-value* | ; *or Code 059* |
| *Nested values* | \ *or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAM Eþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:
   \*CaseName*\**LoadFiles**
   \*CaseName*\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
   \*CaseName*\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \*CaseName*\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \*CaseName*\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)

\\*CaseName*\\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

**3.**    **Required Metadata/Database Fields**

A "√" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | √ | √ | √ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | √ | √ | √ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | √ | √ | √ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | √ | √ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | √ | √ |
| AUTHOR | Creator of the document | Text | 500 | | | √ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | √ | √ | √ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other. If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.: e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/ YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

### 4. Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures

a. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.

- All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

b. All files should be globally de-duplicated with the following conditions:

i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

iv. No customization of hashing may occur without prior express approval by the Government.

v. De-duplication must be done by document family, not by individual document.

vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be

expressly stated in the cover letter accompanying the subsequent production(s).

    c.   The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

### 5. Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

### 6. Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

### 7. Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8. Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

    a.   The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.

        ▪  If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

9. **Production of Imaged Hard Copy Records**

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

      a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).

        ▪  The first document in the collection represents the parent document and all other documents will represent the children.

      b.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

        ▪  All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

10. **Production of Spreadsheets and Presentation Files**

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

11. **Production of E-mail Repositories**

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

12. **Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items**

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies.  These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies.  However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timesta mp: Date | Date | Date | Date | | Timestamp -Date | Timestamp- Date | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

Page 20 of 30

| Field Name | Field Description | Mobile Cellebrite Categories | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Mobile | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format.  The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production.  The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#.  The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government.  The following are examples:

    a.   AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.

       ▪  GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

      b.   Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

## 22.    Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|  | *Document #1* | *Document #2* |
|---|---|---|
| *Page #1* | PREFIX00000000001 | PREFIX00000000002 |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

## 23.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

      a.   CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
        ▪  External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
      b.   Government approved File Transfer Protocol (FTP) technologies.
        ▪  Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
      c.   Media should be labeled with the case name, production date, Bates range, and producing party.

## 24.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

**25.    Compliance and Adherence to Generally Accepted Technical Standards**

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

**26.    Read Me Text File**

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

**27.    Exception Report**

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

**28.    Transmittal Letter to Accompany Deliverables**

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

**ATTACHMENT C TO CIVIL INVESTIGATIVE DEMAND NO. 23-1309**

**DOCUMENT REQUESTS**

You are required by this Demand to produce any and all of the following documents in Your possession, custody, or control:

1. All documents reflecting any formal or informal contracts and agreements between You or Wound Pros and the persons and entities identified in connection with interrogatory 1, including all documents and communications reflecting any compensation, payment, commissions, bonuses, reimbursement of expenses, risk sharing, or any other remuneration or benefits of any kind.

2. All documents and communications concerning any compensation, commission, bonus, or any other remuneration or benefits of any kind offered and/or paid by or on behalf of You or Wound Pros to any person or entity that provides, supervises, directs, refers, or otherwise causes the provision or billing of the federal healthcare programs for any skin substitute products or services by or on behalf of You or Wound Pros, including, but not limited to, all documents and communications related to any fair market value assessment of that compensation.

3. All personnel evaluations, records, schedules, timesheets, logs, and any other documentation of payments, remuneration, commission, reimbursement of expenses, risk sharing, benefits of any kind, referral, sanction, penalty, disciplinary action, or any other unfavorable action or consequence of any kind relating to the provision of or billing for any skin substitute products or services by or on behalf of You or Wound Pros.

4. All documents and communications relating to supervision or direction by any physician affiliated with Wound Pros, including, but not limited to, Dr. Bill J. Releford, Dr. Christopher Otiko, Dr. Owen Ellington, Dr. Joseph M. Palumbo, Dr. Sherman Washington, and Dr. Allyson Pizzo-Berkey, of the provision of any skin substitute products or services by any non-physician practitioner on behalf of Wound Pros.

5. All projections, analyses, reports, drafts, reviews, or other documentation reflecting any performance metric, including, but not limited to, revenue, profit, and return on investment ("ROI"), relating to the provision of or billing for any skin substitute products or services by any person or entity affiliated with Wound Pros.

6. All documents and communications relating to the ordering by any Wound Pros-affiliated provider of any DME supplies from any Wound Pros-affiliated DME supplier, including the preparation and ordering of pre-made DME kits.

7. All formal and informal policies, practices, procedures, guidelines, standard operating procedures, FAQs, training materials, instructions, advice, evaluations, or other guidance in any form relating to (a) supervision of non-physician practitioners, including remote supervision; (b) billing for products and services provided by non-physician practitioners, including billing for services "incident to" services provided by a physician; (c) billing

for products and services provided to patients in hospice, nursing facilities, skilled nursing facilities, or any other board or care facilities; (d) identifying the point of service and the entity that provided any products or services in any documentation related to billing; (e) ordering DME supplies; (f) providing DME to patients; and (g) compliance with federal healthcare program billing requirements, the False Claims Act, Stark Law, Anti-Kickback Statute, or other state and federal laws and regulatory guidance.

8.      All documents and communications concerning compliance with the requirements of any federal healthcare program, including, but not limited to, all documents exchanged with CMS relating to Your or Wound Pros' ability to participate in the federal healthcare programs, revocation by CMS, and any notifications from CMS regarding any actual, potential, or suspected failure to comply with CMS requirements.

9.      All formal or informal complaints, allegations, objections, inquiries, or concerns of any kind from any source concerning potential fraud, inappropriate billing, noncompliance with federal healthcare program requirements, unsatisfactory or inappropriate products or services, harm to patients, or violations of statutes or regulations by You or Wound Pros.

10.     Documents sufficient to show Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.

11.     Documents sufficient to show Your organizational chart(s) for the Relevant Time Period.

12.     All documents relied on to answer the interrogatories in **Attachment D**.

## ATTACHMENT D TO CIVIL INVESTIGATIVE DEMAND NO. 23-1309

## INTERROGATORIES

1.  Identify in Microsoft Excel format all persons and entities with which You and/or Wound Pros contracted in connection with providing or billing for healthcare products or services, by specifying in separate fields: (a) the name of the person or entity with which You and/or Wound Pros contracted; (b) the contract name(s); (c) the contract date(s); (d) the contract number(s); (e) all parties to the contract(s); (f) the signatories to the contract(s); (g) the person(s) involved in the contracting process(es); (h) all products and services covered by the contract(s), including whether the contract related in any way to skin substitutes; (i) any amendments to the contract(s); (j) the status of any pending contract negotiations; (k) the reason(s) for any amendment, modification, or termination of any contract; (l) the termination date of the contract; and (m) any documentation related to the contract(s).

2.  For each Wound Pros entity and affiliate, identify in Microsoft Excel format all owners, investors, and financial supporters of any kind by (a) full name; (b) current or last known business address, home address, and telephone number; (c) ownership share, if applicable; (d) investments and/or financial support provided, including the itemized amount(s) and date(s); (e) return on investment provided by the Wound Pros entity or affiliate to the owner, investor, or financial supporter, if applicable, including the amount(s) and date(s); (f) description of the nature of the ownership, investment relationship, and/or financial support; and (g) any other metric that You or Wound Pros uses to track or quantify the relationship with the owner, investor, or financial supporter.

3.  For each Wound Pros entity and affiliate, identify in Microsoft Excel format all current and former employees by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) job title; (e) job responsibilities; (f) whether the employee was a direct employee, volunteer, independent contractor, agent, director, officer, representative, account, advisor, or consultant; (g) start date; (h) termination date, if applicable; (i) Wound Pros entity with which the individual interacted; (j) locations where any services were provided by the individual; (k) all compensation and benefits of any kind; (l) supervising responsibilities; (m) direct report(s); (n) supervisor(s); and (o) manager(s).

4.  Identify in Microsoft Excel format all persons and/or entities through whom Wound Pros submits claims for reimbursement to the federal healthcare programs by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) nature of the relationship with Wound Pros; (f) start date of relationship; (g) end date of the relationship; (h) services provided; (i) dates during which the services were provided; (j) locations where the services were provided; (k) Wound Pros entity on behalf of which the person or entity submitted claims; (l) all compensation and benefits of any kind; and (m) whether the compensation was consistent with fair market value, including the basis for that conclusion.

5.    Identify in Microsoft Excel format all systems, programs, platforms, software, algorithms, analytics, or other tools used by Wound Pros, including, but not limited to, Slack, RITA, HL7, Smart Sheet, Black Doctor 24/7, Wound Docs, Office Ally, Kareo, Google Drive, Google Email, Zelis, Paychex, and ADP, by (a) name; (b) function and/or use; (c) dates of use; (d) the Wound Pros entities and/or individuals involved or impacted; and (e) the name(s) and title(s) of the employees or other third parties most knowledgeable about its function and/or use.

6.    For each system, program, platform, software, algorithm, analytic, or other tool identified in response to interrogatory 5, describe (a) all fields that are auto-populated by the system; (b) all fields that are added or revised by anyone other than the provider who directly treated the patient; and (c) the circumstances under which those fields are auto-populated, added, or revised.  If this process changed during the Relevant Time Period, describe all changes during this time period.

7.    Identify in Microsoft Excel format all DME suppliers used by any person or entity affiliated with Wound Pros by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) DME supplies ordered from that supplier; and (f) dates during which DME supplies were ordered from that supplier.

8.    Identify in Microsoft Excel format all DME orders filled by Wound Pros for DME, including (a) the item or service furnished; (b) the patient (i) full name, (ii) date of birth, (iii) social security number, and (iv) Medicare Beneficiary Number or other federal health care program identifier; (c) the referring physician; and (d) the amount reimbursed.

9.    Identify in Microsoft Excel format all Wound Pros facilities and medical offices where services were provided by any Wound Pros provider by (a) full name; (b) address; (c) the date range(s) during which services were provided at that facility or medical office; (d) all persons and entities that billed the federal healthcare programs for services performed at that facility or medical office, including the person's or entity's NPI and EIN; and (e) the services provided at that facility.

10.    Identify in Microsoft Excel format all patients treated by a Wound Pros non-physician practitioner, including identifying the patient by (a) full name; (b) date of birth; (c) social security number; (d) date of first encounter with Wound Pros; (e) date of the most recent encounter with Wound Pros; (f) date on which the service was provided; (g) whether the patient was treated with a skin substitute; (h) date of the skin substitute service, if any; (i) address where the service was performed; (j) whether the patient was located at a facility of any kind when the patient received the service, and if so, the type of facility, name of the facility, and address of the facility; (k) name of the person who performed the service; (l) name of the supervising physician, if any; (m) health insurance plan; (n) whether the patient was diagnosed with any condition related to the services provided, and if so, any associated diagnosis, HCPCS, and CPT codes; (o) all follow-up treatments

associated with the services provided; and (p) all documentation or other information considered in connection with the services provided.

11.     Describe Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership. If the structure has changed during the Relevant Time Period, describe all changes to the structure during this time period.

12.     Describe Your relationship with each of the following entities, including any ownership interest, financial relationship, and overlap in providers, services, or patients: (a) Wound Pros Washington; (b) Wound Pros Utah; (c) Wound Pros Louisiana; (d) Wound Pros Illinois; (e) Texas Wound Care Management; (f) PLS Podiatry Group; (g) Ohio Wound Care Specialists; (h) Ohio Wound Care Network; (i) DPMOTIKONRCA LLC; (j) Coast to Coast Podiatry; (l) Coast to Coast Foot Doctors, a Podiatry Corporation; (m) Coast to Coast DME; (n) Christopher A Otiko DPM; (o) Global Wound Care Medical Group; (p) American Wound Care Partners; (q) National Wound Care Associates; (r) Horizon Wound Care LLC; and (s) PLS Foot Doctors. If the relationship has changed during the Relevant Time Period, describe all changes during this time period.

# Exhibit 10

## CIVIL INVESTIGATIVE DEMAND

# United States Department of Justice
### Washington, D.C. 20530

TO:    Wound Pros Nevada Inc.                          Civil Investigative
       Legal Solutions (Registered Agent)         Demand No. 23-1310
       2831 St. Rose Parkway, Ste. 200
       Henderson, Nevada 89052

       This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729.  The False Claims Act investigation concerns allegations that Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, Wound Pros Management Group, Inc., and certain related entities and individuals (collectively, "Wound Pros") made false statements in claims submitted to the federal healthcare programs in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral ("Stark") Law, 42 U.S.C. § 1395nn, and common law. Specifically, we are investigating whether Wound Pros submitted or caused the submission of (1) claims for reimbursement falsely stating that services provided by non-physician personnel were "incident to" a physician's services; (2) claims for medically unnecessary skin substitutes and associated services; (3) point of service information falsely indicating that services were provided in an office setting; (4) claims for reimbursement through entities other than the one that performed the services; and (5) claims for durable medical equipment based on self-referrals in violation of the Stark Law.  We further are investigating whether Wound Pros paid or caused the payment of unlawful kickbacks to personnel in exchange for the personnel ordering products and services reimbursable by the federal healthcare programs.

       This Demand requires you to provide documents and answers to the attached written interrogatories to the Federal Government.  This is the original of the Demand; no copies have been served on other parties.  The information and documents provided in response to this Demand may be shared, used, and disclosed as provided by 31 U.S.C. § 3733.

-2-

**Document Request**:

     In accordance with the definitions and instructions set forth in **Attachment A** and the production specifications in **Attachment B**, you are required by this Demand to produce any and all documents in your possession, custody or control responsive to the document requests set forth in **Attachment C**.

     You must make this material available to Department of Justice Trial Attorney Jessica M. Bergin and Assistant United States Attorney David Thiess, who have been designated as False Claims Act custodians in this case. Ms. Bergin may be contacted at (202) 305-4207 or Jessica.Bergin@usdoj.gov, and Mr. Thiess may be contacted at (916) 554-2825 or David.Thiess@usdoj.gov, if you have any questions. These documents shall be produced no later than thirty (30) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The production of documentary material in response to this Demand must be made under a sworn certificate in the form printed in this Demand.

**Written Interrogatories**:

     In accordance with the definitions and instructions set forth in **Attachment A**, you are required by this Demand to answer the interrogatories set forth in **Attachment D**. The answers to interrogatories shall be submitted no later than twenty (20) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The interrogatories shall be answered separately and fully in writing under oath and also shall be submitted under a sworn certificate in the form printed in this Demand. If you object to any interrogatory, the reasons for the objection shall be stated with specificity.

     Issued at Washington, DC, this _27th_ day of ____September____, 2023.


                             _____

                             Jamie Ann Yavelberg
                             Director
                             Commercial Litigation Branch

**FORM OF CERTIFICATE OF COMPLIANCE**[1]

I have responsibility for producing the documents requested in Civil Investigative Demand No. 23-1310.  I hereby certify that all the materials required by that Civil Investigative Demand which are in the possession, custody or control of the person to whom the Demand is directed have been submitted to a custodian named therein.

If any such material has not been produced because of a lawful objection, the objection to the document request and the reasons for the objection have been stated.

Signature ———————————————

Title      ———————————————

**SWORN TO** before me this _____ day of _____, 2023

_____
NOTARY PUBLIC

---

[1]    In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

# FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for answering interrogatory numbers_____in Civil Investigative Demand No. 23-1310.  I hereby certify that all the information required by the Civil Investigative Demand and in the possession, custody, control, or knowledge of the person to whom the Civil Investigative Demand is directed has been submitted.  To the extent information has not been furnished, the information is identified and the reasons why the information was not furnished are set forth with particularity.  Additionally, if any such information has not been produced because of a lawful objection, the objection to the interrogatory and the reasons for the objection have been stated. I certify under penalty of perjury that the foregoing interrogatory responses are true and correct.


Signature_____

Title_____


**SWORN TO** before me this_____day of _____, 2023


_____
        NOTARY PUBLIC

---

[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## <u>VERIFIED RETURN OF SERVICE</u>

I,_____, an employee of the United States working under the direction and supervision of attorney Jessica Bergin in connection with a false claims law investigation, hereby certify that at the time of _____, on the_____day of _____, 2023, I personally served Civil Investigative Demand No. 23-1310 on _____, by delivering an executed copy of such Demand at:

_____

_____

_____

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this _____day of _____, 2023.

Signature_____

Title_____

## ATTACHMENT A TO CIVIL INVESTIGATIVE DEMAND NO. 23-1310

### DEFINITIONS AND INSTRUCTIONS

#### A. DEFINITIONS

1.      Unless specified otherwise, the terms "You" or "Your" mean Wound Pros Nevada Inc., and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

2.      Unless specified otherwise, the term "Wound Pros" means Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, and Wound Pros Management Group, Inc.; and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

3.      "Communication" is used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and means any transmission or exchange of information orally or in writing, and include, but are not limited to, any emails and text message conversations (including those stored on organization and personal devices).

4.      "CPT code" means any Current Procedural Terminology code.

5.      "DME" means any durable medical equipment, including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes:  A4245-A5120, A6000-A6461, and L4360-L4387.

6.      "Document" and "documents" are used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations.

7.      "Employee" shall mean any person including, but not limited to, an employee, volunteer, independent contractor or agent, all past and present directors, officers, agents, representatives, accountants, advisors, and consultants who acted or purported to act on Your or Wound Pros' behalf or who performed any service for You or Wound Pros under Your or Wound Pros' name, whether on a full-time, part-time, piece-work, commission or other basis and whether paid or unpaid.

8.      "Federal healthcare program" means any healthcare program administered or funded wholly or in part by the United States, including, but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA and other VA health care programs and services, the Federal Employee Health Benefits Program, and the Federal Bureau of Prisons Health Services Program.

9.      "HCPCS code" means any Healthcare Common Procedure Coding System code.

10.      "Identify" means to provide the following information in Your response:

     a.      With respect to a natural person:
       (i)      the person's full name;
       (ii)     the name of the person's current or last known employer;
       (iii)    the person's title and position, if known;
       (iv)    the person's current or last known business and home address and telephone number; and
       (v)     if applicable, the person's National Provider Identifier ("NPI");

     b.      With respect to a corporation, partnership, joint venture, or other entity:
       (i)      the name of the entity;
       (ii)     the addresses and telephone numbers of its principal office(s);
       (iii)    the tax identification number; and
       (iv)    if the entity is a medical provider, the entity's NPI, Medicare provider number, and CMS Certification Number ("CCN"), if applicable;

     c.      With respect to documents:
       (i)      the title of the document;
       (ii)     the date of the document;
       (iii)    a description of the type of document;
       (iv)    a summary of the document's contents;
       (v)     the present location of the original and all existing copies of the document;
       (vi)    a list of all intended recipients of the document, including, but not limited to, all addressees, and all persons who were supposed to receive a copy of the document (*i.e.*, through "cc" or "bcc"); and
       (vii)   the identity of the author and a list of all persons who participated in the creation of the document.

11.      "Non-physician practitioner" means any practitioner of healthcare services who is not also a doctor of medicine or a doctor of osteopathic medicine.

12.      "Physician" means any provider of healthcare services who is a doctor of medicine or a doctor of osteopathic medicine

13.      "Provider" means any physician, physician group, hospital, laboratory, skilled nursing facility, home health agency, hospice, board and care facility, physician assistant, nurse,

nurse practitioner, medical assistant, or any other person or entity who provides any healthcare services, including any non-physician practitioner who provides any healthcare services.

14.    "Relating to" and "related to" mean consisting of, concerning, referring to, reflecting, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the matter discussed.

15.    "Skin substitute" means any graft used to assist with wound healing, such as non-autologous human skin (dermal or epidermal, cellular and acellular) grafts, non-human skin substitute grafts, and biological products (placental and amniotic skin substitutes), including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: C5271-C5278 and Q4101-Q4284.

16.    "Text message conversations" refers to any and all electronic communications (other than emails) that can or do contain text, regardless of the format of the communications, the application or platform used to send or receive the communications, and whether the communications are immediately retrievable or retrievable only via a forensic extraction, including, but not limited to, those occurring in or via SMS, MMS, EMS, iMessage, Facebook chat, Facebook messenger, Google Talk (formerly Gchat), Blackberry Messenger (BBM), Skype, GroupMe, AIM, WhatsApp, Slack, Snapchat, Signal, WeChat, or company-deployed electronic health records or communications platforms, as well as, recoverable deleted data, backup files (e.g., iCloud or iPhone backup files), and archive snapshots.

17.    The terms "and" and "or" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

18.    The terms "any" and "all" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

19.    The singular and plural forms of any word shall be construed interchangeably so as to bring within the scope of this Demand any document which might otherwise be construed as outside its scope.

## B. INSTRUCTIONS

1.    *Relevant Time Period:* Unless otherwise stated in any specific request below, each request covers the relevant time period since January 1, 2016.

2.    This Demand is continuing in nature. If You become aware of or acquire possession, custody, or control of additional documents that are responsive to this Demand, or if You become aware of or acquire additional information that is responsive to these interrogatories, You shall promptly produce such additional documents or supplement Your interrogatory responses.

3.    This Demand applies to all documents and information in Your possession, custody, or control regardless of their location and regardless of whether such documents or

information are held by Your current or former employees, including, but not limited to, in-house IT specialists and technicians, IT specialists and technicians to whom digital services have been out-sourced.

4.    All documents produced pursuant to this Demand are to be organized in such a manner that all documents relating to a particular request are grouped together and identified as being responsive to that request.

5.    If any document which is otherwise responsive to this Demand is not disclosed because of a claim of privilege or other objection, You shall identify such documents on a Privilege Log.  The Privilege Log shall be produced in Excel or Word format and include the following information:

> (a) the basis for the assertion of the privilege or objection;
>
> (b) the type of document (e.g., letter, memorandum, email, etc.)
>
> (c) the name and title of the author (and if different, the preparer and signatory);
>
> (d) the name(s) and title(s) of the individual(s) to whom the document was addressed;
>
> (e) the name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
> (f) the date of the document;
>
> (g) number of pages;
>
> (h) a general description of the subject matter; and
>
> (i) the Request(s) to which the document is responsive.

6.    When a requested document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible.  If a privilege is asserted with regard to a part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed.  When a document is redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration.  Any redaction must be clearly visible on the redacted document.

7.    If any document otherwise responsive to this Demand is not produced because it was lost, destroyed, or discarded:

> (a) identify the document by type, date, and title;

(b) identify the person who last had custody or control over the document;

(c) state the date on which the document was destroyed or was discovered to have been lost;

(d) if the document was destroyed, state why it was destroyed and identify the person(s) who destroyed it;

(e) if the document was lost, describe the circumstances in which its loss was discovered, state the date that it was last seen or otherwise accounted for, and identify the person(s) who discovered its loss and who last saw or otherwise accounted for it;

(f) identify all persons who have knowledge pertaining to the destruction or loss of the document, giving a concise but complete statement of the knowledge You claim each such person has;

(g) identify all persons who have knowledge of the contents of each lost or destroyed document, giving a concise but complete statement of the knowledge You claim each such person has; and

(h) produce all existing indices, lists, or other documents in Your possession, custody, or control that reflect the existence of such lost or destroyed documents, and/or their transfer or destruction.

8.      If no documents exist that are responsive to a specific document request, a written statement to that effect shall be provided at the time of production.

9.      To the extent that documents responsive to this Demand are in the possession, custody, or control of third parties, this Demand requires a statement to that effect at the time of production, specifically providing the name, address, telephone number and principal contact of the third party, and shall further identify those documents in said third party's possession.

10.     Please produce imaged hard copy and electronic documents according to the Specifications for Production of Electronically Stored Information and Digitized Images at **Attachment B**.

11.     For each interrogatory and subpart thereof, You must respond separately and in writing.  Your responses must identify all documents that You used, referenced, or relied upon in Your written responses.

12.     If You withhold any information responsive to any interrogatory based on a claim of privilege or other objection: (a) furnish the basis for the assertion of the privilege or objection, (b) identify all individuals who could respond to the interrogatory with regard to the information that is being withheld, and (c) set forth the general subject matter and the specific interrogatory or interrogatories to which each individual could testify.

13.    When providing the name of an individual in response to any interrogatory or individuals identified pursuant to Instruction 12 above, provide the individual's last known address, telephone number, email address, or other contact information, as well as the individual's relationship to You.  If the individual is or was an employee, provide the individual's title and dates of employment.

## ATTACHMENT B TO CIVIL INVESTIGATIVE DEMAND NO. 23-1310

### Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")

#### Collection of Electronically Stored Information (ESI)

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

### 1. Specification Modifications

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

### 2. Production Format of ESI and Imaged Hard Copy Documents

Responsive ESI and imaged hard copy shall be produced in the format outlined below.  All ESI, except as outlined below in sections 5 – 21, shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

  a. **Image File Format:** All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

  b. When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT Group IV (2D Compression).  When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

    i. All TIFF file names shall include the unique Bates number burned into the image.  (See section 22, below, regarding Bates number instructions.)

    ii. All TIFF image files shall be stored with the ".tif" extension.

       iii. Images without corresponding extracted text shall be OCR'd using standard COTS products.

           1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

       iv. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

       v. No image folder shall contain more than 2,000 images.

  c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

```
REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,
```

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.
- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

  d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat

database environment.  The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8.  The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters.  For example:

| | |
|---|---|
| *Field Separator* | ¶ *or Code 020* |
| *Text Qualifier* | þ *or Code 254* |
| *Newline* | ® *or Code 174* |
| *Multi-value* | ; *or Code 059* |
| *Nested values* | \ *or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within.  For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAM Eþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:**  The directory structure for productions should be:
   \\*CaseName*\\**LoadFiles**
   \\*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)
   \\*CaseName*\\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)

\\*CaseName*\\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

### 3.    Required Metadata/Database Fields

A "✓" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | ✓ | ✓ | ✓ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | ✓ | ✓ | ✓ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| AUTHOR | Creator of the document | Text | 500 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | ✓ | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/YYYY HH:MM:SS | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

**4.    Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

    a. De-duplication of exact hash copies shall be performed globally – across all custodians.  The custodian of each record shall be populated in the DupeCustodian field.

    ▪ All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

    b. All files should be globally de-duplicated with the following conditions:

      i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

      ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

      iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

      iv. No customization of hashing may occur without prior express approval by the Government.

      v. De-duplication must be done by document family, not by individual document.

      vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government.  For every production after the first, a separate Unified Custodian overlay shall be provided.  If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be

expressly stated in the cover letter accompanying the subsequent production(s).

   c.  The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

## 5.   Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

## 6.   Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

## 7.   Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

## 8.   Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

   a.  The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.
     ▪  If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

9.    **Production of Imaged Hard Copy Records**

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

a.  Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).

- The first document in the collection represents the parent document and all other documents will represent the children.

b.  All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.

- All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

10.    **Production of Spreadsheets and Presentation Files**

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

11.    **Production of E-mail Repositories**

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

12.    **Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items**

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies.  These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies.  However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timesta mp: Date | Date | Date | Date | | Timestamp -Date | Timestamp-Date | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements:  (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format.  The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production.  The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#.  The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government.  The following are examples:

  a.  AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.
  - GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

b.  Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

## 22.    Bates Number Convention

All images should be assigned Bates numbers before production to the government.  Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page.  The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document.  Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field).  The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion.  The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file).  If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production.  There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation."  Below is a sample of dot notation:

|          | *Document #1*        | *Document #2*        |
|----------|----------------------|----------------------|
| *Page #1* | PREFIX00000000001    | PREFIX00000000002    |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

## 23.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

a.  CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
- External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
b.  Government approved File Transfer Protocol (FTP) technologies.
- Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
c.  Media should be labeled with the case name, production date, Bates range, and producing party.

## 24.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses.  Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

### 25.    Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 26.    Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing:  total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats.  The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 27.    Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 28.    Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced.  Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

**ATTACHMENT C TO CIVIL INVESTIGATIVE DEMAND NO. 23-1310**

**DOCUMENT REQUESTS**

You are required by this Demand to produce any and all of the following documents in Your possession, custody, or control:

1.   All documents reflecting any formal or informal contracts and agreements between You or Wound Pros and the persons and entities identified in connection with interrogatory 1, including all documents and communications reflecting any compensation, payment, commissions, bonuses, reimbursement of expenses, risk sharing, or any other remuneration or benefits of any kind.

2.   All documents and communications concerning any compensation, commission, bonus, or any other remuneration or benefits of any kind offered and/or paid by or on behalf of You or Wound Pros to any person or entity that provides, supervises, directs, refers, or otherwise causes the provision or billing of the federal healthcare programs for any skin substitute products or services by or on behalf of You or Wound Pros, including, but not limited to, all documents and communications related to any fair market value assessment of that compensation.

3.   All personnel evaluations, records, schedules, timesheets, logs, and any other documentation of payments, remuneration, commission, reimbursement of expenses, risk sharing, benefits of any kind, referral, sanction, penalty, disciplinary action, or any other unfavorable action or consequence of any kind relating to the provision of or billing for any skin substitute products or services by or on behalf of You or Wound Pros.

4.   All documents and communications relating to supervision or direction by any physician affiliated with Wound Pros, including, but not limited to, Dr. Bill J. Releford, Dr. Christopher Otiko, Dr. Owen Ellington, Dr. Joseph M. Palumbo, Dr. Sherman Washington, and Dr. Allyson Pizzo-Berkey, of the provision of any skin substitute products or services by any non-physician practitioner on behalf of Wound Pros.

5.   All projections, analyses, reports, drafts, reviews, or other documentation reflecting any performance metric, including, but not limited to, revenue, profit, and return on investment ("ROI"), relating to the provision of or billing for any skin substitute products or services by any person or entity affiliated with Wound Pros.

6.   All documents and communications relating to the ordering by any Wound Pros-affiliated provider of any DME supplies from any Wound Pros-affiliated DME supplier, including the preparation and ordering of pre-made DME kits.

7.   All formal and informal policies, practices, procedures, guidelines, standard operating procedures, FAQs, training materials, instructions, advice, evaluations, or other guidance in any form relating to (a) supervision of non-physician practitioners, including remote supervision; (b) billing for products and services provided by non-physician practitioners, including billing for services "incident to" services provided by a physician; (c) billing

for products and services provided to patients in hospice, nursing facilities, skilled nursing facilities, or any other board or care facilities; (d) identifying the point of service and the entity that provided any products or services in any documentation related to billing; (e) ordering DME supplies; (f) providing DME to patients; and (g) compliance with federal healthcare program billing requirements, the False Claims Act, Stark Law, Anti-Kickback Statute, or other state and federal laws and regulatory guidance.

8.     All documents and communications concerning compliance with the requirements of any federal healthcare program, including, but not limited to, all documents exchanged with CMS relating to Your or Wound Pros' ability to participate in the federal healthcare programs, revocation by CMS, and any notifications from CMS regarding any actual, potential, or suspected failure to comply with CMS requirements.

9.     All formal or informal complaints, allegations, objections, inquiries, or concerns of any kind from any source concerning potential fraud, inappropriate billing, noncompliance with federal healthcare program requirements, unsatisfactory or inappropriate products or services, harm to patients, or violations of statutes or regulations by You or Wound Pros.

10.    Documents sufficient to show Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.

11.    Documents sufficient to show Your organizational chart(s) for the Relevant Time Period.

12.    All documents relied on to answer the interrogatories in **Attachment D**.

## ATTACHMENT D TO CIVIL INVESTIGATIVE DEMAND NO. 23-1310

## INTERROGATORIES

1.  Identify in Microsoft Excel format all persons and entities with which You and/or Wound Pros contracted in connection with providing or billing for healthcare products or services, by specifying in separate fields: (a) the name of the person or entity with which You and/or Wound Pros contracted; (b) the contract name(s); (c) the contract date(s); (d) the contract number(s); (e) all parties to the contract(s); (f) the signatories to the contract(s); (g) the person(s) involved in the contracting process(es); (h) all products and services covered by the contract(s), including whether the contract related in any way to skin substitutes; (i) any amendments to the contract(s); (j) the status of any pending contract negotiations; (k) the reason(s) for any amendment, modification, or termination of any contract; (l) the termination date of the contract; and (m) any documentation related to the contract(s).

2.  For each Wound Pros entity and affiliate, identify in Microsoft Excel format all owners, investors, and financial supporters of any kind by (a) full name; (b) current or last known business address, home address, and telephone number; (c) ownership share, if applicable; (d) investments and/or financial support provided, including the itemized amount(s) and date(s); (e) return on investment provided by the Wound Pros entity or affiliate to the owner, investor, or financial supporter, if applicable, including the amount(s) and date(s); (f) description of the nature of the ownership, investment relationship, and/or financial support; and (g) any other metric that You or Wound Pros uses to track or quantify the relationship with the owner, investor, or financial supporter.

3.  For each Wound Pros entity and affiliate, identify in Microsoft Excel format all current and former employees by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) job title; (e) job responsibilities; (f) whether the employee was a direct employee, volunteer, independent contractor, agent, director, officer, representative, account, advisor, or consultant; (g) start date; (h) termination date, if applicable; (i) Wound Pros entity with which the individual interacted; (j) locations where any services were provided by the individual; (k) all compensation and benefits of any kind; (l) supervising responsibilities; (m) direct report(s); (n) supervisor(s); and (o) manager(s).

4.  Identify in Microsoft Excel format all persons and/or entities through whom Wound Pros submits claims for reimbursement to the federal healthcare programs by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) nature of the relationship with Wound Pros; (f) start date of relationship; (g) end date of the relationship; (h) services provided; (i) dates during which the services were provided; (j) locations where the services were provided; (k) Wound Pros entity on behalf of which the person or entity submitted claims; (l) all compensation and benefits of any kind; and (m) whether the compensation was consistent with fair market value, including the basis for that conclusion.

5.    Identify in Microsoft Excel format all systems, programs, platforms, software, algorithms, analytics, or other tools used by Wound Pros, including, but not limited to, Slack, RITA, HL7, Smart Sheet, Black Doctor 24/7, Wound Docs, Office Ally, Kareo, Google Drive, Google Email, Zelis, Paychex, and ADP, by (a) name; (b) function and/or use; (c) dates of use; (d) the Wound Pros entities and/or individuals involved or impacted; and (e) the name(s) and title(s) of the employees or other third parties most knowledgeable about its function and/or use.

6.    For each system, program, platform, software, algorithm, analytic, or other tool identified in response to interrogatory 5, describe (a) all fields that are auto-populated by the system; (b) all fields that are added or revised by anyone other than the provider who directly treated the patient; and (c) the circumstances under which those fields are auto-populated, added, or revised. If this process changed during the Relevant Time Period, describe all changes during this time period.

7.    Identify in Microsoft Excel format all DME suppliers used by any person or entity affiliated with Wound Pros by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) DME supplies ordered from that supplier; and (f) dates during which DME supplies were ordered from that supplier.

8.    Identify in Microsoft Excel format all DME orders filled by Wound Pros for DME, including (a) the item or service furnished; (b) the patient (i) full name, (ii) date of birth, (iii) social security number, and (iv) Medicare Beneficiary Number or other federal health care program identifier; (c) the referring physician; and (d) the amount reimbursed.

9.    Identify in Microsoft Excel format all Wound Pros facilities and medical offices where services were provided by any Wound Pros provider by (a) full name; (b) address; (c) the date range(s) during which services were provided at that facility or medical office; (d) all persons and entities that billed the federal healthcare programs for services performed at that facility or medical office, including the person's or entity's NPI and EIN; and (e) the services provided at that facility.

10.    Identify in Microsoft Excel format all patients treated by a Wound Pros non-physician practitioner, including identifying the patient by (a) full name; (b) date of birth; (c) social security number; (d) date of first encounter with Wound Pros; (e) date of the most recent encounter with Wound Pros; (f) date on which the service was provided; (g) whether the patient was treated with a skin substitute; (h) date of the skin substitute service, if any; (i) address where the service was performed; (j) whether the patient was located at a facility of any kind when the patient received the service, and if so, the type of facility, name of the facility, and address of the facility; (k) name of the person who performed the service; (l) name of the supervising physician, if any; (m) health insurance plan; (n) whether the patient was diagnosed with any condition related to the services provided, and if so, any associated diagnosis, HCPCS, and CPT codes; (o) all follow-up treatments

associated with the services provided; and (p) all documentation or other information considered in connection with the services provided.

11.    Describe Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.  If the structure has changed during the Relevant Time Period, describe all changes to the structure during this time period.

12.    Describe Your relationship with each of the following entities, including any ownership interest, financial relationship, and overlap in providers, services, or patients:  (a) Wound Pros Washington; (b) Wound Pros Utah; (c) Wound Pros Louisiana; (d) Wound Pros Illinois; (e) Texas Wound Care Management; (f) PLS Podiatry Group; (g) Ohio Wound Care Specialists; (h) Ohio Wound Care Network; (i) DPMOTIKONRCA LLC; (j) Coast to Coast Podiatry; (l) Coast to Coast Foot Doctors, a Podiatry Corporation; (m) Coast to Coast DME; (n) Christopher A Otiko DPM; (o) Global Wound Care Medical Group; (p) American Wound Care Partners; (q) National Wound Care Associates; (r) Horizon Wound Care LLC; and (s) PLS Foot Doctors.  If the relationship has changed during the Relevant Time Period, describe all changes during this time period.

# Exhibit 11

CIVIL INVESTIGATIVE DEMAND

# United States Department of Justice
**Washington, D.C. 20530**

TO:    Wound Pros Doctors P.C.                                    Civil Investigative
        4640 Admiralty Way, Ste. 500                        Demand No. 23-1311
        Marina Del Ray, California 90292
        c/o LegalCorp Solutions, Inc. (Registered Agent)
        8939 S Sepulveda Blvd, Ste. 102
        Los Angeles, California 90045

       This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729. The False Claims Act investigation concerns allegations that Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, Wound Pros Management Group, Inc., and certain related entities and individuals (collectively, "Wound Pros") made false statements in claims submitted to the federal healthcare programs in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral ("Stark") Law, 42 U.S.C. § 1395nn, and common law. Specifically, we are investigating whether Wound Pros submitted or caused the submission of (1) claims for reimbursement falsely stating that services provided by non-physician personnel were "incident to" a physician's services; (2) claims for medically unnecessary skin substitutes and associated services; (3) point of service information falsely indicating that services were provided in an office setting; (4) claims for reimbursement through entities other than the one that performed the services; and (5) claims for durable medical equipment based on self-referrals in violation of the Stark Law. We further are investigating whether Wound Pros paid or caused the payment of unlawful kickbacks to personnel in exchange for the personnel ordering products and services reimbursable by the federal healthcare programs.

       This Demand requires you to provide documents and answers to the attached written interrogatories to the Federal Government. This is the original of the Demand; no copies have been served on other parties. The information and documents provided in response to this Demand may be shared, used, and disclosed as provided by 31 U.S.C. § 3733.

-2-

**Document Request**:

In accordance with the definitions and instructions set forth in **Attachment A** and the production specifications in **Attachment B**, you are required by this Demand to produce any and all documents in your possession, custody or control responsive to the document requests set forth in **Attachment C**.

You must make this material available to Department of Justice Trial Attorney Jessica M. Bergin and Assistant United States Attorney David Thiess, who have been designated as False Claims Act custodians in this case. Ms. Bergin may be contacted at (202) 305-4207 or Jessica.Bergin@usdoj.gov, and Mr. Thiess may be contacted at (916) 554-2825 or David.Thiess@usdoj.gov, if you have any questions. These documents shall be produced no later than thirty (30) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The production of documentary material in response to this Demand must be made under a sworn certificate in the form printed in this Demand.

**Written Interrogatories**:

In accordance with the definitions and instructions set forth in **Attachment A**, you are required by this Demand to answer the interrogatories set forth in **Attachment D**. The answers to interrogatories shall be submitted no later than twenty (20) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The interrogatories shall be answered separately and fully in writing under oath and also shall be submitted under a sworn certificate in the form printed in this Demand. If you object to any interrogatory, the reasons for the objection shall be stated with specificity.

Issued at Washington, DC, this __27th__ day of ___September___, 2023.

_____
Jamie Ann Yavelberg
Director
Commercial Litigation Branch

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for producing the documents requested in Civil Investigative Demand No. 23-1311.  I hereby certify that all the materials required by that Civil Investigative Demand which are in the possession, custody or control of the person to whom the Demand is directed have been submitted to a custodian named therein.

If any such material has not been produced because of a lawful objection, the objection to the document request and the reasons for the objection have been stated.

Signature ————————————————

Title    ————————————————

**SWORN TO** before me this _____ day of

————————————, 2023

————————————————————
        NOTARY PUBLIC

--------------------------------

[1]     In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for answering interrogatory numbers_____in Civil Investigative Demand No. 23-1311.  I hereby certify that all the information required by the Civil Investigative Demand and in the possession, custody, control, or knowledge of the person to whom the Civil Investigative Demand is directed has been submitted.  To the extent information has not been furnished, the information is identified and the reasons why the information was not furnished are set forth with particularity.  Additionally, if any such information has not been produced because of a lawful objection, the objection to the interrogatory and the reasons for the objection have been stated. I certify under penalty of perjury that the foregoing interrogatory responses are true and correct.


Signature_____

Title_____


**SWORN TO** before me this_____day of _____, 2023


_____
              NOTARY PUBLIC

---

[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## VERIFIED RETURN OF SERVICE

I,_____, an employee of the United States working under the direction and supervision of attorney Jessica Bergin in connection with a false claims law investigation, hereby certify that at the time of _____, on the_____day of _____, 2023, I personally served Civil Investigative Demand No. 23-1311 on _____, by delivering an executed copy of such Demand at:

_____

_____

_____

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this _____day of _____, 2023.

Signature_____

Title_____

ATTACHMENT A TO CIVIL INVESTIGATIVE DEMAND NO. 23-1311

DEFINITIONS AND INSTRUCTIONS

A. DEFINITIONS

1.    Unless specified otherwise, the terms "You" or "Your" mean Wound Pros Doctors P.C., and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

2.    Unless specified otherwise, the term "Wound Pros" means Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, and Wound Pros Management Group, Inc.; and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

3.    "Communication" is used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and means any transmission or exchange of information orally or in writing, and include, but are not limited to, any emails and text message conversations (including those stored on organization and personal devices).

4.    "CPT code" means any Current Procedural Terminology code.

5.    "DME" means any durable medical equipment, including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes:  A4245-A5120, A6000-A6461, and L4360-L4387.

6.    "Document" and "documents" are used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations.

7.    "Employee" shall mean any person including, but not limited to, an employee, volunteer, independent contractor or agent, all past and present directors, officers, agents, representatives, accountants, advisors, and consultants who acted or purported to act on Your or Wound Pros' behalf or who performed any service for You or Wound Pros under Your or Wound Pros' name, whether on a full-time, part-time, piece-work, commission or other basis and whether paid or unpaid.

8.    "Federal healthcare program" means any healthcare program administered or funded wholly or in part by the United States, including, but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA and other VA health care programs and services, the Federal Employee Health Benefits Program, and the Federal Bureau of Prisons Health Services Program.

9.    "HCPCS code" means any Healthcare Common Procedure Coding System code.

10.    "Identify" means to provide the following information in Your response:

  a.    With respect to a natural person:
    (i)    the person's full name;
    (ii)    the name of the person's current or last known employer;
    (iii)    the person's title and position, if known;
    (iv)    the person's current or last known business and home address and telephone number; and
    (v)    if applicable, the person's National Provider Identifier ("NPI");

  b.    With respect to a corporation, partnership, joint venture, or other entity:
    (i)    the name of the entity;
    (ii)    the addresses and telephone numbers of its principal office(s);
    (iii)    the tax identification number; and
    (iv)    if the entity is a medical provider, the entity's NPI, Medicare provider number, and CMS Certification Number ("CCN"), if applicable;

  c.    With respect to documents:
    (i)    the title of the document;
    (ii)    the date of the document;
    (iii)    a description of the type of document;
    (iv)    a summary of the document's contents;
    (v)    the present location of the original and all existing copies of the document;
    (vi)    a list of all intended recipients of the document, including, but not limited to, all addressees, and all persons who were supposed to receive a copy of the document (*i.e.*, through "cc" or "bcc"); and
    (vii)    the identity of the author and a list of all persons who participated in the creation of the document.

11.    "Non-physician practitioner" means any practitioner of healthcare services who is not also a doctor of medicine or a doctor of osteopathic medicine.

12.    "Physician" means any provider of healthcare services who is a doctor of medicine or a doctor of osteopathic medicine

13.    "Provider" means any physician, physician group, hospital, laboratory, skilled nursing facility, home health agency, hospice, board and care facility, physician assistant, nurse,

nurse practitioner, medical assistant, or any other person or entity who provides any healthcare services, including any non-physician practitioner who provides any healthcare services.

14.    "Relating to" and "related to" mean consisting of, concerning, referring to, reflecting, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the matter discussed.

15.    "Skin substitute" means any graft used to assist with wound healing, such as non-autologous human skin (dermal or epidermal, cellular and acellular) grafts, non-human skin substitute grafts, and biological products (placental and amniotic skin substitutes), including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: C5271-C5278 and Q4101-Q4284.

16.    "Text message conversations" refers to any and all electronic communications (other than emails) that can or do contain text, regardless of the format of the communications, the application or platform used to send or receive the communications, and whether the communications are immediately retrievable or retrievable only via a forensic extraction, including, but not limited to, those occurring in or via SMS, MMS, EMS, iMessage, Facebook chat, Facebook messenger, Google Talk (formerly Gchat), Blackberry Messenger (BBM), Skype, GroupMe, AIM, WhatsApp, Slack, Snapchat, Signal, WeChat, or company-deployed electronic health records or communications platforms, as well as, recoverable deleted data, backup files (e.g., iCloud or iPhone backup files), and archive snapshots.

17.    The terms "and" and "or" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

18.    The terms "any" and "all" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

19.    The singular and plural forms of any word shall be construed interchangeably so as to bring within the scope of this Demand any document which might otherwise be construed as outside its scope.

## B. INSTRUCTIONS

1.    *Relevant Time Period:* Unless otherwise stated in any specific request below, each request covers the relevant time period since January 1, 2016.

2.    This Demand is continuing in nature. If You become aware of or acquire possession, custody, or control of additional documents that are responsive to this Demand, or if You become aware of or acquire additional information that is responsive to these interrogatories, You shall promptly produce such additional documents or supplement Your interrogatory responses.

3.    This Demand applies to all documents and information in Your possession, custody, or control regardless of their location and regardless of whether such documents or

information are held by Your current or former employees, including, but not limited to, in-house IT specialists and technicians, IT specialists and technicians to whom digital services have been out-sourced.

      4.     All documents produced pursuant to this Demand are to be organized in such a manner that all documents relating to a particular request are grouped together and identified as being responsive to that request.

      5.     If any document which is otherwise responsive to this Demand is not disclosed because of a claim of privilege or other objection, You shall identify such documents on a Privilege Log. The Privilege Log shall be produced in Excel or Word format and include the following information:

      (a) the basis for the assertion of the privilege or objection;

      (b) the type of document (e.g., letter, memorandum, email, etc.)

      (c) the name and title of the author (and if different, the preparer and signatory);

      (d) the name(s) and title(s) of the individual(s) to whom the document was addressed;

      (e) the name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;

      (f) the date of the document;

      (g) number of pages;

      (h) a general description of the subject matter; and

      (i) the Request(s) to which the document is responsive.

      6.     When a requested document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible. If a privilege is asserted with regard to a part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed. When a document is redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration. Any redaction must be clearly visible on the redacted document.

      7.     If any document otherwise responsive to this Demand is not produced because it was lost, destroyed, or discarded:

      (a) identify the document by type, date, and title;

(b) identify the person who last had custody or control over the document;

(c) state the date on which the document was destroyed or was discovered to have been lost;

(d) if the document was destroyed, state why it was destroyed and identify the person(s) who destroyed it;

(e) if the document was lost, describe the circumstances in which its loss was discovered, state the date that it was last seen or otherwise accounted for, and identify the person(s) who discovered its loss and who last saw or otherwise accounted for it;

(f) identify all persons who have knowledge pertaining to the destruction or loss of the document, giving a concise but complete statement of the knowledge You claim each such person has;

(g) identify all persons who have knowledge of the contents of each lost or destroyed document, giving a concise but complete statement of the knowledge You claim each such person has; and

(h) produce all existing indices, lists, or other documents in Your possession, custody, or control that reflect the existence of such lost or destroyed documents, and/or their transfer or destruction.

8.      If no documents exist that are responsive to a specific document request, a written statement to that effect shall be provided at the time of production.

9.      To the extent that documents responsive to this Demand are in the possession, custody, or control of third parties, this Demand requires a statement to that effect at the time of production, specifically providing the name, address, telephone number and principal contact of the third party, and shall further identify those documents in said third party's possession.

10.     Please produce imaged hard copy and electronic documents according to the Specifications for Production of Electronically Stored Information and Digitized Images at **Attachment B**.

11.     For each interrogatory and subpart thereof, You must respond separately and in writing. Your responses must identify all documents that You used, referenced, or relied upon in Your written responses.

12.     If You withhold any information responsive to any interrogatory based on a claim of privilege or other objection: (a) furnish the basis for the assertion of the privilege or objection, (b) identify all individuals who could respond to the interrogatory with regard to the information that is being withheld, and (c) set forth the general subject matter and the specific interrogatory or interrogatories to which each individual could testify.

13.    When providing the name of an individual in response to any interrogatory or individuals identified pursuant to Instruction 12 above, provide the individual's last known address, telephone number, email address, or other contact information, as well as the individual's relationship to You.  If the individual is or was an employee, provide the individual's title and dates of employment.

**ATTACHMENT B TO CIVIL INVESTIGATIVE DEMAND NO. 23-1311**

**Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")**

**Collection of Electronically Stored Information (ESI)**

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

1. **Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form. Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

2. **Production Format of ESI and Imaged Hard Copy Documents**

Responsive ESI and imaged hard copy shall be produced in the format outlined below. All ESI, except as outlined below in sections 5 – 21, shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

    a. **Image File Format:** All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

    b. When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT Group IV (2D Compression). When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

        i. All TIFF file names shall include the unique Bates number burned into the image. (See section 22, below, regarding Bates number instructions.)

        ii. All TIFF image files shall be stored with the ".tif" extension.

       iii.  Images without corresponding extracted text shall be OCR'd using standard COTS products.

          1.  An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

       iv.  All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

       v.  No image folder shall contain more than 2,000 images.

  c.  **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,
REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,
REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.
- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

  d.  **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat

database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| | |
|---|---|
| *Field Separator* | ¶ *or Code 020* |
| *Text Qualifier* | þ *or Code 254* |
| *Newline* | ® *or Code 174* |
| *Multi-value* | ; *or Code 059* |
| *Nested values* | \ *or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAM Eþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:
\\*CaseName*\\**LoadFiles**
\\*CaseName*\\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
\\*CaseName*\\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
\\*CaseName*\\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)
\\*CaseName*\\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)

\*CaseName*\**Translated Text** <Translated Text files location (as needed
for translated text; can include subfolders as needed, should not include
more than 2,000 files per folder).

### 3.    Required Metadata/Database Fields

A "√" denotes that the indicated field should be present in the load file produced.  "Other ESI"
includes data discussed in sections 5 – 21 below, but does not include email, email repositories
(section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and
production from ESI collected from Smart Phones, Mobile Devices and Other Technology
(section 13). Email, email repositories, and "stand alone" materials (section 12) should comply
with "Email" column below.  Imaged hard copy materials should comply with the "Hard Copy"
column. Production from ESI collected from Smart Phones, Mobile Devices and Other
Technology should comply with the requirements of section 13. The parties will meet and confer
about any field which cannot be populated automatically (i.e. would require manual population
of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | √ | √ | √ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | √ | √ | √ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | √ | √ | √ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | √ | √ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | √ | √ |
| AUTHOR | Creator of the document | Text | 500 | | | √ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | √ | √ | √ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | √ | √ | √ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/ YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

**4.**     **Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

    a. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.

      ▪ All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.

    b. All files should be globally de-duplicated with the following conditions:

      i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.

      ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.

      iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.

      iv. No customization of hashing may occur without prior express approval by the Government.

      v. De-duplication must be done by document family, not by individual document.

      vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be

expressly stated in the cover letter accompanying the subsequent production(s).

   c.  The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

### 5.   Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

### 6.   Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

### 7.   Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

### 8.   Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

   a.  The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.

      ▪  If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

### 9. Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

- a. Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).
  - The first document in the collection represents the parent document and all other documents will represent the children.
- b. All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.
  - All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

### 10. Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

### 11. Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

### 12. Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies.  These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies.  However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timesta mp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

| Field Name | Field Description | Mobile | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | Mobile Cellebrite Categories | | |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements: (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format.  The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production.  The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#.  The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government.  The following are examples:

> a.  AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.
> - GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

    b.  Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

### 22.    Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|         | *Document #1*         | *Document #2*         |
|---------|-----------------------|-----------------------|
| *Page #1* | PREFIX00000000001     | PREFIX00000000002     |
| *Page #2* | PREFIX00000000001.002 | PREFIX00000000002.002 |
| *Page #3* | PREFIX00000000001.003 | PREFIX00000000002.003 |

### 23.    Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

    a.  CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
       • External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives
    b.  Government approved File Transfer Protocol (FTP) technologies.
       • Storage media used to deliver ESI shall be appropriate to the size of the data in the production.
    c.  Media should be labeled with the case name, production date, Bates range, and producing party.

### 24.    Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

### 25. Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 26. Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing: total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats. The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 27. Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 28. Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced. Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

## ATTACHMENT C TO CIVIL INVESTIGATIVE DEMAND NO. 23-1311

## DOCUMENT REQUESTS

You are required by this Demand to produce any and all of the following documents in Your possession, custody, or control:

1.  All documents reflecting any formal or informal contracts and agreements between You or Wound Pros and the persons and entities identified in connection with interrogatory 1, including all documents and communications reflecting any compensation, payment, commissions, bonuses, reimbursement of expenses, risk sharing, or any other remuneration or benefits of any kind.

2.  All documents and communications concerning any compensation, commission, bonus, or any other remuneration or benefits of any kind offered and/or paid by or on behalf of You or Wound Pros to any person or entity that provides, supervises, directs, refers, or otherwise causes the provision or billing of the federal healthcare programs for any skin substitute products or services by or on behalf of You or Wound Pros, including, but not limited to, all documents and communications related to any fair market value assessment of that compensation.

3.  All personnel evaluations, records, schedules, timesheets, logs, and any other documentation of payments, remuneration, commission, reimbursement of expenses, risk sharing, benefits of any kind, referral, sanction, penalty, disciplinary action, or any other unfavorable action or consequence of any kind relating to the provision of or billing for any skin substitute products or services by or on behalf of You or Wound Pros.

4.  All documents and communications relating to supervision or direction by any physician affiliated with Wound Pros, including, but not limited to, Dr. Bill J. Releford, Dr. Christopher Otiko, Dr. Owen Ellington, Dr. Joseph M. Palumbo, Dr. Sherman Washington, and Dr. Allyson Pizzo-Berkey, of the provision of any skin substitute products or services by any non-physician practitioner on behalf of Wound Pros.

5.  All projections, analyses, reports, drafts, reviews, or other documentation reflecting any performance metric, including, but not limited to, revenue, profit, and return on investment ("ROI"), relating to the provision of or billing for any skin substitute products or services by any person or entity affiliated with Wound Pros.

6.  All documents and communications relating to the ordering by any Wound Pros-affiliated provider of any DME supplies from any Wound Pros-affiliated DME supplier, including the preparation and ordering of pre-made DME kits.

7.  All formal and informal policies, practices, procedures, guidelines, standard operating procedures, FAQs, training materials, instructions, advice, evaluations, or other guidance in any form relating to (a) supervision of non-physician practitioners, including remote supervision; (b) billing for products and services provided by non-physician practitioners, including billing for services "incident to" services provided by a physician; (c) billing

for products and services provided to patients in hospice, nursing facilities, skilled nursing facilities, or any other board or care facilities; (d) identifying the point of service and the entity that provided any products or services in any documentation related to billing; (e) ordering DME supplies; (f) providing DME to patients; and (g) compliance with federal healthcare program billing requirements, the False Claims Act, Stark Law, Anti-Kickback Statute, or other state and federal laws and regulatory guidance.

8.    All documents and communications concerning compliance with the requirements of any federal healthcare program, including, but not limited to, all documents exchanged with CMS relating to Your or Wound Pros' ability to participate in the federal healthcare programs, revocation by CMS, and any notifications from CMS regarding any actual, potential, or suspected failure to comply with CMS requirements.

9.    All formal or informal complaints, allegations, objections, inquiries, or concerns of any kind from any source concerning potential fraud, inappropriate billing, noncompliance with federal healthcare program requirements, unsatisfactory or inappropriate products or services, harm to patients, or violations of statutes or regulations by You or Wound Pros.

10.   Documents sufficient to show Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.

11.   Documents sufficient to show Your organizational chart(s) for the Relevant Time Period.

12.   All documents relied on to answer the interrogatories in **Attachment D**.

## ATTACHMENT D TO CIVIL INVESTIGATIVE DEMAND NO. 23-1311

## INTERROGATORIES

1.  Identify in Microsoft Excel format all persons and entities with which You and/or Wound Pros contracted in connection with providing or billing for healthcare products or services, by specifying in separate fields: (a) the name of the person or entity with which You and/or Wound Pros contracted; (b) the contract name(s); (c) the contract date(s); (d) the contract number(s); (e) all parties to the contract(s); (f) the signatories to the contract(s); (g) the person(s) involved in the contracting process(es); (h) all products and services covered by the contract(s), including whether the contract related in any way to skin substitutes; (i) any amendments to the contract(s); (j) the status of any pending contract negotiations; (k) the reason(s) for any amendment, modification, or termination of any contract; (l) the termination date of the contract; and (m) any documentation related to the contract(s).

2.  For each Wound Pros entity and affiliate, identify in Microsoft Excel format all owners, investors, and financial supporters of any kind by (a) full name; (b) current or last known business address, home address, and telephone number; (c) ownership share, if applicable; (d) investments and/or financial support provided, including the itemized amount(s) and date(s); (e) return on investment provided by the Wound Pros entity or affiliate to the owner, investor, or financial supporter, if applicable, including the amount(s) and date(s); (f) description of the nature of the ownership, investment relationship, and/or financial support; and (g) any other metric that You or Wound Pros uses to track or quantify the relationship with the owner, investor, or financial supporter.

3.  For each Wound Pros entity and affiliate, identify in Microsoft Excel format all current and former employees by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) job title; (e) job responsibilities; (f) whether the employee was a direct employee, volunteer, independent contractor, agent, director, officer, representative, account, advisor, or consultant; (g) start date; (h) termination date, if applicable; (i) Wound Pros entity with which the individual interacted; (j) locations where any services were provided by the individual; (k) all compensation and benefits of any kind; (l) supervising responsibilities; (m) direct report(s); (n) supervisor(s); and (o) manager(s).

4.  Identify in Microsoft Excel format all persons and/or entities through whom Wound Pros submits claims for reimbursement to the federal healthcare programs by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) nature of the relationship with Wound Pros; (f) start date of relationship; (g) end date of the relationship; (h) services provided; (i) dates during which the services were provided; (j) locations where the services were provided; (k) Wound Pros entity on behalf of which the person or entity submitted claims; (l) all compensation and benefits of any kind; and (m) whether the compensation was consistent with fair market value, including the basis for that conclusion.

5.    Identify in Microsoft Excel format all systems, programs, platforms, software, algorithms, analytics, or other tools used by Wound Pros, including, but not limited to, Slack, RITA, HL7, Smart Sheet, Black Doctor 24/7, Wound Docs, Office Ally, Kareo, Google Drive, Google Email, Zelis, Paychex, and ADP, by (a) name; (b) function and/or use; (c) dates of use; (d) the Wound Pros entities and/or individuals involved or impacted; and (e) the name(s) and title(s) of the employees or other third parties most knowledgeable about its function and/or use.

6.    For each system, program, platform, software, algorithm, analytic, or other tool identified in response to interrogatory 5, describe (a) all fields that are auto-populated by the system; (b) all fields that are added or revised by anyone other than the provider who directly treated the patient; and (c) the circumstances under which those fields are auto-populated, added, or revised. If this process changed during the Relevant Time Period, describe all changes during this time period.

7.    Identify in Microsoft Excel format all DME suppliers used by any person or entity affiliated with Wound Pros by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) DME supplies ordered from that supplier; and (f) dates during which DME supplies were ordered from that supplier.

8.    Identify in Microsoft Excel format all DME orders filled by Wound Pros for DME, including (a) the item or service furnished; (b) the patient (i) full name, (ii) date of birth, (iii) social security number, and (iv) Medicare Beneficiary Number or other federal health care program identifier; (c) the referring physician; and (d) the amount reimbursed.

9.    Identify in Microsoft Excel format all Wound Pros facilities and medical offices where services were provided by any Wound Pros provider by (a) full name; (b) address; (c) the date range(s) during which services were provided at that facility or medical office; (d) all persons and entities that billed the federal healthcare programs for services performed at that facility or medical office, including the person's or entity's NPI and EIN; and (e) the services provided at that facility.

10.    Identify in Microsoft Excel format all patients treated by a Wound Pros non-physician practitioner, including identifying the patient by (a) full name; (b) date of birth; (c) social security number; (d) date of first encounter with Wound Pros; (e) date of the most recent encounter with Wound Pros; (f) date on which the service was provided; (g) whether the patient was treated with a skin substitute; (h) date of the skin substitute service, if any; (i) address where the service was performed; (j) whether the patient was located at a facility of any kind when the patient received the service, and if so, the type of facility, name of the facility, and address of the facility; (k) name of the person who performed the service; (l) name of the supervising physician, if any; (m) health insurance plan; (n) whether the patient was diagnosed with any condition related to the services provided, and if so, any associated diagnosis, HCPCS, and CPT codes; (o) all follow-up treatments

associated with the services provided; and (p) all documentation or other information considered in connection with the services provided.

11. Describe Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership. If the structure has changed during the Relevant Time Period, describe all changes to the structure during this time period.

12. Describe Your relationship with each of the following entities, including any ownership interest, financial relationship, and overlap in providers, services, or patients: (a) Wound Pros Washington; (b) Wound Pros Utah; (c) Wound Pros Louisiana; (d) Wound Pros Illinois; (e) Texas Wound Care Management; (f) PLS Podiatry Group; (g) Ohio Wound Care Specialists; (h) Ohio Wound Care Network; (i) DPMOTIKONRCA LLC; (j) Coast to Coast Podiatry; (l) Coast to Coast Foot Doctors, a Podiatry Corporation; (m) Coast to Coast DME; (n) Christopher A Otiko DPM; (o) Global Wound Care Medical Group; (p) American Wound Care Partners; (q) National Wound Care Associates; (r) Horizon Wound Care LLC; and (s) PLS Foot Doctors. If the relationship has changed during the Relevant Time Period, describe all changes during this time period.

# Exhibit 12

## CIVIL INVESTIGATIVE DEMAND

# United States Department of Justice
### Washington, D.C. 20530

TO:    Wound Pros Tennessee, P.C.                         Civil Investigative
       c/o Christopher Otiko (Registered Agent)           Demand No. 23-1312
       3117 Norbrook Dr.
       Memphis, Tennessee 38116

      This Civil Investigative Demand is issued pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733, in the course of a False Claims Act investigation to determine whether there is or has been a violation of 31 U.S.C. § 3729.  The False Claims Act investigation concerns allegations that Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, Wound Pros Management Group, Inc., and certain related entities and individuals (collectively, "Wound Pros") made false statements in claims submitted to the federal healthcare programs in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, the Physician Self-Referral ("Stark") Law, 42 U.S.C. § 1395nn, and common law. Specifically, we are investigating whether Wound Pros submitted or caused the submission of (1) claims for reimbursement falsely stating that services provided by non-physician personnel were "incident to" a physician's services; (2) claims for medically unnecessary skin substitutes and associated services; (3) point of service information falsely indicating that services were provided in an office setting; (4) claims for reimbursement through entities other than the one that performed the services; and (5) claims for durable medical equipment based on self-referrals in violation of the Stark Law.  We further are investigating whether Wound Pros paid or caused the payment of unlawful kickbacks to personnel in exchange for the personnel ordering products and services reimbursable by the federal healthcare programs.

      This Demand requires you to provide documents and answers to the attached written interrogatories to the Federal Government.  This is the original of the Demand; no copies have been served on other parties.  The information and documents provided in response to this Demand may be shared, used, and disclosed as provided by 31 U.S.C. § 3733.

-2-

**Document Request**:

In accordance with the definitions and instructions set forth in **Attachment A** and the production specifications in **Attachment B**, you are required by this Demand to produce any and all documents in your possession, custody or control responsive to the document requests set forth in **Attachment C**.

You must make this material available to Department of Justice Trial Attorney Jessica M. Bergin and Assistant United States Attorney David Thiess, who have been designated as False Claims Act custodians in this case. Ms. Bergin may be contacted at (202) 305-4207 or Jessica.Bergin@usdoj.gov, and Mr. Thiess may be contacted at (916) 554-2825 or David.Thiess@usdoj.gov, if you have any questions. These documents shall be produced no later than thirty (30) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The production of documentary material in response to this Demand must be made under a sworn certificate in the form printed in this Demand.

**Written Interrogatories**:

In accordance with the definitions and instructions set forth in **Attachment A**, you are required by this Demand to answer the interrogatories set forth in **Attachment D**. The answers to interrogatories shall be submitted no later than twenty (20) days from the receipt of this Demand, at U.S. Department of Justice, Civil Division, 175 N Street NE, Room 9.108, Washington, D.C., 20002, or at another time or location to be mutually agreed upon by you and the False Claims Act custodian. The interrogatories shall be answered separately and fully in writing under oath and also shall be submitted under a sworn certificate in the form printed in this Demand. If you object to any interrogatory, the reasons for the objection shall be stated with specificity.

Issued at Washington, DC, this 27th day of September, 2023.

_____
Jamie Ann Yavelberg
Director
Commercial Litigation Branch

**FORM OF CERTIFICATE OF COMPLIANCE**[1]

I have responsibility for producing the documents requested in Civil Investigative Demand No. 23-1312. I hereby certify that all the materials required by that Civil Investigative Demand which are in the possession, custody or control of the person to whom the Demand is directed have been submitted to a custodian named therein.

If any such material has not been produced because of a lawful objection, the objection to the document request and the reasons for the objection have been stated.

Signature ——————————————

Title ——————————————

**SWORN TO** before me this _____ day of _____, 2023

——————————————————————
NOTARY PUBLIC

———————————————

[1]    In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## FORM OF CERTIFICATE OF COMPLIANCE[1]

I have responsibility for answering interrogatory numbers_____in Civil Investigative Demand No. 23-1312. I hereby certify that all the information required by the Civil Investigative Demand and in the possession, custody, control, or knowledge of the person to whom the Civil Investigative Demand is directed has been submitted. To the extent information has not been furnished, the information is identified and the reasons why the information was not furnished are set forth with particularity. Additionally, if any such information has not been produced because of a lawful objection, the objection to the interrogatory and the reasons for the objection have been stated. I certify under penalty of perjury that the foregoing interrogatory responses are true and correct.

Signature_____

Title_____

**SWORN TO** before me this_____day of
_____, 2023

_____
            NOTARY PUBLIC

_____

[1] In place of a sworn statement, the above certificate of compliance may be supported by an unsworn declaration as provided for by 28 U.S.C. § 1746.

## VERIFIED RETURN OF SERVICE

I,_____, an employee of the United States working under the direction and supervision of attorney Jessica Bergin in connection with a false claims law investigation, hereby certify that at the time of _____, on the_____day of _____, 2023, I personally served Civil Investigative Demand No. 23-1312 on _____, by delivering an executed copy of such Demand at:

_____

_____

_____

I declare under penalty of perjury that the foregoing is true and correct.  Executed on this _____day of _____, 2023.

Signature_____

Title_____

ATTACHMENT A TO CIVIL INVESTIGATIVE DEMAND NO. 23-1312

## DEFINITIONS AND INSTRUCTIONS

### A. DEFINITIONS

1.     Unless specified otherwise, the terms "You" or "Your" mean Wound Pros Tennessee, P.C., and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

2.     Unless specified otherwise, the term "Wound Pros" means Wound Pros, P.C. f/k/a Wound Pros LLC, Global Wound Care Medical Group, Ohio Wound Care Physicians Inc., Wound Care Medical Group P.C., Wound Pros Arizona, P.C., Wound Pros Doctors P.C., Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc., Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc., Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc., Wound Pros Nevada Inc., Wound Pros New York Inc., Wound Pros Ohio Inc., Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc., Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc., WP Texas Medical Group P.C., Washington Wound Pros Nevada, P.C., Wound Pros Holdings, P.C., Wound Pros Enterprises LLC, Wound Pros Technology Inc., Wound Pros Ventures, LP, and Wound Pros Management Group, Inc.; and any and all predecessors, successors, affiliates, subsidiaries, parent companies, branches, divisions, offices, units, officers, directors, employees, agents, consultants, and assigns.

3.     "Communication" is used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and means any transmission or exchange of information orally or in writing, and include, but are not limited to, any emails and text message conversations (including those stored on organization and personal devices).

4.     "CPT code" means any Current Procedural Terminology code.

5.     "DME" means any durable medical equipment, including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: A4245-A5120, A6000-A6461, and L4360-L4387.

6.     "Document" and "documents" are used in the broadest sense permitted by Federal Rules of Civil Procedure 26(b), 34(a) and 45(a) and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations.

7.     "Employee" shall mean any person including, but not limited to, an employee, volunteer, independent contractor or agent, all past and present directors, officers, agents, representatives, accountants, advisors, and consultants who acted or purported to act on Your or Wound Pros' behalf or who performed any service for You or Wound Pros under Your or Wound Pros' name, whether on a full-time, part-time, piece-work, commission or other basis and whether paid or unpaid.

8.    "Federal healthcare program" means any healthcare program administered or funded wholly or in part by the United States, including, but not limited to, Medicare, Medicaid, TRICARE, CHAMPVA and other VA health care programs and services, the Federal Employee Health Benefits Program, and the Federal Bureau of Prisons Health Services Program.

9.    "HCPCS code" means any Healthcare Common Procedure Coding System code.

10.    "Identify" means to provide the following information in Your response:

    a.    With respect to a natural person:
        (i)    the person's full name;
        (ii)    the name of the person's current or last known employer;
        (iii)    the person's title and position, if known;
        (iv)    the person's current or last known business and home address and telephone number; and
        (v)    if applicable, the person's National Provider Identifier ("NPI");

    b.    With respect to a corporation, partnership, joint venture, or other entity:
        (i)    the name of the entity;
        (ii)    the addresses and telephone numbers of its principal office(s);
        (iii)    the tax identification number; and
        (iv)    if the entity is a medical provider, the entity's NPI, Medicare provider number, and CMS Certification Number ("CCN"), if applicable;

    c.    With respect to documents:
        (i)    the title of the document;
        (ii)    the date of the document;
        (iii)    a description of the type of document;
        (iv)    a summary of the document's contents;
        (v)    the present location of the original and all existing copies of the document;
        (vi)    a list of all intended recipients of the document, including, but not limited to, all addressees, and all persons who were supposed to receive a copy of the document (*i.e.*, through "cc" or "bcc"); and
        (vii)    the identity of the author and a list of all persons who participated in the creation of the document.

11.    "Non-physician practitioner" means any practitioner of healthcare services who is not also a doctor of medicine or a doctor of osteopathic medicine.

12.    "Physician" means any provider of healthcare services who is a doctor of medicine or a doctor of osteopathic medicine

13.    "Provider" means any physician, physician group, hospital, laboratory, skilled nursing facility, home health agency, hospice, board and care facility, physician assistant, nurse,

nurse practitioner, medical assistant, or any other person or entity who provides any healthcare services, including any non-physician practitioner who provides any healthcare services.

14.    "Relating to" and "related to" mean consisting of, concerning, referring to, reflecting, supporting, evidencing, prepared in connection with, used in preparation for, or being in any way legally, logically, or factually connected to the matter discussed.

15.    "Skin substitute" means any graft used to assist with wound healing, such as non-autologous human skin (dermal or epidermal, cellular and acellular) grafts, non-human skin substitute grafts, and biological products (placental and amniotic skin substitutes), including, but not limited to, all items that can be classified using the following HCPCS and/or CPT codes: C5271-C5278 and Q4101-Q4284.

16.    "Text message conversations" refers to any and all electronic communications (other than emails) that can or do contain text, regardless of the format of the communications, the application or platform used to send or receive the communications, and whether the communications are immediately retrievable or retrievable only via a forensic extraction, including, but not limited to, those occurring in or via SMS, MMS, EMS, iMessage, Facebook chat, Facebook messenger, Google Talk (formerly Gchat), Blackberry Messenger (BBM), Skype, GroupMe, AIM, WhatsApp, Slack, Snapchat, Signal, WeChat, or company-deployed electronic health records or communications platforms, as well as, recoverable deleted data, backup files (e.g., iCloud or iPhone backup files), and archive snapshots.

17.    The terms "and" and "or" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

18.    The terms "any" and "all" shall be construed conjunctively or disjunctively so as to make each particular request inclusive rather than exclusive.

19.    The singular and plural forms of any word shall be construed interchangeably so as to bring within the scope of this Demand any document which might otherwise be construed as outside its scope.

## B.  INSTRUCTIONS

1.    *Relevant Time Period:* Unless otherwise stated in any specific request below, each request covers the relevant time period since January 1, 2016.

2.    This Demand is continuing in nature.  If You become aware of or acquire possession, custody, or control of additional documents that are responsive to this Demand, or if You become aware of or acquire additional information that is responsive to these interrogatories, You shall promptly produce such additional documents or supplement Your interrogatory responses.

3.    This Demand applies to all documents and information in Your possession, custody, or control regardless of their location and regardless of whether such documents or

information are held by Your current or former employees, including, but not limited to, in-house IT specialists and technicians, IT specialists and technicians to whom digital services have been out-sourced.

4.    All documents produced pursuant to this Demand are to be organized in such a manner that all documents relating to a particular request are grouped together and identified as being responsive to that request.

5.    If any document which is otherwise responsive to this Demand is not disclosed because of a claim of privilege or other objection, You shall identify such documents on a Privilege Log.  The Privilege Log shall be produced in Excel or Word format and include the following information:

> (a) the basis for the assertion of the privilege or objection;
>
> (b) the type of document (e.g., letter, memorandum, email, etc.)
>
> (c) the name and title of the author (and if different, the preparer and signatory);
>
> (d) the name(s) and title(s) of the individual(s) to whom the document was addressed;
>
> (e) the name(s) and title(s) of the individuals to whom the document or a copy of the document was sent or to whom the document or a copy, or any part thereof, was shown;
> (f) the date of the document;
>
> (g) number of pages;
>
> (h) a general description of the subject matter; and
>
> (i) the Request(s) to which the document is responsive.

6.    When a requested document contains both privileged and non-privileged material, the non-privileged material must be disclosed to the fullest extent possible.  If a privilege is asserted with regard to a part of the material contained in a document, the party claiming the privilege must clearly indicate the portions as to which the privilege is claimed.  When a document is redacted or altered in any fashion, identify as to each document the reason for the redaction or alteration, the date of the redaction or alteration, and the person performing the redaction or alteration.  Any redaction must be clearly visible on the redacted document.

7.    If any document otherwise responsive to this Demand is not produced because it was lost, destroyed, or discarded:

> (a) identify the document by type, date, and title;

(b) identify the person who last had custody or control over the document;

(c) state the date on which the document was destroyed or was discovered to have been lost;

(d) if the document was destroyed, state why it was destroyed and identify the person(s) who destroyed it;

(e) if the document was lost, describe the circumstances in which its loss was discovered, state the date that it was last seen or otherwise accounted for, and identify the person(s) who discovered its loss and who last saw or otherwise accounted for it;

(f) identify all persons who have knowledge pertaining to the destruction or loss of the document, giving a concise but complete statement of the knowledge You claim each such person has;

(g) identify all persons who have knowledge of the contents of each lost or destroyed document, giving a concise but complete statement of the knowledge You claim each such person has; and

(h) produce all existing indices, lists, or other documents in Your possession, custody, or control that reflect the existence of such lost or destroyed documents, and/or their transfer or destruction.

8.   If no documents exist that are responsive to a specific document request, a written statement to that effect shall be provided at the time of production.

9.   To the extent that documents responsive to this Demand are in the possession, custody, or control of third parties, this Demand requires a statement to that effect at the time of production, specifically providing the name, address, telephone number and principal contact of the third party, and shall further identify those documents in said third party's possession.

10.   Please produce imaged hard copy and electronic documents according to the Specifications for Production of Electronically Stored Information and Digitized Images at **Attachment B**.

11.   For each interrogatory and subpart thereof, You must respond separately and in writing.  Your responses must identify all documents that You used, referenced, or relied upon in Your written responses.

12.   If You withhold any information responsive to any interrogatory based on a claim of privilege or other objection: (a) furnish the basis for the assertion of the privilege or objection, (b) identify all individuals who could respond to the interrogatory with regard to the information that is being withheld, and (c) set forth the general subject matter and the specific interrogatory or interrogatories to which each individual could testify.

13.    When providing the name of an individual in response to any interrogatory or individuals identified pursuant to Instruction 12 above, provide the individual's last known address, telephone number, email address, or other contact information, as well as the individual's relationship to You.  If the individual is or was an employee, provide the individual's title and dates of employment.

## ATTACHMENT B TO CIVIL INVESTIGATIVE DEMAND NO. 23-1312

### Specifications for Production of ESI and Digitized ("Scanned") Images ("Production Specifications")

#### Collection of Electronically Stored Information (ESI)

Careful consideration should be given to the methodology, implementation and documentation of ESI collection to ensure that all responsive data and metadata are preserved in the collection process. Consideration should also be given as to whether production media should be encrypted when producing to the government when required by law (i.e. Health Insurance Portability and Accountability Act (HIPAA), Family Educational Rights and Privacy Act (FERPA), etc. *See* Section 24 below.

1. **Specification Modifications**

Any modifications or deviations from the Production Specifications may be done only with the express permission of the government and these modifications or deviations should be communicated to the government and approved by the government in written form.  Any responsive data or documents that exist in locations or native forms not discussed in these Production Specifications remain responsive and, therefore, arrangements should be made with the government to facilitate their production.

2. **Production Format of ESI and Imaged Hard Copy Documents**

Responsive ESI and imaged hard copy shall be produced in the format outlined below.  All ESI, except as outlined below in sections 5 – 21, shall be rendered to TIFF image format, and accompanied by an Opticon/Concordance® Image Cross Reference file. All applicable metadata/database (see section 3 below) shall be extracted and provided in Concordance® load file format.

 a. **Image File Format:** All documents shall be produced in black and white TIFF format unless the image requires color.  An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image.

 b. When producing black and white paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi, 1 bit, single-page TIFF files, CCITT Group IV (2D Compression).  When producing in *color,* paper documents scanned to images, or rendered ESI, they shall be produced as 300 dpi single-page JPG. Images should be uniquely and sequentially Bates numbered and unless otherwise specified, Bates numbers should be an endorsement on each image.

  i. All TIFF file names shall include the unique Bates number burned into the image.  (See section 22, below, regarding Bates number instructions.)

  ii. All TIFF image files shall be stored with the ".tif" extension.

       iii. Images without corresponding extracted text shall be OCR'd using standard COTS products.

          1. An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images. The report shall include the DOCID or Bates number(s) corresponding to each such image.

       iv. All pages of a document or all pages of a collection of documents that comprise a folder or other logical grouping, including a box, shall be delivered on a single piece of media.

       v. No image folder shall contain more than 2,000 images.

  c. **Opticon/Concordance® Image Cross Reference file:** Images should be accompanied by an Opticon load file that associates each Bates number with its corresponding single-page TIFF image file. The Cross Reference file should also contain the relative image file path for each Bates numbered page. The Opticon/Concordance® Image Cross Reference file is a page level load file, with each line representing one image.

Below is a sample:

    REL000000001,,.\IMAGES\001\REL000000001.TIF,Y,,,
    REL000000002,,.\IMAGES\001\REL000000002.TIF,,,,,
    REL000000003,,.\IMAGES\001\REL000000003.TIF,,,,,
    REL000000004,,.\IMAGES\001\REL000000004.TIF,Y,,,
    REL000000005,,.\IMAGES\001\REL000000005.TIF,,,,,

The fields are, from left to right:

- Field One – (REL000000001) – the Bates Number. This value must be unique for each row in the OPT file. The first page of each document must match the DOCID or BEGDOC# value of the respective document.
- Field Two – (blank) – the volume identifier. This field is not required.
- Field Three – (.\IMAGES\001\REL000000001.TIF) – The relative file path to the image to be loaded.
- Field Four – (Y) – the document marker. A "Y" indicates the start of a unique document.
- Field Five – (blank) – The folder indicator. This field is not required, and typically is not used.
- Field Six – (blank) – The box indicator. This field is not required, and typically is not used.
- Field Seven – (blank) – The page count. This field is not required.

  d. **Concordance® Load File**: Images should also be accompanied by a flat, document-level load file to provide the metadata and native files containing delimited text that will populate fields in a searchable, flat

database environment. The file encoding must be one of four types: Western European (Windows), Unicode (UTF16), Big-Endian Unicode or UTF8. The file should contain the required fields listed below in section 3.

1. Text delimited load files are defined using the standard Concordance delimiters. For example:

| | |
|---|---|
| *Field Separator* | *¶ or Code 020* |
| *Text Qualifier* | *þ or Code 254* |
| *Newline* | *® or Code 174* |
| *Multi-value* | *; or Code 059* |
| *Nested values* | *\ or Code 092* |

2. This load file should contain the relative file path to the individual multi-page, document level text files.
3. This load file should also contain the relative file path to all provided native files, such as Microsoft Excel or PowerPoint files.
4. There should be one line for every record in a collection.
5. The load file must contain a header listing the metadata/database fields contained within. For example, if the data file consists of a First Page of a Record (BegDoc#), Last Page of a Record (ending Bates / ENDDOC#), DOCID, DOCDate, File Name, and a Title, then the structure may appear as follows:

þBEGDOCþ¶þENDDOCþ¶þDOCIDþ¶þDOCDATEþ¶þFILENAMEþ¶þTITLEþ

d. **The extracted/OCR** text should be provided for each document as a separate single text file. The file name should match the BEGDOC# or DOCID for that specific record and be accompanied by the .txt extension.

e. **Directory and folder structure:** The directory structure for productions should be:
\*CaseName*\**LoadFiles**
\*CaseName*\**Images** < For supporting images (can include subfolders as needed, should not include more than 2,000 files per folder)
\*CaseName*\**Natives** <Native Files location (can include subfolders as needed, should not include more than 2,000 files per folder)
\*CaseName*\**Text** <Extracted Text files location (can include subfolders as needed, should not include more than 2,000 files per folder)
\*CaseName*\**Translated Images** < For supporting images of translated documents (as needed for rendered translated documents; can include subfolders as needed, should not include more than 2,000 files per folder)

\*CaseName*\**Translated Text** <Translated Text files location (as needed for translated text; can include subfolders as needed, should not include more than 2,000 files per folder).

### 3.    Required Metadata/Database Fields

A "✓" denotes that the indicated field should be present in the load file produced. "Other ESI" includes data discussed in sections 5 – 21 below, but does not include email, email repositories (section 11), "stand alone" items (section 12), imaged hard copy material (section 9) and production from ESI collected from Smart Phones, Mobile Devices and Other Technology (section 13). Email, email repositories, and "stand alone" materials (section 12) should comply with "Email" column below. Imaged hard copy materials should comply with the "Hard Copy" column. Production from ESI collected from Smart Phones, Mobile Devices and Other Technology should comply with the requirements of section 13. The parties will meet and confer about any field which cannot be populated automatically (i.e. would require manual population of information).

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| COLLECTION SOURCE | Name of the Company/Organization data was collected from | Text | 160 | ✓ | ✓ | ✓ |
| SOURCE ID (BOX #) | Submission/volume/box number | Text | 10 | ✓ | ✓ | ✓ |
| CUSTODIAN | Custodian/Source - format: Last, First or ABC Dept. | Text | 160 | ✓ | ✓ | ✓ |
| DUPECUSTODIAN | Custodian/Source – all custodians who had the document before de-duplication; format: Last, First or ABC Dept. | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| DUPECUSTODIAN FILE PATH | Listing of all the file locations of the document before de-duplication | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| AUTHOR | Creator of the document | Text | 500 | | | ✓ |
| BEGDOC# | Start Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| ENDDOC# | End Bates (including prefix) - No spaces | Text | 60 | ✓ | ✓ | ✓ |
| DOCID | Unique document Bates # or populate with the same value as Start Bates (DOCID = BEGDOC#) | Text | 60 | ✓ | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| PGCOUNT | Page Count | Number | 10 | ✓ | ✓ | ✓ |
| GROUPID | Contains the Group Identifier for the family, in order to group files with their attachments | Text | 60 | | ✓ | ✓ |
| PARENTID | Contains the Document Identifier of an attachment's parent | Text | 60 | | ✓ | ✓ |
| ATTACHIDS | Child document list; Child DOCID or Child Start Bates | Text – semicolon delimited | Unlimited | ✓ | ✓ | ✓ |
| ATTACHLIST | List of Attachment filenames | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BEGATTACH | Start Bates number of parent | Text | 60 | ✓ | ✓ | ✓ |
| ENDATTACH | End Bates number of last attachment | Text | 60 | ✓ | ✓ | ✓ |
| RECORD TYPE | Use the following choices: Image, Loose E-mail, E-mail, E-Doc, Attachment, Hard Copy or Other.  If using Other, please specify what type after Other | Text | 60 | ✓ | ✓ | ✓ |
| FROM | Sender (i.e.:  e-mail address, Last name, First name) | Text | 160 | | ✓ | ✓ |
| TO | Recipient (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| CC | Carbon Copy Recipients (i.e.: e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| BCC | Blind Carbon Copy Recipients (i.e.:  e-mail address, Last name, First name) | Text – semicolon delimited | Unlimited | | ✓ | ✓ |
| SUBJECT | Subject line of email | Text | Unlimited | | ✓ | |
| TITLE | Document Title | Text | Unlimited | | | ✓ |
| CONVINDEX | E-mail system ID used to track replies, forwards, etc. | Text | Unlimited | | ✓ | |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Other ESI |
|---|---|---|---|---|---|---|
| DOCDATE | Last Modified Date for files and Sent date for e-mail, this field inherits the date for attachments from their parent. Do not provide 00/00/0000. | Date | MM/DD/ YYYY | | ✓ | ✓ |
| TEXT FILEPATH | Relative file path of the text file associated with either the extracted text or the OCR | Text | Unlimited | ✓ | ✓ | ✓ |
| DATE TIME SENT | Date and time Sent (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | |
| DATE TIME CRTD | Date Created (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |
| DATE TIME SVD | Date Saved (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:SS | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| DATE TIME MOD | Date Last Modified (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| DATE TIME RCVD | Date Received (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | |
| DATE TIME ACCD | Date Accessed (USE TIME ZONE OF COLLECTION LOCALITY) Numbers must be populated. If date is unknown, leave blank. Do not provide 00/00/0000 | Date and Time | MM/DD/ YYYY HH:MM:S S | | ✓ | ✓ |
| TIME ZONE OFFSET | Time zone of collection locality, relative to Coordinated Universal Time (UTC). E.g., for US Central Standard Time (CST), the value for this field should be -6.0 | Decimal | 10 | | ✓ | |
| FILE SIZE | Native File Size in KBs | Decimal | 10 | | | ✓ |
| FILE NAME | File name - name of file as it appeared in its original location | Text | Unlimited | | | ✓ |
| APPLICATION | Application used to create native file (e.g. Excel, Outlook, Word) | Text | 160 | | ✓ | ✓ |
| FILE EXTENSION | Extension for the file (e.g. .doc, .pdf, .wpd) | Text | 10 | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| FILEPATH | Data's original source full folder path | Text | Unlimited | | ✓ | ✓ |
| NATIVE LINK | Relative file path location to the native file | Text | Unlimited | | ✓ | ✓ |
| FOLDER ID | Complete E-mail folder path (e.g. Inbox\Active) or Hard Copy container information (e.g. folder or binder name) | Text | Unlimited | ✓ | ✓ | |
| HASH VALUE | Identifying value of an electronic record that is used for deduplication during processing. MD5 or SHA1 hash algorithms may be used, but must be kept consistent throughout all productions and communicated to Government. | Text | Unlimited | | ✓ | ✓ |
| MESSAGEHEADER | E-mail header. | Text | Unlimited | | ✓ | |
| ATTACHMCOUNT | Number of attachments (any level child document) associated with a ParentID | Text | 10 | | ✓ | |
| FILE TYPE | Description that represents the file type to the Windows Operating System. E.g., Adobe Portable Document Format, Microsoft Word 97 – 2003, or Microsoft Office Word Open XML Format. | Text | 160 | | ✓ | ✓ |
| HAS HIDDEN CONTENT | Identifies whether the document has comments, track changes or other hidden content or data associated with it | Text | Yes/No | | ✓ | ✓ |
| MESSAGE TYPE | Exchange Message class or equivalent | Text | 60 | | ✓ | |
| EXTENDED PROPERTIES | | Text | Unlimited | | ✓ | ✓ |

| Field name | Field Description | Field Type | Field Value | Hard Copy | E-mail | Othe r ESI |
|---|---|---|---|---|---|---|
| HAS REDACTIONS | Identifies whether a record has been produced with redactions; should be populated with Y for records with redactions and N for records without redactions. | Text | Yes/No | ✓ | ✓ | ✓ |
| HAS TRANSLATIONS | Identifies whether a document has been produced with translated text or audio contains a transcript | Text | Yes/No | ✓ | ✓ | ✓ |

**4.    Search, De-Duplication, Near-Duplicate Identification, Technology Assisted Review, E-mail Conversation Threading and Other Culling Procedures**

  a. De-duplication of exact hash copies shall be performed globally – across all custodians. The custodian of each record shall be populated in the DupeCustodian field.
    ▪ All files found on the National Institute of Standards and Technology (NIST) list, commonly referred to as deNISTing, should be excluded from delivery to the Government. All available metadata from files withheld from delivery due to the deNISTing process will be available upon request.
  b. All files should be globally de-duplicated with the following conditions:

    i. The "DupeCustodian" metadata field (listing of all custodians who had the document before de-duplication) must be provided with the document production.
    ii. The "DupeCustodian File Path" metadata field (listing all the file locations of the document before de-duplication) must be provided with the document production.
    iii. All files and metadata for the duplicate documents removed during de-duplication must be preserved and available for production upon request.
    iv. No customization of hashing may occur without prior express approval by the Government.
    v. De-duplication must be done by document family, not by individual document.
    vi. A detailed description of the steps taken to de-duplicate (including the process of obtaining hash values) must be provided to the Government. For every production after the first, a separate Unified Custodian overlay shall be provided. If no overlay is necessary due to the fact that no documents de-duped out in connection with previously produced documents, this shall be

expressly stated in the cover letter accompanying the subsequent production(s).

    c.   The Producing Party shall not use any other procedure to cull, filter, group, separate or de-duplicate, or near-deduplicate, etc. (i.e., reduce the volume of) responsive material before discussing with and obtaining the written approval of the government. All objective coding (e.g., near duplicate ID or e-mail thread ID) shall be discussed and produced to the government as additional metadata fields. The Producing Party will not employ analytic software or technology to search, identify, or review potentially responsive material, including but not limited to, technology assisted review or predictive coding, without first discussing with the government.

## 5.    Hidden Text

All hidden text (e.g. track changes, hidden columns, mark-ups, notes) shall be expanded and rendered in the image file. Except for Adobe PDF files, for any files that cannot be expanded, the native files shall be produced with the image file. If an Adobe PDF's hidden text cannot be expanded and rendered in an image file, it need only be produced in native form if individually requested by a specific document identifier or bates number.

## 6.    Embedded Files and File Links

All non-graphic embedded objects (Word documents, Excel spreadsheets, .wav files, etc.) that are found within a file shall be extracted and produced. For purposes of production, the embedded files shall be treated as attachments to the original file, with the parent/child relationship preserved.

The parties shall meet and confer regarding how to treat file links, including links within e-mails to centralized document repositories (e.g. MS OneDrive and Google Drive).

## 7.    Image-Only Files

All image-only files (non-searchable .pdfs, multi-page TIFFs, Snipping Tool and other screenshots, etc., as well as all other images that contain text) shall be produced with OCR text and metadata/database fields identified in section 3 for "Other ESI."

## 8.    Encrypted Files

Any data (whether individual files or digital containers) that is protected by a password, encryption key, digital rights management, or other encryption scheme, shall be decrypted prior to processing for production.

    a.   The unencrypted text shall be extracted and provided per section 2.d. The unencrypted files shall be used to render images and provided per sections 2.a and 2.b. The unencrypted native file shall be produced pursuant to sections 10-21.

        ▪  If such protected data is encountered but unable to be processed, each file or container shall be reported as an exception in the accompanying Exception Report (pursuant to section 27) and shall include all available metadata associated with the data, including custodian information.

### 9. Production of Imaged Hard Copy Records

All imaged hard copy material shall reflect accurate document unitization including all attachments and container information (to be reflected in the PARENTID, ATTACHID, BEGATTACH, ENDATTACH and FOLDERID).

a. Unitization in this context refers to identifying and marking the boundaries of documents within the collection, where a document is defined as the smallest physical fastened unit within a bundle. (e.g., staples, paperclips, rubber bands, folders, or tabs in a binder).
  - The first document in the collection represents the parent document and all other documents will represent the children.
b. All imaged hard copy documents shall be produced as 300 dpi single-page TIFF files, CCITT Group IV (2D Compression). All documents shall be produced in black and white TIFF format unless the image requires color. An image requires color when color in the document adds emphasis to information in the document or is itself information that would not be readily apparent on the face of a black and white image. Images identified as requiring color shall be produced as color 300 dpi single-page JPEG files.
  - All objective coding (e.g., document date or document author) should be discussed and could be produced to the government as additional metadata/database fields should they be deemed as necessary.

### 10. Production of Spreadsheets and Presentation Files

All spreadsheet and presentation files (e.g. Excel, PowerPoint) shall be produced in the unprocessed "as kept in the ordinary course of business" state (i.e., in native format), with an associated placeholder image and endorsed with a unique Bates number. *See* section 22 below. The file produced should maintain the integrity of all source, custodian, application, embedded and related file system metadata.

### 11. Production of E-mail Repositories

E-mail repositories, also known as e-mail databases (e.g., Outlook PST, Lotus NSF), can contain a variety of items, including: messages, calendars, contacts, tasks, etc. E-mail database systems should not be produced without consultation with and written consent of the government about the format for the production of such databases.

### 12. Production of Items Originally Generated in E-mail Repositories but Found and Collected Outside of E-mail Repositories, i.e., "Stand-alone" Items

Any parent e-mail or other parent items (e.g., calendar, contacts, tasks, notes, etc.) found and collected outside of e-mail repositories (e.g., items having extensions .msg, .htm, .mht, etc.), shall be produced with the "Loose E-mail" metadata fields outlined in section 3, including but not limited to any attachments, maintaining the family (parent/child) relationship.

### 13.    Production of ESI Collected from Mobile Devices, Messaging Platforms, Workplace Collaboration Tools and Other Technologies

The responding party shall identify, collect, and produce any and all data which is responsive to the requests, collected from mobile devices, messaging platforms, workspace collaboration tools and other technologies.  These technologies include, but are not limited to smart phones, cell phones, tablets, PDAs, Blackberry, smart phone data, tablet data, voicemail messaging data, instant messaging, chat messaging, text messaging, Slack, conference call data, video/audio conferencing, workspace collaboration tools (e.g., GoTo Meeting, WebEx, MS Teams, Zoom), and related/similar technologies.  However, such data, logs, metadata or other files related thereto, as well as other less common but similar data types, shall be produced after consultation with and written consent of the government about the format for the production of such data.

The expectation of the government is that all familial relationships for all data will be maintained. Similar to email conversations and families, the expectation is that all messages/texts in a conversation will be provided the same conversation index and groupid data (maintaining the familial relationship) allowing the government to read the entire conversation in context. Messages should be produced to align with the formats listed in section 2 and as individual Unicode text files, and attachments should be produced as native files with images and OCR text.

While the parties shall meet and confer on precise metadata formats, as an example, metadata collected from mobile devices shall be provided in formats such as the following:

| Field Name | Field Description | Mobile | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Mobile Cellebrite Categories | | | | |
| TXT-ROWNUMBER | Row number. | ✓ | # | # | # | # | # | # | # | # | # |
| TXT-CHATNUMBER | Chat number, identifies chat groups. | ✓ | Chat # | | | | | | | | |
| TXT-STARTTIME | Start date-time for conversation, calendar item. | ✓ | Start Time: Date | | | | | | | | Start Date: Date |
| TXT-ENDTIME | End date-time for calendar item. | ✓ | | | | | | | | | End Date: Date |
| TXT-LASTACTIVITYTIME | End date-time for conversation. | ✓ | Last Activity: Date | | | | | | | | |
| TXT-PARTICIPANTS | Who was involved in the conversation, meeting. | ✓ | Participants | | Party | | | | | | Attendees |
| TXT-MESSAGENUMBER | Individual identifier for message. | ✓ | Instant Message # | | | | | | | | |
| TXT-BODY | Body of the chat, message, item. | ✓ | Body | Body | Message | | | | | Body | |
| TXT-STATUS | Whether the text was Sent or Read on the device. | ✓ | Status | Status | Status | | | | | | Status |
| TXT-LOCATION | GPS Information. | ✓ | Location | | | | Location | | | | Location |
| TXT-TIMESTAMP | Timestamp of item. Equivalent to DateReceived for incoming items or to | ✓ | Timestamp: Date | Date | Date | Date | | Timestamp-Date | Timestamp-Date | | |

| Field Name | Field Description | Mobile | Mobile Cellebrite Categories | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Chats | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | DateSent for outgoing items. | | | | | | | | | | |
| TXT-READDATE | Date read | ✓ | Read: Date | | Read-Date | | Read-Date | | | | |
| TXT-DELETED | Indicates whether a message was deleted and recovered by Cellebrite. | ✓ | Deleted - Chat | Deleted | | Deleted | Deleted | Deleted | Deleted | Deleted | Deleted |
| TXT-STARREDMESSAGE | Notes whether the message was flagged. | ✓ | Starred message | | | | Starred message | | | | |
| TXT-THREAD-GROUP | Populate with the DOCID of the first text in the chat conversation to allow the entire chat conversation to be grouped as a family. (Sort each device by Chat Number and then by Row Number to assign TXT-THREAD-GROUP identifier). This is NOT the BEGATTACH field or | ✓ | Chat # | | | | | | | | |

| Field Name | Field Description | Mobile | Chats | Mobile Cellebrite Categories | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | MMS | SMS | Email | Instant Message | Voicemail | Recordings | Notes | Calendar |
| | Relativity Group Identifier. | | | | | | | | | | |
| TXT-SMSC | Short Message Service Center (handles SMS text messages on behalf of phone service provider) | ✓ | | | SMSC | | | | | | |
| DIRECTION | Direction of communication; Outgoing or Incoming. | ✓ | | Direction | Direction | Direction | Direction | | | | |
| IMPORTANCE | | ✓ | | Priority | | Priority | | | | | Priority |
| ACCOUNT | Account identifier for device user: email address, phone number, account number. | ✓ | | Name | | Account | | Name | | | |
| DURATION | Duration time of call, voice message, audio, video in HH:MM:SS format, e.g. 00:00:32 | ✓ | | | | | | Duration | Duration | | |

### 14.    Production of Social Media

Prior to any production of responsive data from social media (e.g., Twitter, Facebook, LinkedIn, etc.), the producing party shall first discuss with the government the potential export formats before collecting the information, to ensure it is collected and produced in a way that preserves the original metadata, has a clear chain of custody, and provides as much information as possible regarding the source and history of each individual communication.

Social media platforms offer different functions, forms of content, and capability for downloading accounts. Because of these differences, prior to collection of social media data, the producing party must discuss with the government the available export and production methods and formats that the producing party is considering. Unless the government agrees to an alternative in writing, regardless of the social media platform, productions of social media content must meet the following general requirements:  (1) separate (2) searchable (3) static images of (4) each responsive posting on the social media platform, (5) all related content (e.g., comments, likes, share or re-transmittal information, images, videos, linked documents and content), and (6) associated metadata (e.g., user name(s), date, and time of all posts, comments, likes, share or re-transmittals).

These general requirements are in addition to any more specific requirements in a particular request (e.g., geolocation data), and the producing party must ask the government about any perceived conflict between these requirements and another source of specifications or requirements. If available from the social media platform or through social media data processing software, files that facilitate interactive review of the data (i.e., html files) as well as load files in .csv format must be produced with the associated content.

### 15.    Production of Structured Data

Prior to any production of responsive data from a structured database (e.g., Oracle, SAP, SQL, MySQL, QuickBooks, proprietary timekeeping, accounting, sales rep call notes, CRMs, SharePoint, etc.), the producing party shall first identify the database type and version number, discuss providing the database dictionary (in whole or part) and any user manuals, or any other documentation describing the structure and/or content of the database and a list of all reports that can be generated from the database. Upon consultation with and written consent of the government, if a report is provided, the standard format of that report provided should be in comma separated values (.csv) format. The information contained in any such report must be thoroughly explained to the government before production.

### 16.    Production of Photographs with Native File or Digitized ESI

Photographs shall be produced as single-page JPEG files with a resolution equivalent to the original image as they were captured/created. All JPEG files shall have extracted metadata/database fields provided in a Concordance® load file format as outlined in section 3 for "Other ESI."

### 17.    Production of Images from which Text Cannot be OCR Converted

An exception report shall be provided when limitations of paper digitization software/hardware or attribute conversion do not allow for OCR text conversion of certain images.  The report shall include the DOCID or Bates number(s) corresponding to each such image.

### 18.    Production of Translated Text with Non-English Language ESI or Documents

To the extent translated text is available to the producing party through machine language translation, such translations shall be provided to the government with the production. The producing party shall provide the original extracted text as well as the translated extracted text in load ready format.  The translated text and images of translated documents shall be provided as a separate folder volume to the main production. The parties shall meet and confer regarding any required translated text redactions.

### 19.    Production of Audio File Transcripts

To the extent audio files are produced and transcripts are available to the producing party through machine transcription, such transcripts shall be provided to the government with the production.  The producing party shall provide the audio file transcript as a text file in load ready format like any other text file named by the BEGDOC#.  The parties shall meet and confer regarding any required audio file redactions.

### 20.    Production of ESI from Non-PC or Non-Windows-based Systems

If responsive ESI is in non-PC or non-Windows-based Systems (e.g., Apple, IBM mainframes, and UNIX machines, Android device, etc.), the ESI shall be produced after discussion with and written consent of the government about the format for the production of such data.

### 21.    Production of Native Files (When Applicable Pursuant to These Specifications)

Production of native files, as called for in these specifications, shall have extracted metadata/database fields provided in a Concordance® load file format as defined in the field specifications for "Other ESI" as outlined in section 3 as well as a placeholder image which indicates a native file is being produced.

ESI shall be produced in a manner which is functionally usable by the government.  The following are examples:

   a.    AutoCAD data, e.g., DWG and DXF files, shall be processed/converted and produced as single-page JPG image files and accompanied by a Concordance® Image formatted load file as described above. The native files shall be placed in a separate folder on the production media and linked by a hyperlink within the text load file.
   - GIS data shall be produced in its native format and be accompanied by a viewer such that the mapping or other data can be reviewed in a manner that does not detract from its ability to be reasonably understood.

      b. Audio and video recordings shall be produced in native format and be accompanied by a viewer if such recordings do not play in a generic application (e.g., Windows Media Player).

## 22. Bates Number Convention

All images should be assigned Bates numbers before production to the government. Each Bates number shall be a standard length, include leading zeros in the number, and be unique for each produced page. The numbers should be endorsed on the actual images at a location that does not obliterate, conceal, or interfere with any information from the source document. Native files should be assigned a single Bates number for the entire file which will represent the native document in the Opticon/ Concordance® Image Cross Reference file. The load file will include a reference to the native file path and utilize the NATIVELINK metadata field). The Bates number shall not exceed 30 characters in length and shall include leading zeros in the numeric portion. The Bates number shall be a unique number given sequentially (i.e. page one of document is PREFIX0000000001, page two of the same document is PREFIX0000000002) to each page (when assigned to an image) or to each document (when assigned to a native file). If the parties agree to a rolling production, the numbering convention shall remain consistent throughout the entire production. There shall be no spaces between the prefix and numeric value. If suffixes are required, please use "dot notation." Below is a sample of dot notation:

|         | *Document #1*           | *Document #2*           |
|---------|-------------------------|-------------------------|
| *Page #1* | PREFIX00000000001       | PREFIX00000000002       |
| *Page #2* | PREFIX00000000001.002   | PREFIX00000000002.002   |
| *Page #3* | PREFIX00000000001.003   | PREFIX00000000002.003   |

## 23. Media Formats for Storage and Delivery of Production Data

Electronic documents and data shall be delivered on any of the following media:

      a. CD-ROMs and/or DVD-R (+/-) formatted to ISO/IEC 13346 and Universal Disk Format 1.02 specifications; Blu-ray.
- External hard drives (USB 3.0 or higher, formatted to NTFS format specifications) or flash drives

      b. Government approved File Transfer Protocol (FTP) technologies.
- Storage media used to deliver ESI shall be appropriate to the size of the data in the production.

      c. Media should be labeled with the case name, production date, Bates range, and producing party.

## 24. Virus Protection and Security for Delivery of Production Data

Production data shall be free of computer viruses. Any files found to include a virus shall be quarantined by the producing party and noted in a log to be provided to the government. Password protected or encrypted files or media shall be provided with corresponding passwords and specific decryption instructions. All encryption software shall be used with approval by and with the written consent of the government.

### 25. Compliance and Adherence to Generally Accepted Technical Standards

Production shall be in conformance with standards and practices established by the National Institute of Standards and Technology ("NIST" at www.nist.gov), U.S. National Archives & Records Administration ("NARA" at www.archives.gov), American Records Management Association ("ARMA International" at www.arma.org), American National Standards Institute ("ANSI" at www.ansi.org), International Organization for Standardization ("ISO" at www.iso.org), and/or other U.S. Government or professional organizations.

### 26. Read Me Text File

All deliverables shall include a "read me" text file at the root directory containing: total number of records, total number of images/pages or files, mapping of fields to plainly identify field names, types, lengths, and formats. The file shall also indicate the field name to which images will be linked for viewing, date and time format, and confirmation that the number of files in load files matches the number of files produced.

### 27. Exception Report

An exception report, in .csv format, shall be included, documenting any production anomalies during the collection, processing, and production phases. The report shall provide all available BEGDOC# or DOCID values and metadata listed in section 3, including but not limited to file names and file paths for all affected files.

### 28. Transmittal Letter to Accompany Deliverables

All deliverables should be accompanied by a transmittal letter including the production date, case name and number, producing party name, and Bates range produced. Technical instructions on how to decrypt media should be included in the transmittal letter but the password should be transmitted separately.

-XXX-

**ATTACHMENT C TO CIVIL INVESTIGATIVE DEMAND NO. 23-1312**

**DOCUMENT REQUESTS**

You are required by this Demand to produce any and all of the following documents in Your possession, custody, or control:

1. All documents reflecting any formal or informal contracts and agreements between You or Wound Pros and the persons and entities identified in connection with interrogatory 1, including all documents and communications reflecting any compensation, payment, commissions, bonuses, reimbursement of expenses, risk sharing, or any other remuneration or benefits of any kind.

2. All documents and communications concerning any compensation, commission, bonus, or any other remuneration or benefits of any kind offered and/or paid by or on behalf of You or Wound Pros to any person or entity that provides, supervises, directs, refers, or otherwise causes the provision or billing of the federal healthcare programs for any skin substitute products or services by or on behalf of You or Wound Pros, including, but not limited to, all documents and communications related to any fair market value assessment of that compensation.

3. All personnel evaluations, records, schedules, timesheets, logs, and any other documentation of payments, remuneration, commission, reimbursement of expenses, risk sharing, benefits of any kind, referral, sanction, penalty, disciplinary action, or any other unfavorable action or consequence of any kind relating to the provision of or billing for any skin substitute products or services by or on behalf of You or Wound Pros.

4. All documents and communications relating to supervision or direction by any physician affiliated with Wound Pros, including, but not limited to, Dr. Bill J. Releford, Dr. Christopher Otiko, Dr. Owen Ellington, Dr. Joseph M. Palumbo, Dr. Sherman Washington, and Dr. Allyson Pizzo-Berkey, of the provision of any skin substitute products or services by any non-physician practitioner on behalf of Wound Pros.

5. All projections, analyses, reports, drafts, reviews, or other documentation reflecting any performance metric, including, but not limited to, revenue, profit, and return on investment ("ROI"), relating to the provision of or billing for any skin substitute products or services by any person or entity affiliated with Wound Pros.

6. All documents and communications relating to the ordering by any Wound Pros-affiliated provider of any DME supplies from any Wound Pros-affiliated DME supplier, including the preparation and ordering of pre-made DME kits.

7. All formal and informal policies, practices, procedures, guidelines, standard operating procedures, FAQs, training materials, instructions, advice, evaluations, or other guidance in any form relating to (a) supervision of non-physician practitioners, including remote supervision; (b) billing for products and services provided by non-physician practitioners, including billing for services "incident to" services provided by a physician; (c) billing

for products and services provided to patients in hospice, nursing facilities, skilled nursing facilities, or any other board or care facilities; (d) identifying the point of service and the entity that provided any products or services in any documentation related to billing; (e) ordering DME supplies; (f) providing DME to patients; and (g) compliance with federal healthcare program billing requirements, the False Claims Act, Stark Law, Anti-Kickback Statute, or other state and federal laws and regulatory guidance.

8.     All documents and communications concerning compliance with the requirements of any federal healthcare program, including, but not limited to, all documents exchanged with CMS relating to Your or Wound Pros' ability to participate in the federal healthcare programs, revocation by CMS, and any notifications from CMS regarding any actual, potential, or suspected failure to comply with CMS requirements.

9.     All formal or informal complaints, allegations, objections, inquiries, or concerns of any kind from any source concerning potential fraud, inappropriate billing, noncompliance with federal healthcare program requirements, unsatisfactory or inappropriate products or services, harm to patients, or violations of statutes or regulations by You or Wound Pros.

10.    Documents sufficient to show Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.

11.    Documents sufficient to show Your organizational chart(s) for the Relevant Time Period.

12.    All documents relied on to answer the interrogatories in **Attachment D**.

## ATTACHMENT D TO CIVIL INVESTIGATIVE DEMAND NO. 23-1312

## INTERROGATORIES

1.   Identify in Microsoft Excel format all persons and entities with which You and/or Wound Pros contracted in connection with providing or billing for healthcare products or services, by specifying in separate fields: (a) the name of the person or entity with which You and/or Wound Pros contracted; (b) the contract name(s); (c) the contract date(s); (d) the contract number(s); (e) all parties to the contract(s); (f) the signatories to the contract(s); (g) the person(s) involved in the contracting process(es); (h) all products and services covered by the contract(s), including whether the contract related in any way to skin substitutes; (i) any amendments to the contract(s); (j) the status of any pending contract negotiations; (k) the reason(s) for any amendment, modification, or termination of any contract; (l) the termination date of the contract; and (m) any documentation related to the contract(s).

2.   For each Wound Pros entity and affiliate, identify in Microsoft Excel format all owners, investors, and financial supporters of any kind by (a) full name; (b) current or last known business address, home address, and telephone number; (c) ownership share, if applicable; (d) investments and/or financial support provided, including the itemized amount(s) and date(s); (e) return on investment provided by the Wound Pros entity or affiliate to the owner, investor, or financial supporter, if applicable, including the amount(s) and date(s); (f) description of the nature of the ownership, investment relationship, and/or financial support; and (g) any other metric that You or Wound Pros uses to track or quantify the relationship with the owner, investor, or financial supporter.

3.   For each Wound Pros entity and affiliate, identify in Microsoft Excel format all current and former employees by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) job title; (e) job responsibilities; (f) whether the employee was a direct employee, volunteer, independent contractor, agent, director, officer, representative, account, advisor, or consultant; (g) start date; (h) termination date, if applicable; (i) Wound Pros entity with which the individual interacted; (j) locations where any services were provided by the individual; (k) all compensation and benefits of any kind; (l) supervising responsibilities; (m) direct report(s); (n) supervisor(s); and (o) manager(s).

4.   Identify in Microsoft Excel format all persons and/or entities through whom Wound Pros submits claims for reimbursement to the federal healthcare programs by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) nature of the relationship with Wound Pros; (f) start date of relationship; (g) end date of the relationship; (h) services provided; (i) dates during which the services were provided; (j) locations where the services were provided; (k) Wound Pros entity on behalf of which the person or entity submitted claims; (l) all compensation and benefits of any kind; and (m) whether the compensation was consistent with fair market value, including the basis for that conclusion.

5.     Identify in Microsoft Excel format all systems, programs, platforms, software, algorithms, analytics, or other tools used by Wound Pros, including, but not limited to, Slack, RITA, HL7, Smart Sheet, Black Doctor 24/7, Wound Docs, Office Ally, Kareo, Google Drive, Google Email, Zelis, Paychex, and ADP, by (a) name; (b) function and/or use; (c) dates of use; (d) the Wound Pros entities and/or individuals involved or impacted; and (e) the name(s) and title(s) of the employees or other third parties most knowledgeable about its function and/or use.

6.     For each system, program, platform, software, algorithm, analytic, or other tool identified in response to interrogatory 5, describe (a) all fields that are auto-populated by the system; (b) all fields that are added or revised by anyone other than the provider who directly treated the patient; and (c) the circumstances under which those fields are auto-populated, added, or revised. If this process changed during the Relevant Time Period, describe all changes during this time period.

7.     Identify in Microsoft Excel format all DME suppliers used by any person or entity affiliated with Wound Pros by (a) full name; (b) current or last known business address, home address, and telephone number; (c) NPI, if applicable; (d) tax identification number, if applicable; (e) DME supplies ordered from that supplier; and (f) dates during which DME supplies were ordered from that supplier.

8.     Identify in Microsoft Excel format all DME orders filled by Wound Pros for DME, including (a) the item or service furnished; (b) the patient (i) full name, (ii) date of birth, (iii) social security number, and (iv) Medicare Beneficiary Number or other federal health care program identifier; (c) the referring physician; and (d) the amount reimbursed.

9.     Identify in Microsoft Excel format all Wound Pros facilities and medical offices where services were provided by any Wound Pros provider by (a) full name; (b) address; (c) the date range(s) during which services were provided at that facility or medical office; (d) all persons and entities that billed the federal healthcare programs for services performed at that facility or medical office, including the person's or entity's NPI and EIN; and (e) the services provided at that facility.

10.    Identify in Microsoft Excel format all patients treated by a Wound Pros non-physician practitioner, including identifying the patient by (a) full name; (b) date of birth; (c) social security number; (d) date of first encounter with Wound Pros; (e) date of the most recent encounter with Wound Pros; (f) date on which the service was provided; (g) whether the patient was treated with a skin substitute; (h) date of the skin substitute service, if any; (i) address where the service was performed; (j) whether the patient was located at a facility of any kind when the patient received the service, and if so, the type of facility, name of the facility, and address of the facility; (k) name of the person who performed the service; (l) name of the supervising physician, if any; (m) health insurance plan; (n) whether the patient was diagnosed with any condition related to the services provided, and if so, any associated diagnosis, HCPCS, and CPT codes; (o) all follow-up treatments

associated with the services provided; and (p) all documentation or other information considered in connection with the services provided.

11.    Describe Your corporate structure during the Relevant Time Period from Your corporate parent(s) through any holding companies, limited liability corporations, affiliated corporations or entities, partnerships, or subsidiaries, including specifically identifying the owner(s) of each such entity and the fractional share of ownership.  If the structure has changed during the Relevant Time Period, describe all changes to the structure during this time period.

12.    Describe Your relationship with each of the following entities, including any ownership interest, financial relationship, and overlap in providers, services, or patients:  (a) Wound Pros Washington; (b) Wound Pros Utah; (c) Wound Pros Louisiana; (d) Wound Pros Illinois; (e) Texas Wound Care Management; (f) PLS Podiatry Group; (g) Ohio Wound Care Specialists; (h) Ohio Wound Care Network; (i) DPMOTIKONRCA LLC; (j) Coast to Coast Podiatry; (l) Coast to Coast Foot Doctors, a Podiatry Corporation; (m) Coast to Coast DME; (n) Christopher A Otiko DPM; (o) Global Wound Care Medical Group; (p) American Wound Care Partners; (q) National Wound Care Associates; (r) Horizon Wound Care LLC; and (s) PLS Foot Doctors.  If the relationship has changed during the Relevant Time Period, describe all changes during this time period.

# Exhibit 13

| | |
|---|---|
| **From:** | Bergin, Jessica (CIV) |
| **To:** | Keith Greer |
| **Cc:** | Thiess, David (USACAE) |
| **Subject:** | RE: Wound Pros |
| **Date:** | Friday, September 29, 2023 5:41:30 PM |
| **Attachments:** | Wound Pros Management Group CID No. 23-1300.pdf |
| | Wound Pros Holdings CID No. 23-1301.pdf |
| | Wound Pros Enterprises CID No. 23-1302.pdf |
| | Wound Pros Technology CID No. 23-1303.pd² |
| | Wound Pros Ventures CID No. 23-1304.pdf |
| | Wound Pros PC CID No. 23-1305.pdf |
| | Global Wound Care CID No. 23-1306.pdf |
| | WP Texas Medical Group CID No. 23-1307.pcf |
| | Wound Pros Texas CID No. 23-1308.pdf |
| | Wound Pros Georgia CID No. 23-1309.pdf |
| | Wound Pros Nevada CID No. 23-1310.pdf |
| | Wound Pros Doctors CID No. 23-1311.pdf |
| | Wound Pros Tennessee CID No. 23-1312.pdf |
| | Releford CID No. 23-1313.pdf |
| | Otiko CID No. 23-1314.pdf |
| | Ellington CID No. 23-1315.pdf |
| | Palumbo CID No. 23-1316.pdf |
| | Washington CID No. 23-1317.pdf |
| | Pizzo-Berkey CID No. 23-1318.pdf |

Keith,

Attached please find the Civil Investigative Demands directed to Wound Pros Management Group, Inc.; Wound Pros Holdings, PC; Wound Pros Enterprises LLC; Wound Pros Technology Inc.; Wound Pros Ventures, LP; Wound Pros PC; Global Wound Care Medical Group; WP Texas Medical Group PC; Wound Pros Texas PLLC; Wound Pros Georgia PC; Wound Pros Nevada Inc.; Wound Pros Doctors PC; Wound Pros Tennessee PC; Bill J. Releford; Christopher Otiko; Owen Ellington; Joseph M. Palumbo; Sherman Washington; and Allyson Pizzo Berkey.

Best,

Jessica

**From:** Keith Greer <keith.greer@greerlaw.biz>
**Sent:** Friday, September 29, 2023 7:18 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>
**Subject:** [EXTERNAL] Re: Wound Pros

Sorry, I thought I replied to that a couple of days ago. Yes, I have spoken to each of the individuals and principals for the entities identified in your email, and they have authorized me to accept service on their behalf.

Sent from my iPhone

C. Keith Greer, Esq.
Greer & Associates, APC
16855 W. Bernardo Dr., Suite 255
San Diego, CA 92127

Ph (858)613-6677
Fax (858)613-6680

On Sep 29, 2023, at 8:17 AM, Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov> wrote:

Keith,

I'm following up on my below message. Could you please let us know whether you also represent all of the individuals and entities that I identified below?

Thank you,

Jessica

**From:** Bergin, Jessica (CIV)
**Sent:** Thursday, September 28, 2023 8:41 AM
**To:** Keith Greer <keith.greer@greerlaw.biz>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>
**Subject:** RE: Wound Pros

Keith,

Thank you for your reply. Can you please confirm that you are authorized to accept service on behalf of the below entities and individuals because you represent them in responding to the Civil Investigative Demands?

Best,

Jessica

**From:** Keith Greer <keith.greer@greerlaw.biz>
**Sent:** Wednesday, September 27, 2023 8:42 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>
**Subject:** [EXTERNAL] Re: Wound Pros

Sorry for the delayed response. Yes, I have authority to accept service on behalf of all the cited entities and individuals.

Sent from my iPhone

C. Keith Greer, Esq.
Greer & Associates, APC

16855 W. Bernardo Dr., Suite 255
San Diego, CA 92127
Ph (858)613-6677
Fax (858)613-6680

On Sep 27, 2023, at 9:14 AM, Bergin, Jessica (CIV)
<Jessica.Bergin@usdoj.gov> wrote:

Keith,

We have Civil Investigative Demands directed to the following entities and
individuals that we plan to serve this week: Wound Pros Management
Group, Inc.; Wound Pros Holdings, PC; Wound Pros Enterprises LLC;
Wound Pros Technology Inc.; Wound Pros Ventures, LP; Wound Pros PC;
Global Wound Care Medical Group; WP Texas Medical Group PC; Wound
Pros Texas PLLC; Wound Pros Georgia PC; Wound Pros Nevada Inc.;
Wound Pros Doctors PC; Wound Pros Tennessee PC; Bill J. Releford;
Christopher Otiko; Owen Ellington; Joseph M. Palumbo; Sherman
Washington; and Allyson Pizzo Berkey.

Today, could you please confirm whether you represent each of those
entities and individuals? Could you also please let us know today whether
you are willing to accept service via email on behalf of the entities and
individuals that you represent?

Best,

Jessica

**From:** Bergin, Jessica (CIV)
**Sent:** Monday, September 25, 2023 12:33 PM
**To:** Keith Greer <keith.greer@greerlaw.biz>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>
**Subject:** RE: Wound Pros

Keith,

We are writing to follow up on the below. We were expecting to hear
from you last week about the corporate structure of the Wound Pros
organization and all affiliates, but we have not received this information
from you yet. We also have not heard back from you as to whether you
represent Sherman Washington, Owen Ellington, Christopher Otiko,

Joseph Palumbo, Allyson Pizzo-Berkey, and Bill Releford.  Please provide an update on both items at your earliest convenience.

Thank you,

Jessica

**From:** Bergin, Jessica (CIV)
**Sent:** Wednesday, September 13, 2023 5:28 PM
**To:** Keith Greer <keith.greer@greerlaw.biz>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>
**Subject:** Wound Pros

Keith,

Thank you for speaking with us earlier today about the letters that we recently sent to several Wound Pros entities and individuals.  We appreciate you confirming on our call that you serve as both outside counsel and general counsel for all Wound Pros entities.  As discussed, we are following up to provide copies of the attached notice letters that we sent to the following Wound Pros entities:  Wound Pros, P.C. f/k/a Wound Pros LLC; Wound Pros Holdings, P.C.; Wound Pros Management Group, Inc.; Wound Pros Ventures, LP; Wound Care Medical Group P.C.; Wound Pros Texas PLLC f/k/a Wound Pros Texas Inc.; Wound Pros Nevada Inc.; Washington Wound Pros Nevada, P.C.; Wound Pros Arizona, P.C. f/k/a Wound Pros Arizona, Inc.; Wound Pros Doctors P.C.; Wound Pros Enterprises, LLC; Wound Pros Florida, P.A. f/k/a Wound Pros Florida, Inc.; Wound Pros Georgia P.C. f/k/a Wound Pros Georgia Inc.; Wound Pros Michigan, P.C. f/k/a Wound Pros Michigan Inc.; Wound Pros New York Inc.; Wound Pros Ohio Inc.; Ohio Wound Care Physicians Inc.; Wound Pros Technology Inc.; Wound Pros Tennessee, P.C. f/k/a Wound Pros Tennessee Inc.; and WP Texas Medical Group P.C.

You reported that you also received copies of some of the letters that we sent to individuals affiliated with the Wound Pros entities, but you could not recall which individuals' letters you had received.  You further indicated that you intend to represent some of the individuals affiliated with Wound Pros in connection with our investigation.  Could you please confirm whether you represent Sherman Washington, Owen Ellington, Christopher Otiko, Joseph Palumbo, Allyson Pizzo-Berkey, and Bill Releford?

We then discussed the steps that the Wound Pros entities and their affiliates, agents, officers, and employees are taking to retain and preserve documents and information (including information stored on

platforms such as Slack) in connection with our ongoing investigation. You stated that the Wound Pros entities have retained everything related to our investigation. However, you have not yet sent an investigative hold to the individuals who may have information relevant to our investigation. You indicated that you intended to send an investigative hold after our call, per our strong recommendation.

We also discussed the corporate structure of the various Wound Pros entities. You explained that Wound Pros operates under a standard venture capital model, whereby Wound Pros, P.C. is the parent company with control over all centralized documents and billing-related documentation for the Wound Pros entities. Wound Pros Management Group is a management services organization for the other Wound Pros entities, and it maintains all documents (including emails) sent or prepared by anyone affiliated with any Wound Pros entity. The various state-based Wound Pros entities are friendly/captive corporations of Wound Pros, P.C., and they provide medical services. We asked about the roles of various other Wound Pros entities (e.g., Wound Pros Ventures, Wound Pros Holdings, Wound Pros Enterprises), and we appreciate you offering to follow up next week with a more comprehensive overview of the complete Wound Pros corporate structure, including any other affiliates beyond those listed above.

We look forward to hearing back from you about the individuals that you represent, as well as the corporate structure of the Wound Pros organization and all affiliates. In the meantime, please feel free to reach out to us if you have any questions.

Best,

Jessica

Jessica M. Bergin
Trial Attorney
U.S. Department of Justice
Fraud Section, Civil Division
Jessica.Bergin@usdoj.gov
(202) 305-4207

# Exhibit 14

| From: | Bergin, Jessica (CIV) |
|---|---|
| To: | Jordan Kearney; Keith Greer; Andrew R. Hayes |
| Cc: | Thiess, David (USACAE) |
| Subject: | Civil Investigative Demand Nos. 23-1300 to 23-1318 |
| Date: | Thursday, December 21, 2023 5:22:05 PM |

Jordan, Keith, and Andrew,

Thank you for speaking with us today about the following items:

1. **Representation of the CID Recipients**. We understand that all three of you now represent all of the entities that we served with a CID: Wound Pros Management Group, Inc.; Wound Pros Holdings, PC; Wound Pros Enterprises LLC; Wound Pros Technology Inc.; Wound Pros Ventures, LP; Wound Pros PC; Global Wound Care Medical Group; WP Texas Medical Group PC; Wound Pros Texas PLLC; Wound Pros Georgia PC; Wound Pros Nevada Inc.; Wound Pros Doctors PC; and Wound Pros Tennessee PC.

   While Keith also continues to represent the individual CID recipients (Bill J. Releford; Christopher Otiko; Owen Ellington; Joseph M. Palumbo; Sherman Washington; and Allyson Pizzo Berkey), we understand that Hooper Lundy is still assessing whether it also will represent the individuals. We look forward to hearing an update by mid-January as to whether Hooper Lundy intends to represent the individual CID recipients.

2. **Current Priority Document Productions**. When we spoke with Keith on November 28, he agreed to produce by early December the documents and information outlined in my November 29 email. However, we have not received those items. We understand that you now are aiming to produce the items outlined in my November 29 email by the week of January 15. By the week of January 15, you also agreed to re-produce all previously produced documents in compliance with the ESI specifications attached to the CIDs.

3. **Custodians**. We also discussed the initial set of custodians for our investigation involving more than a dozen entities and many different allegations. Keith previously proposed the custodians noted in the below table in black text, which he explained include the entities' current and former principles, leaders, and medical directors. We agree that all of those individuals should be custodians. Please also include as custodians the individuals that we added below in red text: Dr. Melody Lin; Dr. Ashley Meusa; Dr. Hugh Richardson; Dwane Antonio Edmondson; Fahim Feroz; Debbie Bridges; Michael MacDonald; Dr. Swati Hans; Dr. Robert Frykberg; and Rachel Broaddus.

   To avoid any further delay, we ask that you promptly begin pulling PST files, Slack content, and other sources of responsive materials for this initial set of custodians. Our current understanding of the key individuals is largely dependent on the information that you have chosen to share with us, and as discussed, we have not yet received most of the priority documents that we requested or meaningful responses to the interrogatories. As we learn more during the course of our ongoing investigation, including after you produce additional documents and information in response to the CIDs, we expect that we will request

additional custodians.

4. **Search terms**. As discussed, we understand that you are working with your clients to draft proposed search terms and prepare hit counts, which you plan to share with us <u>by January 31</u>.

5. **Interrogatories**. We appreciate you acknowledging that the previously produced interrogatory responses are insufficient and that you plan to start over in preparing amended responses. In the amended responses, the CID recipients should reconsider their objections to the meaning of plain English terms and the terms defined in the CID. The amended responses also should include written responses providing all of the information requested in the interrogatories. While citations to supporting documents can be useful to augment a written response, they cannot be used in place of complete written responses. Please also produce certifications of compliance with each interrogatory response. We look forward to discussing your timeline for responding to the interrogatories <u>at our meeting on January 17</u>.

6. **Document preservation**. We appreciate you confirming that the CID recipients have been preserving all potentially relevant documents since we served notice letters and the CIDs earlier this year.

While we discussed that the above deadlines are target deadlines, please be sure to let us know in advance of each target deadline if you encounter unexpected delays. We look forward to speaking with you again on January 17. In the meantime, please let us know if you have any questions.

Best,

Jessica

Jessica M. Bergin
Trial Attorney
U.S. Department of Justice
Civil Division, Fraud Section
(202) 305-4207
Jessica.Bergin@usdoj.gov

_____

| Custodians | Notes |
|---|---|
| Dr. Bill Releford | Your Proposal |
| Dr. Chris Otiko | Your Proposal |
| Dr. Owen Ellington | Your Proposal |
| Dr. Daniel Hallman | Your Proposal |
| Brian Abrahams | Your Proposal |
| Yen Lee | Your Proposal |
| Shameka Crump | Your Proposal |

| | |
|---|---|
| Caleb Mpofu | Your Proposal |
| Kadian Martin | Your Proposal |
| Hamsa Mohan | Your Proposal |
| David Thomas | Your Proposal |
| Kermit Johnson | Your Proposal |
| Kenya Manning | Your Proposal |
| Kevin Smith | Your Proposal |
| Daniel Yeager | Your Proposal |
| Jerome Cannon | Your Proposal |
| Cynthia Owusu | Your Proposal |
| Ralph Cetrulo | Your Proposal |
| Amador Miranda | Your Proposal |
| Dr. Alvin May | Your Proposal |
| Dr. Christine Rongey | Your Proposal |
| Dr. Edward Opoku | Your Proposal |
| Dr. Reynaldo Castillo | Your Proposal |
| Dr. Richard Park | Your Proposal |
| Dr. Philip Kim | Your Proposal |
| Dr. Joel Jones | Your Proposal |
| Dr. Antul Munjal | Your Proposal |
| Dr. Sivi Chandy | Your Proposal |
| Dr. Brian McCrary | Your Proposal |
| Dr. Garrett Cuppels | Your Proposal |
| Dr. Jay Flottmann | Your Proposal |
| Dr. Jason Chertoff | Your Proposal |
| Dr. Joseph Palumbo | Your Proposal |
| Dr. Paul Drago | Your Proposal |
| Dr. Rami Ahmed | Your Proposal |
| Dr. Susan Meller | Your Proposal |
| Dr. Wesley Nahm | Your Proposal |
| Dr. Christian Ogbebor | Your Proposal |
| Dr. Allyson Pizzo Berkey | Your Proposal |
| Dr. Sherman Washington | Your Proposal |
| Dr. Steven Shapiro | Your Proposal |
| Dr . Bertram Prosser | Your Proposal |
| Dr. Negin Rajaipour | Your Proposal |
| Dr. Troy Williams | Your Proposal |
| Dr. Melody Lin | DOJ Addition |
| Dr. Ashley Meusa | DOJ Addition |
| Dr. Hugh Richardson | DOJ Addition |
| Dwane Antonio Edmondson | DOJ Addition |
| Fahim Feroz | DOJ Addition |
| Debbie Bridges | DOJ Addition |

| Michael MacDonald | DOJ Addition |
|---|---|
| Dr. Swati Hans | DOJ Addition |
| Dr. Robert Frykberg | DOJ Addition |
| Rachel Broaddus | DOJ Addition |

# Exhibit 15

| | |
|---|---|
| **From:** | Bergin, Jessica (CIV) |
| **To:** | Jordan Kearney; Keith Greer; Andrew R. Hayes |
| **Cc:** | Thiess, David (USACAE) |
| **Subject:** | RE: Civil Investigative Demand Nos. 23-1300 to 23-1318 |
| **Date:** | Wednesday, January 17, 2024 2:13:00 PM |

Jordan, Keith, and Andrew,

Thank you for speaking with us today to provide an update on your clients' responses to the CIDs. As discussed:

1. **Representation of the CID Recipients**. We appreciate you confirming that Hooper Lundy and Keith Greer represent all of the entities that we served with a CID: Wound Pros Management Group, Inc.; Wound Pros Holdings, PC; Wound Pros Enterprises LLC; Wound Pros Technology Inc.; Wound Pros Ventures, LP; Wound Pros PC; Global Wound Care Medical Group; WP Texas Medical Group PC; Wound Pros Texas PLLC; Wound Pros Georgia PC; Wound Pros Nevada Inc.; and Wound Pros Doctors PC; and Wound Pros Tennessee PC. We further understand that while Keith also represents the individual CID recipients (Bill J. Releford; Christopher Otiko; Owen Ellington; Joseph M. Palumbo; Sherman Washington; and Allyson Pizzo Berkey), Hooper Lundy does not represent the individuals at this time.

2. **Collection of Documents and Information from the Individual CID Recipients**. We appreciate you confirming that the document preservation notices that you sent to the individual CID recipients are broad enough to cover all potential sources of responsive information. The entities likely possess many responsive documents involving the individual CID recipients (e.g., Slack messages, emails sent using work email accounts, etc.) and will produce those documents in response to their CIDs. Keith also is planning to look into whether the individual CID recipients ever used their personal email accounts or their personal phones (e.g., text messages, other communication platforms such as What's App, etc.) to communicate about the issues encompassed by the CIDs.

3. **Document Production Priorities**. By the end of this week, you are on track to (a) re-produce all previously produced documents in compliance with the ESI specifications attached to the CIDs; and (b) produce the documents and information outlined in my November 29 email.

4. **Search terms**. You are on track to provide your proposed search terms and hit counts by January 31.

5. **Interrogatory responses**. We understand that you currently are focusing on the document production priorities and draft proposed search terms noted above, and we agreed to discuss a plan for your clients' responses to the interrogatories in early February.

If you run into any unexpected delays, please let us know in advance of the above target deadlines.

Best,

Jessica

**From:** Bergin, Jessica (CIV)
**Sent:** Thursday, December 21, 2023 5:22 PM
**To:** Jordan Kearney <jkearney@hooperlundy.com>; Keith Greer <keith.greer@greerlaw.biz>; Andrew R. Hayes <arhayes@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>
**Subject:** Civil Investigative Demand Nos. 23-1300 to 23-1318

Jordan, Keith, and Andrew,

Thank you for speaking with us today about the following items:

1. **Representation of the CID Recipients**. We understand that all three of you now represent all of the entities that we served with a CID: Wound Pros Management Group, Inc.; Wound Pros Holdings, PC; Wound Pros Enterprises LLC; Wound Pros Technology Inc.; Wound Pros Ventures, LP; Wound Pros PC; Global Wound Care Medical Group; WP Texas Medical Group PC; Wound Pros Texas PLLC; Wound Pros Georgia PC; Wound Pros Nevada Inc.; Wound Pros Doctors PC; and Wound Pros Tennessee PC.

   While Keith also continues to represent the individual CID recipients (Bill J. Releford; Christopher Otiko; Owen Ellington; Joseph M. Palumbo; Sherman Washington; and Allyson Pizzo Berkey), we understand that Hooper Lundy is still assessing whether it also will represent the individuals. We look forward to hearing an update by mid-January as to whether Hooper Lundy intends to represent the individual CID recipients.

2. **Current Priority Document Productions**. When we spoke with Keith on November 28, he agreed to produce by early December the documents and information outlined in my November 29 email. However, we have not received those items. We understand that you now are aiming to produce the items outlined in my November 29 email by the week of January 15. By the week of January 15, you also agreed to re-produce all previously produced documents in compliance with the ESI specifications attached to the CIDs.

3. **Custodians**. We also discussed the initial set of custodians for our investigation involving more than a dozen entities and many different allegations. Keith previously proposed the custodians noted in the below table in black text, which he explained include the entities' current and former principles, leaders, and medical directors. We agree that all of those individuals should be custodians. Please also include as custodians the individuals that we added below in red text: Dr. Melody Lin; Dr. Ashley Meusa; Dr. Hugh Richardson; Dwane Antonio Edmondson; Fahim Feroz; Debbie Bridges; Michael MacDonald; Dr. Swati Hans; Dr. Robert Frykberg; and Rachel Broaddus.

   To avoid any further delay, we ask that you promptly begin pulling PST files, Slack content, and other sources of responsive materials for this initial set of custodians. Our current

understanding of the key individuals is largely dependent on the information that you have chosen to share with us, and as discussed, we have not yet received most of the priority documents that we requested or meaningful responses to the interrogatories. As we learn more during the course of our ongoing investigation, including after you produce additional documents and information in response to the CIDs, we expect that we will request additional custodians.

4. **Search terms**. As discussed, we understand that you are working with your clients to draft proposed search terms and prepare hit counts, which you plan to share with us by January 31.

5. **Interrogatories**. We appreciate you acknowledging that the previously produced interrogatory responses are insufficient and that you plan to start over in preparing amended responses. In the amended responses, the CID recipients should reconsider their objections to the meaning of plain English terms and the terms defined in the CID. The amended responses also should include written responses providing all of the information requested in the interrogatories. While citations to supporting documents can be useful to augment a written response, they cannot be used in place of complete written responses. Please also produce certifications of compliance with each interrogatory response. We look forward to discussing your timeline for responding to the interrogatories at our meeting on January 17.

6. **Document preservation**. We appreciate you confirming that the CID recipients have been preserving all potentially relevant documents since we served notice letters and the CIDs earlier this year.

While we discussed that the above deadlines are target deadlines, please be sure to let us know in advance of each target deadline if you encounter unexpected delays. We look forward to speaking with you again on January 17. In the meantime, please let us know if you have any questions.

Best,

Jessica

Jessica M. Bergin
Trial Attorney
U.S. Department of Justice
Civil Division, Fraud Section
(202) 305-4207
Jessica.Bergin@usdoj.gov

———————

| Custodians | Notes |
|---|---|
| Dr. Bill Releford | Your Proposal |
| Dr. Chris Otiko | Your Proposal |

| | |
|---|---|
| Dr. Owen Ellington | Your Proposal |
| Dr. Daniel Hallman | Your Proposal |
| Brian Abrahams | Your Proposal |
| Yen Lee | Your Proposal |
| Shameka Crump | Your Proposal |
| Caleb Mpofu | Your Proposal |
| Kadian Martin | Your Proposal |
| Hamsa Mohan | Your Proposal |
| David Thomas | Your Proposal |
| Kermit Johnson | Your Proposal |
| Kenya Manning | Your Proposal |
| Kevin Smith | Your Proposal |
| Daniel Yeager | Your Proposal |
| Jerome Cannon | Your Proposal |
| Cynthia Owusu | Your Proposal |
| Ralph Cetrulo | Your Proposal |
| Amador Miranda | Your Proposal |
| Dr. Alvin May | Your Proposal |
| Dr. Christine Rongey | Your Proposal |
| Dr. Edward Opoku | Your Proposal |
| Dr. Reynaldo Castillo | Your Proposal |
| Dr. Richard Park | Your Proposal |
| Dr. Philip Kim | Your Proposal |
| Dr. Joel Jones | Your Proposal |
| Dr. Antul Munjal | Your Proposal |
| Dr. Sivi Chandy | Your Proposal |
| Dr. Brian McCrary | Your Proposal |
| Dr. Garrett Cuppels | Your Proposal |
| Dr. Jay Flottmann | Your Proposal |
| Dr. Jason Chertoff | Your Proposal |
| Dr. Joseph Palumbo | Your Proposal |
| Dr. Paul Drago | Your Proposal |
| Dr. Rami Ahmed | Your Proposal |
| Dr. Susan Meller | Your Proposal |
| Dr. Wesley Nahm | Your Proposal |
| Dr. Christian Ogbebor | Your Proposal |
| Dr. Allyson Pizzo Berkey | Your Proposal |
| Dr. Sherman Washington | Your Proposal |
| Dr. Steven Shapiro | Your Proposal |
| Dr . Bertram Prosser | Your Proposal |
| Dr. Negin Rajaipour | Your Proposal |
| Dr. Troy Williams | Your Proposal |
| Dr. Melody Lin | DOJ Addition |

| | |
|---|---|
| Dr. Ashley Meusa | DOJ Addition |
| Dr. Hugh Richardson | DOJ Addition |
| Dwane Antonio Edmondson | DOJ Addition |
| Fahim Feroz | DOJ Addition |
| Debbie Bridges | DOJ Addition |
| Michael MacDonald | DOJ Addition |
| Dr. Swati Hans | DOJ Addition |
| Dr. Robert Frykberg | DOJ Addition |
| Rachel Broaddus | DOJ Addition |

# Exhibit 16

| From: | Bergin, Jessica (CIV) |
| --- | --- |
| To: | Jordan Kearney; Keith Greer; Andrew R. Hayes; Sheryl B. Xavier |
| Cc: | Thiess, David (USACAE) |
| Subject: | Wound Pros - Civil Investigative Demands |
| Date: | Friday, February 02, 2024 9:38:00 AM |

Jordan, Keith, Andrew, and Sheryl,

Thank you for speaking with us yesterday. As you know, we discussed your correspondence dated January 18, which offers your interpretation of the document requests in the CIDs. We do not accept these interpretations or the ways in which that letter construes the CIDs. In offering your interpretation, you effectively seek to narrow the scope of the CIDs in a manner that is inconsistent with the plain language in the CIDs. By way of example, we discussed document request 3: "All personnel evaluations, records, schedules, timesheets, logs, and any other documentation of payments, remuneration, commission, reimbursement of expenses, risk sharing, benefits of any kind, referral, sanction, penalty, disciplinary action, or any other unfavorable action or consequence of any kind relating to the provision of or billing for any skin substitute products or services by or on behalf of You or Wound Pros." Yet, you "construe the scope of this request to include only records related to adverse employment actions." Your narrow interpretations of the CIDs are not plausible readings of the plain language of the CIDs.

While we cannot agree to narrow the scope of the CIDs served on your clients, we welcome a discussion about our current priorities for your clients' responses to the CIDs. In that regard, we discussed the following:

1. **Custodians**. For now, please prioritize producing emails from the following individuals: Dr. Bill Releford, Dr. Christopher Otiko, Amador Miranda, Jerome Cannon, Dr. Allyson Pizzo Berkey, Dr. Sherman Washington, Dr. Joseph Palumbo, Dr. Owen Ellington, and Dr. Richard Park. As we learn more during the course of our ongoing investigation, including after you produce additional documents and information in response to the CIDs, we expect that we will add additional custodians and that we will ask you to prioritize additional custodians.

2. **Search terms for emails**. We understand that you plan to use search terms in connection with your review of the custodial emails, and you agreed to provide proposed search terms and hit counts for our consideration. We look forward to receiving your response to this email letting us know the date by which you are aiming to provide your proposed search terms. When you provide search terms, please also let us know if you intend to use any other tools to cull the email review set (e.g., technology-assisted review, email threading) so that we can discuss your proposal.

3. **Non-email documents**.

    a. Slack. You agreed to provide a Slack folder structure with your production next week, as well as get back to us next week with a date by which you will provide additional information about your clients' other uses of Slack (e.g., messaging) and the future production of Slack messages.

      b.  <u>Other priority documents identified in my November 29 email</u>. Thank you for clarifying that you now have produced all of the documents and information requested in my November 29 email to Keith, with the exception of (a) the employee list, (b) a policy manual, and (c) the appeal records. You agreed to produce these documents <u>by Tuesday, February 6</u>. You explained that the appeal records might take slightly longer to produce, and if so, you would let us know on Tuesday the date by which you will produce the appeal records.

    4.  **<u>Interrogatories</u>**. You agreed to respond to the following priority interrogatories <u>by April 1</u>: 1, 2, 3, 7, 9, 11, and 12. Further, as discussed yesterday, you also will learn more about your clients' billing and medical record maintenance systems so that we can discuss a schedule for interrogatories seeking patient and billing data.

In the meantime, please let us know if you have any questions.

Best,

Jessica

Jessica M. Bergin
Trial Attorney
U.S. Department of Justice
Civil Division, Fraud Section
(202) 305-4207
Jessica.Bergin@usdoj.gov

# Exhibit 17

# Filed Under Seal

# Exhibit 18

| | |
|---|---|
| **From:** | Bergin, Jessica (CIV) |
| **To:** | Catherine S. Wicker |
| **Cc:** | Thiess, David (USACAE); Jordan Kearney; Sheryl B. Xavier; Andrew R. Hayes |
| **Subject:** | RE: Wound Pros |
| **Date:** | Monday, March 25, 2024 3:45:34 PM |

Jordan, Catherine, and Andrew,

Thank you for speaking with us on Thursday afternoon. On our call, we discussed your below questions and you agreed to do the following by the below target dates:

1. **Payroll records.** By this week, you plan to produce your clients' payroll records for 2023 and 2024. After producing those records, you will look into whether there are any other missing records responsive to the CID.

2. **Slack data.** We discussed that there is limited information in the spreadsheet that you provided on February 16, and we cannot agree that simply selecting channels listed on that spreadsheet is sufficient for your clients to meet their obligations to produce all responsive Slack data in response to the CIDs. By April 2, you plan to (a) load all of your clients' Slack data into your e-discovery platform, (b) provide us with an update on whether you are able to identify all of the individuals who participated in, owned, or had access to those channels (as well as how frequently they participated), (c) provide an update on the possible production formats for the Slack data, including with respect to the available metadata, and (d) confirm that the spreadsheet that you produced on February 16 reflects all Slack channels, including any informal channels. After you provide this information, we will discuss next steps, which we agreed would include discussion of which Slack channels your clients should prioritize producing in total.

3. **Custodial document review.** We discussed options for identifying a review set of custodial documents that captures the documents responsive to the CID. By this week, you will let us know whether you plan to use technology-assisted review to review the documents plus families that hit on the Wound Pros and DOJ search terms. If you plan to use TAR, the next step is for you to share your proposed TAR protocol with us by April 9. As discussed, in the TAR protocol, we would appreciate you providing the following information: (1) the TAR tool name and version; (2) whether TAR is being administered in-firm or through a vendor; (3) how you plan to train TAR; (4) who will be involved in training TAR; (5) all ESI sources that will be collected in connection with your review; (6) any parameters that you plan to use to cull ESI before running it through TAR, including any process that you propose using to review and produce documents contained within email threads; (7) all categories of documents that will be excluded from TAR, including your plans for providing us with information about file types and ESI volume by file type; (8) how you will handle review of the documents excluded from TAR; (9) which interim metrics you will provide to us, including the file types and de-duplicated counts of processed documents being included in and excluded from TAR, updates on training progress, and the size, richness, confidence level, and confidence interval of the initial training set; (10) the stages at which you will provide interim metrics; (11) how you will handle quality control and validation, including the metrics that you will provide to us at your

proposed review cutoff (including sample size, R-Set document volumes, F-measure, recall, precision, richness, elusion rate, rank cutoff, confidence level, and confidence interval); and (12) confirmation that non-privileged responsive documents identified through the validation process will be produced and identified. Once you provide your proposed TAR protocol, we will review it with our e-discovery team and get back to you about any additional information that we may need or follow-up questions that we may have.

Please just let us know ahead of the target dates if anything unexpected comes up and you anticipate needing more time.

Thank you,

Jessica

---

**From:** Catherine S. Wicker <cwicker@hooperlundy.com>
**Sent:** Monday, March 18, 2024 5:29 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>; Jordan Kearney <jkearney@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>
**Subject:** [EXTERNAL] RE: Wound Pros

Hi Jessica,

Thank you for your summary. We have a few questions and clarifications set forth below. Please let us know your thoughts and if you would like to arrange a time to discuss further.

1. **Search Terms**: We ran all 162 search terms you proposed through our e-Discovery database. Please see the attached Excel spreadsheet for the results. Based on our review, we feel that many of the DOJ's proposed terms are individually overbroad (e.g., "Medicare*" is likely to yield mostly irrelevant results) and taken together, this search would impose an undue burden on Wound Pros ("WP"). While we are still working to understand WP's operations in order to effectively narrow this list, we are a bit taken aback by how broad the search is and the difficulty of meaningfully narrowing 162 search terms. We welcome your thoughts about priorities on this list, based on the new hit report.

2. **Slack Data**: We want to clarify our plan and the order of operations for Slack collection. Our understanding from our call was that DOJ would use the information that we have already provided to identify an initial subset of relevant Slack data for import into our e-discovery software. We are happy to work with our vendor to develop a more detailed understanding of our e-discovery capabilities with respect to Slack. However, the approach you propose would involve importing a massive amount of information and incurring related e-discovery costs for largely irrelevant data. Can you please help us define the scope of initial Slack collections,

based on the summary of channels we provided? After that, we will collect the most relevant subset, and provide a hit report, alongside the related information you are seeking. We have confirmed that the list we shared includes all formal Slack channels as well as ad hoc direct messages between two or more individuals (what we referred to as "informal channels" on our call).

3. **Audit Records**: We have received a collection of medical record requests and documents responsive to those requests from the client. We plan to collect all remaining decision letters, appeals, and records associated with these requests from the client early next week, with the goal of producing them to you by mid-week.

4. **Payroll Records**: Since we did not have a chance to address this on our call, we would appreciate some more information to inform our next steps. Can you clarify whether you are missing information for specific employees, for specific periods of time, or both? If you can provide more details about any missing information it will make it easier for us to determine what was missed and collect it. Please let us know if you are only missing the most recent information (2023 and early 2024 as you mentioned) or if we should go back further.

Sincerely,

**Catherine S. Wicker**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 619.744.7311    MAIN: +1 619.744.7300    FAX: +1 619.230.0987
cwicker@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Sent:** Thursday, March 7, 2024 12:56 PM
**To:** Jordan Kearney <jkearney@hooperlundy.com>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>
**Subject:** Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Jordan, Catherine, Andrew, and Sheryl,

Thank you for speaking with us yesterday.  As discussed:

1. **Search terms**.  We have reviewed your proposed search terms, and our additions are listed below this email.  The search terms need to be broad enough to capture responsive custodial documents for your review team to then assess – not so narrowly crafted that the search terms fail to hit on some responsive documents.  Thus, our below additions effectively remove some of your proposed connectors and proximity modifiers that overly narrowed the review set.  We also have added additional search terms likely to return responsive documents.  Of course, our investigation is ongoing, and our revisions to the search terms are limited by the information that you have chosen to share with us to date.  For example, we are still learning all of the words, phrases, and abbreviations that your clients use to discuss the key issues in our investigation.  Thus, the below search terms are just a starting point, and we expect to add additional search terms as our investigation continues.

In terms of next steps, you agreed to prepare new hits reports for our below search terms reflecting hits both in the custodial files of the initial priority custodians as well as in the Slack data.  Please provide those detailed hit reports (including total hits on documents, unique hits, and the overall size of the review universe), as well as any proposed revisions that you may have to our additional search terms, by March 21.  Once we receive this information, we welcome a discussion about whether including additional connectors and proximity modifiers may be appropriate.  At that point, depending on the universe of documents subject to review, we also can discuss the appropriateness of your proposal to use technology-assisted review in addition to search terms.

2. **Slack data**.  Please also provide information about the possible production formats for the Slack data, including with respect to the metadata, by March 21.  You also agreed to get back to us regarding whether (a) the spreadsheet that you produced on February 16 reflects all Slack channels, including any informal channels, (b) you have information regarding all of the individuals who participated in, received, or had access to those channels (as well as how frequently they participated), and (c) any other information is available about the Slack data.

3. **Clawback agreement**.  It is not our usual practice to enter into clawback agreements with CID recipients.  We intend to abide by our legal and ethical obligations in handling the documents that your clients produce.

4. **Audit materials**.  The CIDs require your clients to produce all responsive audits.  We discussed that your client should pull and produce any responsive external audits that are readily available.  We also understand that you plan to get back to us soon with more information about any responsive internal audits.  Please provide an update by March 21.

We also have one more request that we did not raise on our call. Your clients' productions include copies of some, but not all, of your clients' payroll records. <u>By March 21</u>, could you please produce the remaining payroll records, including any records for 2023 and early 2024?

Best,

Jessica

**DOJ additions**

1. Biologic*
2. Graft*
3. (Skin w/5 sub*)
4. "incident to"
5. DME*
6. (Durable w/5 medical)
7. Supplie*
8. ((note* OR record*) AND (physician* OR doc* OR encounter* OR patient* OR provider* OR customer* OR bene* OR WCS*))
9. Superv*
10. Countersign* OR "Counter-sign*" OR "Counter sign*"
11. Rendering w/5 provider*
12. Bill w/5 under*
13. (med* w/5 (necess* OR indicat*))
14. (1099* AND (commission* OR bonus* OR volume OR provider* OR assistant* OR physician* OR PA* OR tech* OR WCS*))
15. Rebate*
16. Skilled w/5 nursing
17. SNF*
18. Hospice*
19. Home w/5 health*
20. Assist* w/5 living*
21. "Long term"
22. "Long-term"
23. Facilit*
24. LTC*
25. Institution*
26. (Claw* w/5 back*)
27. "Clawback*"
28. Risk*
29. Distribution*
30. Equit*
31. Consult*
32. Referral*
33. Gift*
34. Credential*
35. Resubmi*
36. Re-submi*

37. Denial*
38. Conceal*
39. Hide*
40. Coverup* OR Cover-up* OR "Cover up*"
41. Inconsisten*
42. Reconcile*
43. (application* w/5 fee*)
44. (Contract* w/5 rate*)
45. Arrangement*
46. (Under w/5 radar)
47. Free*
48. Freebie*
49. ComeSailAway*
50. "Come sail"
51. (Sail w/5 away)
52. Amnio*
53. Armor*
54. Biogenx*
55. Zenith*
56. Orion*
57. Surgraft*
58. Impax*
59. Carepatch*
60. Barrera*
61. Impax*
62. Dermacyte *
63. Helicoll*
64. Vendaje*
65. (dual w/5 layer*)
66. Woundfix*
67. "Wound fix"
68. Xplus*
69. BioWound* OR "Bio Wound"
70. Woundex*
71. Helicoll*
72. Epifix*
73. Novafix*
74. Membrane*
75. Allograft*
76. Legacy*
77. ExtremityCare* OR "Extremity Care*"
78. "Bone Bank"
79. BBA*
80. BioStem* OR "Bio Stem*"
81. RegenTX*
82. Skye*
83. Regenativ* OR Regenerativ*
84. HRT*
85. BioLab*
86. "Bio Lab*"

87. Merakris*
88. EnColl*
89. MiMedx*
90. Convatec*
91. Triad*
92. Radiant*
93. Nugeneron*
94. "Physician Alliance"
95. Horizon*
96. A42* OR A43* OR A44* OR A45* OR A46* OR A47* OR A48* OR A49* OR A50* OR A51* OR A60* OR A61* OR A62* OR A63* OR A64* OR L43* OR C52* OR Q41* OR Q42*
97. "Q Code*" OR "Q-Code*" OR "Qcode*"
98. (return* w/5 invest*)
99. ROI*
100. performan*
101. revenue*
102. profit*
103. incentiv*
104. outlier*

105. remuneration*
106. commission*
107. bonus*
108. (mov* OR transfer* OR send* OR wire*) w/5 (money* OR fund* or revenue* OR payment*)
109. (fair w/5 (market* OR value*))
110. FMV*
111. Expand* w/5 understand*

112. Illegal*
113. Jail*
114. Improper *
115. False*
116. FCA*
117. Fraud*
118. Unethical*
119. Kickback*
120. "kick back"
121. "anti-kickback*"
122. Stark*
123. AKS*
124. "safe harbor*"
125. (federal w/5 (health* OR law* OR reg* OR statute* OR req*))
126. inappropriat*
127. (not w/5 appropriat*)
128. unnecessar*
129. suspiciou*
130. suspect*
131. fault*

132. blame*
133. trouble*
134. violat*
135. manipulat*
136. Incorrec*
137. Investigat*
138. DOJ*

139. LCD*
140. "local coverage"
141. NCD*
142. "national coverage"
143. MAC OR MACs OR "Medicare admin*"

144. Noridian*
145. Novitas*
146. Cahaba*
147. "First Coast*"
148. CGS*
149. WPS*
150. "Wisconsin Physician Services"
151. Palmetto*
152. NGS*
153. "National Government Services"
154. UPIC* OR "Unified Program Integrity"
155. ZPIC* OR "Zone Program Integrity"
156. CMS*
157. Medicare*

158. (Operat* w/3 Proce*)
159. complain*
160. compli*
161. comply*
162. audit*

Jessica M. Bergin
Trial Attorney
U.S. Department of Justice
Civil Division, Fraud Section
(202) 305-4207
Jessica.Bergin@usdoj.gov

# Exhibit 19

| From: | Catherine S. Wicker |
|---|---|
| To: | Bergin, Jessica (CIV) |
| Cc: | Thiess, David (USACAE); Jordan Kearney; Sheryl B. Xavier; Andrew R. Hayes |
| Subject: | [EXTERNAL] RE: Wound Pros |
| Date: | Monday, March 25, 2024 5:15:30 PM |

Hi Jessica,

Thank you for your email. I want to clarify our understanding of what was agreed to during the March 21 call.

1. **Payroll Records** – We agreed to provide you with an update by this week as to the status of our production of payroll records for 2023 and 2024. We have requested this information from our client but as explained during our call, the person responsible for gathering the requested records has been diligently working to prepare responses to the CID interrogatories. We will have an update for you sometime this week.

2. **Slack Data** – We are currently working to load Slack data onto our e-discovery platform and will update you on April 2, as to whether this process has been completed. We can confirm that the spreadsheet produced on February 16 reflects all Slack channels, including any informal channels. With respect to items 2(b) and 2(c), we will provide you with an update by April 2.

3. **Custodial Document Review** – We agreed to let you know also by April 2, whether we planned to use technology-assisted review (TAR). If proceeding with TAR, we will circulate a proposed TAR protocol to you by April 9. We appreciate you listing the specific information you would like included in any such proposal.

Please let us know if you have any issues or concerns with the dates set forth in this email. Thank you so much.

Sincerely,

**Catherine S. Wicker**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 619.744.7311   MAIN: +1 619.744.7300   FAX: +1 619.230.0987
cwicker@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>

**Sent:** Monday, March 25, 2024 12:46 PM
**To:** Catherine S. Wicker <cwicker@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Jordan Kearney
<jkearney@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>; Andrew R. Hayes
<arhayes@hooperlundy.com>
**Subject:** RE: Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Jordan, Catherine, and Andrew,

Thank you for speaking with us on Thursday afternoon.  On our call, we discussed your below
questions and you agreed to do the following by the below target dates:

1. **Payroll records.**  By this week, you plan to produce your clients' payroll records for 2023 and
   2024.  After producing those records, you will look into whether there are any other missing
   records responsive to the CID.

2. **Slack data.**  We discussed that there is limited information in the spreadsheet that you
   provided on February 16, and we cannot agree that simply selecting channels listed on that
   spreadsheet is sufficient for your clients to meet their obligations to produce all responsive
   Slack data in response to the CIDs.  By April 2, you plan to (a) load all of your clients' Slack data
   into your e-discovery platform, (b) provide us with an update on whether you are able to
   identify all of the individuals who participated in, owned, or had access to those channels (as
   well as how frequently they participated), (c) provide an update on the possible production
   formats for the Slack data, including with respect to the available metadata, and (d) confirm
   that the spreadsheet that you produced on February 16 reflects all Slack channels, including
   any informal channels.  After you provide this information, we will discuss next steps, which
   we agreed would include discussion of which Slack channels your clients should prioritize
   producing in total.

3. **Custodial document review.**  We discussed options for identifying a review set of custodial
   documents that captures the documents responsive to the CID.  By this week, you will let us
   know whether you plan to use technology-assisted review to review the documents plus
   families that hit on the Wound Pros and DOJ search terms.  If you plan to use TAR, the next
   step is for you to share your proposed TAR protocol with us by April 9.  As discussed, in the
   TAR protocol, we would appreciate you providing the following information:  (1) the TAR tool
   name and version; (2) whether TAR is being administered in-firm or through a vendor; (3) how
   you plan to train TAR; (4) who will be involved in training TAR; (5) all ESI sources that will be
   collected in connection with your review; (6) any parameters that you plan to use to cull ESI
   before running it through TAR, including any process that you propose using to review and

produce documents contained within email threads; (7) all categories of documents that will be excluded from TAR, including your plans for providing us with information about file types and ESI volume by file type; (8) how you will handle review of the documents excluded from TAR; (9) which interim metrics you will provide to us, including the file types and de-duplicated counts of processed documents being included in and excluded from TAR, updates on training progress, and the size, richness, confidence level, and confidence interval of the initial training set; (10) the stages at which you will provide interim metrics; (11) how you will handle quality control and validation, including the metrics that you will provide to us at your proposed review cutoff (including sample size, R-Set document volumes, F-measure, recall, precision, richness, elusion rate, rank cutoff, confidence level, and confidence interval); and (12) confirmation that non-privileged responsive documents identified through the validation process will be produced and identified.  Once you provide your proposed TAR protocol, we will review it with our e-discovery team and get back to you about any additional information that we may need or follow-up questions that we may have.

Please just let us know ahead of the target dates if anything unexpected comes up and you anticipate needing more time.

Thank you,

Jessica

**From:** Catherine S. Wicker <cwicker@hooperlundy.com>
**Sent:** Monday, March 18, 2024 5:29 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>; Jordan Kearney <jkearney@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>
**Subject:** [EXTERNAL] RE: Wound Pros

Hi Jessica,

Thank you for your summary. We have a few questions and clarifications set forth below. Please let us know your thoughts and if you would like to arrange a time to discuss further.

1. **Search Terms**: We ran all 162 search terms you proposed through our e-Discovery database. Please see the attached Excel spreadsheet for the results. Based on our review, we feel that many of the DOJ's proposed terms are individually overbroad (e.g., "Medicare*" is likely to yield mostly irrelevant results) and taken together, this search would impose an undue burden on Wound Pros ("WP"). While we are still working to understand WP's operations in order to effectively narrow this list, we are a bit taken aback by how broad the search is and the difficulty of meaningfully narrowing 162 search terms. We welcome your thoughts about priorities on this list, based on the new hit report.

2. **Slack Data**: We want to clarify our plan and the order of operations for Slack collection. Our understanding from our call was that DOJ would use the information that we have already provided to identify an initial subset of relevant Slack data for import into our e-discovery software. We are happy to work with our vendor to develop a more detailed understanding of our e-discovery capabilities with respect to Slack. However, the approach you propose would involve importing a massive amount of information and incurring related e-discovery costs for largely irrelevant data. Can you please help us define the scope of initial Slack collections, based on the summary of channels we provided? After that, we will collect the most relevant subset, and provide a hit report, alongside the related information you are seeking. We have confirmed that the list we shared includes all formal Slack channels as well as ad hoc direct messages between two or more individuals (what we referred to as "informal channels" on our call).

3. **Audit Records**: We have received a collection of medical record requests and documents responsive to those requests from the client. We plan to collect all remaining decision letters, appeals, and records associated with these requests from the client early next week, with the goal of producing them to you by mid-week.

4. **Payroll Records**: Since we did not have a chance to address this on our call, we would appreciate some more information to inform our next steps. Can you clarify whether you are missing information for specific employees, for specific periods of time, or both? If you can provide more details about any missing information it will make it easier for us to determine what was missed and collect it. Please let us know if you are only missing the most recent information (2023 and early 2024 as you mentioned) or if we should go back further.

Sincerely,

**Catherine S. Wicker**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 619.744.7311    MAIN: +1 619.744.7300    FAX: +1 619.230.0987
cwicker@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Sent:** Thursday, March 7, 2024 12:56 PM
**To:** Jordan Kearney <jkearney@hooperlundy.com>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>

**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>
**Subject:** Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Jordan, Catherine, Andrew, and Sheryl,

Thank you for speaking with us yesterday. As discussed:

1. **Search terms**. We have reviewed your proposed search terms, and our additions are listed below this email. The search terms need to be broad enough to capture responsive custodial documents for your review team to then assess – not so narrowly crafted that the search terms fail to hit on some responsive documents. Thus, our below additions effectively remove some of your proposed connectors and proximity modifiers that overly narrowed the review set. We also have added additional search terms likely to return responsive documents. Of course, our investigation is ongoing, and our revisions to the search terms are limited by the information that you have chosen to share with us to date. For example, we are still learning all of the words, phrases, and abbreviations that your clients use to discuss the key issues in our investigation. Thus, the below search terms are just a starting point, and we expect to add additional search terms as our investigation continues.

In terms of next steps, you agreed to prepare new hits reports for our below search terms reflecting hits both in the custodial files of the initial priority custodians as well as in the Slack data. Please provide those detailed hit reports (including total hits on documents, unique hits, and the overall size of the review universe), as well as any proposed revisions that you may have to our additional search terms, by March 21. Once we receive this information, we welcome a discussion about whether including additional connectors and proximity modifiers may be appropriate. At that point, depending on the universe of documents subject to review, we also can discuss the appropriateness of your proposal to use technology-assisted review in addition to search terms.

2. **Slack data**. Please also provide information about the possible production formats for the Slack data, including with respect to the metadata, by March 21. You also agreed to get back to us regarding whether (a) the spreadsheet that you produced on February 16 reflects all Slack channels, including any informal channels, (b) you have information regarding all of the individuals who participated in, received, or had access to those channels (as well as how frequently they participated), and (c) any other information is available about the Slack data.

3. **Clawback agreement**. It is not our usual practice to enter into clawback agreements with CID

recipients. We intend to abide by our legal and ethical obligations in handling the documents that your clients produce.

4. **Audit materials**. The CIDs require your clients to produce all responsive audits. We discussed that your client should pull and produce any responsive external audits that are readily available. We also understand that you plan to get back to us soon with more information about any responsive internal audits. Please provide an update <u>by March 21</u>.

We also have one more request that we did not raise on our call. Your clients' productions include copies of some, but not all, of your clients' payroll records. <u>By March 21</u>, could you please produce the remaining payroll records, including any records for 2023 and early 2024?

Best,

Jessica

**<u>DOJ additions</u>**

1. Biologic*
2. Graft*
3. (Skin w/5 sub*)
4. "incident to"
5. DME*
6. (Durable w/5 medical)
7. Supplie*
8. ((note* OR record*) AND (physician* OR doc* OR encounter* OR patient* OR provider* OR customer* OR bene* OR WCS*))
9. Superv*
10. Countersign* OR "Counter-sign*" OR "Counter sign*"
11. Rendering w/5 provider*
12. Bill w/5 under*
13. (med* w/5 (necess* OR indicat*))
14. (1099* AND (commission* OR bonus* OR volume OR provider* OR assistant* OR physician* OR PA* OR tech* OR WCS*))
15. Rebate*
16. Skilled w/5 nursing
17. SNF*
18. Hospice*
19. Home w/5 health*
20. Assist* w/5 living*
21. "Long term"
22. "Long-term"
23. Facilit*

24. LTC*
25. Institution*
26. (Claw* w/5 back*)
27. "Clawback*"
28. Risk*
29. Distribution*
30. Equit*
31. Consult*
32. Referral*
33. Gift*
34. Credential*
35. Resubmi*
36. Re-submi*
37. Denial*
38. Conceal*
39. Hide*
40. Coverup* OR Cover-up* OR "Cover up*"
41. Inconsisten*
42. Reconcile*
43. (application* w/5 fee*)
44. (Contract* w/5 rate*)
45. Arrangement*
46. (Under w/5 radar)
47. Free*
48. Freebie*
49. ComeSailAway*
50. "Come sail"
51. (Sail w/5 away)
52. Amnio*
53. Armor*
54. Biogenx*
55. Zenith*
56. Orion*
57. Surgraft*
58. Impax*
59. Carepatch*
60. Barrera*
61. Impax*
62. Dermacyte *
63. Helicoll*
64. Vendaje*
65. (dual w/5 layer*)
66. Woundfix*
67. "Wound fix"
68. Xplus*

69. BioWound* OR "Bio Wound"
70. Woundex*
71. Helicoll*
72. Epifix*
73. Novafix*
74. Membrane*
75. Allograft*
76. Legacy*
77. ExtremityCare* OR "Extremity Care*"
78. "Bone Bank"
79. BBA*
80. BioStem* OR "Bio Stem*"
81. RegenTX*
82. Skye*
83. Regenativ* OR Regenerativ*
84. HRT*
85. BioLab*
86. "Bio Lab*"
87. Merakris*
88. EnColl*
89. MiMedx*
90. Convatec*
91. Triad*
92. Radiant*
93. Nugeneron*
94. "Physician Alliance"
95. Horizon*
96. A42* OR A43* OR A44* OR A45* OR A46* OR A47* OR A48* OR A49* OR A50* OR A51* OR A60* OR A61* OR A62* OR A63* OR A64* OR L43* OR C52* OR Q41* OR Q42*
97. "Q Code*" OR "Q-Code*" OR "Qcode*"
98. (return* w/5 invest*)
99. ROI*
100. performan*
101. revenue*
102. profit*
103. incentiv*
104. outlier*

105. remuneration*
106. commission*
107. bonus*
108. (mov* OR transfer* OR send* OR wire*) w/5 (money* OR fund* or revenue* OR payment*)
109. (fair w/5 (market* OR value*))
110. FMV*

111. Expand* w/5 understand*

112. Illegal*
113. Jail*
114. Improper *
115. False*
116. FCA*
117. Fraud*
118. Unethical*
119. Kickback*
120. "kick back"
121. "anti-kickback*"
122. Stark*
123. AKS*
124. "safe harbor*"
125. (federal w/5 (health* OR law* OR reg* OR statute* OR req*))
126. inappropriat*
127. (not w/5 appropriat*)
128. unnecessar*
129. suspiciou*
130. suspect*
131. fault*
132. blame*
133. trouble*
134. violat*
135. manipulat*
136. Incorrec*
137. Investigat*
138. DOJ*

139. LCD*
140. "local coverage"
141. NCD*
142. "national coverage"
143. MAC OR MACs OR "Medicare admin*"

144. Noridian*
145. Novitas*
146. Cahaba*
147. "First Coast*"
148. CGS*
149. WPS*
150. "Wisconsin Physician Services"
151. Palmetto*
152. NGS*
153. "National Government Services"

154. UPIC* OR "Unified Program Integrity"
155. ZPIC* OR "Zone Program Integrity"
156. CMS*
157. Medicare*

158. (Operat* w/3 Proce*)
159. complain*
160. compli*
161. comply*
162. audit*

Jessica M. Bergin
Trial Attorney
U.S. Department of Justice
Civil Division, Fraud Section
(202) 305-4207
Jessica.Bergin@usdoj.gov

# Exhibit 20

| From: | Catherine S. Wicker |
|---|---|
| To: | Bergin, Jessica (CIV) |
| Cc: | Thiess, David (USACAE); Jordan Kearney; Sheryl B. Xavier; Andrew R. Hayes |
| Subject: | [EXTERNAL] RE: Wound Pros |
| Date: | Tuesday, April 02, 2024 8:09:25 PM |

Hi Jessica,

Please find below an update on our progress with respect to the production of 2023-2024 payroll records and our review of electronically stored data.

1. **Payroll Records** – We have requested this information from our client and anticipate producing the records to you by Friday, April 5, 2024.

2. **Slack Data**

   • **Loading Slack Data** – Our vendor is currently loading one day of Slack data into our e-discovery platform. We are also working with the client's Slack vendor to determine if any pre-processing tools could meaningfully narrow the data to certain custodians before upload. If we cannot narrow the data outside of our platform, we will proceed to upload all Slack data for further processing in our e-discovery platform.

   • **Slack Participants** – Our e-discovery vendor expects to be able to identify all individuals who participated in or had access to Slack channels. However, the metadata in a single record does not permit counting the frequency of participation in a channel overall. We are also unaware of any data field that indicates which participant "owned" a channel but can follow-up once the sample data is loaded.

   • **Possible Production Formats for Slack Data and Available Metadata** – Our e-discovery vendor tentatively advised that TIFF (.tiff) and plain text are possible production formats, however, this information needs to be confirmed. We will follow up on this. Additionally, as previously discussed, we expect the available metadata to be similar to what is available for e-mails. To the extent more granular information would be helpful, we can prepare a test production of a record from the data we are uploading so you can review the metadata actually available.

3. **Custodial Document Review** – We are still in the process of determining whether TAR would be a viable method to review the emails (plus families) that hit on the DOJ's search terms. To assist in making this determination, we are currently reviewing and marking a random set of documents to assess the responsiveness rate of the e-mail data, which will predict the rough scope of the review. These markings will also be used to train the algorithm, determine the size of the contract review team, and develop reasonable targets for the metrics you outlined in our last meeting. Please be advised that if more than half of collected e-mails are

responsive, then TAR will not offer significant benefits (i.e., training the algorithm would require review of the majority of documents) and we will have to explore alternative options for e-mail review.

-

Sincerely,

**Catherine S. Wicker**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 619.744.7311    MAIN: +1 619.744.7300    FAX: +1 619.230.0987
cwicker@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Sent:** Monday, April 1, 2024 5:59 AM
**To:** Catherine S. Wicker <cwicker@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Jordan Kearney <jkearney@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>
**Subject:** RE: Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Catherine,

Thank you for the update.  Could you please also provide an update on the status of the audit records described in your below March 18 email, which we were expecting to receive by mid-last week?

Best,

Jessica

**From:** Catherine S. Wicker <cwicker@hooperlundy.com>
**Sent:** Friday, March 29, 2024 4:25 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>

**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>; Jordan Kearney <jkearney@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>
**Subject:** [EXTERNAL] RE: Wound Pros

Hi Jessica,

I write regarding the status of our production of payroll records for 2023 and 2024. Please be advised that we will produce the records to you next week. I hope you have a wonderful weekend.

Sincerely,

**Catherine S. Wicker**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 619.744.7311   MAIN: +1 619.744.7300   FAX: +1 619.230.0987
cwicker@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Catherine S. Wicker
**Sent:** Monday, March 25, 2024 2:15 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Jordan Kearney <jkearney@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>
**Subject:** RE: Wound Pros

Hi Jessica,

Thank you for your email. I want to clarify our understanding of what was agreed to during the March 21 call.

1. **Payroll Records** – We agreed to provide you with an update by this week as to the status of our production of payroll records for 2023 and 2024. We have requested this information from our client but as explained during our call, the person responsible for gathering the requested records has been diligently working to prepare responses to the CID interrogatories. We will have an update for you sometime this week.

2. **Slack Data** – We are currently working to load Slack data onto our e-discovery platform and will update you on April 2, as to whether this process has been completed. We can confirm that the spreadsheet produced on February 16 reflects all Slack channels, including any informal channels. With respect to items 2(b) and 2(c), we will provide you with an update by

April 2.

3. **Custodial Document Review** – We agreed to let you know also by April 2, whether we planned to use technology-assisted review (TAR). If proceeding with TAR, we will circulate a proposed TAR protocol to you by April 9. We appreciate you listing the specific information you would like included in any such proposal.

Please let us know if you have any issues or concerns with the dates set forth in this email. Thank you so much.

Sincerely,

**Catherine S. Wicker**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 619.744.7311    MAIN: +1 619.744.7300    FAX: +1 619.230.0987
cwicker@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Sent:** Monday, March 25, 2024 12:46 PM
**To:** Catherine S. Wicker <cwicker@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Jordan Kearney <jkearney@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>
**Subject:** RE: Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Jordan, Catherine, and Andrew,

Thank you for speaking with us on Thursday afternoon.  On our call, we discussed your below questions and you agreed to do the following by the below target dates:

1. **Payroll records.**  By this week, you plan to produce your clients' payroll records for 2023 and 2024.  After producing those records, you will look into whether there are any other missing records responsive to the CID.

2. **Slack data.** We discussed that there is limited information in the spreadsheet that you provided on February 16, and we cannot agree that simply selecting channels listed on that spreadsheet is sufficient for your clients to meet their obligations to produce all responsive Slack data in response to the CIDs. By April 2, you plan to (a) load all of your clients' Slack data into your e-discovery platform, (b) provide us with an update on whether you are able to identify all of the individuals who participated in, owned, or had access to those channels (as well as how frequently they participated), (c) provide an update on the possible production formats for the Slack data, including with respect to the available metadata, and (d) confirm that the spreadsheet that you produced on February 16 reflects all Slack channels, including any informal channels. After you provide this information, we will discuss next steps, which we agreed would include discussion of which Slack channels your clients should prioritize producing in total.

3. **Custodial document review.** We discussed options for identifying a review set of custodial documents that captures the documents responsive to the CID. By this week, you will let us know whether you plan to use technology-assisted review to review the documents plus families that hit on the Wound Pros and DOJ search terms. If you plan to use TAR, the next step is for you to share your proposed TAR protocol with us by April 9. As discussed, in the TAR protocol, we would appreciate you providing the following information: (1) the TAR tool name and version; (2) whether TAR is being administered in-firm or through a vendor; (3) how you plan to train TAR; (4) who will be involved in training TAR; (5) all ESI sources that will be collected in connection with your review; (6) any parameters that you plan to use to cull ESI before running it through TAR, including any process that you propose using to review and produce documents contained within email threads; (7) all categories of documents that will be excluded from TAR, including your plans for providing us with information about file types and ESI volume by file type; (8) how you will handle review of the documents excluded from TAR; (9) which interim metrics you will provide to us, including the file types and de-duplicated counts of processed documents being included in and excluded from TAR, updates on training progress, and the size, richness, confidence level, and confidence interval of the initial training set; (10) the stages at which you will provide interim metrics; (11) how you will handle quality control and validation, including the metrics that you will provide to us at your proposed review cutoff (including sample size, R-Set document volumes, F-measure, recall, precision, richness, elusion rate, rank cutoff, confidence level, and confidence interval); and (12) confirmation that non-privileged responsive documents identified through the validation process will be produced and identified. Once you provide your proposed TAR protocol, we will review it with our e-discovery team and get back to you about any additional information that we may need or follow-up questions that we may have.

Please just let us know ahead of the target dates if anything unexpected comes up and you anticipate needing more time.

Thank you,

Jessica

---

**From:** Catherine S. Wicker <cwicker@hooperlundy.com>
**Sent:** Monday, March 18, 2024 5:29 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>; Jordan Kearney <jkearney@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>
**Subject:** [EXTERNAL] RE: Wound Pros

Hi Jessica,

Thank you for your summary. We have a few questions and clarifications set forth below. Please let us know your thoughts and if you would like to arrange a time to discuss further.

1. **Search Terms**: We ran all 162 search terms you proposed through our e-Discovery database. Please see the attached Excel spreadsheet for the results. Based on our review, we feel that many of the DOJ's proposed terms are individually overbroad (e.g., "Medicare*" is likely to yield mostly irrelevant results) and taken together, this search would impose an undue burden on Wound Pros ("WP"). While we are still working to understand WP's operations in order to effectively narrow this list, we are a bit taken aback by how broad the search is and the difficulty of meaningfully narrowing 162 search terms. We welcome your thoughts about priorities on this list, based on the new hit report.

2. **Slack Data**: We want to clarify our plan and the order of operations for Slack collection. Our understanding from our call was that DOJ would use the information that we have already provided to identify an initial subset of relevant Slack data for import into our e-discovery software. We are happy to work with our vendor to develop a more detailed understanding of our e-discovery capabilities with respect to Slack. However, the approach you propose would involve importing a massive amount of information and incurring related e-discovery costs for largely irrelevant data. Can you please help us define the scope of initial Slack collections, based on the summary of channels we provided? After that, we will collect the most relevant subset, and provide a hit report, alongside the related information you are seeking. We have confirmed that the list we shared includes all formal Slack channels as well as ad hoc direct messages between two or more individuals (what we referred to as "informal channels" on our call).

3. **Audit Records**: We have received a collection of medical record requests and documents responsive to those requests from the client. We plan to collect all remaining decision letters, appeals, and records associated with these requests from the client early next week, with the goal of producing them to you by mid-week.

4. **Payroll Records**: Since we did not have a chance to address this on our call, we would

appreciate some more information to inform our next steps. Can you clarify whether you are missing information for specific employees, for specific periods of time, or both? If you can provide more details about any missing information it will make it easier for us to determine what was missed and collect it. Please let us know if you are only missing the most recent information (2023 and early 2024 as you mentioned) or if we should go back further.

Sincerely,

**Catherine S. Wicker**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 619.744.7311     MAIN: +1 619.744.7300     FAX: +1 619.230.0987
cwicker@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Sent:** Thursday, March 7, 2024 12:56 PM
**To:** Jordan Kearney <jkearney@hooperlundy.com>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>
**Subject:** Wound Pros

## **\*\*EXTERNAL EMAIL MESSAGE\*\***

Jordan, Catherine, Andrew, and Sheryl,

Thank you for speaking with us yesterday. As discussed:

1. **Search terms**. We have reviewed your proposed search terms, and our additions are listed below this email. The search terms need to be broad enough to capture responsive custodial documents for your review team to then assess – not so narrowly crafted that the search terms fail to hit on some responsive documents. Thus, our below additions effectively remove some of your proposed connectors and proximity modifiers that overly narrowed the review set. We also have added additional search terms likely to return responsive documents. Of course, our investigation is ongoing, and our revisions to the search terms are limited by the information that you have chosen to share with us to date. For example, we

are still learning all of the words, phrases, and abbreviations that your clients use to discuss the key issues in our investigation. Thus, the below search terms are just a starting point, and we expect to add additional search terms as our investigation continues.

In terms of next steps, you agreed to prepare new hits reports for our below search terms reflecting hits both in the custodial files of the initial priority custodians as well as in the Slack data. Please provide those detailed hit reports (including total hits on documents, unique hits, and the overall size of the review universe), as well as any proposed revisions that you may have to our additional search terms, by March 21. Once we receive this information, we welcome a discussion about whether including additional connectors and proximity modifiers may be appropriate. At that point, depending on the universe of documents subject to review, we also can discuss the appropriateness of your proposal to use technology-assisted review in addition to search terms.

2. **Slack data**. Please also provide information about the possible production formats for the Slack data, including with respect to the metadata, by March 21. You also agreed to get back to us regarding whether (a) the spreadsheet that you produced on February 16 reflects all Slack channels, including any informal channels, (b) you have information regarding all of the individuals who participated in, received, or had access to those channels (as well as how frequently they participated), and (c) any other information is available about the Slack data.

3. **Clawback agreement**. It is not our usual practice to enter into clawback agreements with CID recipients. We intend to abide by our legal and ethical obligations in handling the documents that your clients produce.

4. **Audit materials**. The CIDs require your clients to produce all responsive audits. We discussed that your client should pull and produce any responsive external audits that are readily available. We also understand that you plan to get back to us soon with more information about any responsive internal audits. Please provide an update by March 21.

We also have one more request that we did not raise on our call. Your clients' productions include copies of some, but not all, of your clients' payroll records. By March 21, could you please produce the remaining payroll records, including any records for 2023 and early 2024?

Best,

Jessica

### DOJ additions

1. Biologic*

2. Graft*
3. (Skin w/5 sub*)
4. "incident to"
5. DME*
6. (Durable w/5 medical)
7. Supplie*
8. ((note* OR record*) AND (physician* OR doc* OR encounter* OR patient* OR provider* OR customer* OR bene* OR WCS*))
9. Superv*
10. Countersign* OR "Counter-sign*" OR "Counter sign*"
11. Rendering w/5 provider*
12. Bill w/5 under*
13. (med* w/5 (necess* OR indicat*))
14. (1099* AND (commission* OR bonus* OR volume OR provider* OR assistant* OR physician* OR PA* OR tech* OR WCS*))
15. Rebate*
16. Skilled w/5 nursing
17. SNF*
18. Hospice*
19. Home w/5 health*
20. Assist* w/5 living*
21. "Long term"
22. "Long-term"
23. Facilit*
24. LTC*
25. Institution*
26. (Claw* w/5 back*)
27. "Clawback*"
28. Risk*
29. Distribution*
30. Equit*
31. Consult*
32. Referral*
33. Gift*
34. Credential*
35. Resubmi*
36. Re-submi*
37. Denial*
38. Conceal*
39. Hide*
40. Coverup* OR Cover-up* OR "Cover up*"
41. Inconsisten*
42. Reconcile*
43. (application* w/5 fee*)
44. (Contract* w/5 rate*)

45. Arrangement*
46. (Under w/5 radar)
47. Free*
48. Freebie*
49. ComeSailAway*
50. "Come sail"
51. (Sail w/5 away)
52. Amnio*
53. Armor*
54. Biogenx*
55. Zenith*
56. Orion*
57. Surgraft*
58. Impax*
59. Carepatch*
60. Barrera*
61. Impax*
62. Dermacyte *
63. Helicoll*
64. Vendaje*
65. (dual w/5 layer*)
66. Woundfix*
67. "Wound fix"
68. Xplus*
69. BioWound* OR "Bio Wound"
70. Woundex*
71. Helicoll*
72. Epifix*
73. Novafix*
74. Membrane*
75. Allograft*
76. Legacy*
77. ExtremityCare* OR "Extremity Care*"
78. "Bone Bank"
79. BBA*
80. BioStem* OR "Bio Stem*"
81. RegenTX*
82. Skye*
83. Regenativ* OR Regenerativ*
84. HRT*
85. BioLab*
86. "Bio Lab*"
87. Merakris*
88. EnColl*
89. MiMedx*

90. Convatec*
91. Triad*
92. Radiant*
93. Nugeneron*
94. "Physician Alliance"
95. Horizon*
96. A42* OR A43* OR A44* OR A45* OR A46* OR A47* OR A48* OR A49* OR A50* OR A51* OR A60* OR A61* OR A62* OR A63* OR A64* OR L43* OR C52* OR Q41* OR Q42*
97. "Q Code*" OR "Q-Code*" OR "Qcode*"
98. (return* w/5 invest*)
99. ROI*
100. performan*
101. revenue*
102. profit*
103. incentiv*
104. outlier*

105. remuneration*
106. commission*
107. bonus*
108. (mov* OR transfer* OR send* OR wire*) w/5 (money* OR fund* or revenue* OR payment*)
109. (fair w/5 (market* OR value*))
110. FMV*
111. Expand* w/5 understand*

112. Illegal*
113. Jail*
114. Improper *
115. False*
116. FCA*
117. Fraud*
118. Unethical*
119. Kickback*
120. "kick back"
121. "anti-kickback*"
122. Stark*
123. AKS*
124. "safe harbor*"
125. (federal w/5 (health* OR law* OR reg* OR statute* OR req*))
126. inappropriat*
127. (not w/5 appropriat*)
128. unnecessar*
129. suspiciou*
130. suspect*
131. fault*

132. blame*
133. trouble*
134. violat*
135. manipulat*
136. Incorrec*
137. Investigat*
138. DOJ*

139. LCD*
140. "local coverage"
141. NCD*
142. "national coverage"
143. MAC OR MACs OR "Medicare admin*"

144. Noridian*
145. Novitas*
146. Cahaba*
147. "First Coast*"
148. CGS*
149. WPS*
150. "Wisconsin Physician Services"
151. Palmetto*
152. NGS*
153. "National Government Services"
154. UPIC* OR "Unified Program Integrity"
155. ZPIC* OR "Zone Program Integrity"
156. CMS*
157. Medicare*

158. (Operat* w/3 Proce*)
159. complain*
160. compli*
161. comply*
162. audit*

Jessica M. Bergin
Trial Attorney
U.S. Department of Justice
Civil Division, Fraud Section
(202) 305-4207
Jessica.Bergin@usdoj.gov

# Exhibit 21

| From: | Bergin, Jessica (CIV) |
|---|---|
| To: | Jordan Kearney; Catherine S. Wicker; Andrew R. Hayes; Sheryl B. Xavier |
| Cc: | Thiess, David (USACAE); Hill, Laura E (CIV) |
| Subject: | Wound Pros |
| Date: | Friday, April 19, 2024 9:04:40 AM |

Jordan, Catherine, Andrew, and Sheryl,

Thank you for speaking with us yesterday afternoon.  We appreciate you providing updates on the following items:

1. **Certifications of compliance for the interrogatory responses**

As discussed, we received your responses to interrogatories 1, 2, 3, 7, 9, 11, and 12.  While we are still reviewing those interrogatory responses, we noted that they were produced without the required certifications of compliance.  We understand that you currently are working with your clients to prepare amended responses to the interrogatories and that you currently anticipate that you will produce those amended responses with certifications of compliance in the format outlined in the CIDs within the next week or two.  If you haven't produced the amended answers and certifications by April 26, please provide an update on your progress and expected timeline on or before that date.

We also discussed using one of our next calls to set target deadlines for your clients to respond to the remaining interrogatories.

2. **Compliance changes**

We understand that our CIDs have prompted your clients to begin making compliance changes and that you expect to be in a position to share more information about those compliance changes in the next few weeks.

3. **Custodial document review**

We understand that you have completed your sample review of custodial emails and that you intend to use technology-assisted review to review the custodial documents (plus families) that hit on the search terms that we shared with you on March 7 and the terms that you shared with us on February 16.  We further understand that you are working with your vendor to prepare a draft TAR protocol (including the information that we requested in my March 25 email) for our review.  Please aim to provide that draft TAR protocol by May 2.  We then will review the draft TAR protocol with our e-discovery team and get back to you with any questions or revisions.  If you anticipate needing more time, please just let us know in advance of May 2.

4. **Slack data**

On our call, you proposed using a custodial approach to identifying responsive Slack messages, starting with the same nine priority custodians that you are prioritizing for the non-Slack custodial

document review. Those nine custodians are Dr. Bill Releford, Dr. Christopher Otiko, Amador Miranda, Jerome Cannon, Dr. Allyson Pizzo Berkey, Dr. Sherman Washington, Dr. Joseph Palumbo, Dr. Owen Ellington, and Dr. Richard Park. We agree that this is an appropriate place to begin a custodial review of the Slack messages. In terms of next steps, we understand that you will get back to us in the next week or two (by May 2) with your proposed process for reviewing those Slack messages. During our discussion, you floated the possibility of running the March 7 and February 16 search terms against 24-hour snippets of Slack conversation. You proposed then reviewing any 24-hour snippets that hit on those search terms and producing portions of the 24-hour snippets of conversation. We expressed concern that this approach likely would be too narrow to ensure compliance with the CIDs. Chat messages typically contain shorthand, lingo, and nuance that likely will be difficult to decipher and distinguish from the responsive contents of the chat message, making it likely that this approach would result in your clients withholding responsive information and important context. Moreover, there is no basis for withholding non-responsive portions of responsive documents. Just as an entire email thread containing responsive information must be produced even if the thread also contains non-responsive information, the complete 24-hour conversation snippets containing responsive information should be produced as well. As it is, by focusing on 24-hour snippets, we likely will be receiving truncated portions of longer conversation threads in many cases.

We also discussed that, in addition to a custodial approach, you should begin reviewing all Slack channels that contain the word "biologic" or "biologics" in their channel name. If any of those channels contains responsive information, they should be produced in their entirety.

We are continuing to learn more throughout the course of our ongoing investigation, including as we receive responsive documents and additional interrogatory responses from your clients. Thus, we anticipate that, in addition to adding the remaining custodians, we will continue to ask you to refine your process for identifying, reviewing, and producing responsive documents. As always, we continue to reserve our rights to fully enforce the CIDs if your document review process does not identify all documents responsive to the CIDs.

5. **Employee and contractor contracts**

We asked you to prioritize producing the contracts between your clients and their employees and contractors. We understand that you already have collected many of these contracts from your clients, and you are working to organize them. Given that the contracts are unlikely to contain privileged information, we asked that you promptly begin producing those contracts. By May 2, please either produce all of the contracts or provide an update on your timeline for producing the contracts.

6. **Criminal investigation**

You asked us whether there is a related criminal investigation. As we explained, we are civil attorneys pursuing a civil investigation. We cannot comment one way or the other as to the existence of any criminal investigation.

Best,

Jessica

Jessica M. Bergin
Trial Attorney
U.S. Department of Justice
Civil Division, Fraud Section
(202) 305-4207
Jessica.Bergin@usdoj.gov

# Exhibit 22

| | |
|---|---|
| **From:** | Bergin, Jessica (CIV) |
| **To:** | Sheryl B. Xavier |
| **Cc:** | Thiess, David (USACAE); Hill, Laura E (CIV); Catherine S. Wicker; Andrew R. Hayes; O"Connor, John (CIV) |
| **Subject:** | RE: Wound Pros |
| **Date:** | Friday, May 03, 2024 12:15:43 PM |

Sheryl,

By which date are you aiming to provide your draft of the proposed TAR protocol for the custodial document review? Please also let us know the target date by which you expect to share your proposed process for reviewing Slack messages. We were expecting to receive both of those items by yesterday. We understand that you need additional time, but we would appreciate more specific information about the target deadlines that you have in mind.

Best,

Jessica

---

**From:** Sheryl B. Xavier <sxavier@hooperlundy.com>
**Sent:** Thursday, May 2, 2024 6:03 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>;
Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>;
O'Connor, John (CIV) <John.O'Connor2@usdoj.gov>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>;
**Subject:** [EXTERNAL] RE: Wound Pros

Hi Jessica,

As an update on the development of a TAR protocol, please be advised that we are still working with our vendor to develop a formal protocol for your review, which addresses the specific questions listed in your March 25, 2024, email. We will circulate it once it is ready.

Best,


**Sheryl B. Xavier**
she/her/hers

---

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7716    MAIN: +1 202.580.7700    FAX: +1 202.609.8931
sxavier@hooperlundy.com | www.hooperlundy.com

---

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

---

**From:** Andrew R. Hayes <arhayes@hooperlundy.com>

**Sent:** Friday, April 26, 2024 2:16 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>; Catherine S. Wicker
<cwicker@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Subject:** RE: Wound Pros

Hi Jessica,

Thanks for your summary, we have a few responses and clarifications, please let us know if
you have any questions on the below:

1.  **Certifications of Compliance**: We are still working with our client to prepare amended
    responses and hope to provide them to you along with their certifications by May 8,
    2024. If for some reason we are unable to do so by that date, we will update you
    accordingly.

2.  **Compliance Changes**: You are correct that certain compliance changes are in process.
    We will provide information about those changes at an appropriate time.

3.  **Custodial Document Review**: You referenced two sets of search terms that we
    previously exchanged. To be clear, the Wound Pros has only agreed to review and
    produce e-mails from the universe of documents that hit on the 162 terms proposed by
    the DOJ. We provided a hit report describing that universe in our March 18, 2024 e-
    mail.

4.  **Slack Data**: We are working with our vendor to load all historic data and parse that data
    into 24-hour segments, containing: (i) messages to/from identified custodians, and (ii)
    channels with "biologic*" in the name. We understand that the investigation is ongoing,
    but please note that processing Slack data in this manner requires uploading nearly a
    terabyte of data to our e-discovery platform for processing, which entails significant
    costs.

5.  **Employee and Contractor Contracts:** As discussed, we will produce the contracts we
    have previously collected, and then proceed to assess whether any relevant contracts
    remain to be collected.

6.  **Criminal Investigation**: We appreciate your offer to connect with a criminal AUSA in
    your offices regarding this investigation. We will follow-up if it would be helpful to
    schedule a call with your colleagues in the criminal section.

Best,
**Andrew R. Hayes**
he/him/his

**HOOPER, LUNDY & BOOKMAN, P.C.**

DIRECT: +1 202.580.7703    MAIN: +1 202.580.7700    FAX: +1 202.609.8931

arhayes@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>

**Sent:** Friday, April 19, 2024 9:05 AM

**To:** Jordan Kearney <jkearney@hooperlundy.com>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>

**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>

**Subject:** Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Jordan, Catherine, Andrew, and Sheryl,

Thank you for speaking with us yesterday afternoon.  We appreciate you providing updates on the following items:

1. **Certifications of compliance for the interrogatory responses**

As discussed, we received your responses to interrogatories 1, 2, 3, 7, 9, 11, and 12.  While we are still reviewing those interrogatory responses, we noted that they were produced without the required certifications of compliance.  We understand that you currently are working with your clients to prepare amended responses to the interrogatories and that you currently anticipate that you will produce those amended responses with certifications of compliance in the format outlined in the CIDs within the next week or two.  If you haven't produced the amended answers and certifications by April 26, please provide an update on your progress and expected timeline on or before that date.

We also discussed using one of our next calls to set target deadlines for your clients to respond to the remaining interrogatories.

2. **Compliance changes**

We understand that our CIDs have prompted your clients to begin making compliance changes and that you expect to be in a position to share more information about those compliance changes in the next few weeks.

3. **Custodial document review**

We understand that you have completed your sample review of custodial emails and that you intend to use technology-assisted review to review the custodial documents (plus families) that hit on the search terms that we shared with you on March 7 and the terms that you shared with us on February 16. We further understand that you are working with your vendor to prepare a draft TAR protocol (including the information that we requested in my March 25 email) for our review. Please aim to provide that draft TAR protocol by May 2. We then will review the draft TAR protocol with our e-discovery team and get back to you with any questions or revisions. If you anticipate needing more time, please just let us know in advance of May 2.

4. **Slack data**

On our call, you proposed using a custodial approach to identifying responsive Slack messages, starting with the same nine priority custodians that you are prioritizing for the non-Slack custodial document review. Those nine custodians are Dr. Bill Releford, Dr. Christopher Otiko, Amador Miranda, Jerome Cannon, Dr. Allyson Pizzo Berkey, Dr. Sherman Washington, Dr. Joseph Palumbo, Dr. Owen Ellington, and Dr. Richard Park. We agree that this is an appropriate place to begin a custodial review of the Slack messages. In terms of next steps, we understand that you will get back to us in the next week or two (by May 2) with your proposed process for reviewing those Slack messages. During our discussion, you floated the possibility of running the March 7 and February 16 search terms against 24-hour snippets of Slack conversation. You proposed then reviewing any 24-hour snippets that hit on those search terms and producing portions of the 24-hour snippets of conversation. We expressed concern that this approach likely would be too narrow to ensure compliance with the CIDs. Chat messages typically contain shorthand, lingo, and nuance that likely will be difficult to decipher and distinguish from the responsive contents of the chat message, making it likely that this approach would result in your clients withholding responsive information and important context. Moreover, there is no basis for withholding non-responsive portions of responsive documents. Just as an entire email thread containing responsive information must be produced even if the thread also contains non-responsive information, the complete 24-hour conversation snippets containing responsive information should be produced as well. As it is, by focusing on 24-hour snippets, we likely will be receiving truncated portions of longer conversation threads in many cases.

We also discussed that, in addition to a custodial approach, you should begin reviewing all Slack channels that contain the word "biologic" or "biologics" in their channel name. If any of those channels contains responsive information, they should be produced in their entirety.

We are continuing to learn more throughout the course of our ongoing investigation, including as we receive responsive documents and additional interrogatory responses from your clients. Thus, we anticipate that, in addition to adding the remaining custodians, we will continue to ask you to refine your process for identifying, reviewing, and producing responsive documents. As always, we continue to reserve our rights to fully enforce the CIDs if your document review process does not identify all documents responsive to the CIDs.

5. **Employee and contractor contracts**

We asked you to prioritize producing the contracts between your clients and their employees and contractors.  We understand that you already have collected many of these contracts from your clients, and you are working to organize them.  Given that the contracts are unlikely to contain privileged information, we asked that you promptly begin producing those contracts. By May 2, please either produce all of the contracts or provide an update on your timeline for producing the contracts.

6. **Criminal investigation**

You asked us whether there is a related criminal investigation.  As we explained, we are civil attorneys pursuing a civil investigation.  We cannot comment one way or the other as to the existence of any criminal investigation.

Best,

Jessica

Jessica M. Bergin
Trial Attorney
U.S. Department of Justice
Civil Division, Fraud Section
(202) 305-4207
Jessica.Bergin@usdoj.gov

# Exhibit 23

| From: | Sheryl B. Xavier |
| To: | Bergin, Jessica (CIV) |
| Cc: | Thiess, David (USACAE); Hill, Laura E (CIV); Catherine S. Wicker; Andrew R. Hayes; O"Connor, John (CIV) |
| Subject: | [EXTERNAL] RE: Wound Pros |
| Date: | Thursday, May 09, 2024 1:10:24 PM |

Hi Jessica,

Unfortunately, we cannot provide you with a firm date for circulation of our proposed TAR protocol because we are still in the process of finalizing it with our vendor. We will give you with a status update by next Tuesday, May 14, 2024, if we do not receive the final protocol before then.

Regarding our proposed process for reviewing Slack messages, you are correct that we proposed using a custodial approach to identify responsive Slack messages, starting with the same nine custodians that we are prioritizing for the non-Slack document review. We plan to run the 162 search terms provided by the DOJ against this Slack data and produce the entire 24-hour chat thread if it includes responsive information. You expressed concern in your April 19 email that our proposal, as discussed during our April 18 call, was too narrow to ensure compliance with the CID. To clarify, we do not intend to only produce portions of 24-hour increments of conversations.

Additionally, we will also produce Slack channels containing the words "biologics" or "biologics" in their channel name. If any of these channels contain responsive information, then we will produce the non-privileged responsive information in its entirety.

Finally, we wanted to confirm that WP's production of email and Slack communications is responsive to certain document requests listed in the CID. As you may recall, in our correspondence dated February 16, 2024, we had proposed e-mail search terms that corresponded to specific document requests in the CID—namely, Nos. 2, 4, 6, and 8. In response, you circulated 162 search terms without indicating which requests they were directed to. It is our understanding that we are responding to Request Nos. 2, 4, 6, and 8, for purposes of identifying responsive information. Please let us know if you have a different understanding.

Thank you,

**Sheryl B. Xavier**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7716    MAIN: +1 202.580.7700    FAX: +1 202.609.8931
sxavier@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>

**Sent:** Friday, May 3, 2024 12:16 PM
**To:** Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; O'Connor, John (CIV) <John.O'Connor2@usdoj.gov>
**Subject:** RE: Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Sheryl,

By which date are you aiming to provide your draft of the proposed TAR protocol for the custodial document review?  Please also let us know the target date by which you expect to share your proposed process for reviewing Slack messages.  We were expecting to receive both of those items by yesterday.  We understand that you need additional time, but we would appreciate more specific information about the target deadlines that you have in mind.

Best,

Jessica

**From:** Sheryl B. Xavier <sxavier@hooperlundy.com>
**Sent:** Thursday, May 2, 2024 6:03 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; O'Connor, John (CIV) <John.O'Connor2@usdoj.gov>
**Subject:** [EXTERNAL] RE: Wound Pros

Hi Jessica,

As an update on the development of a TAR protocol, please be advised that we are still working with our vendor to develop a formal protocol for your review, which addresses the specific questions listed in your March 25, 2024, email. We will circulate it once it is ready.

Best,

**Sheryl B. Xavier**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7716     MAIN: +1 202.580.7700     FAX: +1 202.609.8931
sxavier@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Andrew R. Hayes <arhayes@hooperlundy.com>
**Sent:** Friday, April 26, 2024 2:16 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Subject:** RE: Wound Pros

Hi Jessica,

Thanks for your summary, we have a few responses and clarifications, please let us know if you have any questions on the below:

1. **Certifications of Compliance**: We are still working with our client to prepare amended responses and hope to provide them to you along with their certifications by May 8, 2024. If for some reason we are unable to do so by that date, we will update you accordingly.

2. **Compliance Changes**: You are correct that certain compliance changes are in process. We will provide information about those changes at an appropriate time.

3. **Custodial Document Review**: You referenced two sets of search terms that we previously exchanged. To be clear, the Wound Pros has only agreed to review and produce e-mails from the universe of documents that hit on the 162 terms proposed by the DOJ. We provided a hit report describing that universe in our March 18, 2024 e-mail.

4. **Slack Data**: We are working with our vendor to load all historic data and parse that data into 24-hour segments, containing: (i) messages to/from identified custodians, and (ii) channels with "biologic*" in the name. We understand that the investigation is ongoing, but please note that processing Slack data in this manner requires uploading nearly a terabyte of data to our e-discovery platform for processing, which entails significant costs.

5. **Employee and Contractor Contracts:** As discussed, we will produce the contracts we have previously collected, and then proceed to assess whether any relevant contracts remain to be collected.

6. **Criminal Investigation**: We appreciate your offer to connect with a criminal AUSA in your offices regarding this investigation. We will follow-up if it would be helpful to schedule a call

with your colleagues in the criminal section.

Best,
**Andrew R. Hayes**
he/him/his

---

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7703     MAIN: +1 202.580.7700     FAX: +1 202.609.8931
arhayes@hooperlundy.com | www.hooperlundy.com

---

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

---

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Sent:** Friday, April 19, 2024 9:05 AM
**To:** Jordan Kearney <jkearney@hooperlundy.com>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Subject:** Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Jordan, Catherine, Andrew, and Sheryl,

Thank you for speaking with us yesterday afternoon.  We appreciate you providing updates on the following items:

1. **Certifications of compliance for the interrogatory responses**

As discussed, we received your responses to interrogatories 1, 2, 3, 7, 9, 11, and 12.  While we are still reviewing those interrogatory responses, we noted that they were produced without the required certifications of compliance.  We understand that you currently are working with your clients to prepare amended responses to the interrogatories and that you currently anticipate that you will produce those amended responses with certifications of compliance in the format outlined in the CIDs within the next week or two.  If you haven't produced the amended answers and certifications by April 26, please provide an update on your progress and expected timeline on or before that date.

We also discussed using one of our next calls to set target deadlines for your clients to respond to the remaining interrogatories.

2. **Compliance changes**

We understand that our CIDs have prompted your clients to begin making compliance changes and that you expect to be in a position to share more information about those compliance changes in the next few weeks.

3. **Custodial document review**

We understand that you have completed your sample review of custodial emails and that you intend to use technology-assisted review to review the custodial documents (plus families) that hit on the search terms that we shared with you on March 7 and the terms that you shared with us on February 16. We further understand that you are working with your vendor to prepare a draft TAR protocol (including the information that we requested in my March 25 email) for our review. Please aim to provide that draft TAR protocol by May 2. We then will review the draft TAR protocol with our e-discovery team and get back to you with any questions or revisions. If you anticipate needing more time, please just let us know in advance of May 2.

4. **Slack data**

On our call, you proposed using a custodial approach to identifying responsive Slack messages, starting with the same nine priority custodians that you are prioritizing for the non-Slack custodial document review. Those nine custodians are Dr. Bill Releford, Dr. Christopher Otiko, Amador Miranda, Jerome Cannon, Dr. Allyson Pizzo Berkey, Dr. Sherman Washington, Dr. Joseph Palumbo, Dr. Owen Ellington, and Dr. Richard Park. We agree that this is an appropriate place to begin a custodial review of the Slack messages. In terms of next steps, we understand that you will get back to us in the next week or two (by May 2) with your proposed process for reviewing those Slack messages. During our discussion, you floated the possibility of running the March 7 and February 16 search terms against 24-hour snippets of Slack conversation. You proposed then reviewing any 24-hour snippets that hit on those search terms and producing portions of the 24-hour snippets of conversation. We expressed concern that this approach likely would be too narrow to ensure compliance with the CIDs. Chat messages typically contain shorthand, lingo, and nuance that likely will be difficult to decipher and distinguish from the responsive contents of the chat message, making it likely that this approach would result in your clients withholding responsive information and important context. Moreover, there is no basis for withholding non-responsive portions of responsive documents. Just as an entire email thread containing responsive information must be produced even if the thread also contains non-responsive information, the complete 24-hour conversation snippets containing responsive information should be produced as well. As it is, by focusing on 24-hour snippets, we likely will be receiving truncated portions of longer conversation threads in many cases.

We also discussed that, in addition to a custodial approach, you should begin reviewing all Slack channels that contain the word "biologic" or "biologics" in their channel name. If any of those

channels contains responsive information, they should be produced in their entirety.

We are continuing to learn more throughout the course of our ongoing investigation, including as we receive responsive documents and additional interrogatory responses from your clients. Thus, we anticipate that, in addition to adding the remaining custodians, we will continue to ask you to refine your process for identifying, reviewing, and producing responsive documents. As always, we continue to reserve our rights to fully enforce the CIDs if your document review process does not identify all documents responsive to the CIDs.

5. **Employee and contractor contracts**

We asked you to prioritize producing the contracts between your clients and their employees and contractors. We understand that you already have collected many of these contracts from your clients, and you are working to organize them. Given that the contracts are unlikely to contain privileged information, we asked that you promptly begin producing those contracts. By May 2, please either produce all of the contracts or provide an update on your timeline for producing the contracts.

6. **Criminal investigation**

You asked us whether there is a related criminal investigation. As we explained, we are civil attorneys pursuing a civil investigation. We cannot comment one way or the other as to the existence of any criminal investigation.

Best,

Jessica

Jessica M. Bergin
Trial Attorney
U.S. Department of Justice
Civil Division, Fraud Section
(202) 305-4207
Jessica.Bergin@usdoj.gov

# Exhibit 24

| From: | Hill, Laura E (CIV) |
|---|---|
| To: | Sheryl B. Xavier |
| Cc: | Thiess, David (USACAE); Catherine S. Wicker; Bergin, Jessica (CIV); Andrew R. Hayes |
| Subject: | RE: Wound Pros |
| Date: | Thursday, May 09, 2024 4:23:00 PM |

Sheryl,

Thanks for your email. We'll look out for the proposed TAR protocol on or before May 14. If you are unable to finalize the protocol prior to that date, please provide an update and the date by which you expect to send the protocol.

We appreciate you providing more information on the production of the Slack messages and ask that you provide a proposed production timeline for that data, as well.

Also, based on your 4/26 email, we had understood that you would be producing the amended interrogatory answers and certificates yesterday. Please provide an update.

Regarding the final paragraph of your email below, we agree that the proposed terms could return documents responsive to those document requests, but only you and your client are in a position to determine whether you've fully complied with the CID. We also reserve the right to request production of additional, responsive documents based on those documents requests.

Best,
Laura

**From:** Sheryl B. Xavier <sxavier@hooperlundy.com>
**Sent:** Thursday, May 09, 2024 1:10 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; O'Connor, John (CIV) <John.O'Connor2@usdoj.gov>
**Subject:** [EXTERNAL] RE: Wound Pros

Hi Jessica,

Unfortunately, we cannot provide you with a firm date for circulation of our proposed TAR protocol because we are still in the process of finalizing it with our vendor. We will give you with a status update by next Tuesday, May 14, 2024, if we do not receive the final protocol before then.

Regarding our proposed process for reviewing Slack messages, you are correct that we proposed using a custodial approach to identify responsive Slack messages, starting with the same nine custodians that we are prioritizing for the non-Slack document review. We plan to run the 162 search terms provided by the DOJ against this Slack data and produce the entire 24-hour chat thread if it includes responsive information. You expressed concern in your April 19 email that our proposal,

as discussed during our April 18 call, was too narrow to ensure compliance with the CID. To clarify, we do not intend to only produce portions of 24-hour increments of conversations.

Additionally, we will also produce Slack channels containing the words "biologics" or "biologics" in their channel name. If any of these channels contain responsive information, then we will produce the non-privileged responsive information in its entirety.

Finally, we wanted to confirm that WP's production of email and Slack communications is responsive to certain document requests listed in the CID. As you may recall, in our correspondence dated February 16, 2024, we had proposed e-mail search terms that corresponded to specific document requests in the CID—namely, Nos. 2, 4, 6, and 8. In response, you circulated 162 search terms without indicating which requests they were directed to. It is our understanding that we are responding to Request Nos. 2, 4, 6, and 8, for purposes of identifying responsive information. Please let us know if you have a different understanding.

Thank you,

**Sheryl B. Xavier**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7716    MAIN: +1 202.580.7700    FAX: +1 202.609.8931
sxavier@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Sent:** Friday, May 3, 2024 12:16 PM
**To:** Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; O'Connor, John (CIV) <John.O'Connor2@usdoj.gov>
**Subject:** RE: Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Sheryl,

By which date are you aiming to provide your draft of the proposed TAR protocol for the custodial document review?  Please also let us know the target date by which you expect to share your proposed process for reviewing Slack messages.  We were expecting to receive both of those items

by yesterday. We understand that you need additional time, but we would appreciate more specific information about the target deadlines that you have in mind.

Best,

Jessica

**From:** Sheryl B. Xavier <sxavier@hooperlundy.com>
**Sent:** Thursday, May 2, 2024 6:03 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>;
Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>;
O'Connor, John (CIV) <John.O'Connor2@usdoj.gov>
**Subject:** [EXTERNAL] RE: Wound Pros

Hi Jessica,

As an update on the development of a TAR protocol, please be advised that we are still working with our vendor to develop a formal protocol for your review, which addresses the specific questions listed in your March 25, 2024, email. We will circulate it once it is ready.

Best,

**Sheryl B. Xavier**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7716    MAIN: +1 202.580.7700    FAX: +1 202.609.8931
sxavier@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Andrew R. Hayes <arhayes@hooperlundy.com>
**Sent:** Friday, April 26, 2024 2:16 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>; Catherine S. Wicker
<cwicker@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Subject:** RE: Wound Pros

Hi Jessica,

Thanks for your summary, we have a few responses and clarifications, please let us know if you have

any questions on the below:

1. **Certifications of Compliance**: We are still working with our client to prepare amended responses and hope to provide them to you along with their certifications by May 8, 2024. If for some reason we are unable to do so by that date, we will update you accordingly.

2. **Compliance Changes**: You are correct that certain compliance changes are in process. We will provide information about those changes at an appropriate time.

3. **Custodial Document Review**: You referenced two sets of search terms that we previously exchanged. To be clear, the Wound Pros has only agreed to review and produce e-mails from the universe of documents that hit on the 162 terms proposed by the DOJ. We provided a hit report describing that universe in our March 18, 2024 e-mail.

4. **Slack Data**: We are working with our vendor to load all historic data and parse that data into 24-hour segments, containing: (i) messages to/from identified custodians, and (ii) channels with "biologic*" in the name. We understand that the investigation is ongoing, but please note that processing Slack data in this manner requires uploading nearly a terabyte of data to our e-discovery platform for processing, which entails significant costs.

5. **Employee and Contractor Contracts:** As discussed, we will produce the contracts we have previously collected, and then proceed to assess whether any relevant contracts remain to be collected.

6. **Criminal Investigation**: We appreciate your offer to connect with a criminal AUSA in your offices regarding this investigation. We will follow-up if it would be helpful to schedule a call with your colleagues in the criminal section.

Best,
**Andrew R. Hayes**
he/him/his

---

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7703    MAIN: +1 202.580.7700    FAX: +1 202.609.8931
arhayes@hooperlundy.com | www.hooperlundy.com

---

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

---

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>

**Sent:** Friday, April 19, 2024 9:05 AM
**To:** Jordan Kearney <jkearney@hooperlundy.com>; Catherine S. Wicker
<cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; Sheryl B. Xavier
<sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Subject:** Wound Pros


**\*\*EXTERNAL EMAIL MESSAGE\*\***



Jordan, Catherine, Andrew, and Sheryl,

Thank you for speaking with us yesterday afternoon.  We appreciate you providing updates on the
following items:


1. **Certifications of compliance for the interrogatory responses**

As discussed, we received your responses to interrogatories 1, 2, 3, 7, 9, 11, and 12.  While we are
still reviewing those interrogatory responses, we noted that they were produced without the
required certifications of compliance.  We understand that you currently are working with your
clients to prepare amended responses to the interrogatories and that you currently anticipate that
you will produce those amended responses with certifications of compliance in the format outlined
in the CIDs within the next week or two.  If you haven't produced the amended answers and
certifications by April 26, please provide an update on your progress and expected timeline on or
before that date.

We also discussed using one of our next calls to set target deadlines for your clients to respond to
the remaining interrogatories.


2. **Compliance changes**

We understand that our CIDs have prompted your clients to begin making compliance changes and
that you expect to be in a position to share more information about those compliance changes in the
next few weeks.


3. **Custodial document review**

We understand that you have completed your sample review of custodial emails and that you intend
to use technology-assisted review to review the custodial documents (plus families) that hit on the
search terms that we shared with you on March 7 and the terms that you shared with us on
February 16.  We further understand that you are working with your vendor to prepare a draft TAR

protocol (including the information that we requested in my March 25 email) for our review.  Please aim to provide that draft TAR protocol by May 2.  We then will review the draft TAR protocol with our e-discovery team and get back to you with any questions or revisions.  If you anticipate needing more time, please just let us know in advance of May 2.

4. **Slack data**

On our call, you proposed using a custodial approach to identifying responsive Slack messages, starting with the same nine priority custodians that you are prioritizing for the non-Slack custodial document review.  Those nine custodians are Dr. Bill Releford, Dr. Christopher Otiko, Amador Miranda, Jerome Cannon, Dr. Allyson Pizzo Berkey, Dr. Sherman Washington, Dr. Joseph Palumbo, Dr. Owen Ellington, and Dr. Richard Park.  We agree that this is an appropriate place to begin a custodial review of the Slack messages.  In terms of next steps, we understand that you will get back to us in the next week or two (by May 2) with your proposed process for reviewing those Slack messages.  During our discussion, you floated the possibility of running the March 7 and February 16 search terms against 24-hour snippets of Slack conversation.  You proposed then reviewing any 24-hour snippets that hit on those search terms and producing portions of the 24-hour snippets of conversation.  We expressed concern that this approach likely would be too narrow to ensure compliance with the CIDs.  Chat messages typically contain shorthand, lingo, and nuance that likely will be difficult to decipher and distinguish from the responsive contents of the chat message, making it likely that this approach would result in your clients withholding responsive information and important context.  Moreover, there is no basis for withholding non-responsive portions of responsive documents.  Just as an entire email thread containing responsive information must be produced even if the thread also contains non-responsive information, the complete 24-hour conversation snippets containing responsive information should be produced as well.  As it is, by focusing on 24-hour snippets, we likely will be receiving truncated portions of longer conversation threads in many cases.

We also discussed that, in addition to a custodial approach, you should begin reviewing all Slack channels that contain the word "biologic" or "biologics" in their channel name.  If any of those channels contains responsive information, they should be produced in their entirety.

We are continuing to learn more throughout the course of our ongoing investigation, including as we receive responsive documents and additional interrogatory responses from your clients.  Thus, we anticipate that, in addition to adding the remaining custodians, we will continue to ask you to refine your process for identifying, reviewing, and producing responsive documents.  As always, we continue to reserve our rights to fully enforce the CIDs if your document review process does not identify all documents responsive to the CIDs.

5. **Employee and contractor contracts**

We asked you to prioritize producing the contracts between your clients and their employees and contractors.  We understand that you already have collected many of these contracts from your clients, and you are working to organize them.  Given that the contracts are unlikely to contain

privileged information, we asked that you promptly begin producing those contracts.  By May 2, please either produce all of the contracts or provide an update on your timeline for producing the contracts.

6. **Criminal investigation**

You asked us whether there is a related criminal investigation.  As we explained, we are civil attorneys pursuing a civil investigation.  We cannot comment one way or the other as to the existence of any criminal investigation.

Best,

Jessica

Jessica M. Bergin
Trial Attorney
U.S. Department of Justice
Civil Division, Fraud Section
(202) 305-4207
Jessica.Bergin@usdoj.gov

# Exhibit 25

| From: | Andrew R. Hayes |
|---|---|
| To: | Hill, Laura E (CIV); Sheryl B. Xavier |
| Cc: | Thiess, David (USACAE); Catherine S. Wicker; Bergin, Jessica (CIV) |
| Subject: | [EXTERNAL] RE: Wound Pros |
| Date: | Tuesday, May 14, 2024 6:11:34 PM |

Hi Laura,

We are currently finalizing the TAR protocol with our vendor to ensure that it addresses the specific points raised in your team's prior correspondence. The last remaining item that we are discussing is a strategy for handling documents excluded from TAR, and specifically the procedure for any communications that require translation. We appreciate your patience here and we will provide another update by Friday, May 17, 2024.

Regarding a proposed production timeline for Slack data, we are working with our vendor to import Slack data simultaneous with our commencement of TAR for email communications. We will be able to provide more details on production of Slack data in the next few weeks, including a projected timeline. Currently, we are unable to determine how much the compressed Slack data will expand upon upload to our e-discovery platform. We do not want to set goals for Slack review and productions until we have the information needed to inform our estimates.

Also, we are continuing to work with our client on verifications and amended interrogatory responses and expect to provide another update by this Friday, May 17, 2024.

Finally, we appreciate your guidance that the scope of this review is consistent with what is called for in the CID. Our review of the CID confirms that the only document requests that seek Wound Pros "communications" are Nos. 2, 4, 6, and 8. Accordingly, we will take your prior e-mail as confirmation that we are responding to Request Nos. 2, 4, 6, and 8, for purposes of identifying responsive information and will develop our document review protocol with this understanding in mind.

Best,

**Andrew R. Hayes**
he/him/his

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7703     MAIN: +1 202.580.7700     FAX: +1 202.609.8931
arhayes@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Sent:** Thursday, May 9, 2024 4:24 PM
**To:** Sheryl B. Xavier <sxavier@hooperlundy.com>

**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>; Andrew R. Hayes <arhayes@hooperlundy.com>
**Subject:** RE: Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Sheryl,

Thanks for your email. We'll look out for the proposed TAR protocol on or before May 14. If you are unable to finalize the protocol prior to that date, please provide an update and the date by which you expect to send the protocol.

We appreciate you providing more information on the production of the Slack messages and ask that you provide a proposed production timeline for that data, as well.

Also, based on your 4/26 email, we had understood that you would be producing the amended interrogatory answers and certificates yesterday. Please provide an update.

Regarding the final paragraph of your email below, we agree that the proposed terms could return documents responsive to those document requests, but only you and your client are in a position to determine whether you've fully complied with the CID. We also reserve the right to request production of additional, responsive documents based on those documents requests.

Best,
Laura

**From:** Sheryl B. Xavier <sxavier@hooperlundy.com>
**Sent:** Thursday, May 09, 2024 1:10 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; O'Connor, John (CIV) <John.O'Connor2@usdoj.gov>
**Subject:** [EXTERNAL] RE: Wound Pros

Hi Jessica,

Unfortunately, we cannot provide you with a firm date for circulation of our proposed TAR protocol because we are still in the process of finalizing it with our vendor. We will give you with a status update by next Tuesday, May 14, 2024, if we do not receive the final protocol before then.

Regarding our proposed process for reviewing Slack messages, you are correct that we proposed using a custodial approach to identify responsive Slack messages, starting with the same nine

custodians that we are prioritizing for the non-Slack document review. We plan to run the 162 search terms provided by the DOJ against this Slack data and produce the entire 24-hour chat thread if it includes responsive information. You expressed concern in your April 19 email that our proposal, as discussed during our April 18 call, was too narrow to ensure compliance with the CID. To clarify, we do not intend to only produce portions of 24-hour increments of conversations.

Additionally, we will also produce Slack channels containing the words "biologics" or "biologics" in their channel name. If any of these channels contain responsive information, then we will produce the non-privileged responsive information in its entirety.

Finally, we wanted to confirm that WP's production of email and Slack communications is responsive to certain document requests listed in the CID. As you may recall, in our correspondence dated February 16, 2024, we had proposed e-mail search terms that corresponded to specific document requests in the CID—namely, Nos. 2, 4, 6, and 8. In response, you circulated 162 search terms without indicating which requests they were directed to. It is our understanding that we are responding to Request Nos. 2, 4, 6, and 8, for purposes of identifying responsive information. Please let us know if you have a different understanding.

Thank you,

**Sheryl B. Xavier**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7716     MAIN: +1 202.580.7700     FAX: +1 202.609.8931
sxavier@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Sent:** Friday, May 3, 2024 12:16 PM
**To:** Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; O'Connor, John (CIV) <John.O'Connor2@usdoj.gov>
**Subject:** RE: Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Sheryl,

By which date are you aiming to provide your draft of the proposed TAR protocol for the custodial document review? Please also let us know the target date by which you expect to share your proposed process for reviewing Slack messages. We were expecting to receive both of those items by yesterday. We understand that you need additional time, but we would appreciate more specific information about the target deadlines that you have in mind.

Best,

Jessica

**From:** Sheryl B. Xavier <sxavier@hooperlundy.com>
**Sent:** Thursday, May 2, 2024 6:03 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; O'Connor, John (CIV) <John.O'Connor2@usdoj.gov>
**Subject:** [EXTERNAL] RE: Wound Pros

Hi Jessica,

As an update on the development of a TAR protocol, please be advised that we are still working with our vendor to develop a formal protocol for your review, which addresses the specific questions listed in your March 25, 2024, email. We will circulate it once it is ready.

Best,


**Sheryl B. Xavier**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7716    MAIN: +1 202.580.7700    FAX: +1 202.609.8931
sxavier@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Andrew R. Hayes <arhayes@hooperlundy.com>
**Sent:** Friday, April 26, 2024 2:16 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Subject:** RE: Wound Pros

Hi Jessica,

Thanks for your summary, we have a few responses and clarifications, please let us know if you have any questions on the below:

1. **Certifications of Compliance**: We are still working with our client to prepare amended responses and hope to provide them to you along with their certifications by May 8, 2024. If for some reason we are unable to do so by that date, we will update you accordingly.

2. **Compliance Changes**: You are correct that certain compliance changes are in process. We will provide information about those changes at an appropriate time.

3. **Custodial Document Review**: You referenced two sets of search terms that we previously exchanged. To be clear, the Wound Pros has only agreed to review and produce e-mails from the universe of documents that hit on the 162 terms proposed by the DOJ. We provided a hit report describing that universe in our March 18, 2024 e-mail.

4. **Slack Data**: We are working with our vendor to load all historic data and parse that data into 24-hour segments, containing: (i) messages to/from identified custodians, and (ii) channels with "biologic*" in the name. We understand that the investigation is ongoing, but please note that processing Slack data in this manner requires uploading nearly a terabyte of data to our e-discovery platform for processing, which entails significant costs.

5. **Employee and Contractor Contracts:** As discussed, we will produce the contracts we have previously collected, and then proceed to assess whether any relevant contracts remain to be collected.

6. **Criminal Investigation**: We appreciate your offer to connect with a criminal AUSA in your offices regarding this investigation. We will follow-up if it would be helpful to schedule a call with your colleagues in the criminal section.

Best,
**Andrew R. Hayes**
he/him/his

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7703    MAIN: +1 202.580.7700    FAX: +1 202.609.8931
arhayes@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that

you received the message in error and delete or destroy the email and any attachment.

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Sent:** Friday, April 19, 2024 9:05 AM
**To:** Jordan Kearney <jkearney@hooperlundy.com>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Subject:** Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Jordan, Catherine, Andrew, and Sheryl,

Thank you for speaking with us yesterday afternoon. We appreciate you providing updates on the following items:

1. **Certifications of compliance for the interrogatory responses**

As discussed, we received your responses to interrogatories 1, 2, 3, 7, 9, 11, and 12. While we are still reviewing those interrogatory responses, we noted that they were produced without the required certifications of compliance. We understand that you currently are working with your clients to prepare amended responses to the interrogatories and that you currently anticipate that you will produce those amended responses with certifications of compliance in the format outlined in the CIDs within the next week or two. If you haven't produced the amended answers and certifications by April 26, please provide an update on your progress and expected timeline on or before that date.

We also discussed using one of our next calls to set target deadlines for your clients to respond to the remaining interrogatories.

2. **Compliance changes**

We understand that our CIDs have prompted your clients to begin making compliance changes and that you expect to be in a position to share more information about those compliance changes in the next few weeks.

3. **Custodial document review**

We understand that you have completed your sample review of custodial emails and that you intend

to use technology-assisted review to review the custodial documents (plus families) that hit on the search terms that we shared with you on March 7 and the terms that you shared with us on February 16. We further understand that you are working with your vendor to prepare a draft TAR protocol (including the information that we requested in my March 25 email) for our review. Please aim to provide that draft TAR protocol by May 2. We then will review the draft TAR protocol with our e-discovery team and get back to you with any questions or revisions. If you anticipate needing more time, please just let us know in advance of May 2.

4. **Slack data**

On our call, you proposed using a custodial approach to identifying responsive Slack messages, starting with the same nine priority custodians that you are prioritizing for the non-Slack custodial document review. Those nine custodians are Dr. Bill Releford, Dr. Christopher Otiko, Amador Miranda, Jerome Cannon, Dr. Allyson Pizzo Berkey, Dr. Sherman Washington, Dr. Joseph Palumbo, Dr. Owen Ellington, and Dr. Richard Park. We agree that this is an appropriate place to begin a custodial review of the Slack messages. In terms of next steps, we understand that you will get back to us in the next week or two (by May 2) with your proposed process for reviewing those Slack messages. During our discussion, you floated the possibility of running the March 7 and February 16 search terms against 24-hour snippets of Slack conversation. You proposed then reviewing any 24-hour snippets that hit on those search terms and producing portions of the 24-hour snippets of conversation. We expressed concern that this approach likely would be too narrow to ensure compliance with the CIDs. Chat messages typically contain shorthand, lingo, and nuance that likely will be difficult to decipher and distinguish from the responsive contents of the chat message, making it likely that this approach would result in your clients withholding responsive information and important context. Moreover, there is no basis for withholding non-responsive portions of responsive documents. Just as an entire email thread containing responsive information must be produced even if the thread also contains non-responsive information, the complete 24-hour conversation snippets containing responsive information should be produced as well. As it is, by focusing on 24-hour snippets, we likely will be receiving truncated portions of longer conversation threads in many cases.

We also discussed that, in addition to a custodial approach, you should begin reviewing all Slack channels that contain the word "biologic" or "biologics" in their channel name. If any of those channels contains responsive information, they should be produced in their entirety.

We are continuing to learn more throughout the course of our ongoing investigation, including as we receive responsive documents and additional interrogatory responses from your clients. Thus, we anticipate that, in addition to adding the remaining custodians, we will continue to ask you to refine your process for identifying, reviewing, and producing responsive documents. As always, we continue to reserve our rights to fully enforce the CIDs if your document review process does not identify all documents responsive to the CIDs.

5. **Employee and contractor contracts**

We asked you to prioritize producing the contracts between your clients and their employees and contractors.  We understand that you already have collected many of these contracts from your clients, and you are working to organize them.  Given that the contracts are unlikely to contain privileged information, we asked that you promptly begin producing those contracts.  <u>By May 2</u>, please either produce all of the contracts or provide an update on your timeline for producing the contracts.

6. **Criminal investigation**

You asked us whether there is a related criminal investigation.  As we explained, we are civil attorneys pursuing a civil investigation.  We cannot comment one way or the other as to the existence of any criminal investigation.

Best,

Jessica

Jessica M. Bergin
Trial Attorney
U.S. Department of Justice
Civil Division, Fraud Section
(202) 305-4207
Jessica.Bergin@usdoj.gov

# Exhibit 26

| From: | Catherine S. Wicker |
|---|---|
| To: | Hill, Laura E (CIV) |
| Cc: | Thiess, David (USACAE); Bergin, Jessica (CIV); Andrew R. Hayes; Sheryl B. Xavier |
| Subject: | [EXTERNAL] RE: Wound Pros |
| Date: | Friday, May 17, 2024 8:33:49 PM |
| Attachments: | 2024-05-17 - OpenText TAR Protocol (WP CID).pdf |

Hi Laura,

Please find attached for your review, a proposed TAR protocol for email communications. Regarding a proposed production timeline for Slack data, as mentioned in prior correspondence, we are unable to determine at this time how much the compressed Slack data will expand upon upload to our e-discovery platform. We are working with our vendor to import Slack data and will be able to provide more details in the next few weeks, including a projected timeline.
With respect to the certificates of compliance and amended interrogatory responses, we will provide an update by May 22, 2024.

Finally, we are seeking clarification on the scope of email/Slack review. It was our understanding that such review is in connection with Request Nos. 2, 4, 6, and 8, which seek Wound Pros "communications." We would appreciate any guidance that you can provide and will be happy to schedule a call for later next week so that we can clear up any confusion.

Thank you and I hope you have a great weekend.

Sincerely,

**Catherine S. Wicker**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 619.744.7311    MAIN: +1 619.744.7300    FAX: +1 619.230.0987
cwicker@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Sent:** Wednesday, May 15, 2024 10:32 AM
**To:** Andrew R. Hayes <arhayes@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>; Catherine S. Wicker <cwicker@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Subject:** RE: Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Andrew,

The Wound Pros Entities have yet to produce any emails or Slack data in response to the CIDs, despite service of the CIDs in September of last year and repeated requests by the DOJ to prioritize these two document categories. In fact, the Wound Pros Entities have yet to provide even a proposed protocol or production timeline for emails or Slack data.

As such, by Friday, May 17, please provide the following:

1. The proposed TAR protocol for the email review
2. A proposed production timeline for Slack data
3. A proposed timeline for production of revised answers to previously answered interrogatories, certificates of compliance, and responses to the remaining interrogatories. If the Wound Pros Entities propose a deadline after Wednesday, May 22 for production of the revised answers and accompanying certificates of compliance, please provide additional explanation for the continued delay.

Also, I'm not sure I understand the final paragraph in your email, so I can't agree to the characterization. Please see my email from May 9.

We are available for a call if needed.

Best,
Laura

---

**From:** Andrew R. Hayes <arhayes@hooperlundy.com>
**Sent:** Tuesday, May 14, 2024 6:11 PM
**To:** Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Subject:** [EXTERNAL] RE: Wound Pros

Hi Laura,

We are currently finalizing the TAR protocol with our vendor to ensure that it addresses the specific points raised in your team's prior correspondence. The last remaining item that we are discussing is a strategy for handling documents excluded from TAR, and specifically the procedure for any communications that require translation. We appreciate your patience here and we will provide another update by Friday, May 17, 2024.

Regarding a proposed production timeline for Slack data, we are working with our vendor to import Slack data simultaneous with our commencement of TAR for email communications. We will be able

to provide more details on production of Slack data in the next few weeks, including a projected timeline. Currently, we are unable to determine how much the compressed Slack data will expand upon upload to our e-discovery platform. We do not want to set goals for Slack review and productions until we have the information needed to inform our estimates.

Also, we are continuing to work with our client on verifications and amended interrogatory responses and expect to provide another update by this Friday, May 17, 2024.

Finally, we appreciate your guidance that the scope of this review is consistent with what is called for in the CID. Our review of the CID confirms that the only document requests that seek Wound Pros "communications" are Nos. 2, 4, 6, and 8. Accordingly, we will take your prior e-mail as confirmation that we are responding to Request Nos. 2, 4, 6, and 8, for purposes of identifying responsive information and will develop our document review protocol with this understanding in mind.

Best,

**Andrew R. Hayes**
he/him/his

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7703    MAIN: +1 202.580.7700    FAX: +1 202.609.8931
arhayes@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Sent:** Thursday, May 9, 2024 4:24 PM
**To:** Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>; Andrew R. Hayes <arhayes@hooperlundy.com>
**Subject:** RE: Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Sheryl,

Thanks for your email. We'll look out for the proposed TAR protocol on or before May 14. If you are unable to finalize the protocol prior to that date, please provide an update and the date by which you expect to send the protocol.

We appreciate you providing more information on the production of the Slack messages and ask that you provide a proposed production timeline for that data, as well.

Also, based on your 4/26 email, we had understood that you would be producing the amended interrogatory answers and certificates yesterday. Please provide an update.

Regarding the final paragraph of your email below, we agree that the proposed terms could return documents responsive to those document requests, but only you and your client are in a position to determine whether you've fully complied with the CID. We also reserve the right to request production of additional, responsive documents based on those documents requests.

Best,
Laura

**From:** Sheryl B. Xavier <sxavier@hooperlundy.com>
**Sent:** Thursday, May 09, 2024 1:10 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; O'Connor, John (CIV) <John.O'Connor2@usdoj.gov>
**Subject:** [EXTERNAL] RE: Wound Pros

Hi Jessica,

Unfortunately, we cannot provide you with a firm date for circulation of our proposed TAR protocol because we are still in the process of finalizing it with our vendor. We will give you with a status update by next Tuesday, May 14, 2024, if we do not receive the final protocol before then.

Regarding our proposed process for reviewing Slack messages, you are correct that we proposed using a custodial approach to identify responsive Slack messages, starting with the same nine custodians that we are prioritizing for the non-Slack document review. We plan to run the 162 search terms provided by the DOJ against this Slack data and produce the entire 24-hour chat thread if it includes responsive information. You expressed concern in your April 19 email that our proposal, as discussed during our April 18 call, was too narrow to ensure compliance with the CID. To clarify, we do not intend to only produce portions of 24-hour increments of conversations.

Additionally, we will also produce Slack channels containing the words "biologics" or "biologics" in their channel name. If any of these channels contain responsive information, then we will produce the non-privileged responsive information in its entirety.

Finally, we wanted to confirm that WP's production of email and Slack communications is responsive to certain document requests listed in the CID. As you may recall, in our correspondence dated February 16, 2024, we had proposed e-mail search terms that corresponded to specific document requests in the CID—namely, Nos. 2, 4, 6, and 8. In response, you circulated 162 search terms

without indicating which requests they were directed to. It is our understanding that we are responding to Request Nos. 2, 4, 6, and 8, for purposes of identifying responsive information. Please let us know if you have a different understanding.

Thank you,

**Sheryl B. Xavier**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7716     MAIN: +1 202.580.7700     FAX: +1 202.609.8931
sxavier@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Sent:** Friday, May 3, 2024 12:16 PM
**To:** Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; O'Connor, John (CIV) <John.O'Connor2@usdoj.gov>
**Subject:** RE: Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Sheryl,

By which date are you aiming to provide your draft of the proposed TAR protocol for the custodial document review?  Please also let us know the target date by which you expect to share your proposed process for reviewing Slack messages.  We were expecting to receive both of those items by yesterday.  We understand that you need additional time, but we would appreciate more specific information about the target deadlines that you have in mind.

Best,

Jessica

**From:** Sheryl B. Xavier <sxavier@hooperlundy.com>
**Sent:** Thursday, May 2, 2024 6:03 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Cc:** Thiess, David (USACAE) <DThiess@usa.doj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>;

Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; O'Connor, John (CIV) <John.O'Connor2@usdoj.gov>
**Subject:** [EXTERNAL] RE: Wound Pros

Hi Jessica,

As an update on the development of a TAR protocol, please be advised that we are still working with our vendor to develop a formal protocol for your review, which addresses the specific questions listed in your March 25, 2024, email. We will circulate it once it is ready.

Best,

**Sheryl B. Xavier**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7716    MAIN: +1 202.580.7700    FAX: +1 202.609.8931
sxavier@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Andrew R. Hayes <arhayes@hooperlundy.com>
**Sent:** Friday, April 26, 2024 2:16 PM
**To:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>; Catherine S. Wicker <cwicker@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Subject:** RE: Wound Pros

Hi Jessica,

Thanks for your summary, we have a few responses and clarifications, please let us know if you have any questions on the below:

1. **Certifications of Compliance**: We are still working with our client to prepare amended responses and hope to provide them to you along with their certifications by May 8, 2024. If for some reason we are unable to do so by that date, we will update you accordingly.

2. **Compliance Changes**: You are correct that certain compliance changes are in process. We will provide information about those changes at an appropriate time.

3. **Custodial Document Review**: You referenced two sets of search terms that we previously exchanged. To be clear, the Wound Pros has only agreed to review and produce e-mails from the universe of documents that hit on the 162 terms proposed by the DOJ. We provided a hit report describing that universe in our March 18, 2024 e-mail.

4. **Slack Data**: We are working with our vendor to load all historic data and parse that data into 24-hour segments, containing: (i) messages to/from identified custodians, and (ii) channels with "biologic*" in the name. We understand that the investigation is ongoing, but please note that processing Slack data in this manner requires uploading nearly a terabyte of data to our e-discovery platform for processing, which entails significant costs.

5. **Employee and Contractor Contracts:** As discussed, we will produce the contracts we have previously collected, and then proceed to assess whether any relevant contracts remain to be collected.

6. **Criminal Investigation**: We appreciate your offer to connect with a criminal AUSA in your offices regarding this investigation. We will follow-up if it would be helpful to schedule a call with your colleagues in the criminal section.

Best,
**Andrew R. Hayes**
he/him/his

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 202.580.7703    MAIN: +1 202.580.7700    FAX: +1 202.609.8931
arhayes@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Bergin, Jessica (CIV) <Jessica.Bergin@usdoj.gov>
**Sent:** Friday, April 19, 2024 9:05 AM
**To:** Jordan Kearney <jkearney@hooperlundy.com>; Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>; Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Subject:** Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Jordan, Catherine, Andrew, and Sheryl,

Thank you for speaking with us yesterday afternoon. We appreciate you providing updates on the following items:

1. **Certifications of compliance for the interrogatory responses**

As discussed, we received your responses to interrogatories 1, 2, 3, 7, 9, 11, and 12. While we are still reviewing those interrogatory responses, we noted that they were produced without the required certifications of compliance. We understand that you currently are working with your clients to prepare amended responses to the interrogatories and that you currently anticipate that you will produce those amended responses with certifications of compliance in the format outlined in the CIDs within the next week or two. If you haven't produced the amended answers and certifications by April 26, please provide an update on your progress and expected timeline on or before that date.

We also discussed using one of our next calls to set target deadlines for your clients to respond to the remaining interrogatories.

2. **Compliance changes**

We understand that our CIDs have prompted your clients to begin making compliance changes and that you expect to be in a position to share more information about those compliance changes in the next few weeks.

3. **Custodial document review**

We understand that you have completed your sample review of custodial emails and that you intend to use technology-assisted review to review the custodial documents (plus families) that hit on the search terms that we shared with you on March 7 and the terms that you shared with us on February 16. We further understand that you are working with your vendor to prepare a draft TAR protocol (including the information that we requested in my March 25 email) for our review. Please aim to provide that draft TAR protocol by May 2. We then will review the draft TAR protocol with our e-discovery team and get back to you with any questions or revisions. If you anticipate needing more time, please just let us know in advance of May 2.

4. **Slack data**

On our call, you proposed using a custodial approach to identifying responsive Slack messages, starting with the same nine priority custodians that you are prioritizing for the non-Slack custodial document review. Those nine custodians are Dr. Bill Releford, Dr. Christopher Otiko, Amador

Miranda, Jerome Cannon, Dr. Allyson Pizzo Berkey, Dr. Sherman Washington, Dr. Joseph Palumbo, Dr. Owen Ellington, and Dr. Richard Park. We agree that this is an appropriate place to begin a custodial review of the Slack messages. In terms of next steps, we understand that you will get back to us in the next week or two (by May 2) with your proposed process for reviewing those Slack messages. During our discussion, you floated the possibility of running the March 7 and February 16 search terms against 24-hour snippets of Slack conversation. You proposed then reviewing any 24-hour snippets that hit on those search terms and producing portions of the 24-hour snippets of conversation. We expressed concern that this approach likely would be too narrow to ensure compliance with the CIDs. Chat messages typically contain shorthand, lingo, and nuance that likely will be difficult to decipher and distinguish from the responsive contents of the chat message, making it likely that this approach would result in your clients withholding responsive information and important context. Moreover, there is no basis for withholding non-responsive portions of responsive documents. Just as an entire email thread containing responsive information must be produced even if the thread also contains non-responsive information, the complete 24-hour conversation snippets containing responsive information should be produced as well. As it is, by focusing on 24-hour snippets, we likely will be receiving truncated portions of longer conversation threads in many cases.

We also discussed that, in addition to a custodial approach, you should begin reviewing all Slack channels that contain the word "biologic" or "biologics" in their channel name. If any of those channels contains responsive information, they should be produced in their entirety.

We are continuing to learn more throughout the course of our ongoing investigation, including as we receive responsive documents and additional interrogatory responses from your clients. Thus, we anticipate that, in addition to adding the remaining custodians, we will continue to ask you to refine your process for identifying, reviewing, and producing responsive documents. As always, we continue to reserve our rights to fully enforce the CIDs if your document review process does not identify all documents responsive to the CIDs.

5. **Employee and contractor contracts**

We asked you to prioritize producing the contracts between your clients and their employees and contractors. We understand that you already have collected many of these contracts from your clients, and you are working to organize them. Given that the contracts are unlikely to contain privileged information, we asked that you promptly begin producing those contracts. By May 2, please either produce all of the contracts or provide an update on your timeline for producing the contracts.

6. **Criminal investigation**

You asked us whether there is a related criminal investigation. As we explained, we are civil attorneys pursuing a civil investigation. We cannot comment one way or the other as to the existence of any criminal investigation.

Best,

Jessica

Jessica M. Bergin
Trial Attorney
U.S. Department of Justice
Civil Division, Fraud Section
(202) 305-4207
Jessica.Bergin@usdoj.gov

# Exhibit 26.1

**opentext**™                                    The Information Company

## 1)    The TAR tool name and version:

OpenText Axcelerate discovery software using proprietary machine learning engine in a TAR 2.0, Continuous Active Learning workflow.

## 2)    Whether TAR is being administered in-firm or through a vendor

TAR is administered by a vendor, OpenText, using Axcelerate discovery software.

## 3)    How you plan to train TAR; Attorney review of an initial sample set;

Attorney coding decisions inform the continuous active learning model. Starting with the review of an estimation sample, a ranking model is initiated and continuously updated by all subsequent attorney coding of documents.

## 4)    Who will be involved in training TAR:

The first coding decisions will be made by Hooper Lundy & Bookman attorneys, via review of the estimation sample that will initiate the TAR ranking. Additional attorney coding continues to inform the model. As this is a continuous learning model, all coding decisions update the algorithm.

## 5)    All ESI sources that will be collected in connection with your review

Email, Slack message data.

## 6)    Any parameters that you plan to use to cull ESI before running it through TAR, including any process that you propose using to review and produce documents contained within email threads

The collected data was refined by search terms and date limitations. The resulting data was deduplicated using global deduplication on a family level. The surviving documents are subject to the TAR 2.0 review workflow.

**opentext.com**

275 Frank Tompa Drive Waterloo, ON N2L 0A1 | Phone: 519-888-7111 | Fax: 519-888-0677

**opentext™**

7)    All categories of documents that will be excluded from TAR, including your plans for providing us with information about file types and ESI volume by file type;

All documents without extracted or OCR generated text (e.g. certain images, audio, video, etc.) are excluded from the TAR workflow. Additionally, documents identified as having a predominant non-English language will be excluded from the TAR workflow.

We propose providing detail about this population by preparing a report including: unique document ID, document date, mime type, file extension, file size. Additional metadata can be provided if requested.

8)    How you will handle review of the documents excluded from TAR;

We intend to conduct a document-by-document, linear review of documents unsuitable for TAR (e.g. no text documents, documents in a non-English language). Coding may be propagated to hash duplicates where responsiveness is apparent on the face of the document.

9)    Which interim metrics you will provide to DOJ, including the file types and de-duplicated counts of processed documents being included in and excluded from TAR, updates on training progress, and the size, richness, confidence level, and confidence interval of the initial training set;

We will provide snapshot tagging counts of identified responsive documents, which provides insight into progress of the review when compared to the expected number of responsive documents from the estimation sample. Additional metrics or statistics can be provided if requested.

10)    The stages at which you will provide interim metrics

We will provide monthly updates about the progress of the review.

**opentext**™                                    The Information Company

## 11)    How you will handle quality control and validation, including the metrics that you will provide to DOJ at your proposed review cutoff (including sample size, R-Set document volumes, F-measure, recall, precision, richness, elusion rate, rank cutoff, confidence level, and confidence interval);

Our review workflow involves comprehensive quality control at multiple stages, ensuring high quality coding. Random samples of reviewed documents are drawn to confirm tagging accuracy. Tranches of reviewed data are scrutinized with a second level review.

Our workflow validates using an elusion sample to calculate Recall (calculated as: Responsive documents coded ÷ (Responsive documents coded PLUS estimated number of Responsive documents in null set based on the elusion sample). This calculation is expressed as a percentage.

Metrics requested below can be included in reporting to DOJ.

| | |
|---|---|
| a. Sample size | 392 documents |
| b. R-Set Document Volumes | Further explanation of this metric is requested |
| c. F-measure | n/a for our workflow |
| d. Recall | 80% (target) |
| e. Precision | With TAR 2.0, production precision is nominally 100% (since only responsive documents and their families are being produced). |
| f. Richness | Calculated from estimation sample review |
| g. Elusion Rate | n/a, although we use an elusion sample to calculate recall, we do not calculate an elusion rate |
| h. Rank Cutoff | we do not apply a rank cutoff; rather, we continue to review until the validation sample confirms that we have achieved our recall objective |
| i. Confidence Level | 95 |
| j. Confidence Interval | 5 |

## Confirmation that non-privileged responsive documents identified through the validation process will be produced and identified.

Any responsive document identified during elusion sampling will be produced, provided that it is not privileged.

**opentext.com**

275 Frank Tompa Drive Waterloo, ON N2L 0A1 | Phone: 519-888-7111 | Fax: 519-888-0677

# Exhibit 27

| From: | Hill, Laura E (CIV) |
|---|---|
| To: | Catherine S. Wicker; Andrew R. Hayes; Sheryl B. Xavier |
| Cc: | Thiess, David (USACAE) |
| Subject: | Wound Pros |
| Date: | Friday, May 31, 2024 8:43:00 AM |

Catherine, Andrew, and Sheryl:

Thank you for speaking with us on May 24 and again on May 28 regarding the below items.

TAR Protocol and Slack

1. On both calls, we stated that the scope of relevance for TAR should encompass all of the document requests in the CID and should <u>not</u> be limited to only certain document requests in the CID. Please refer to the definitions in Attachment A of the CID which identifies that "document" and "documents" "are used in the broadest sense . . . and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations."

2. The email universe for TAR is approximately 740,000 emails. You expect that most of the data will be reviewable by TAR.

3. You are currently drafting a review protocol for the contract reviewers that will be reviewing documents for TAR. None of the approximately 740,000 documents have been reviewed to date.

4. You have not uploaded any non-email documents or data to your document review platform and, at this time, do not intend to include any non-email data (such as hard copy documents, word processing documents (i.e. Microsoft Word files), spreadsheets, or other standalone ESI) in TAR. You are unfamiliar with your clients' folder structures and were unable to confirm whether such responsive documents exist.

5. You identified that you have collected the entirety of the companies' Slack data, including channels and messages between two or more users. You intend to upload all Slack data for all employees since 2019 to your document review platform. This includes all messages and all chatroom discussions. You are processing the data in 24-hour time frames.

6. You reiterated that you intend to produce all Slack channels that hit on the term "biologic" or "biologics."

7. Regarding privilege, you intend to code for responsiveness and privilege at the same time during TAR. For every document marked as privileged, a second-level, quality control review will be completed. If the document is marked as privileged in that second-level review, it will not be produced and will be included on a privilege tracker. You intend to produce the privilege tracker.

8. At this time, you are unable to provide estimated timelines or additional information regarding the following:
   A. Email production/TAR:
      i. The date by which you will have a draft review protocol for your contract reviewers;
      ii. When the review of emails will begin;
      iii. What interim metrics you intend to provide to DOJ; and
      iv. A projected production timeline.
   B. Slack
      i. Whether Slack data will be reviewed using TAR;

           ii. A date by which you will decide whether you would like to include Slack data in the TAR protocol;

          iii. When you will begin to expand the Slack data;

          iv. When the Slack data will be fully expanded and uploaded to the review database;

          v. When the Slack review will commence;

          vi. When you will produce Slack channels that include the terms "biologic" or "biologics;" and

          vii. A projected production timeline for responsive Slack data.

8. You had identified that you were conferring with OpenText on whether providing the results of the initial sample set shortly after completing review of the sample set would impact the review.

Interrogatories

1. You expect to produce the final, amended interrogatories with certifications of compliance by today, **May 31**.

2. You will provide a timeline for answering the remaining interrogatories by **June 11**.

Dr. Otiko

1. You notified us that Dr. Otiko had left Wound Pros and affiliated entities and that Ralph Cetrulo has taken over for Dr. Otiko.

2. You were unable to answer:

    A. Which Wound Pros entities Dr. Otiko left;

    B. The circumstances of Dr. Otiko leaving Wound Pros;

    C. Whether Dr. Otiko has sold his interest in any Wound Pros entities; and

    D. If so, to whom Dr. Otiko sold his interest.

We request a call to further discuss Dr. Otiko's departure from Wound Pros. Please let us know your availability for next week.

And, finally, we wanted to notify you that we are seeking internal authority to enforce the CIDs to the Wound Pros entities. We hope that significant progress is made in the near future and that we are not required to file a petition. We are happy to further discuss.

Laura

Laura Hill
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch, Fraud Section
(202) 598-3962
Laura.E.Hill@usdoj.gov

# Exhibit 28

## Filed Under Seal

# Exhibit 29

## Filed Under Seal

# Exhibit 30

## Filed Under Seal

# Exhibit 31

# Filed Under Seal

# Exhibit 32

# Filed Under Seal

# Exhibit 33

| From: | Hill, Laura E (CIV) |
|---|---|
| To: | Catherine S. Wicker |
| Cc: | Sheryl B. Xavier; Andrew R. Hayes; Thiess, David (USACAE) |
| Subject: | RE: Wound Pros CID - Amended Responses to Interrogatories |
| Date: | Wednesday, June 05, 2024 2:47:00 PM |
| Attachments: | image001.png |

Counsel:

We received Wound Pros' answers for Interrogatories 2, 3, 7, 11, and 12 and have the below comments and questions.

Interrogatory 2

- Some of the information in the answers to Interrogatory 2 conflicts with Interrogatory 11. For instance, the answer to interrogatory 2 lists Christopher Otiko as the sole owner of Wound Pros Management Group, whereas the answer to interrogatory 11 lists Bill Releford as the current owner and Otiko as a 50% former owner. The answer to Interrogatory 2 also lists Otiko as a "shareholder" but states that he is not an owner. Can you please explain these conflicts?
- You requested clarification regarding the term "return on investment." "Return on investment" is the financial return or any other material result or benefit obtained by any investor or other financial supporter.

Interrogatory 3

- You requested clarification regarding the word "interacted." "Interacted" means worked with, reported to, employed by, volunteered for, contracted with, consulted for, represented, or advised.
- Your answer did not respond to 3(j) or (l) on that basis that such requests are "vague, ambiguous, overly broad, and unduly burdensome." Please provide further detail on what requires clarification for 3(j) and 3(l).

Interrogatory 7

- You sought additional clarification regarding the term "affiliated." "Affiliation" has the meaning set forth in 42 CFR § 424.502. Based on this definition, please confirm whether the answer to Interrogatory 7 is complete, or, if an amendment is required, the date by which you will amend this interrogatory answer.

Interrogatory 9

- We received a certificate of compliance for Interrogatory 9 but did not receive the answer to Interrogatory 9. If that was an oversight, please provide the answer. If it was not an oversight, please let us know when you intend to answer Interrogatory 9.

Interrogatory 11

- For all entities who ceased providing professional services or ceased operations in March 2023, please provide current ownership.
- In column D, please define "Unrelated."
- You sought additional clarification regarding the term "affiliated." "Affiliation" has the

meaning set forth in 42 CFR § 424.502. Based on this definition, please confirm whether the answer to Interrogatory 11 is complete, or, if an amendment is required, the date by which you will amend this interrogatory answer.

Interrogatory 12

- This answer does not respond to the interrogatory. Please provide a date by which you will provide the information sought in the interrogatory.

Also, as mentioned in my May 31 email, we are requesting a call regarding Dr. Otiko's departure from Wound Pros. Please let us know your availability to discuss that topic. We are happy to discuss any of the above questions or comments regarding the interrogatories, as well, if needed.

Best,
Laura

---

**From:** Catherine S. Wicker <cwicker@hooperlundy.com>
**Sent:** Friday, May 31, 2024 8:21 PM
**To:** Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>; Thiess, David (USACAE) <DThiess@usa.doj.gov>
**Cc:** Sheryl B. Xavier <sxavier@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>
**Subject:** [EXTERNAL] RE: Wound Pros CID - Amended Responses to Interrogatories

Counsel,

I just realized that Kevin Smith's signature was inadvertently removed by our firm's email scrubber. Please see attached letter.

Thank you,

**Catherine S. Wicker**
she/her/hers

---

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 619.744.7311    MAIN: +1 619.744.7300    FAX: +1 619.230.0987
cwicker@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Catherine S. Wicker <cwicker@hooperlundy.com>
**Sent:** Friday, May 31, 2024 5:13 PM
**To:** Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>; Thiess, David (USACAE) <David.Thiess@usdoj.gov>
**Cc:** Sheryl B. Xavier <sxavier@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>

**Subject:** Wound Pros CID - Amended Responses to Interrogatories

Dear Counsel,

Please find attached and linked below Wound Pros Entities' objections and amended responses to Interrogatories 2, 3, 7, 11, and 12. Please note that additional certifications and an amended response to Interrogatory No. 1 will follow next week.

https://health-law.sharefile.com/d-s6297eefaaa954b0290a16b1adb85938a

A password will be sent under separate cover. Please let us know if you have any issues accessing the documents. Thank you and have a great weekend.

Sincerely,

**Catherine S. Wicker**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
101 W. Broadway, Suite 1200
San Diego, CA 92101
DIRECT: +1 619.744.7311    MAIN: +1 619.744.7300    FAX: +1 619.230.0987
cwicker@hooperlundy.com | www.hooperlundy.com

BOSTON | DENVER | LOS ANGELES | SAN DIEGO | SAN FRANCISCO | WASHINGTON, DC

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

# Exhibit 34

| From: | Hill, Laura E (CIV) |
|---|---|
| To: | Catherine S. Wicker; Andrew R. Hayes; Sheryl B. Xavier |
| Cc: | Thiess, David (USACAE) |
| Subject: | RE: Wound Pros |
| Date: | Monday, June 17, 2024 9:09:00 PM |

Catherine, Andrew, Sheryl:

Thank you for speaking with us on Friday, June 14 regarding the below items.

**TAR**

- In your June 13 email you stated that a sample of the 740,000 documents has been reviewed. We understand from Friday's discussion that all of those documents with need to be re-reviewed because the scope of the initial review only considered a subset of the CIDs' document requests.
- You have drafted the document review protocol and provided it to your vendor.
- You have scheduled a kickoff call with your e-discovery vendor for Thursday, June 20. During the kickoff call, you intend to meet the team of document reviewers, train the reviewers on the document review protocol, discuss interim TAR deadlines (such as when the Hooper Lundy team will be able to conduct a QA review), and discuss a timeline for productions. On **Friday, June 21**, you will provide us with the date by which the review of emails will begin, the interim TAR deadlines, and general email production deadlines.
- We understand that you intend to provide the items set forth in #9 and #11 of the TAR review protocol. You further notified us that you would consider providing additional metrics at our request. At this time, we are also requesting the results of the initial sampling set or estimation sample identified in paragraph #3 of the protocol. We understand that you intend to discuss this request at the kickoff meeting, so we ask that you provide a response by **Friday, June 21**.

**Slack**

- The Slack data has been expanded and uploaded to the e-discovery platform.
- On June 13, you notified us that the Slack data consists of approximately 95,000 documents or about 168,600 documents when including families. We asked how you were defining "document," and you stated you would respond to that question by **Friday, June 21**.
- The "biologics" channels are not included in the above totals. You intend to do an eyes-on review of these channels and expect to be able to produce those channels by the end of the month. You will provide a status update by **Friday, June 21**.
- You do not know whether you intend to use TAR for Slack data. That is because none of the Slack data has been reviewed. To make this determination, you intend to review approximately 400 Slack documents. I understand that two people, Andrew and Sheryl, will be reviewing those documents. They will not each be reviewing the 400 documents; each document will be reviewed only once. As of Friday, you did not intend to discuss the Slack data at Thursday's kickoff meeting because, due to bandwidth issues, Andrew and Sheryl will likely not be able to complete the review of 400 documents before Thursday. You agreed to provide an update on the review of the 400 documents by **Friday, June 21**.
- Unlike the privilege review you have detailed for emails (and as outlined in my May 31 email), you intend to do an eyes-on review of all Slack data that is produced.

You are unsure whether the document review protocol for emails will also apply to Slack data. You may need to create a new document review protocol and retrain the reviewers.

- You are unable to provide a date by which you will decide whether you would like to include Slack data in the TAR protocol.
- You are unable to provide a date by which the Slack review will commence.
- You are unable to provide a projected production timeline for the approximately 95,000 documents.

**Other documents sought in the CID**

- You have not uploaded any non-email documents or data to your document review platform and, at this time, do not intend to include any non-email data (such as hard copy documents, word processing documents (i.e. Microsoft Word files), spreadsheets, or other standalone ESI) in TAR. You are unfamiliar with your clients' folder structures and were unable to confirm whether such responsive documents exist.
- You stated that you have not focused on non-email, non-Slack documents because you are focused on producing emails and Slack data and answering interrogatories. We agreed to your plan to prioritize the emails, Slack data, and answers to interrogatories but asked that you provide additional information regarding these additional documents as you receive it.

**Interrogatories**

- Interrogatory 1
  - You had initially notified us that you would answer Interrogatory 1 by May 31.
  - On May 31, you stated that the answer would be provided the following week, June 3-7.
  - On our June 14 call, you notified us that Dr. Releford is taking the lead in answering Interrogatory 1. He was out of town last week but is back in town this week.
  - You will provide a date by which you will provide an answer on Interrogatory 1 by **Friday, June 21**.
- Interrogatories 2, 3, 7, 11, 12
  - After we received your May 31 responses, we, on June 5, 2024, sought clarifications and asked several question, and we clarified certain terms for you as requested in your May 31, 2024, production letter. We also notified you that the answer to Interrogatory 12 did not respond to the interrogatory.
  - You sought clarification regarding the manner in which your answer to Interrogatory 12 failed to respond to the interrogatory. As discussed during the call, Interrogatory 12 asks the recipient to "**Describe Your relationship with each of the following entities, including any** ownership interest**, financial relationship, and overlap in providers, services, or patients**." The May 31 answer does not respond to the bolded sections of the interrogatory. You agreed, and further agreed to provide a date by which you would fully answer the interrogatory by **Friday, June 21**.
- You will provide a projected timeline for answering all remaining interrogatories by **Friday, June 21**.
- We stated that we would prefer a rolling production of the interrogatory answers. With that in mind, you notified us that you expect to be able to produce the answer to Interrogatory 8 by **Friday, June 21**.
- We understand Interrogatory 9 is the only interrogatory that has been fully and completely

answered.

**Dr. Otiko**
- You notified us that Dr. Otiko has left all "Wound Pros entities" but are checking on what entities are included in "Wound Pros entities." You will respond to this inquiry by **Friday, June 21**.
- You are checking whether Dr. Otiko touches the finances of any of the Wound Pros entities, including whether he still financially benefits from any of the entities. You will provide an answer to this question by **Friday, June 21**.
- You are unsure whether Dr. Otiko continues to communicate with the current managers and owners of the Wound Pros entities.

As always, we are happy to discuss any of the above.

Best,
Laura

**From:** Catherine S. Wicker <cwicker@hooperlundy.com>
**Sent:** Thursday, June 13, 2024 9:24 PM
**To:** Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>; Thiess, David (USACAE) <DThiess@usa.doj.gov>
**Cc:** Andrew R. Hayes <arhayes@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Subject:** [EXTERNAL] RE: Wound Pros

Dear Laura and David,

We appreciate your May 31, 2024 correspondence concerning Wound Pros' progress in responding to the CID. We communicated your concerns to the client and would like to reiterate that Wound Pros (WP) is committed to fully cooperating with the CID. We anticipate greater progress on both the remaining interrogatories and the email and Slack reviews.

In advance of our meeting tomorrow, we wanted to provide you with an update on our progress and a response to the various issues raised in your email below.

TAR Protocol and Slack

-
We understand your position and have refined our Document Review Protocol to address all of the document requests in the CID. Please know that the Document Review Protocol has been completed and submitted to our e-discovery vendor, OpenText. Additionally, your assertion that none of the approximately 740,000 documents have been reviewed is incorrect. To clarify, a sample of documents from the 740,000 was previously reviewed to inform the vendor's TAR parameters as well as develop the document review protocol. Consistent with item #9 in the TAR Protocol provided by OpenText, which we previously shared with you, we will provide snapshot tagging counts of identified responsive documents on a monthly basis. We can consider additional metrics if you have specific requests.

With regards to review of Slack messages, we have collected the entirety of the companies' Slack data, including channels and messages between two or more users, and have uploaded all Slack data for all employees since 2020 to our document review platform. This includes all messages and all chatroom discussions, and we are processing the data in 24-hour time frames. We intend to produce all Slack channels that hit on the term "biologic" or "biologics."

Our vendor reports the scope of review (not including "biologics" channels) is approximately 95,045 documents; 168,651 including families. We are not able to offer a production timeline at this time, but expect to move quickly to begin either TAR or linear review after we have marked the Slack sample and conferred with the vendor on the best approach. Additionally, to correct an error from our last call: we reported that Slack data dates back to 2019, but the Slack platform was actually implemented in November 2020. We apologize for the error and want to reassure you that we have collected all Slack data since the implementation of the platform.

Finally, you are correct that the scope of the current review is limited to e-mail communications, Slack data, and the documents included with that data. We will address your request for additional information regarding other document repositories with our client.

Interrogatories

On May 31, 2024, we provided amended responses to Interrogatory Nos. 2, 3, 7, 11, and 12. We received your follow-up communication regarding the amended responses and are currently working to address your questions. As noted in my June 6 email, we would appreciate further clarification from you as to what additional information you are seeking from WP's amended response to Interrogatory No. 12.

We are currently working with the client to prepare responses to the remaining interrogatories as well as an amended response to Interrogatory No. 1, with certifications. If it is your preference, we can produce responses to the interrogatories on a rolling basis as the client completes them.

Dr. Otiko

Regarding Dr. Otiko's departure, please be advised that he has disengaged from all WP entities. The circumstance that prompted Dr. Otiko's departure was his preclusion from the Medicare program and the termination of entities associated with Dr. Otiko, from Medicare. WP was understandably concerned by this and made the prudent decision to separate from him. Wound Pros Management Group, Inc. repurchased all shares owned by Dr. Otiko.

\*\*\*\*\*

We look forward to speaking with you soon.

Sincerely,

**Catherine S. Wicker**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 619.744.7311    MAIN: +1 619.744.7300    FAX: +1 619.230.0987
cwicker@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Sent:** Friday, May 31, 2024 5:43 AM
**To:** Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>
**Subject:** Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Catherine, Andrew, and Sheryl:
Thank you for speaking with us on May 24 and again on May 28 regarding the below items.
TAR Protocol and Slack

1. On both calls, we stated that the scope of relevance for TAR should encompass all of the document requests in the CID and should not be limited to only certain document requests in the CID. Please refer to the definitions in Attachment A of the CID which identifies that "document" and "documents" "are used in the broadest sense . . . and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations."
2. The email universe for TAR is approximately 740,000 emails. You expect that most of the data will be reviewable by TAR.
3. You are currently drafting a review protocol for the contract reviewers that will be reviewing documents for TAR. None of the approximately 740,000 documents have been reviewed to date.
4. You have not uploaded any non-email documents or data to your document review platform and, at this time, do not intend to include any non-email data (such as hard copy documents, word processing documents (i.e. Microsoft Word files), spreadsheets, or other standalone ESI) in TAR. You are unfamiliar with your clients' folder structures and were unable to confirm whether such responsive documents exist.
5. You identified that you have collected the entirety of the companies' Slack data, including channels and messages between two or more users. You intend to upload all

Slack data for all employees since 2019 to your document review platform. This includes all messages and all chatroom discussions. You are processing the data in 24-hour time frames.

6. You reiterated that you intend to produce all Slack channels that hit on the term "biologic" or "biologics."

7. Regarding privilege, you intend to code for responsiveness and privilege at the same time during TAR. For every document marked as privileged, a second-level, quality control review will be completed. If the document is marked as privileged in that second-level review, it will not be produced and will be included on a privilege tracker. You intend to produce the privilege tracker.

8. At this time, you are unable to provide estimated timelines or additional information regarding the following:

   1. Email production/TAR:

      1. The date by which you will have a draft review protocol for your contract reviewers;
      2. When the review of emails will begin;
      3. What interim metrics you intend to provide to DOJ; and
      4. A projected production timeline.

   1. Slack

      1. Whether Slack data will be reviewed using TAR;
      2. A date by which you will decide whether you would like to include Slack data in the TAR protocol;
      3. When you will begin to expand the Slack data;
      4. When the Slack data will be fully expanded and uploaded to the review database;
      5. When the Slack review will commence;
      6. When you will produce Slack channels that include the terms "biologic" or "biologics;" and
      7. A projected production timeline for responsive Slack data.

2. You had identified that you were conferring with OpenText on whether providing the results of the initial sample set shortly after completing review of the sample set would impact the review.

Interrogatories

1. You expect to produce the final, amended interrogatories with certifications of compliance by today, **May 31**.
2. You will provide a timeline for answering the remaining interrogatories by **June 11**.

Dr. Otiko

1. You notified us that Dr. Otiko had left Wound Pros and affiliated entities and that Ralph Cetrulo has taken over for Dr. Otiko.
2. You were unable to answer:

   1. Which Wound Pros entities Dr. Otiko left;
   2. The circumstances of Dr. Otiko leaving Wound Pros;
   3. Whether Dr. Otiko has sold his interest in any Wound Pros entities; and

    4.  If so, to whom Dr. Otiko sold his interest.

We request a call to further discuss Dr. Otiko's departure from Wound Pros. Please let us know your availability for next week.

And, finally, we wanted to notify you that we are seeking internal authority to enforce the CIDs to the Wound Pros entities. We hope that significant progress is made in the near future and that we are not required to file a petition. We are happy to further discuss.

Laura


Laura Hill
Trial Attorney
U.S. Department of Justice
Civil Division
Commercial Litigation Branch, Fraud Section
(202) 598-3962
Laura.E.Hill@usdoj.gov

# Exhibit 35

| From: | Catherine S. Wicker |
|---|---|
| To: | Hill, Laura E (CIV); Thiess, David (USACAE) |
| Cc: | Andrew R. Hayes; Sheryl B. Xavier |
| Subject: | [EXTERNAL] RE: Wound Pros |
| Date: | Friday, June 21, 2024 8:33:08 PM |

Hi Laura and David,

Please find below our responses and updates. We hope you have a wonderful weekend.

Sincerely,

**Catherine S. Wicker**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 619.744.7311    MAIN: +1 619.744.7300    FAX: +1 619.230.0987
cwicker@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Sent:** Monday, June 17, 2024 6:09 PM
**To:** Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes <arhayes@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>
**Subject:** RE: Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Catherine, Andrew, Sheryl:
Thank you for speaking with us on Friday, June 14 regarding the below items.
**TAR**
1. In your June 13 email you stated that a sample of the 740,000 documents has been reviewed. We understand from Friday's discussion that all of those documents with need to be re-reviewed because the scope of the initial review only considered a subset of the CIDs' document requests.
2. You have drafted the document review protocol and provided it to your vendor.
3. You have scheduled a kickoff call with your e-discovery vendor for Thursday, June 20. During the kickoff call, you intend to meet the team of document reviewers, train the reviewers on the document review protocol, discuss interim TAR deadlines (such as when the Hooper

Lundy team will be able to conduct a QA review), and discuss a timeline for productions. On **Friday, June 21**, you will provide us with the date by which the review of emails will begin, the interim TAR deadlines, and general email production deadlines.

- **We met with our e-discovery vendor on Thursday, June 20, for a kick-off call and they advised that the email review will begin on June 21. The goal is that by the end of next week, documents will be ready for QC review by our team.**

4. We understand that you intend to provide the items set forth in #9 and #11 of the TAR review protocol. You further notified us that you would consider providing additional metrics at our request. At this time, we are also requesting the results of the initial sampling set or estimation sample identified in paragraph #3 of the protocol. We understand that you intend to discuss this request at the kickoff meeting, so we ask that you provide a response by **Friday, June 21**.

- **We are still discussing this request with the vendor and will get back to you next week.**

**Slack**

1. The Slack data has been expanded and uploaded to the e-discovery platform.
2. On June 13, you notified us that the Slack data consists of approximately 95,000 documents or about 168,600 documents when including families. We asked how you were defining "document," and you stated you would respond to that question by **Friday, June 21**.
3. The "biologics" channels are not included in the above totals. You intend to do an eyes-on review of these channels and expect to be able to produce those channels by the end of the month. You will provide a status update by **Friday, June 21**.

- **It is still our expectation that we can produce the "biologics" channels by the end of this month. We are diligently working to meet this goal.**

4. You do not know whether you intend to use TAR for Slack data. That is because none of the Slack data has been reviewed. To make this determination, you intend to review approximately 400 Slack documents. I understand that two people, Andrew and Sheryl, will be reviewing those documents. They will not each be reviewing the 400 documents; each document will be reviewed only once. As of Friday, you did not intend to discuss the Slack data at Thursday's kickoff meeting because, due to bandwidth issues, Andrew and Sheryl will likely not be able to complete the review of 400 documents before Thursday. You agreed to provide an update on the review of the 400 documents by **Friday, June 21**.

- **Andrew and Sheryl have been reviewing the 400 Slack documents and we anticipate producing relevant, non-privileged Slack communications from this subset by the end of next week.**

5. Unlike the privilege review you have detailed for emails (and as outlined in my May 31 email), you intend to do an eyes-on review of all Slack data that is produced.
6. You are unsure whether the document review protocol for emails will also apply to Slack data. You may need to create a new document review protocol and retrain the reviewers.
7. You are unable to provide a date by which you will decide whether you would like to include Slack data in the TAR protocol.
8. You are unable to provide a date by which the Slack review will commence.

9. You are unable to provide a projected production timeline for the approximately 95,000 documents.

**Other documents sought in the CID**

5. You have not uploaded any non-email documents or data to your document review platform and, at this time, do not intend to include any non-email data (such as hard copy documents, word processing documents (i.e. Microsoft Word files), spreadsheets, or other standalone ESI) in TAR. You are unfamiliar with your clients' folder structures and were unable to confirm whether such responsive documents exist.

6. You stated that you have not focused on non-email, non-Slack documents because you are focused on producing emails and Slack data and answering interrogatories. We agreed to your plan to prioritize the emails, Slack data, and answers to interrogatories but asked that you provide additional information regarding these additional documents as you receive it.

**Interrogatories**

1. Interrogatory 1
    1. You had initially notified us that you would answer Interrogatory 1 by May 31.
    2. On May 31, you stated that the answer would be provided the following week, June 3-7.
    3. On our June 14 call, you notified us that Dr. Releford is taking the lead in answering Interrogatory 1. He was out of town last week but is back in town this week.
    4. You will provide a date by which you will provide an answer on Interrogatory 1 by **Friday, June 21**.

    • **We are still working with the client to provide an amended response to Interrogatory No. 1.**

2. Interrogatories 2, 3, 7, 11, 12
    1. After we received your May 31 responses, we, on June 5, 2024, sought clarifications and asked several question, and we clarified certain terms for you as requested in your May 31, 2024, production letter. We also notified you that the answer to Interrogatory 12 did not respond to the interrogatory.
    2. You sought clarification regarding the manner in which your answer to Interrogatory 12 failed to respond to the interrogatory. As discussed during the call, Interrogatory 12 asks the recipient to "**Describe Your relationship with each of the following entities, including any** ownership interest, **financial relationship, and overlap in providers, services, or patients**." The May 31 answer does not respond to the bolded sections of the interrogatory. You agreed, and further agreed to provide a date by which you would fully answer the interrogatory by **Friday, June 21**.

    • **WP has made progress and is still working to amend its response to Interrogatory No. 12, which we anticipate producing next week.**

3. You will provide a projected timeline for answering all remaining interrogatories by **Friday, June 21**.

    • **As discussed on our call, we are unable to provide a definitive timeline as to when the remaining interrogatories will be answered. We are working diligently with the client to prepare those responses and, as agreed to on our June 14 call, we will produce them on a rolling basis. Our goal is to provide a response to Interrogatory No. 4 by next**

**Friday, June 28.**

4. We stated that we would prefer a rolling production of the interrogatory answers. With that in mind, you notified us that you expect to be able to produce the answer to Interrogatory 8 by **Friday, June 21**.

   - **WP provided a response to Interrogatory No. 8. The accompanying certification form will follow next week.**

5. We understand Interrogatory 9 is the only interrogatory that has been fully and completely answered.

**Dr. Otiko**

1. You notified us that Dr. Otiko has left all "Wound Pros entities" but are checking on what entities are included in "Wound Pros entities." You will respond to this inquiry by **Friday, June 21**.

   - **Dr. Otiko has completely separated from all Wound Pros entities listed in the CID.**

2. You are checking whether Dr. Otiko touches the finances of any of the Wound Pros entities, including whether he still financially benefits from any of the entities. You will provide an answer to this question by **Friday, June 21**.

   - **In connection with Dr. Otiko's complete separation from all of the Wound Pros entities, he resold all of his ownership interest in Wound Pros Management Group Inc. (the "Corporation"), effective May 1, 2024 for a purchase price (subject to potential future adjustment in accordance with a pending third party valuation) equal to fifty percent (50%) of the net income of the Corporation from May 1, 2024 until April 30, 2027, and thus Dr. Otiko could be considered to "benefit financially" from the Corporation, notwithstanding his complete divestment and separation from the Corporation, based on the purchase price for Dr. Otiko's shares of the Corporation. The parties chose this tentative purchase price (subject to the pending valuation) because: (1) they wished to consummate the sale of shares as quickly as practicable and not wait for the valuation to be completed; (2) the current value of Dr. Otiko's shares seemed highly uncertain given the unpredictability of the Corporation's future earnings in light of its recent rapid growth, on the one hand, and the ongoing investigation by the DOJ, on the other (as well as expected changes in Medicare reimbursement); (3) they were confident that Dr. Otiko's complete separation from the Corporation meant he would have no future ability to influence the Corporation's earnings or business prospects and thus, there would be no compliance concerns presented by a purchase price styled as an earnout; and (4) the purchase price would be subject to adjustment, if and as necessary, once the fair market valuation was completed.**

3. You are unsure whether Dr. Otiko continues to communicate with the current managers and owners of the Wound Pros entities.

As always, we are happy to discuss any of the above.

Best,
Laura

**From:** Catherine S. Wicker <cwicker@hooperlundy.com>
**Sent:** Thursday, June 13, 2024 9:24 PM
**To:** Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>; Thiess, David (USACAE) <DThiess@usa.doj.gov>
**Cc:** Andrew R. Hayes <arhayes@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Subject:** [EXTERNAL] RE: Wound Pros

Dear Laura and David,

We appreciate your May 31, 2024 correspondence concerning Wound Pros' progress in responding to the CID. We communicated your concerns to the client and would like to reiterate that Wound Pros (WP) is committed to fully cooperating with the CID. We anticipate greater progress on both the remaining interrogatories and the email and Slack reviews.

In advance of our meeting tomorrow, we wanted to provide you with an update on our progress and a response to the various issues raised in your email below.

TAR Protocol and Slack

-
We understand your position and have refined our Document Review Protocol to address all of the document requests in the CID. Please know that the Document Review Protocol has been completed and submitted to our e-discovery vendor, OpenText. Additionally, your assertion that none of the approximately 740,000 documents have been reviewed is incorrect. To clarify, a sample of documents from the 740,000 was previously reviewed to inform the vendor's TAR parameters as well as develop the document review protocol. Consistent with item #9 in the TAR Protocol provided by OpenText, which we previously shared with you, we will provide snapshot tagging counts of identified responsive documents on a monthly basis. We can consider additional metrics if you have specific requests.

-
With regards to review of Slack messages, we have collected the entirety of the companies' Slack data, including channels and messages between two or more users, and have uploaded all Slack data for all employees since 2020 to our document review platform. This includes all messages and all chatroom discussions, and we are processing the data in 24-hour time frames. We intend to produce all Slack channels that hit on the term "biologic" or "biologics."

Our vendor reports the scope of review (not including "biologics" channels) is approximately 95,045 documents; 168,651 including families. We are not able to offer a production timeline at this time, but expect to move quickly to begin either TAR or linear review after we have marked the Slack sample and conferred with the vendor on the best approach. Additionally, to correct an error from our last call: we reported that Slack data dates back to 2019, but the Slack platform was actually implemented in November 2020. We apologize for the error and want to reassure you that we have collected all Slack data since the implementation of the platform.

Finally, you are correct that the scope of the current review is limited to e-mail communications, Slack data, and the documents included with that data. We will address your request for additional

information regarding other document repositories with our client.

Interrogatories

On May 31, 2024, we provided amended responses to Interrogatory Nos. 2, 3, 7, 11, and 12. We received your follow-up communication regarding the amended responses and are currently working to address your questions. As noted in my June 6 email, we would appreciate further clarification from you as to what additional information you are seeking from WP's amended response to Interrogatory No. 12.

We are currently working with the client to prepare responses to the remaining interrogatories as well as an amended response to Interrogatory No. 1, with certifications. If it is your preference, we can produce responses to the interrogatories on a rolling basis as the client completes them.

Dr. Otiko

Regarding Dr. Otiko's departure, please be advised that he has disengaged from all WP entities. The circumstance that prompted Dr. Otiko's departure was his preclusion from the Medicare program and the termination of entities associated with Dr. Otiko, from Medicare. WP was understandably concerned by this and made the prudent decision to separate from him. Wound Pros Management Group, Inc. repurchased all shares owned by Dr. Otiko.

*****

We look forward to speaking with you soon.

Sincerely,

**Catherine S. Wicker**
she/her/hers

**HOOPER, LUNDY & BOOKMAN, P.C.**
DIRECT: +1 619.744.7311    MAIN: +1 619.744.7300    FAX: +1 619.230.0987
cwicker@hooperlundy.com | www.hooperlundy.com

Disclaimer: This email, including attachments, is intended solely for the use of the intended recipient and may be confidential, proprietary, or protected by any applicable privilege. If you are not the intended recipient, be advised that any dissemination, distribution, or use of the contents of this message is prohibited. If you have received this message in error, please reply that you received the message in error and delete or destroy the email and any attachment.

**From:** Hill, Laura E (CIV) <Laura.E.Hill@usdoj.gov>
**Sent:** Friday, May 31, 2024 5:43 AM
**To:** Catherine S. Wicker <cwicker@hooperlundy.com>; Andrew R. Hayes

<arhayes@hooperlundy.com>; Sheryl B. Xavier <sxavier@hooperlundy.com>
**Cc:** Thiess, David (USACAE) <David.Thiess@usdoj.gov>
**Subject:** Wound Pros

**\*\*EXTERNAL EMAIL MESSAGE\*\***

Catherine, Andrew, and Sheryl:
Thank you for speaking with us on May 24 and again on May 28 regarding the below items.
TAR Protocol and Slack

1. On both calls, we stated that the scope of relevance for TAR should encompass all of the document requests in the CID and should not be limited to only certain document requests in the CID. Please refer to the definitions in Attachment A of the CID which identifies that "document" and "documents" "are used in the broadest sense . . . and include, but are not limited to, any hard copy or electronically stored information, emails, and text message conversations."

2. The email universe for TAR is approximately 740,000 emails. You expect that most of the data will be reviewable by TAR.

3. You are currently drafting a review protocol for the contract reviewers that will be reviewing documents for TAR. None of the approximately 740,000 documents have been reviewed to date.

4. You have not uploaded any non-email documents or data to your document review platform and, at this time, do not intend to include any non-email data (such as hard copy documents, word processing documents (i.e. Microsoft Word files), spreadsheets, or other standalone ESI) in TAR. You are unfamiliar with your clients' folder structures and were unable to confirm whether such responsive documents exist.

5. You identified that you have collected the entirety of the companies' Slack data, including channels and messages between two or more users. You intend to upload all Slack data for all employees since 2019 to your document review platform. This includes all messages and all chatroom discussions. You are processing the data in 24-hour time frames.

6. You reiterated that you intend to produce all Slack channels that hit on the term "biologic" or "biologics."

7. Regarding privilege, you intend to code for responsiveness and privilege at the same time during TAR. For every document marked as privileged, a second-level, quality control review will be completed. If the document is marked as privileged in that second-level review, it will not be produced and will be included on a privilege tracker. You intend to produce the privilege tracker.

8. At this time, you are unable to provide estimated timelines or additional information regarding the following:

   1. Email production/TAR:

      1. The date by which you will have a draft review protocol for your contract

reviewers;
2. When the review of emails will begin;
3. What interim metrics you intend to provide to DOJ; and
4. A projected production timeline.

1. Slack

1. Whether Slack data will be reviewed using TAR;
2. A date by which you will decide whether you would like to include Slack data in the TAR protocol;
3. When you will begin to expand the Slack data;
4. When the Slack data will be fully expanded and uploaded to the review database;
5. When the Slack review will commence;
6. When you will produce Slack channels that include the terms "biologic" or "biologics;" and
7. A projected production timeline for responsive Slack data.

2. You had identified that you were conferring with OpenText on whether providing the results of the initial sample set shortly after completing review of the sample set would impact the review.

Interrogatories

1. You expect to produce the final, amended interrogatories with certifications of compliance by today, **May 31**.
2. You will provide a timeline for answering the remaining interrogatories by **June 11**.

Dr. Otiko

1. You notified us that Dr. Otiko had left Wound Pros and affiliated entities and that Ralph Cetrulo has taken over for Dr. Otiko.
2. You were unable to answer:

1. Which Wound Pros entities Dr. Otiko left;
2. The circumstances of Dr. Otiko leaving Wound Pros;
3. Whether Dr. Otiko has sold his interest in any Wound Pros entities; and
4. If so, to whom Dr. Otiko sold his interest.

We request a call to further discuss Dr. Otiko's departure from Wound Pros. Please let us know your availability for next week.

And, finally, we wanted to notify you that we are seeking internal authority to enforce the CIDs to the Wound Pros entities. We hope that significant progress is made in the near future and that we are not required to file a petition. We are happy to further discuss.

Laura

Laura Hill
Trial Attorney

U.S. Department of Justice
Civil Division
Commercial Litigation Branch, Fraud Section
(202) 598-3962
Laura.E.Hill@usdoj.gov